**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

GLOBAL VOICE GROUP SA,

*Plaintiff*,

v.

THE REPUBLIC OF GUINEA,

*Defendant*.

Civil Action No. 1:22-cv-02100

**EXHIBIT A (Part 1 – Pages 1-35) TO DECLARATION OF MARIANNE KECSMAR**

**INTERNATIONAL CHAMBER OF COMMERCE**

**INTERNATIONAL COURT OF ARBITRATION**

**(2012 ICC Arbitration Rules)**

**Case no. 22467/DDA**

**BETWEEN:**

GLOBAL VOICE GROUP SA (Seychelles)

**Claimant/**

**Respondent in counterclaim**

And

1.  THE POSTAL AND TELECOMMUNICATIONS REGULATORY
    AUTHORITY OF GUINEA (Guinea)
2.  THE REPUBLIC OF GUINEA (Guinea)

**Respondents/**

**Claimants in counterclaim**

---

## FINAL AWARD

---

**Members of the Arbitral Tribunal:**

Maître Sophie Nappert (President)

Professor Charles Jarrosson (Co-Arbitrator)

Carmen Núñez-Lagos, Esq. (Co-Arbitrator)

**Jurisdiction:** **Paris, France**

IN THE PROCEEDINGS BETWEEN:

**Global Voice Group SA**, 1st Floor, #5 Dekk: House, De Zippora Street, PO Box 456, Providence Industrial Estate, Mahé, the Republic of Seychelles.

**Claimant/Respondent in counterclaim**

Represented by:

Marianne Kecsmar, Esq., lawyer with the firm of Pellerin Kecsmar Mirza Avocats, 20, Rue des Pyramides 75001 Paris, France. Email address: marianne.kecsmar@pkm-avocats.com;

and

Bassam Mirza, Esq., lawyer with the firm of Pellerin Kecsmar Mirza Avocats, 11, Place de l'Étoile, Wakf Al-Marouni Building, Beirut Center-Ville 2011-8860, Lebanon. Email address: bassam.mirza@pkm-avocats.com;

and

Bertrand Madsen, Esq., with the firm of Madsen Law PC, 1115 Broadway, 11th Floor, New York, NY 10010. Email address: bmadsen@madsenlawpc.com.


In

**The Postal and Telecommunications Regulatory Authority of Guinea,** Almamya District, Municipality of Kaloum, BP: 1500, Conakry, Republic of Guinea.

and

**The Republic of Guinea**

**Respondents/Claimants in counterclaim**

Represented by:

Sena Agbayissah, Esq., lawyer with the firm of Hughes Hubbard & Reed LLP, 5-7, rue de Monttessuy 75007 Paris, France. Email address: sena.agbayissah@hugheshubbard.com.

Before the Arbitral Tribunal composed of:

Sophie Nappert, Esq., President, 3 Verulam Buildings, Gray's Inn, London WClR 5NT, the United Kingdom. Email address: snappert@3vb.com;

Professor Charles Jarrosson, Co-Arbitrator, 15, rue Alphonse de Neuville, 75017 Paris, France. Email address: charles.jarrosson@wanadoo.fr;

Carmen Núñez-Lagos, Esq., Co-Arbitrator, 125 Avenue de Villiers, 75017 Paris, France. Email address: carmen.nunezlagos@orange.fr.

**TABLE OF CONTENTS**

**A. BACKGROUND** ..................................................................................................... 6

    **I.**    **THE PARTIES** ................................................................................................. 6

    **II.**    **THE APPLICABLE ARBITRATION AND LAW CLAUSE** ............................ 6

    **III.**    **SUMMARY OF THE LITIGATION** ............................................................. 7

    **IV.**    **THE ARBITRAL PROCEDURE** ................................................................. 12

        *IV.1. Brief reminder of the procedure and constitution of the Arbitral Tribunal*..................... 13

        *IV.2. The parties' pleadings* ................................................................................. 16

        *IV.3. Witness attestations* ................................................................................... 16

        *IV.4. The expert's report* .................................................................................... 16

        *IV.5. Procedural orders* ..................................................................................... 17

        *IV.6. The main hearing* ...................................................................................... 17

        *IV.7. Closing arguments* ..................................................................................... 18

        *IV.8. The Arbitration Regulations* ......................................................................... 18

**B. THE CLAIMS OF THE PARTIES** ......................................................................... 18

    **I.**    **CLAIMS OF THE CLAIMANT** ................................................................. 18

    **II.**    **THE CLAIMS OF THE RESPONDENTS** .................................................. 19

**C. THE TRIBUNAL'S ANALYSIS AND DECISION** .................................................. 20

    **I.**    **PRELIMINARY RESERVATIONS** ............................................................ 20

        *I.1. Summary of the parties' positions* ................................................................... 20

        *I.2. Analysis* ................................................................................................... 21

    **II.**    **JURISDICTION OF THE ARBITRAL TRIBUNAL** ................................... 22

        *II.1. Subject matter jurisdiction* ........................................................................... 22

        II.1.a. Summary of the parties' positions ................................................................ 22

        II.1.b. Analysis ................................................................................................. 23

        *II.2. Personal jurisdiction* .................................................................................. 25

        II.2.a.    Summary of the parties' positions ....................................................... 25

        II.2.b.    Analysis ......................................................................................... 27

    **III.**    **NULLITY OF THE PROCEDURE AGAINST THE STATE** ........................ 29

        *III.1. On the format* .......................................................................................... 29

        III.1.a. Summary of the parties' positions ............................................................... 29

        III.1.b. Analysis ................................................................................................ 30

        *III.2. On the merits* ........................................................................................... 30

        III.2.a. Summary of the parties' positions ............................................................... 30

        III.2.b. Analysis ................................................................................................ 31

**IV.    VALIDITY OR INVALIDITY OF THE PARTNERSHIP AGREEMENT**................32

*IV.1. Summary of the parties' positions* ....................................................... 32

*IV.2. Analysis* ....................................................................................... 32

IV.2.a.  Exception of inadmissibility of the action for nullity based on the violation of the PPC due to expiration of statute of limitations ...................................... 32

IV.2.b.  Invalidity for violation of the PPC ...................................................33

IV.2.c. Exception of inadmissibility of the action for nullity of a corruption pact due to expiration of statute of limitations ...................................................36

IV.2.d. Invalidity for corruption pact ...........................................................36

    *IV.2.d. (i). Burden of proof. Standard of proof* ........................ 37

    *IV.2.d. (ii). Summary of the Respondents' position* .................... 37

    *IV.2.d. (iii).    Summary of GVG's position* ........................... 38

    *IV.2.d.(iv). Analysis*.................................................. 40

**V.    EXECUTION OF THE PARTNERSHIP AGREEMENT** ............................ 43

*V.1. Summary of the parties' positions* ...................................................... 43

V.1.a.  GVG ........................................................................................43

    *V.1.a.(i). The Partnership Agreement and the obligations of the parties*............... 43

    *VI.a.(ii). GVG's remuneration* ...................................... 45

    *V.1.a.(iii).    The alleged breaches of GVG as alleged by the Respondents*............ 46

    *V.1.a.(iv). Services provided outside the Partnership Agreement* ......................... 48

    *V.1.a.(v). The Respondents' non-resolution of the Agreement*............................. 49

    *V.1.a.(vi). Non-suspension of contractual relations* ............................................. 50

V.1.b.  The Respondents .......................................................................50

*V.2. Analysis* ........................................................................................ 52

**VI.    VALIDITY OF THE AMENDMENT OF JULY 6, 2009 AND OF THE ADDENDUM OF JULY 10, 2012** ............................................................. 54

*VI.1. Summary of the parties' positions* ..................................................... 54

VI.1.a.GVG ........................................................................................54

    *VI.1.a. (i). The Amendment* ...................................................... 54

    *VI.1.a.(ii). The automatic renewal of the Agreement* ............................................. 55

    *VI.1.a.(iii). The Addendum* ...................................................... 56

VI.1.b. The Respondents .......................................................................57

    *VI.b.(i).    The Amendment* ...................................................... 57

    *VI.1.b.(ii). Illegality of the automatic renewal clause* ............................................. 58

    *VI.1.b.(iii). The Addendum* ...................................................... 58

*VI.2. Analysis* ...................................................................................... 59

VI.2.a. The Amendment ........................................................................59

VI.2.b. Automatic renewal ......................................................................59

VI.2.c. The Addendum .........................................................................61

**VII.    DAMAGES** ............................................................................................ 62

*VII.1. Summary of the parties' positions* ...................................................... 62

VII.1.a.GVG ...................................................................................... 62

VII.1.b. The Respondents.................................................................... 65

*VII.2. Analysis* .............................................................................................. 66

VII.2.a. Outstanding payments for the contractual period ...................... 66

**D. THE ARBITRATION COSTS** ........................................................................ 68

I.    SUMMARY OF THE PARTIES' POSITIONS ...................................... 68

II.    ANALYSIS.......................................................................................... 69

**E. COUNTERCLAIMS** ...................................................................................... 70

**F. THE DECISION** ............................................................................................ 70

## A. BACKGROUND

## I.    THE PARTIES

1. **The Claimant**, Global Voice Group SA ("**the Claimant**" or "**GVG**") is a company incorporated under Seychellois law, with a capital of USD 100,000, whose registered office is located at 1st Floor, #5 Dekk House, De Zippora Street, PO Box 456, Providence Industrial Estate, Mahé, Republic of Seychelles, registered under number 022185. GVG supplies advanced technologies and financial protection and income generation systems related to telecommunications flows and operations. GVG was created in 2005 when its two shareholders decided to transfer their activities previously based in Haiti to the Seychelles, due to the group's international expansion.

2. The Respondents are:

    a.    The Postal and Telecommunications Regulatory Authority of Guinea ("**PTRA**") is a public legal entity, governed by the statute defined by Guinean law L/2005/018/AN of September 8, 2005, relating to general telecommunications regulations. The PTRA comes under the supervision of the Minister responsible for telecommunications; and

    b.    The Republic of Guinea ("**State**" or "**Guinea**").

## II.    THE APPLICABLE ARBITRATION AND LAW CLAUSE

3. Under Article 17 of the Partnership Agreement entered into on May 22, 2009 between GVG and APRT (**"the Partnership Agreement or the Agreement"**) [**Exhibit C-1**]:

    "*In the absence of an amicable agreement between the Parties within a period of six (6) months following the date on which a dispute arises, any dispute of any kind, including the Annexes and any amendments thereto, which may arise between them, shall be subject to the exclusive jurisdiction of the Arbitration Rules of the International Chamber of Commerce in Paris by one or more arbitrators appointed in accordance with these Rules*".

4. Article 17.1 of the Partnership Agreement stipulates that: "[t]*he present Contract is subject to the laws of the Republic of Guinea*" [**Exhibit C-1**].

### III.    SUMMARY OF THE LITIGATION

5. The following summary is based on the pleadings of the parties, as indicated in the references in square brackets.

6. In 2002, GVG entered the telecommunications market in Guinea by entering into a contract with the Société Guinéenne des Télécommunications (**"Sotelgui"**) relating to a "*wholesale carrier*" activity **[Summary and Response Memorandum ¶¶25–26]**.

7. On September 8, 2005, Guinea adopted Law L/2005/018/AN establishing the PTRA under the oversight of the Minister responsible for telecommunications. The PTRA's mission is, among other things, to ensure compliance by the telephone carriers with the provisions of the aforementioned text, to take the necessary measures to ensure continuity of service, to issue licenses and authorizations and to plan and manage frequencies. **[Summary and Response Memorandum ¶¶20-21; Statement of Rejoinder ¶¶37–40; Exhibit C-32].**

8. On October 6, 2006, GVG and Sotelgui signed a technical assistance and service contract with the provision of equipment for the management of the Sotelgui international gateway, under which GVG assumed "*management of the entire international transport network and international traffic invoicing for SOTELGUI [..]*" **[Summary and Response Memorandum ¶27; Exhibit C-41].**

9. On December 22, 2009, the President of Guinea Mr. Lansana Conté died. On December 24, 2009, state power was seized by the military forces **[Statement of Rejoinder ¶47].**

10. On May 22, 2009, GVG and PTRA entered into the Partnership Agreement for a period of 5 years, the purpose of which was "*to establish the general framework of a technological partnership aiming to assist the PTRA in the process of modernizing its structures of control and supervision of national and international signaling networks in Guinea*". The Partnership Agreement was also signed "*[f]or the Ministry of Telecommunications and New Information Technologies*" by the Minister at the time, Mr. Mathurin Banghoura **[Summary and Response Memorandum ¶¶30 - 31; Statement of Rejoinder ¶47; Exhibit C-1].**

11. In execution of the Partnership Agreement (Annex 1), on May 29, 2009 the Minister of Telecommunications and New Information Technologies and the Minister for the Presidency in charge of Economy and Finance established a Decree ("**Order**") "*setting the international tariff for the Republic of Guinea destination and shares to be transferred to the postal and telecommunications regulatory authority and to local carriers of telecommunications networks open to the public*" **[Summary and Response Memorandum ¶41; Statement of Rejoinder ¶55; Exhibit C-2].**

12. GVG alleges that on July 6, 2009, GVG and PTRA entered into an Amendment ("**Amendment**") bringing the initial term of the Partnership Agreement to six years. Under the terms of the Amendment, GVG undertook to finance up to USD 1,200,000 (by paying a

monthly sum of USD 100,000) for the construction of a building intended to house the equipment covered by the Partnership Agreement, part of the PTRA staff as well as any other equipment belonging to it or belonging to the Ministry of Telecommunications and New Information Technologies. The amount paid by GVG in respect of the Amendment was to be deducted from the remuneration which GVG was to receive under the Partnership Agreement. The Respondents question the authenticity of this Amendment **[Summary and Response Memorandum ¶47; Statement of Rejoinder ¶¶58-64; Exhibit C-3].**

13. In August 2009, GVG set up an IMS-STP supervision system, which became operational in September 2009 by giving the PTRA the possibility of collecting revenue after this date **[Summary and Response Memorandum ¶¶51, 56; Exhibit C-23].**

14. At the end of 2009, GVG offered two interscholastic computer laboratories on the occasion of the inauguration of the PTRA Traffic Control and Supervision Center **[Summary and Response Memorandum ¶460; Statement of Rejoinder ¶423; Exhibits C 24-25].**

15. GVG produced a Certificate dated January 18, 2010 issued by the Minister of Telecommunications of New Information Technologies certifying the payment of the first tranche (in September 2009) as an Amendment concerning the construction of the PTRA national and international telephone traffic control headquarters. Nevertheless, the Respondents invoked the doubtful nature of this certificate and contested its authenticity **[Summary and Response Memorandum ¶230; Statement of Rejoinder ¶¶486-489; Exhibit C-53].**

16. On May 11, 2010, the new Director of PTRA, Mr. Morlaye Youla, informed GVG of the account in which to make a transfer of USD 151,800 for the purchase of two vehicles **[Summary and Response Memorandum ¶¶60, 460; Statement of Rejoinder ¶72; Exhibit C-46].**

17. By letter dated July 9, 2010, the Director of PTRA, Mr. Morlaye Youla, thanked GVG for its invitation to Cape Town in South Africa on the occasion of the Africa Network Summit, stressing "*the quality of the welcome and the special attention we received during our stay*". In the same letter, the Director of PTRA congratulated GVG "*for the quality, the seriousness and the expertise that you bring to us within the framework of the assistance agreements which bind you to our institution*" **[Summary and Response Memorandum ¶¶58, 509; Statement of Rejoinder ¶74; Exhibit C-44].**

18. On July 15, 2010, the Director of PTRA said in a letter, "*Global Voice Group delivered for the Traffic Control and Supervision Center, high quality redundant STP solutions. The level of support provided by Global Voice Group, both for the management of signaling data collection, for billing and the fight against fraud, allowed us to obtain very good results in just ten (10) months of activity*" **[Summary and Response Memorandum ¶509; Statement of Rejoinder ¶¶70-75; Exhibit C-45].**

19. At the end of 2009, Guinea elected a new President, Mr. Alpha Condé. Subsequently, Mr. Oyé Guilavogui was appointed as the new Minister of Telecommunications and New Information Technology **[Summary and Response Memorandum ¶61; Statement of Rejoinder ¶81].**

20. On December 2, 2010, PTRA issued a communication referring to GVG's services in these terms: "*from the launch of the project to the establishment of infrastructure, including staff training, we highly appreciated the unique skills and the exemplary professionalism of Global Voice Group SA. We highly recommend the services of this group to our counterparts in other governments and Regulatory Authorities*" **[Summary and Response Memorandum ¶510; Statement of Rejoinder ¶¶70-75; Exhibit C-5].**

21. By letter dated December 28, 2010, GVG congratulated Mr. Oyé Guilavogui on his appointment as Minister **[Summary and Response Memorandum ¶231; Statement of Rejoinder ¶82; Exhibit C-27].**

22. On February 4, 2011, the PTRA sent a letter entitled "*Contract revision and notice of termination,*" referring to a letter dated February 3, 2011 from Boucabar Sow, Attorney-at-Lae,, relating to a "*private agreement for the facilitation of the signature* [of a decree] *fixing the termination tariff in Guinea and obtaining customs exemptions,*" and inviting GVG "*to support this case before the State Judicial Agent on Thursday February 10, 2011*" **[Summary and Response Memorandum ¶539; Statement of Rejoinder ¶83; Exhibit R-6].**

23. By letter dated February 10, 2011, the Minister involved GVG in events organized for the promotion of the communications sector **[Summary and Response Memorandum ¶511; Exhibit C- 48].**

24. By letter dated March 22, 2011, Mr. Moustapha Mamy Diaby, new Director General of PTRA, invited GVG to participate "*in an evaluation from April 12, 2011*" **[Summary and Response Memorandum ¶515; Statement of Rejoinder ¶¶84-85; Exhibit C-28].**

25. From April 2011 until May 2012, GVG's activity was the subject of a "Mid-term review" evaluation by PTRA **[Summary and Response Memorandum ¶¶65-66; Statement of Rejoinder ¶¶84-88].**

26. On November 3, 2011, the PTRA and GVG signed a first report specifying the actions and commitments taken by GVG to finalize the outstanding points relating to: (i) the local installation of supervision applications and tools; (ii) measuring the quality of service; (iii) the spectrum management system and; (iv) the solution for the migration of national traffic **[Statement of Rejoinder ¶87; Exhibit R-7].**

27. On May 11, 2012, Ms. Aminata Camara Kaba on behalf of the PTRA and GVG signed a Performance Report of contractual obligations between the PTRA and GVG ("**Performance Report**") detailing the results of the joint assessment of contractual performance and implementation of the obligations of the Partnership Agreement **[Summary and Response Memorandum ¶69; Statement of Rejoinder ¶502; Exhibit C-6].**

28. On June 10, 2012, Mr. Katim Touray on behalf of GVG and Mr. Diaby on behalf of PTRA signed an Addendum to the Partnership Agreement ("**Addendum**") stipulating that GVG "*executed the Action Plan agreed between the parties relating to the obligations mentioned in the*" Performance report. Under the Addendum, the PTRA owed GVG a balance of USD 13,237,182.60 from the invoices accumulated from September 2009 to December 31, 2011. Under the terms of the Addendum: (i) GVG waived the revenues (USD) corresponding to the remainder of the share of Sotelgui's international traffic for the period from September 2009 to December 31, 2011; (ii) GVG reduced the PTRA debt to USD 2 million, which had to be paid no later than June 30, 2012; (iii) the fees to be paid by the PTRA to GVG were reduced from USD 0.07 to USD 0.025/minute retroactively, as of April 1, 2011 **[Summary and Response Memorandum ¶¶79-82; Statement of Rejoinder ¶¶90-92; Exhibit C-7].**

29. On March 28, 2014, an Action Plan was signed between the PTRA and GVG providing a report on the actions implemented by GVG, as well as future commitments **[Summary and Response Memorandum ¶¶467, 494; Statement of Rejoinder ¶¶194-95; Exhibits C-9, R-8].**

30. In May 2014, the PTRA interrupted the payment of GVG's invoices. The PTRA considered that the Partnership Agreement ended on May 22, 2014 **[Summary and Response Memorandum ¶530; Statement of Rejoinder ¶99; Exhibit C-11].**

31. By email dated June 18, 2014, the PTRA informed GVG that their contractual relations had ended on May 22, 2014 **[Statement of Rejoinder ¶¶97; Exhibit R-9].**

32. On July 10, 2014 GVG wrote to the PTRA informing it of the renewal of the Partnership Agreement for a period of two years by virtue of the Amendment of July 6, 2009, exclusive of twelve months' notice, and of the arrival of a GVG delegation during the first week of August 2014 to continue discussions **[Summary and Response Memorandum ¶90; Statement of Rejoinder ¶99; Exhibit R-2].**

33. By letter dated July 15, 2014, the PTRA stated that "*there has never been an amendment relating to a contribution from GVG to the construction of a building let alone an extension of the duration of the initial contract. Consequently, we consider that this amendment is deemed to have never existed*" **[Summary and Response Memorandum ¶90; Exhibit C-10].**

34. By letter dated July 15, 2014, the PTRA requested that GVG send it a report on the implementation of the Partnership Agreement. GVG sent this report in July 2014 **[Statement of Rejoinder ¶98; Exhibits C-4, R-10].**

35. By letter dated November 24, 2014, the PTRA stated that "[a]*ccording to the provisions of the partnership agreement of May 22, 2009, these invoices are outside the contractual period which ended on May 22, 2014, for this reason we cannot honor the payment of said invoices*" **[Summary and Response Memorandum ¶92; Statement of Rejoinder ¶99; Exhibit C-11].**

36. By letter dated May 8, 2015, GVG indicated to the PTRA "*We extend our sincere* [sic] *thanks to the PTRA for its perfect collaboration. (...) In view of the consolidation of relationships over the years and with a view to bringing our discussions to a successful conclusion, GVG proposes an automatic renewal of the contract which binds us to your entity.*" **[Statement of Rejoinder ¶100; Exhibit R-11].**

37. By letter dated May 15, 2015, the PTRA recalled that it had already clarified its position regarding GVG's request for the renewal of the Partnership Agreement. The PTRA added that GVG had been requested in March 2014 to present "*a technical and commercial proposal*" for "[a] *verification system for the tariffs of telephone carriers*" and "[a] *carrier revenues supervision system*" **[Summary and Response Memorandum ¶93; Statement of Rejoinder ¶101; Exhibit C-12].**

38. By letter dated July 2, 2015, GVG demanded payment of its invoices which had remained unpaid for more than 13 months for an amount of more than USD 6 million **[Summary and Response Memorandum ¶94; Statement of Rejoinder ¶102; Exhibit C-13].**

39. By letter dated July 9, 2015, the PTRA disputed the terms of GVG's letter by recalling GVG's breaches of its contractual commitments transcribed in the 2011 and 2014 reports **[Summary and Response Memorandum ¶94; Statement of Rejoinder ¶104; Parts C 14, R- 13].**

40. On July 24, 2015 the Minister of Posts, Telecommunications and New Information Technology, Mr. Guilavogui, invited GVG to a meeting in the week of July 27, 2015 in order to find an amicable solution: "[I] *have exchanged with the National Council for the Regulation of Posts and Telecommunications and the General Management that is why I invite you to a meeting during the week of July 27, 2015 in Conakry so that we can find an amicable solution*" **[Summary and Response Memorandum ¶242; Statement of Rejoinder ¶106; Exhibit C-30].**

41. By letter dated July 27, 2015, GVG disputed the terms of the PTRA letter dated July 9, 2015 and indicated that "*for us, our contract does not expire until May 22, 2017*" 16) **[Summary and Response Memorandum ¶97; Statement of Rejoinder ¶105; Exhibit C-16].**

42. A meeting between GVG and PTRA was held on August 3, 2015. Following this meeting, GVG, by letter dated August 4, 2015, presented a new commercial offer to the PTRA. By letter dated the same day, GVG referred to the "*difficulties with which it carried out the inventory of equipment and materials belonging to the PTRA*" **[Summary and Response Memorandum ¶98; Statement of Rejoinder ¶¶107-109; Exhibit C-17, R-14].**

43. On August 6, 2015, the PTRA sent a letter to GVG stating "[that] *at the request of the Minister of State in charge of Telecommunications we met with you once again to inform you of these points and you yourself have recognized that your first contracts were all poorly written. In view of all the above, we reiterate our non-satisfaction, both technically and relational. As*

*you also know, your current services do not meet our control, security and anti-fraud needs; and we no longer intend to continue working with you*". The letter also added that "[o]f *the 14 points entered in the basic contract, as being GVG's obligations, 64% (9 out of 14 points) were not achieved on time or not at all*" **[Summary and Response Memorandum ¶¶239, 471–472, 521, 555, 557-560; Statement of Rejoinder ¶¶110,209,497,505,540; Exhibit C-15].**

44. On August 24, 2015, the Minister invited GVG to a meeting in the week of August 31, 2015 in order to finalize negotiations for an amicable resolution of the situation **[Summary and Response Memorandum ¶242; Statement of Rejoinder ¶210; Exhibit C-31].**

45. On September 8, 2015, the Minister and the President of the National Council for the Regulation of Posts and Telecommunications established a friendly resolution which provided for "[t]*he payment in full and in one instalment of the sum of 300,000 dollars per month for a total amount of 3,900,000 dollars representing the thirteen (13) months The payment of 6,824,441 dollars claimed by GVG in respect of fees on the basis of 2.5 US cents per minute of incoming international communications, based on a schedule spread over five (5) years with 10 payments spaced six (06) months apart. It is understood that this amount will be confirmed on the basis of the CSRs*". By letter dated September 14, 2015, GVG refused this offer **[Summary and Response Memorandum ¶242 Statement of Rejoinder ¶114-115; Exhibits C-19, C-20].**

46. On November 20, 2015, the PTRA concluded with Subah Infosolutions Limited ("**Subah**"), a "*Service contract for the supervision of international and national traffic, certification of carriers' revenues, monitoring pricing and the fight against fraud*" ("**Subah Contract**"). **[Summary and Response Memorandum ¶¶566-571; Statement of Rejoinder ¶¶526-536; Exhibit R-30].** The Subah Contract was concluded without a request for proposals. It also stipulates a ICC arbitration clause in its Article 10.3.

47. In January 2016, Mr. Diaby took office as Minister of Posts, Telecommunications and Digital Economy.

48. On May 3, 2016, the GVG's counsel sent a letter giving formal notice to the PTRA to pay the sum of USD 103,171,862.66, in the absence of an agreement between the parties before June 30, 2016 **[Summary and Response Memorandum ¶¶01; Statement of Rejoinder ¶118; Exhibit C-21].**

## IV.     THE ARBITRAL PROCEDURE

### *IV.1. Brief reminder of the procedure and constitution of the Arbitral Tribunal*

49. By letter dated December 13, 2016, the ICC Secretariat ("**the Secretariat**") acknowledged receipt of the Request for Arbitration dated December 8, 2016 and received on December 9, 2016.

50. By letter dated December 28, 2016, the Secretariat transmitted the Request for arbitration to the Respondents, informing them inter alia that they had 30 days from the day following receipt of this correspondence to respond to the Request, as well as the possibility for them to request an extension of this deadline by providing their comments on the number of arbitrators and, if necessary, by appointing an arbitrator (Article 5(2) of the 2012 ICC Arbitration Rules ("**the Rules**")).

51. By letter dated February 14, 2017, the Secretariat informed the parties that the Request for Arbitration had been received by the Respondents via DHL on December 30, 2016 and that, therefore, the period of 30 days to submit a Response to the Request for Arbitration had expired on January 31, 2017 without this Response having been submitted. The Secretariat added that in accordance with Article 6(3) of the Rules, the arbitration would continue despite the absence of a Response; that in the absence of comments from the Respondents, the Court would constitute the Arbitral Tribunal (Article 12(2) of the Rules) and fix the location of the arbitration (Article 18(1) of the Rules).

52. By letter dated February 17, 2017, the PTRA acknowledged receipt of the letter from the Secretariat dated February 14, 2017, expressed its surprise and transmitted a letter dated August 6, 2015 which it had addressed to the President Director-General of GVG.

53. By letter dated April 18, 2017, the Secretariat informed the parties that the Court, on April 13, 2017 had:

    a.  Decided to submit this arbitration to three arbitrators (Article 12(2) of the Rules);

    b.  Fixed Paris (France) as the location of the arbitration (Article 18(1) of the Rules);

    c.  Noted the designation of Professor Jarrosson as co-arbitrator appointed by the Claimant;

    d.  Invited the Respondents to appoint a co-arbitrator within 15 days, failing which the Court would be invited to take the necessary measures to constitute the Arbitral Tribunal.

54. By letter dated July 6, 2017, the Secretariat informed the Arbitral Tribunal and the parties that the Court, on the same date:

    a.  Had confirmed Charles Jarrosson as co-arbitrator upon appointment of the Claimant (Article 13(1) of the Rules);

    b.  Had directly appointed Carmen Núñez-Lagos as co-arbitrator in place of the Respondents who had not appointed a co-arbitrator (Article 13(4)(a) of the Rules);

c. Had directly appointed Sophie Nappert as president of the Arbitral Tribunal (Article 13(4)(a) of the Rules).

55. By letter dated July 6, 2017, the Secretariat transmitted the file to the Arbitral Tribunal.

56. By email dated July 11, 2017, also sent to the Respondents by courier, the Arbitral Tribunal, through its president, contacted the parties in order to convene the conference on the management of the procedure (Article 24 of the Rules).

57. By email dated July 19, 2017, counsel for the Claimant responded to the above email and informed the Arbitral Tribunal of the addition to the file of Hughes Hubbard as counsel for the PTRA.

58. By email dated July 19, 2017, Messrs. Sena Agbayissah and Marc Henry of the law firm of Hughes Hubbard confirmed their mandate to represent PTRA in this arbitration and sent a letter dated July 6, 2017 addressed to the Secretariat, by which they requested a period of 30 days, that is until August 4, 2017, to submit the PTRA Response and its choice of co-arbitrator.

59. By email dated July 20, 2017, counsel for the Claimant objected to the grant of the delay requested by counsel for the PTRA, on the grounds in particular that the Respondents had received all useful notifications for submitting their Response and appointing their co-arbitrator but had done nothing with it.

60. By email dated July 28, 2017, also sent by courier to the State, the Arbitral Tribunal, after having contacted the Secretariat and after deliberation, informed the parties that, to the extent that the Respondents had been informed in due course of the proceedings, where the Arbitral Tribunal had been validly constituted and unless the Court intervened, it appeared to the Arbitral Tribunal that the arbitral proceedings had to run their course and that the conference on the management of the proceedings was held in order to conclude the Terms of Reference. The Arbitral Tribunal also noted that the Respondents would have every opportunity to submit their position within the Terms of Reference and their pleadings. The Claimant's counsel having indicated their availability for the conference, in particular for September 4, the Arbitral Tribunal requested the availability of the Respondents.

61. By email dated July 31, 2017, Mr. Henry acknowledged receipt of the communication from the Arbitral Tribunal and informed it of a response as soon as possible.

62. By email dated August 7, 2017, the Arbitral Tribunal followed up the Respondents.

63. By email dated August 11, 2017, Mr. Agbayissah acknowledged receipt of the communication from the Arbitral Tribunal and assured it of a return as soon as possible.

64. By email dated August 14, 2017, also sent by courier to the State, the Arbitral Tribunal informed the parties that in the absence of a response from the Respondents by August 18, 2017, the procedural conference would take place on September 4, 2017.

65. By email dated August 29, 2017 addressed to the parties, the Arbitral Tribunal confirmed that the procedural conference would be held on September 4, 2017 at 2:30 p.m. Paris time, unless counsel indicated another availability, and circulated telephone contact information. The Arbitral Tribunal also invited counsel to come together in an attempt to agree on a procedural timetable and to inform the Arbitral Tribunal of the outcome of their discussions on September 1, 2017.

66. By email dated August 29, 2017, counsel for the Claimant confirmed their availability for the procedural conference.

67. By email dated August 30, 2017, the Arbitral Tribunal circulated a draft Terms of Reference to the parties and to the Secretariat.

68. By email dated September 1, 2017, counsel for the Claimants circulated a draft procedural timetable, counsel for the Respondents having informed them that they were not yet in a position to discuss it.

69. By email dated September 1, 2017, the Arbitral Tribunal circulated an agenda for the conference call of September 4, and requested counsel for the Respondents to indicate whether they intended to participate.

70. By email dated September 4, 2017, Mr. Henry confirmed the participation of counsel for the Respondents in the conference call.

71. The procedural conference was held on September 4, 2017 at 2.30 p.m. Paris time, in the presence of the Arbitral Tribunal and counsel for the parties.

72. By subsequent email dated September 4, 2017, the Arbitral Tribunal confirmed that the counsel of the Guinean parties had agreed to inform the Arbitral Tribunal and the Claimant of the status of their mandate, and of the Respondents' intentions regarding their participation in this arbitration, by September 15, 2017.

73. By email dated September 18, 2017, the Arbitral Tribunal requested counsel for the Respondents to follow up on the above email.

74. By email dated September 19, 2017, Messrs. Agbayissah and Henry transmitted their mandate to represent the State for the purposes of this arbitration.

75. By email dated September 20, 2017, the Arbitral Tribunal acknowledged receipt of the mandate to represent counsel for the Respondents, noted that all the parties involved participated in the arbitration proceedings through their respective counsel, and invited the parties to define their respective positions within the draft Terms of Reference by September 27, 2017.

76. By email dated September 25, 2017, counsel for the Claimant transmitted the summary of the Claimant's claims for inclusion in the Terms of Reference.

77. By email dated September 28, 2017, the Arbitral Tribunal granted the Respondents an additional period until October 13 to produce a summary of their claims and their observations on the draft Terms of Reference and procedural timetable.

78. By email dated October 12, 2017, the counsel for the parties transmitted their joint observations on the draft Terms of Reference as well as a procedural timetable which they had agreed to.

79. By email dated October 13, 2017, the counsel for the Respondents transmitted the summary of the Respondents' claims for the purpose of inclusion in the Terms of Reference.

80. The Terms of Reference, signed by the representatives of the parties and by the members of the Arbitral Tribunal, is dated October 16, 2017.

### *IV.2. The parties' pleadings*

81. On January 30, 2018, GVG filed its Brief in Question **[Brief in Question]**.

82. On April 30, 2018 the Respondents filed their Defense Brief **[Defense Brief]**.

83. On July 31, 2018, GVG filed its Summary and Response Memorandum **[Summary and Response Memorandum]**.

84. On October 31, 2018, the Respondents filed their Statement of Rejoinder **[Statement of Rejoinder]**.

85. On February 4 and 11, 2019, the parties filed their Post-hearing notes.

86. On March 1, 2019, the parties filed their Notes relating to the costs of the arbitration.

### *IV.3. Witness attestations*

87. The Claimant has submitted the following attestations:
    a. Katim Touray's witness attestation dated January 30, 2018;
    b. Witness attestation no.1 by Patrice Baker dated January 30, 2018;
    c. Witness attestation no. 2 by Patrice Baker dated July 31, 2018.

88. The Respondents submitted the following attestation:
    a. Aminata Camara Kaba's witness attestation dated April 30, 2018;
    b. Witness attestation by Diaby Moustapha Many dated April 30, 2018;
    c. Witness attestation by Mamadou Lamarana Bah dated April 30, 2018.

### *IV.4. The expert's report*

89. In support of their Statement of Rejoinder, the Respondents filed a consultation with Professor François-Xavier Train **[Exhibit RL-34]**.

### *IV.5. Procedural orders*

90. During the arbitral proceedings the Tribunal issued the following procedural orders:
    a. Procedural order no. 1 (Procedural calendar) of October 29, 2017;
    b. Procedural order no. 2 (Redfern Schedule) of May 17, 2018;
    c. Procedural order no. 3 (Procedure to follow for the merit hearing) of December 10, 2018.

### *IV.6. The main hearing*

91. The hearing on the merits was held from January 28 to 30, 2019 at the ICC "Hearing Center" in Paris. The agenda for the hearing, agreed between the parties and the Arbitral Tribunal, was as follows:
    a. January 28, 2019:
        (i).   The trial proceedings;
        (ii).  Procedural matters;
        (iii). Introductory argument by Mr. Agbayissah on the preliminary questions (Respondents);
        (iv). Introductory argument by Mr. Mirza on the preliminary questions (Claimant);
        (v).  Introductory pleading by Mr. Kecsmar on the merits (Claimant); (vi). Introductory oral argument of Mr. Agbayissah on the merits (Respondents).
    b. January 29, 2019:
        (i).   The trial proceedings;
        (ii).  Procedural matters;
        (iii). Hearing of Mr. Diaby (examination by Mr. Agbayissah, cross-examination by Mr. Kecsmar, re-examination by Mr. Agbayissah);
        (iv). Hearing of Mr. Parker (examination by Mr. Kecsmar, cross-examination by Mr. Agbayissah; re-examination by Mr. Kecsmar).
    c. January 30, 2019:
        (i).   The trial proceedings;
        (ii).  Hearing of Mr. Tourny (cross-examination by Mr.. Agbayissah);
        (iii). Hearing of Ms. Kaba (cross-examination by Mr.. Kecsmar, re-examination by Mr. Agbayissah);
        (iv). Closing arguments by Mr. Kecsmar;
        (v).  Closing arguments by Mr. Agbayissah;
        (vi). Procedural issues.

### *IV.7. Closing arguments*

92. By email dated March 2, 2019, the Arbitral Tribunal declared the proceedings closed in accordance with Article 27 of the 2012 ICC Arbitration Rules.

### *IV.8. The Arbitration Regulations*

93. The present arbitration procedure is governed by the 2012 ICC Arbitration Rules. The Court fixed the deadline for rendering the final award on April 30, 2019 during its session on November 2, 2017. This deadline was extended to May 31, 2019 on April 18, 2019; to June 28, 2019 on May 9, 2019 and to July 31, 2019 on June 13, 2019.

### B. THE CLAIMS OF THE PARTIES

94. The claims of the Parties are set out below.

### I.    CLAIMS OF THE CLAIMANT

95. In its Summary and Response Memorandum, GVG summarizes all of its claims mentioned in the Brief in Question **[Brief in Question 386].** It requests the Tribunal **[Summary and Response Memorandum 613] to:**

    a. Reject the Respondents' request for the cancellation of the arbitration clause contained in Article 17 of the Partnership Agreement and therefore declare them competent;

    b. Rule that the Republic of Guinea is party to the Partnership Agreement and therefore to the arbitration clause it contains;

    c. Dismiss the Respondents' counterclaims for a declaration that the Partnership Agreement is void, for restitution and damages and any other claim;

    d. Rule that the Respondents improperly terminated the Partnership Agreement;

    e. Declare the Addendum void;

    f.   Indemnify, accordingly, GVG for all of its loss suffered up to USD 106,558,275.20 in respect of outstanding payments during the contractual period in addition to default interest from August 2015 with capitalization on the above amounts at the rate deemed appropriate by the Arbitral Tribunal, to which should be added the costs incurred by GVG during the transactional negotiations estimated at USD 150,000 in addition to default interest;

    g.   Order the Respondents to pay all costs relating to the arbitration, including the fees and expenses of lawyers as well as the fees and expenses of any expert engaged by GVG in the context of these proceedings.

## II.    THE CLAIMS OF THE RESPONDENTS

96.  In their Statement of Rejoinder, the Respondents summarize all of their requests mentioned in the Defense Brief **[Defense Brief ¶300]**. They request the Tribunal **[Statement of Rejoinder ¶554]:**

    a.   As a preliminary point, to declare that it lacks subject matter jurisdiction to hear requests by GVG against both the PTRA and the Republic of Guinea, and to reject them accordingly;

    b.   In the alternative, if the Tribunal does not recognize that it lacks subject matter jurisdiction, to declare that it lacks jurisdiction against the Republic of Guinea, and to accordingly reject GVG's claims against it;

    c.   As a preliminary point, to declare the action brought against the Republic of Guinea void and to accordingly reject GVG's claims against it;

    d.   As a preliminary point, to declare and rule GVG inadmissible in its requests vis-à-vis the PTRA and in the alternative vis-à-vis the Republic of Guinea, and to reject them accordingly,

    e.   In the alternative, to declare and deem unfounded the requests of GVG, and to reject them accordingly;

    f.   In the alternative, pronounce the termination of the Partnership Agreement at the exclusive wrongs of GVG;

    g.   Conversely, to condemn GVG in case of nullity to return the sums wrongfully received, that is to say the sum of USD 48,093,160 to be completed, GVG being unable to derive any benefit from its own turpitude; alternatively to order GVG for poor performance to pay damages in compensation for the damage suffered as a result of GVG's behavior, for an amount of USD 10,000,000 to be completed;

h.  In any event, to order GVG to pay each of the Respondents the sum of USD 100,000 as compensation for the moral prejudice suffered by each of them as a result of the allegations contained in GVG's pleadings;

i.  To order GVG to pay each Respondent the sum of USD 100,000 for abusive procedure;

j.  In any event, to order GVG to bear all the costs relating to the arbitration, including the fees and expenses of lawyers and the fees and expenses of any expert appointed by the Respondents for the requirements of these proceedings.

## C. THE TRIBUNAL'S ANALYSIS AND DECISION

## I.    PRELIMINARY RESERVATIONS

### I.1. Summary of the parties' positions

97.  The Arbitral Tribunal briefly recalls the reservations expressed by the Respondents as regards the constitution of the Arbitral Tribunal by the Court on the one hand, and as to the time allowed for producing a summary statement of their position for the purposes of the Terms of Reference on the other hand **[Defense Brief ¶¶86-91].**

98.  With regard to the constitution of the Arbitral Tribunal, the PTRA and Guinea consider that the latter contravenes the principle of equal treatment of the parties, insofar as GVG freely appointed a co-arbitrator but objected to PTRA and Guinea also being able to exercise this right.

99.  The Respondents add that this situation is all the more questionable in the current context of a multi-party arbitration in which the Respondents are imposed a joint arbitrator, when their respective positions and their interests could have been disjoined. Consequently, the only equitable solution would have been to have the entire Arbitral Tribunal designated by the arbitration institution.

100. For its part, GVG, after a reminder of the chronology of exchanges between counsel for the parties and the Secretariat **[Summary and Response Memorandum ¶¶103-104]**, finds that the Request for Arbitration of December 8, 2016 was received by Respondents on December 30, 2016, and that the Respondents were granted numerous extensions of time by the Secretariat to present their claims and appoint their co-arbitrator, which they did not do. The Arbitral Tribunal was not finally constituted until July 6, 2017 and the Terms of Reference signed on October 16, 2017, so that the Respondents actually had six months to appoint their

co-arbitrator, a time period that greatly exceeds the 30 days provided for in the Rules **[Summary and Response Memorandum ¶¶110-111].**

101. GVG adds that, contrary to what the Respondents state, it did not deny the Respondents the right to appoint a co-arbitrator, but instead requested them to make a proposal, which request remained unanswered. State participation in the proceedings was only confirmed on September 19, 2017 **[Summary and Response Memorandum ¶112].**

102. With regard to the time limit prescribed by the Arbitral Tribunal for the production of the summary statement of the position of the Respondents for the purposes of the Terms of Reference, the PTRA and Guinea stress that their counsel could not invest in this procedure only from September 19, 2017, the date of production of the mandate of the State's representation. However, the Regulation provides for a minimum period of 30 days to allow the Respondent to respond to the request for arbitration. The time limit imposed by the Arbitral Tribunal being lower than the standard provided for in the Rules, the Respondents produced their summary statement subject to being able to amplify and supplement it with new means and claims at any time during the proceedings **[Defense Brief ¶87].**

103. GVG replied that the Respondents had 10 months to produce their summary statement and that, in any event, they had all the opportunity necessary to present their arguments in accordance with the procedural timetable agreed between the parties **[Summary and Response Memorandum ¶¶107-108].**

## _I.2. Analysis_

104. Regarding the reservations expressed on the validity of the constitution of the Arbitral Tribunal, it appears to the Tribunal that this is a question which is eminently within the jurisdiction of the Court, which, upon presentation of the position of the parties, made its decision by applying the Rules. It is not for the Tribunal to retry it. At the most, the Tribunal notes that at no time did the PTRA and the Guinean State mention divergent interests which could have justified the appointment by the arbitration institution of all the arbitrators.

105. Furthermore, the Arbitral Tribunal notes that the Court, in making its decision, did not encroach on the questions raised by the Respondents with regard to the Tribunal's jurisdiction to hear this dispute, questions which will be discussed below.

106. As to the reservations relating to the time limit given to the Respondents to produce a summary statement of their claims for the purposes of the Terms of Reference, the Arbitral Tribunal notes that the Respondents have made full use of the opportunities to assert their position in their pre- and post-hearing pleadings, as well as at the hearing itself, so that the alleged procedural defect that they raise, even supposing that they exist, did not cause them any grievance.

107. The Tribunal concludes from this that with regard to the procedural aspects within its jurisdiction, the rights of the Respondents were respected throughout this Arbitration and that the reservations they express do not affect its validity. In addition, the Tribunal recalls that with regard to the procedure followed before it, it questioned the Parties, at the end of the oral hearing on January 30, 2019, on any comments they might have to make **[T3/61:9-15]**. They both replied that they had no comments to make.

## II.    JURISDICTION OF THE ARBITRAL TRIBUNAL

108. As a preliminary point, the Respondents claim that the Arbitral Tribunal has no jurisdiction to hear this dispute, firstly *subject matter* for violation of the Guinean Public Procurement Code ("**PPC**"), but also personal jurisdiction with regard to the State.

### *II.1. Subject Matter Jurisdiction*

#### II.1.a. Summary of the parties' positions

109. The Respondents claim that the law applicable to the Partnership Agreement is Guinean law by virtue of its Article 17. However, the Partnership Agreement falls under the PPC regime, the terms of which are mandatory, and of which Article 77 provides that disputes between Guinean public legal entities and foreign holders of public contracts must be subject to ad hoc arbitration. This makes Article 17 of the Partnership Agreement and the present procedure incompatible with the mandatory provisions of the PPC **[Statement of Rejoinder ¶¶127-137].**

110. GVG submits that the Respondents cannot be admitted to invoke a violation of the PPC and Guinean national law in the light of French case law **[Exhibits CL-1 to CL-6]**, explained by doctrine **[Exhibit CL-7]**, according to which a State cannot invoke its national law or the law of the contract to withdraw *a posteriori* from an arbitration to which it agreed **[Summary and Response Memorandum ¶¶147-157].**

111. Concerning the *Dalico* jurisprudence invoked by GVG, the Respondents argue that the rule aiming at the autonomy of the arbitration clause compared to any state law is specific to French law and does not constitute a transnational rule. This case law is particularly justified by the desire to promote arbitration and the arbitrability of disputes. However, it is not a question for the Respondents of claiming the jurisdiction of the Guinean domestic courts, but the respect of an *ad hoc* arbitration procedure specially provided for by Guinean law for public procurement contracts concluded with foreign companies **[Statement of Rejoinder ¶¶145-151].**

112. In support of their arguments, the Respondents invoke a critical doctrine of the approach adopted by the *Dalico* judgment and its aftermath, advocating a functional, and not conceptual, understanding of this jurisprudence **[Exhibits RL-1 to RL-3].**

113. They add that there is no need to apply the substantive rules of French law of international arbitration in the present case, the only link with French law being the arbitration jurisdiction, fixed fortuitously by the institution given the silence of the Partnership Agreement on the subject. Furthermore, the award is not intended to be executed in France **[Statement of Rejoinder ¶¶155-158].**

114. With their Statement of Rejoinder, the Respondents filed the Legal Opinion of Professor François-Xavier Train dealing with these questions, and in particular *Dalico* case law and the police laws of the *lex contractus* **[Exhibit RL-34].**

115. Professor Train bases his Opinion on the premise that the PPC applies to the present dispute by reason of the election of Guinean law as *lex contractus* and, therefore, equally the arbitration clause of Article 77 of the PPC by reference to a national police law **[Exhibit RL-34 17].** Professor Train adds that "*this imperative provision cannot be neutralized on the basis of the* Dalico *jurisprudence, since it cannot be assimilated to a local law prohibiting recourse to arbitration for one reason or another, or subjecting the arbitration agreement to excessively restrictive conditions of validity.*" **[Exhibit RL-34128 (1)]**.

116. In response, by way of introductory oral argument, GVG argues in particular that there is no incompatibility between Article 77 of the PPC and Article 17 of the Partnership Agreement **[T1/29:1-25]**; that Professor Train does not explain how Article 77 of the PPC would be police law **[T1/32:32-33:8]**; and that the Subah contract, having succeeded the Partnership Agreement for the benefit of a GVG competitor, also contains a ICC arbitration clause in its Article 10.3 **[T1/33:9-17; Exhibit R-30].**

**II.1.b. Analysis**

117. The Arbitral Tribunal notes at the outset that Professor Train's Opinion is based on the presumption that the Partnership Agreement falls under the aegis of the PPC, a presupposition which is not explained in the Opinion but that the Respondents substantiated in their Statement of Rejoinder **[Statement of Rejoinder ¶¶269-282]** and introductory oral argument at the hearing **[T1/11:22-15:32].**

118. GVG argues for its part that the PPC regime does not apply, the Partnership Agreement constituting a public service delegation, subsidiary to the regime of contracts negotiated by mutual agreement and not public contracts **[Summary and Response Memorandum ¶¶313-352; T1/70:21-73:9].**

119. Professor Train's Opinion also rests on the basis of a second presupposition, namely the qualification of the arbitration procedure of Article 77 of the PPC as ad hoc arbitration,

which contrasts with the ICC institutional arbitration provided for in the Partnership Agreement, which in his opinion renders the two clauses incompatible: "*Ad hoc arbitration and institutional arbitration indeed follow a fairly distinctly different regime, precisely because of the intervention of an arbitration institution which can replace the parties in a certain number of cases, a difference which is particularly significant at the constitution of the Arbitral Tribunal stage*" **[Exhibit RL-34 9; note 6].**

120. On this point, GVG argues the absence of any incompatibility, Article 77 of the PPC making reference to arbitration in the generic sense of the term, without, however, prescribing a particular type of arbitration, whether it is *ad hoc* or institutional **[T1/27:20-28:14].**

121. It does not appear necessary for the determination of the subject matter jurisdiction of the Tribunal to have to rule on the qualification of the Partnership Agreement because, even assuming that the PPC found application, the present procedure does not present any incompatibility with the terms of Article 77 of the PPC which reads as follows: "*In the context of Large Public Markets, or disputes arising between the contracting authority and an entrepreneur, a supplier, an industrialist or a service provider under foreign law must be submitted to arbitration under the conditions established below:*

      -  *The parties to the arbitration are the contracting authority and the contractor;*

      -  *The Arbitral Tribunal consists of three appointed arbitrators, the first by the contracting authority, the second by the foreign contract holder and the third by agreement of the parties.*

*In the event of the death or resignation of one of the appointed arbitrators, his or her successor is designated in accordance with the provisions of this Article applicable to the appointment of the arbitrator who preceded him or her, and said successor has the powers and obligations of his or her predecessor*"

122. These terms are laconic, broadly framed and just as compatible with a procedure managed by an institution (such as the ICC in this case) as with an *ad hoc* procedure (governed for example by UNCITRAL regulations). The Tribunal also notes that Article 77 remains silent on the modalities of the constitution of the Arbitral Tribunal when a party refrains from appointing an arbitrator (as was the case here for the Respondents). In this regard, it is important to recall that ad hoc arbitration as well as institutional arbitration provides that this arbitrator is then appointed, either by an appointing authority for *ad hoc* arbitration, or by the institution in the case of institutional arbitration. Consequently, nothing in the constitution of this Arbitral Tribunal violates the terms of Article 77 of the PPC.

123. For the sake of completeness, the Tribunal notes that ICC arbitration is all the less contrary to Guinean public order since Article 134 of the PPC, in its 2012 version[1] once again contemplates the use of arbitration in terms just as general as the PPC under which the Partnership Agreement with GVG was concluded. However, the Subah contract **[Exhibit R-30]**, concluded on November 24, 2015 and which succeeded the Partnership Agreement here in question, included in its Article 10.3 an arbitration clause which specifically refers to the arbitration of ICC, without questioning its validity.

124. The Tribunal therefore considers that it has subject matter jurisdiction to hear this arbitration and dismisses the objection of lack of jurisdiction raised by the Respondents under this head.

### II.2. Personal jurisdiction

#### II.2.a.  Summary of the parties' positions

125. The Respondents contend that the Arbitral Tribunal must declare that it has no jurisdiction over the State, which, although it signed the Partnership Agreement as supervising authority, did not consent to being a party to it nor was it involved in its conclusion, its execution, or its rupture **[Statement of Rejoinder ¶¶68].**

126. The Respondents claim the absence of the State's direct consent on the grounds that the mere signature of the State as supervisory authority is not sufficient to make it a party to the Agreement in the absence of a clear, express and unequivocal manifestation of its will to adhere to it **[Statement of Rejoinder ¶¶169-174; Exhibits RL-6 and RL-15].**

127. In the present case, the content of the Partnership Agreement, like that of the Amendment or the Addendum, makes no mention of the State **[Statement of Rejoinder ¶¶176-178]**, nor does it impose any obligation on the State **[Statement of Rejoinder ¶¶183-185].**

128. The adoption of the decree of May 29, 2009 fixing the international tariff **[Exhibit C-2]** cannot confer party status on the State, the function of the latter being limited to publishing the standards designed and developed by the PTRA **[Statement of Rejoinder ¶¶189-193]**.

129. Exhibits on the record, including the Contract Performance Report **[Exhibit C-6]** and the invoices sent only to the PTRA **[Exhibits R-4; C-52-1; C-52-2 and C-52-3]**, demonstrate that the State was not involved in the execution of the Agreement and that only GVG and the PTRA are parties to it **[Statement of Rejoinder ¶¶194 -199].**

---

[1] Art. 134 of the PPC 2012: "*Any litigation which has previously been the subject of a hierarchical appeal and which has not been settled amicably within fifteen (15) working days following the lodging of the appeal, will be brought, in accordance with the applicable law and contractual stipulations, before the competent courts or arbitral bodies* ".

130. As for the letters invoked by GVG in favor of State involvement in the execution of the Agreement, a majority emanates from GVG itself and therefore has no probative value **[Exhibits C-24 to C-27; Statement of Rejoinder ¶¶200-201].**

131. The letter from Minister Oyé Guilavogui reflects clumsy drafting which is not confirmed by any other element of the file **[Exhibit C-28; Statement of Rejoinder ¶202].**

132. Finally, the PTRA letter dated July 16, 2012 only reminds us that the State representative signed the Agreement **[Exhibit C-29; Statement of Rejoinder ¶203]**, which he did as a supervisory authority.

133. In addition, other documents confirm the Respondents' position, in particular a progress report signed between the PTRA and GVG (without State intervention) on November 3, 2011 in order to specify the actions and commitments taken to finalize certain outstanding points **[Exhibit R-7; Statement of Rejoinder ¶204]**, as well as the formal notice of GVG of May 3, 2016 preceding the Request for arbitration, addressed to the PTRA alone **[Exhibit C-21; Statement of Rejoinder ¶¶205].**

134. With regard to the termination of the contractual relationship between GVG and the PTRA, the Minister of Telecommunications only intervened as a mediation authority, and at the request of GVG **[Statement of Rejoinder ¶¶206-212].**

135. For its part, GVG recalls the doctrinal and jurisprudential teachings to the effect that the will of the parties, as expressed through all the circumstances of the case, makes it possible to resolve the question of whether an entity has or not consented to being a party to an arbitration clause **[Summary and Response Memorandum ¶¶180-197]**. GVG cites the *Dallah* judgment in particular, Paris CA, Judgment of February 17, 2011 **[Exhibit CL-19]**, where the arbitration clause was extended to the Pakistani State, which had neither signed nor approved the contract, on the basis of its behavior in contractual relationships **[Summary and Response Memorandum ¶¶194-195; T1/35:7-10].**

136. GVG does not claim that the signing of the Agreement by the State alone confers on it party status; however, it contends that this is an important circumstance demonstrating that the State was aware of the arbitration clause. The tripartite nature of the Agreement is further established by the fact that it was signed in triplicate **[Summary and Response Memorandum ¶202]** and in particular by the mention, in the minutes of the meeting of October 6, 2009, of GVG and the Minister of Telecommunications and New Information Technologies as parties to the Agreement **[Exhibit C-22; Summary and Response Memorandum ¶205]**.

137. GVG invokes the close interweaving of the State and GVG and their inseparable designation within the documents in the file as being the beneficiaries of the technological means that GVG was to set up within the framework of the Partnership Agreement **[Summary and Response Memorandum ¶¶211-216].**

138. GVG also invokes the active participation of the State throughout the contractual process. The financial conditions of the Agreement, in the Decree of May 29, 2009, clearly demonstrate that the State negotiated and agreed on the revenue distribution key with GVG. The Decree also adds new obligations in its Article 10 to be borne by GVG, not provided for under the terms of the Agreement **[Exhibit C-2; Summary and Response Memorandum ¶¶218-225].**

139. The State also participated in the implementation of the Partnership Agreement, as demonstrated by the responsibilities assigned to it within the Matrix of Responsibilities annexed to the Agreement, which require the Minister's active intervention in the contractual process **[Summary and Response Memorandum ¶¶226-228].**

140. In addition, the first installment under the Amendment to the Agreement was sent directly to the State **[Summary and Response Memorandum ¶¶229-230].**

141. GVG also argues that in any event, the State indirectly consented to the Partnership Agreement through the PTRA, itself emanating from the State and acting as its agent **[Summary and Response Memorandum ¶¶246-280].**

142. On this point, the Respondents, although they do not deny that the PTRA belongs to the Guinean state apparatus, rely on Article 24 of Law L/2005/018/AL **[Exhibits C-32; RL-9]** to the effect that the PTRA is an independent administrative authority, acting on behalf of the State without, however, coming under the authority of the government. They add that GVG's position leads to the absurd result that the State would necessarily be a party to any contract that would have been concluded by the PTRA **[Statement of Rejoinder ¶¶215-217].**

143. The Respondents add that GVG does not provide proof that the State would have given the PTRA the power to conclude the Partnership Agreement in its name and account, and that within the framework of a real mandate the Minister did not sign the Agreement **[Statement of Rejoinder ¶¶218-221; 235].**

144. As for the Matrix of Responsibilities invoked by GVG, the Respondents say that they do not know it and that in any event, the responsibilities devolved in this Matrix to the Minister of Posts and Telecommunications proceed from its duties of supervisory authority as well as the environment of the Partnership Agreement, rather than its content **[Statement of Rejoinder ¶¶238-240].**

**II.2.b.  Analysis**

145. The Tribunal notes first of all that the two Parties explain themselves on the question of its personal jurisdiction by referring, in addition to Guinean law, largely to law: French, law of arbitration jurisdiction **(Summary and Response Memorandum ¶¶180 et seq.; Statement of Rejoinder ¶¶171 et seq.)**. The Tribunal will also situate its reasoning on these grounds. As taught by the jurisprudence and doctrine referred to in GVG in its pleadings, including the *Dallah* judgment cited above **[Exhibit CL-19]**, the question of whether or not the State consented to be bound by the Partnership Agreement and its arbitration agreement proceeds

from an examination of its behavior during contractual relations, with regard to the elements deposited in the file.

146. To use the terms of GVG's pleadings, this examination reveals circumstances demonstrating the close interweaving of the State and the PTRA as beneficiaries of the technological means that GVG was to set up under the Partnership Agreement. In addition, the Agreement was a necessary instrument for the implementation of a new fiscal policy in Guinea and enabled the Guinean State to collect some USD 212 million in tax revenue **[Exhibit C-1, Preamble; T1/59:24-29; Mr. Diaby T2/123:19-26; Summary and Response Memorandum ¶¶213-216].**

147. The Tribunal also notes the active participation of the State throughout the contractual process, from its conclusion to its termination, including its execution.

148. At the entry of the Agreement, the Tribunal notes that the Ministerial Order of October 29, 2009, issued in accordance with point 10 of the Matrix of Responsibilities assigning this stage to the State, completes the terms of the Agreement specifying the financial conditions. The Tribunal agrees with GVG's position that the Partnership Agreement cannot be conceived without the Order **[Summary and Response Memorandum ¶223].**

149. At the execution stage of the Agreement, here again the Ministerial Decree places no less than twelve specific responsibilities at the charge of the State, whether under the title "*Signature and Establishment*" (Points 1, 2, 5, 6); under *"Project Launch Phase"* (Points 1 to 7 and Point 10); or finally under "*Logistics*" (Points 4 and 6). The Tribunal added that these responsibilities, which had been assumed by the State, were essential to the implementation and proper functioning of the Agreement. The Tribunal can therefore only reject the Respondents' argument that the Agreement "*does not impose any obligation on Guinea*" as being incompatible with this set of facts **[Statement of Rejoinder ¶¶179-187].**

150. The documents added to the file also show the active intervention of the State during the execution of the Agreement. As an indication, the Tribunal notes the Minutes of the meeting between the GSM carriers, the MTNTI and the PTRA Directorate General of October 6, 2009 **[Exhibit C-22]**, which notes that "*the purpose of this meeting is to inform carriers of the signing of an agreement between the* [GVG] *and the* [MTNTI] *relating to the flow of incoming/outgoing international traffic*". This wording is consistent with the terms of the letter dated March 22, 2011 from Minister Oyé Guilavogui to GVG *("As part of our contractual relationship, we invite you to an evaluation from April 12, 2011")* **[Exhibit C-28]** as well as those of the letter dated July 16, 2012 from the PTRA to GVG ("*However, we are ready to reconsider our decision provided that you take into account the realities that have always existed [sic] long before the signing of the agreement protocol between the Guinean State and GVG...*" **[Exhibit C-29].**

151. <u>At the end of the Agreement stage</u>, the Tribunal notes the State's involvement, both at the end of the collaboration between GVG and the PTRA **[Exhibit C-15; Summary and Response Memorandum ¶¶237-239]** only during attempts to reach an amicable settlement **[Exhibits C-16; C-19; C-20; C-30; C-31; Summary and Response Memorandum ¶242].**

152. The Tribunal considers that the foregoing elements clearly establish that the State was a party to the Partnership Agreement and that it considered itself not only bound by its terms and by the Arbitration Agreement it contains, but that it also knew it was the beneficiary of the tools and services provided under the Agreement and of their contribution to the better organization of the Guinean tax system.

153. The Tribunal therefore decides that it has personal jurisdiction with regard to the State and dismisses the objection of lack of jurisdiction raised by the Respondents under this head.

### III.    NULLITY OF THE PROCEDURE AGAINST THE STATE

### *III.1. On the format*

### III.1.a. Summary of the parties' positions

154. The Respondents claim that the proceedings instituted by GVG against the State are void because they have not been served on the State Judicial Agent, the only one empowered by Guinean law **[Exhibit RL-4: Guinean Decree 083/PRG/SGG on the powers and organization of the State Judicial Agency of May 5, 1997]** to receive citations, summonses or introductory petitions served or notified to the State, under penalty of nullity **[Statement of Rejoinder ¶¶244-249].**

155. The Respondents point out that the Hughes Hubbard LLP firm, which represents them, was first mandated verbally and by the Minister of Posts and Telecommunications and by the State Judicial Agent, these verbal mandates having been regularized in writing on September 14, 2017 for the Minister, and on October 15, 2018 for the Judicial Agent **[Exhibits C-64; R-26; Statement of Rejoinder ¶¶255-256].**

156. These regularizations, like GVG's desire to consider that the State is represented by the Minister and by the Judicial Agent, cannot, however, make valid an initially null request for arbitration **[Statement of Rejoinder ¶¶265-267].**

157. For its part, GVG emphasizes that the Terms of Reference signed by the parties, like the mandate initially produced by the Respondents **[Exhibit C-26]**, clearly state that the State is represented for the purposes of this procedure by the Minister of Posts, Telecommunications and Digital Economy. Citing a judgment of the Paris Court of Appeal of May 15, 2012, *Mr. Sylvain X, Esq., c/ The State of the Ivory Coast* **[Exhibit CL-34]**, GVG argues that the State cannot, without contradicting itself to the detriment of GVG, on the one hand produce a

mandate attesting that the State is represented by the Minister of Posts and Telecommunications then to consent to a Terms of Reference resuming this attestation; and on the other hand to maintain thereafter that this same Minister has no power to represent the State **[Summary and Response Memorandum ¶¶125-127].**

158. GVG adds that the Respondents' request for a declaration of invalidity is ill-founded in the light of the ICC Rules, which do not penalize an error in the appointment of the legal representative of the legal person attracted to arbitration; and that in any event, even assuming that Guinean law is applicable to such a procedural question, the Decree on which the Respondents rely only concerns judicial proceedings, and not arbitral proceedings **[Summary and Response Memorandum ¶¶128-138].**

159. GVG finally concludes that it accepts that, as the Respondents now say, the State is represented both by the Minister and by the State Judicial Agent **[Summary and Response Memorandum ¶139].**


**III.1.b. Analysis**

160. The Tribunal notes at the outset that the *ratio legis* of the rules relating to summons rests on the need to ensure that the State is well informed of the proceedings brought against it.

161. In any event, even if we were to be in a situation where Decree RL-4 would apply, the facts which emerge from the file lead to reject a nullity of principle which was covered by each of the Parties: one (GVG) because it indicates that it considers that it is now also addressed to the Judicial Agent and the other (the Respondents) because the State's verbal response  was followed by a written response produced during the procedure and dated October 15, 2018, following the response given by the PTRA on September 14, 2017.

162. It also appears clear to the Tribunal, having regard to the terms of the mandates conferred on counsel for the Respondents and the Terms of Reference, that to allow the State to withdraw may subsequently invoke the nullity of the proceedings against it the fundamental principles of the duty of procedural loyalty as recalled in judgement *Maitre X c/ the Ivory Coast* **[Exhibit CL-34]** as well as the authorities cited by the Respondents **[Exhibit RL-14].**

163. The Respondents' action for nullity under this head is therefore dismissed.


***III.2. On the merits***


**III.2.a. Summary of the parties' positions**

164. The Respondents submit that GVG's action is inadmissible on the ground of infringement of Article 2 of the Implementing Decree of the PPC of November 3, 1997 in that the contracting party of a public person whose public procurement contract was not concluded, approved and notified in accordance with the PPC has no action in execution of the financial commitments

against the contracting public authority under Guinean law **[Exhibit R-1; Statement of Rejoinder ¶¶280-282].**

165. The Respondents rely on the following extract from Article 2 of the Decree in support of the objection of inadmissibility they raise: "*Public contracts must be concluded, approved and notified before the start of any execution. Any contract not approved by the competent authority cannot commit the State financially - also, except in the case provided for in Article 27.2.5 of the Public Procurement Code, if it begins to receive a start of execution, this can only be at the risk of the entrepreneur, supplier, manufacturer, or service provider concerned.*"

166. At the hearing, counsel for GVG argued that Article 2 of the Decree made no reference to inadmissibility and therefore that the objection of inadmissibility raised by the Respondents had no basis. Insofar as the Respondents' motion for inadmissibility is linked to their counterclaim for a declaration of invalidity for violation of the PPC, the arguments put forward by GVG in this respect also apply to inadmissibility **[T1/49:27-48:11].**

### III.2.b. Analysis

167. Even in the event that the PPC finds application, the Arbitral Tribunal finds that the Respondents do not substantiate to what extent Article 2 of the Decree would constitute a dismissal of GVG's claim, other than by reference under the terms "*Any contract not approved by the competent authority cannot commit the State financially; also except in the case provided for in Article 27.2.5 of the Public Procurement Code if it begins to receive a start of execution, it can only be at the risk and peril of the entrepreneur, the supplier, the manufacturer or the service provider concerned*". The Respondents do not cite any authoritative source capable of enlightening the Tribunal on the issue.

168. Article 2 does not in fact mention inadmissibility or any other measure which could penalize the service provider other than saying that the procurement is done "*at its own risk,*" without the meaning of these terms being otherwise made explicit. If there is a sanction, it explicitly targets the agents of the Administration, as stated in the third paragraph of Article 2 of the Decree: "*The agents of the Administration who intervene in the conclusion or execution of such a contract are liable to the sanctions provided for in Article 78 of the Public Procurement Code*". As for Article 79 of the PPC, entitled "*Faults Committed by the Candidate or the Holder of the Public Contract*" under Title 6, itself entitled "*Sanctions for attacks on the regulation of public procurement,*" of which the Respondents have not sought to invoke the application, it does not provide further clarification on this point.

169. For these reasons, the Arbitral Tribunal is of the opinion that the Respondents, on whom the burden of proving their allegations rests, have not demonstrated how Article 2 of the Decree

may constitute an end of inadmissibility to GVG's claim and therefore rejects the objection of inadmissibility under this head.

## IV.     VALIDITY OR INVALIDITY OF THE PARTNERSHIP AGREEMENT

### *IV.1. Summary of the parties' positions*

170. By way of counterclaim, the Respondents seek the nullity of the Partnership Agreement, first on the basis of the violation of the mandatory provisions of the PPC and in particular, in the case of the public contract constituted by the Partnership, the need to proceed to a request for proposals before the award of this public procurement **[Statement of Rejoinder ¶¶285-412]**; and secondly because of a corruption pact **[Statement of Rejoinder ¶¶413-492]**.

171. Consequently, the Respondents claim in return the restitution of all the sums collected by GVG, which they calculate at USD 48,093,160.00 as well as damages which they assess at USD 10 million **[Statement of Rejoinder ¶¶493-495; 554].**

172. GVG argues: (i) primarily, that the action for a declaration of invalidity is time-barred and therefore inadmissible **[Summary and Response Memorandum ¶¶287-312]**; (ii) in the alternative, that the PPC is inapplicable to the Partnership Agreement **[Summary and Response Memorandum ¶¶313-327]**; (iii) on a very subsidiary basis, assuming that the PPC is applicable, that the Partnership Agreement falls within the category of contracts concluded by mutual agreement, and not contracts concluded on a request for proposals **[Summary and Response Memorandum ¶¶328-352]**; (iv) on an infinitely subsidiary basis, supposing that the Partnership Agreement does not fall into the category of contracts concluded by mutual agreement, that the Respondents cannot today avail themselves of the nullity of the Partnership Agreement, thus contradicting themselves at the expense of GVG **[Summary and Response Memorandum ¶¶353-397].**

173. On the action for the nullity of the agreement on the grounds of a corruption pact, GVG pleads expiration of statute of limitations in the main title; and the merits of this action **[Summary and Response Memorandum ¶¶398-463].**

### *IV.2. Analysis*

#### IV.2.a. Exception of inadmissibility of the action for nullity based on the violation of the PPC due to expiration of statute of limitations

174. The Arbitral Tribunal grants the objection of inadmissibility raised by GVG on the basis of Article 770 of the Guinean Civil Code **[Exhibit RL-11].**

175. Since the PPC has not provided for a course of action in nullity of a contract for non-compliance with the request for proposals procedure, it is common law that must be applied, that is to say Article 770 which provides that the action for the nullity of a contract is time-barred after five years:

"*Subject to what will be examined in the section dealing with 'statute of limitations' in all cases where an action for the nullity or rescission of an agreement is not limited to a lesser period of time by law, such action may be brought for a period of five years This short period of time:*

- *for the violence, from the day it ceased;*

- *for error or fraud, from the day they were discovered;*

- *for a minor, from the day he or she becomes independent or reaches the age of majority;*

- *for a protected adult, from the day he or she became aware of the acts injuring him or her, when he or she had acquired the possibility of validly repeating them.*"

176. As the Partnership Agreement was entered into on May 22, 2009 and the Amendment on July 6, 2009, the action for nullity for breach of the PPC counterclaimed by the Respondents on October 13, 2017 is therefore time-barred.

177. The Respondents for their part maintain that the thirty-year statute of limitations is applicable, the nullity invoked by GVG not proceeding from the law of obligations, but constituting a specific nullity based on Article 37.3 of the PPC. This Article provides that "[t]*he public contracts which have not been approved in accordance with the provisions of this chapter are void and of no effect, as well as all acts performed for their execution*".

178. The Arbitral Tribunal's reading of Article 37.3 of the PPC does not prevent the application of Article 770 of the Guinean Civil Code; the fact remains that the PPC does not provide for a remedy for the nullity of a contract, nor does it state a time limit for bringing such an action which is less (or even more) than five years. Article 770, which expressly deals with the action for contractual nullity and which concerns an extinctive statute of limitations, is therefore intended to apply, rather than the provisions concerning the thirty-year statute of limitations applicable to acquisitive statute of limitations.

179. As it stood at the time when the parties entered into the Partnership Agreement, the Guinean Civil Code did not contain any specific provision for absolute nullity and therefore could not provide for a thirty-year period in its regard. Since the Code does not distinguish between the various types of invalidity, the Tribunal sees no reason to distinguish where the law itself does not distinguish. Consequently, the Tribunal also rejects the Respondents' argument that a thirty-year statute of limitations was applicable.

**IV.2.b. Invalidity for violation of the PPC**

180. Notwithstanding the foregoing conclusions concerning the objection of inadmissibility of the action for a declaration of invalidity on the grounds of expiration of statute of limitations, and

for the sake of completeness, the Arbitral Tribunal wishes to state the following with regard to the question of the invalidity of the Agreement due to violation of the PPC.

181. The question of whether the PPC applies to the Partnership Agreement and whether it falls within the category of either contracts entered into on a request for proposals, or to contracts entered into by mutual agreement was the subject of written **[Summary and Response Memorandum ¶¶313-352; Statement or Rejoinder ¶¶285-292; 314-372]** and oral pleadings **[T1/11:21-19:13; 22:8-23:12; 70:21-73:9]** prepared by the parties, which the Tribunal has considered with great care.

182. After careful examination of the arguments, the Arbitral Tribunal concludes that this demonstration, as instructive as it is, eludes the heart of the debate on the validity or not of the Partnership Agreement.

183. Indeed, the essential question underlying the determination of the validity or otherwise of the Partnership Agreement is whether the Respondents, who to date have never challenged the validity of the signing of the Agreement with regard to the PPC, who signed, renegotiated and executed the Agreement without reference to the PPC, can *ex post facto* plead the application of the PPC and, assuming it is applicable, non-compliance with their own regulations.

184. This question comes first from an examination of the circumstances surrounding the signing of the Agreement and of the intention of the parties at the time of this signing.

185. This question also falls under the duty of good faith and loyalty of the parties in the execution of their contractual agreement, a principle enshrined in Guinean law: "*The binding force of conventions has a double foundation: - A moral idea, keeping one's word - An economic interest, the necessity of the credit. This double foundation implies that they must be entered into in good faith and that they require not only compliance with the terms expressed therein, but also with all that equity, custom or law gives them according to their nature.*" **[Article 669 of the Guinean Civil Code; Summary and Response Memorandum ¶364].**

186. On the question of the circumstances surrounding the conclusion of the Agreement, the Arbitral Tribunal makes the following findings. The first is that the Subah contract of November 20, 2015, the validity of which is not disputed and which replaced the Partnership Agreement **[Exhibit R-30]**, was also not subject to a prior call for competition under the terms of the 2012 PPC. The Respondents explain that the Subah contract was entered into  without a request for proposals in accordance with Article 11.4 of the law of October 11, 2012 laying down the rules governing the award, control and regulation of public contracts and public service delegations, which text allows the contract to be awarded by direct agreement "*in the case of extreme urgency, for the works, supply or service that the contracting authority must have performed in place of the defaulting contractor, supplier or service provider.*" **[Statement of Rejoinder ¶535; T3/290:10-13]**.

187. The Arbitral Tribunal also notes that the PPC contains similar provisions in its Articles 27.2(4) and 24.2(5) **[Exhibit R-1]**. It maintains that the State is empowered, in certain circumstances, to go beyond the request for proposals stage.

188. However, it is clear from the hearing of Mr. Diaby that in 2009, at the time of the signing of the Partnership Agreement, the Republic of Guinea was subject to a military regime and in a state of deep political instability **[T2/165:25]**. The Arbitral Tribunal understands that such circumstances also participate in the state of emergency provided for under the terms of the PPC, resulting in a search for stability by all means, easily explaining that the Partnership Agreement has not been the subject of a competitive bidding process. It should be noted that the reference to urgency also existed in the 1997 PPC applicable in this case [cited in the **Summary and Response Memorandum ¶332**] and that it is coupled with other arguments **[Summary and Response Memorandum ¶333].**

189. The Arbitral Tribunal therefore considers that, as for the Subah contract which succeeded it, the circumstances at the time of the signing of the Partnership Agreement justified that the PPC's request for proposals procedure be excluded. It follows that, throughout the duration of the Agreement, it was not subject to the requirements of the PPC, which is entirely consistent with the fact that the Respondents never invoked its application during the period of their contractual relations with GVG.

190. Mr. Diaby continued his testimony by saying that his arrival in office at the PTRA in 2011, once the military regime was ousted, was marked by the concern to "*readjust things, come towards normalcy and build a dynamic ecosystem*" rather than by taking proceedings against the former leaders or GVG **[Monsieur Diaby T2/165:20-166:17; 168:8-12; 172:18-31]**. The Tribunal indeed notes that, even at the stage where the Respondents were dissatisfied with the terms and the execution of the Agreement, they never reported an alleged nullity of the Agreement for lack of competition, the will of Mr. Diaby being rather to seek the maintenance of the Agreement and an adjustment of its terms in particular via the Addendum of 2012 **[Mr. Diaby T2/160:9-24]**.

191. In such circumstances, the Tribunal concludes that the parties have excluded the application of the PPC with respect to the Agreement.

192. Furthermore, the Arbitral Tribunal considers that Article 669 of the abovementioned Guinean Civil Code finds full application and that it would be contrary to its letter and spirit to allow the State to withdraw by invoking for the first time, in favor of this arbitration, the invalidity of the Agreement.

193. The Tribunal adds that this is not a question of confusing the duty of good faith and contractual loyalty with the principle of estoppel. There is no need to resort to the principle of estoppel to conclude that the position of the Respondents, who invoke long after the facts the alleged nullity under Guinean law of the Partnership Agreement from which they benefited during five years with gross revenues of around USD 212 million **[Exhibit C-49;T3/277:13-18; Attestation no. 1 of Mr. Baker 161]** without questioning the validity of this Agreement and