**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

GLOBAL VOICE GROUP SA,

            *Plaintiff*,
    v.

THE REPUBLIC OF GUINEA,


            *Defendant*.

Civil Action No. 1:22-cv-02100


**EXHIBIT A (Part 2 – Pages 36-72) TO DECLARATION OF MARIANNE KECSMAR**

without ever being denounced **[Mr. Diaby T2/150:27-155:21; Ms Kaba T3/263:19-26; 278:33-35-279:3]**, is contrary to their duty of good faith and contractual loyalty.

194. Similarly it is not necessary to invoke the Respondents' confirmation of the Agreement by virtue of their execution of it without protest as to its validity **[T1/103:10-27]**, although it is clear from the facts and documents on file that such confirmation has taken place.

195. For these reasons, the Respondents' request for cancellation on account of a violation of the PPC is rejected. It is therefore not necessary for the Arbitral Tribunal to rule on the other arguments of the Parties under this head.


**IV.2.c. Exception of inadmissibility of the action for nullity of a corruption pact due to expiration of statute of limitations**

196. The Arbitral Tribunal notes that the Guinean Constitution of May 7, 2010 expressly states in its Preamble that there is no statute of limitations for corruption and economic crimes **[T1/84:11-16; T3/289:16-19]**.[2]

197. Although the Constitution is subsequent to the Agreement and the Amendment, the Arbitral Tribunal considers on the one hand that the rule laid down by the Guinean Constitution is of Guinean public order and applies immediately and on the other hand apart from the fact that the invalidity of nullity due to a corruption pact stems from the fact that corruption is contrary to international public order, as explained below.

198. Consequently, the objection of inadmissibility on the grounds of expiration of statute of limitations is rejected.


**IV.2.d. Invalidity for corruption pact**

199. The fight against corruption is part of international public order, as evidenced by the important interstate conventions of which it is the subject, such as the United Nations Convention against Corruption **[Exhibit RL-16; Statement of Rejoinder ¶¶414-416]**.

200. The fight against corruption is also enshrined in the Guinean Criminal Code of 1998 in its Articles 191 to 194, which reflect the international consensus on the subject **[Exhibit RL-18; Statement of Rejoinder ¶¶417-419]**.

201. As was clearly stated at the hearing, the Arbitral Tribunal is extremely sensitive to the gravity of these allegations **[T1/89:6-11]**.

---

[2] Guinean Constitution http://mip.univ-perp.fr /constit/gn2010 .htm : "...*the people of Guinea ... Reaffirms... - its commitment to promote good governance and resolutely fight against corruption and economic crimes. There is no statute of limitations for these crimes.*"

*IV.2.d. (i). Burden of proof. Standard of proof*

202. The Respondents, who invoke them, have the burden of proving the elements of corruption - the reversal of the burden of proof, advocated by a certain doctrine, is rejected by case law, as Professor Emmanuel Gaillard indicates in his recent Article on the subject **[Exhibit RL-55 ¶33].**

203. On the question of the standard that should be applied to the proof of these allegations, the Arbitral Tribunal endorses the words of Professor Gaillard: "*It has been noted that, while the majority of arbitral tribunals have so far demanded 'clear and convincing' evidence of the alleged bribery, arbitrators seem to be increasingly inclined to take a flexible approach and depart from high standards of proof. This discussion is in reality fairly theoretical, the arbitrators in all cases having a broad discretion to assess the convincing nature or not of the evidence submitted to them without being particularly influenced by the abstract discussion of the standard of proof required.*" **[Exhibit RL-55 ¶34].**

204. The Tribunal therefore bases its examination of the Respondents' allegations on the twin principles that they have the burden of proof, and that this proof must convince of the existence of corruption on a balance of probabilities, by means of a bundle of "*serious, precise and corroborating evidence,*" as the Paris Court of Appeal teaches in its judgment in Republic of Kyrgyzstan v. Belokon **[Exhibit CL-60]**, while taking into account the occult nature of acts of corruption. The Tribunal points out that its non-exclusive references to French law are non-exclusive, in particular because they concern the jurisdiction law, to which the review of the award would be subject, if necessary, and that Article 41 of the Arbitration Rules invites the arbitrators to make "*every effort to ensure that the award is subject to legal sanction*".

205. The Tribunal also exercised its power to directly examine witnesses in order to probe them on these questions **[T2/181:14-183:7; T3/251:8-252:6].**

206. The Respondents raised new evidence of corruption throughout the arbitration proceedings, up to and including during the hearing and in the Post-hearing notes. The Tribunal will first recall the essentials of the parties' respective positions. It will then present its analysis.

*IV.2.d. (ii). Summary of the Respondents' position*

207. In support of their allegations of corruption by GVG in the framework of the Partnership Agreement, the Respondents have insisted on the "economic model" which underlies the latter. In essence, their argument on this point amounts to saying that, by its very nature, the Agreement can only result from a corruption pact, having regard to the circumstances in which it was concluded and the economic benefits that it generated for the benefit of GVG: "*A State which signs a contract with a private sector, and a civil servant who accepts, on the basis of an absolutely improbable risk analysis, as what has just been indicated to us. There's no rigor in that. And we are told that the civil servant agrees to give 60% of the revenue that the state can derive from this case. He gives it to the private section. This is unheard of. I think that this model is necessarily consubstantial with corruption. It is not possible, otherwise. No civil*

*servant, no person normally constituted in this world could agree to sign a contract of this nature. It's impossible. It's totally impossible."* **[T1/82:27-83:6. To the same effect, T1/83:10-22; T1/86:19-25; T1/91:16-23; Post-hearing note no. 1 Respondents ¶¶51-54]**.

208. Taking into account such an economic model and the political circumstances surrounding the signing of the Agreement, the Respondents also rely on a circumstantial evidence, which they believe converges towards the inevitable conclusion that the Partnership Agreement is vitiated by corruption.

209. Thus in their Statement of Rejoinder, the Respondents rely on the following circumstances, circumstances which they argue form a cluster which converges towards the indication of a corruption pact **[Statement of Rejoinder ¶¶470-492]:**

    a.   Allocation of cars outside the Partnership Agreement;

    b.   Circumvention of public procurement rules;

    c.   Lack of economic justification of the contract price;

    d.   Collusion with public officials;

    e.   Excessive donations and gifts;

    f.   GVG's bad reputation, as reported in the press;

    g.   False documents produced by GVG in this arbitration.

210. On Saturday January 26, 2019, two days before the start of the hearing, the Respondents announced a new element, adding to the bundle of evidence, namely a set of thirteen checks deposited at the hearing as **[Exhibit R-28]**. The Respondents argue that there is no cause for the checks; that the beneficiary of the checks was Mr. Ismaïla N'Diaye, the "country representative" of GVG in Guinea, in an individual capacity; that these checks were not crossed out; and that GVG's explanations for them are misleading **[Post-hearing note no. 1 Respondents ¶¶28-49].**

211. On the second day of the hearing, the Respondents, during the cross-examination of Mr. Patrice Baker, produced Amendment no. 3 to the Agreement of May 22, 2009 **[Exhibit R-29]**, in which they argue in their Post-hearing note no. 1 that it is unfounded in its existence; fraudulent in its purpose; and constituting a predation tool on Guinean public funds; and they therefore request its cancellation **[Post-hearing note no. 1 Respondents ¶¶6-21; 65-70].**

*IV.2.d. (iii).  Summary of GVG's position*

212. To the foregoing, GVG opposes that the Respondents' assertions, although peremptory, are false and are at a level of generality such that they are insufficient to meet the burden of proof which falls on them. GVG also presents explanations showing that the circumstances mentioned by the Respondents have nothing to do with any corruption pact whatsoever.

213. Thus, the cordial relations maintained by Mr. Laurent Lamothe, CEO of GVG at the time of the signing of the Agreement, with Mr. Nfa Ousmane Camara, Director General of PTRA at the time, are explained in Mr. Baker's Attestation no.1 **[¶¶18-20]**. These cordial relations have also been maintained with the successors of Mr. Camara, Messrs. Laminé Diallo and Morlay Youla. None of these successors, including Mr. Diaby upon his arrival at the head of the PTRA in March 2011, has ever reported any suspicion on the obtaining of the STP Project by GVG **[Summary and Response Memorandum ¶445].**

214. The appointment of Mr. Camara on November 26, 2012 as Honorary Consul of Haiti in Guinea (an unpaid position) was pronounced, not by Mr. Lamothe, but by the President of the Republic of Guinea, himself elected in 2010 following democratic elections **[Exhibit C-51]**. This appointment would not have taken place if suspicions had weighed on Mr. Camara. It is inconceivable that Mr. Camara granted the STP Project to GVG on the promise of such an appointment in 2009, when Mr. Lamothe did not hold any ministerial office in Haiti **[Summary and Response Memorandum ¶¶445-446].**

215. The alleged violation of the PPC's tendering requirements, even if proven, is insufficient in itself to establish a corruption pact, as the Paris Court of Appeal recalls in its judgment in the *Democratic Republic of Congo* **[Exhibit CL-51; Summary and Response Memorandum ¶¶448-449].**

216. As for GVG's contractual remuneration, it is not exorbitant in view of the extent of its investment, the duration of the contract and the assumption of financial risks and political stability by GVG **[Summary and Response Memorandum ¶¶451-452]**. The fact that GVG subsequently agreed to lower this remuneration by way of the Addendum does not prove the contrary, in view of the particular circumstances surrounding the signing of the Addendum and the impact that a disagreement with the PTRA allegedly provoked on GVG's business in Africa **[Summary and Response Memorandum ¶¶453-454].**

217. The so-called "suspicious" donations and congratulations (including letters of congratulations, invitation to a professional congress, donation of two mediatized school computer laboratories, financing against the invoice of two vehicles within the framework of the STP Project) occurred after the conclusion of the Partnership Agreement. None of Mr. Camara's successors at the head of the PTRA, nor any of the Ministers who succeeded Mr. Bangoura, have ever reported suspicions of corruption on the part of GVG. These accusations appeared for the first time in the context of this arbitration **[Summary and Response Memorandum ¶¶460-462].**

218. The thirteen checks and Amendment no. 3 products in extremis and in bad faith by the Respondents concern the payment by the PTRA of the quotas due to GVG for the national telephone traffic, which is not disputed by the Respondents nor does it form the subject of the requests for GVG in this procedure **[Exhibits R-28; R-29; Post-hearing note no. 1 GVG].** In any event, GVG filed a reconciliation table for the amounts subject to checks, which explains the basis **[Exhibits C-74.1; C-74.2; C-74.3; C-75]**.

219. Amendment no. 3 has in any case been canceled and replaced by another fixed rate contract, and as part of the Addendum of June 10, 2012 the sums collected by GVG have been reimbursed, which is accepted by the Respondents. Their request for cancellation of Amendment no. 3 is therefore not applicable **[Post-hearing note no. 2 GVG ¶¶20-33]**.

220. The documents which the Respondents claimed, at various stages of the proceedings, to be false (and by this very fact, signs of corruption) are: The Amendment to the Agreement of July 6, 2009 **[Exhibit C-3]**; the Departmental Certificate of January 18, 2010 relating to the payment made by GVG under the Amendment to the Agreement **[Exhibit C-53]**; and the Matrix of Responsibilities annexed to the Agreement **[Exhibit C-1]**. The Respondents subsequently developed an argument based precisely on these documents, thus demonstrating the inconsistency of their position **[Post-hearing note no. 2 GVG ¶¶2-3]**.

*IV.2.d.(iv). Analysis*

221. The Tribunal first notes that the Respondents' allegation that the "economic model" which underlies the Partnership Agreement can only be consubstantial with corruption amounts to arguing for a reversal of the burden of evidence **[T1/95:31-33]**, compelling GVG to justify the ins and outs of the Agreement. As noted in the introductory remarks above, international arbitral practice rejects the reversal of the burden of proof of corruption, an approach which the Tribunal also adopts.

222. Furthermore, the Tribunal takes note of GVG's initial investment of some USD 13 million, of the costs of the operation borne by it, as well as of the risks which it alone assumed in this Project **[Attestation no. 1 from Mr. Baker ¶¶32-36; Mr. Baker T2/188:1-25]**, in particular the country risk associated with investments in Guinea, which both parties agree is among the highest in the world **[T1/74:1-2; 81:31-33]**.

223. With regard to such an investment and endorsement of the risks, the Tribunal notes that the Respondents, on which the burden of proof rests, have not demonstrated by what standard the Partnership Agreement, in force for five years and bringing in significant revenues to the state, proceeds from an abusive economic model; nor how this model is in itself indicative of corruption. During the cross-examination of Mr. Baker **[T2/199:6-201:5]**, counsel for the Respondents indicated figures and percentages, without these being substantiated in any way that would allow the Tribunal or GVG to precisely verify their basis.

224. The Tribunal concludes that the Respondents have not demonstrated the merits of their allegations of an abusive economic model in a precise and consistent manner. This index is therefore discarded.

225. As regards the other elements put forward by the Respondents as being indicative of corruption, they do not pass the test of gravity, precision and concordance either; this despite the Respondents' use of a highly pictorial vocabulary with regard to GVG (Mr. Diaby spoke of "*banditry*" **[T2/180:5-6]**; the closing remarks mentioned "*swindle*" **[T3/286:28-34]** and "*money laundering*" **[T3/288:28-29]**). More precisely, it is a list of disparate and time-varying (and therefore inconsistent) factors, which remain at the stage of general allegations without being proven (and therefore not precise).

226. The Respondents thus plead GVG's bad reputation as reported in a press release the sources of which are not verified ("*GVG's bad reputation, as reported in the press*"); certain donations and gifts granted <u>after</u> the signing of the Agreement (including the two cars), of which it is not demonstrated how they could have influenced the obtaining of the Agreement ("*Excessive donations and gifts*" "*Allocation of cars outside Partnership Agreement*"); as well as the so-called falsification of documents deposited by GVG in this procedure's file ("*False documents produced by GVG in this arbitration*") without the appearance of a link which could link these elements to the signing of the Agreement for the benefit of GVG rather than its competitors.

227. As for the donation by GVG of two school computer laboratories, for the Tribunal, this is a sponsorship operation exclusive of any corruption, common in the context of investments of the scope of the STP Project, even if such an operation was indirectly intended to give GVG a good image.

228. For the invitation to Mr. Morlaye Youla in 2010, then Director of the PTRA, to attend a professional summit in South Africa **[Exhibit C-44]**, the Tribunal notes, on the one hand that the fact that the invitation was official makes it unlikely that the Respondents' argument would be "*improper advantages*," and secondly that this argument calls into question the probity of Mr. Youla, in which the Guinean State has enough faith to promote Mr. Youla to the rank of Secretary General of the Ministry led by Mr. Diaby, a position he still occupies today **[T2/183:10-12]**.

229. As for the allocation of the two vehicles, the Tribunal notes that Exhibit C-46 is, on the one hand, an official letter from Mr. Youla, then Director of the PTRA, which indicates on May 10, 2010 the account number in which to pay the funds which would be used to acquire the agreed vehicles, and on the other hand, the official receipt of May 13, 2010 attesting to the successful reception of the funds. It is difficult for the Tribunal to accept that to bribe a particular official by offering that person vehicles a company would have officially written to the Tribunal to find out the account number to be credited (which does not include the name of the beneficiary) and that the Deputy Director of PTRA would have sent an official receipt on letterhead.

230. As for the "*Circumvention of the rules of the public market*," the Tribunal rejected this argument for the foregoing reasons.

231. Finally, with regard to "*Collusion with public officials*," the testimony of Mr. Diaby, who mentions payments of money by GVG to public officials and attempts to bribe his own people, is contradicted not only by Mr. Baker **[Attestation no. 2 of Mr. Baker, 45]**, but also and without hesitation by Mr. Tourny, with whom Mr. Diaby worked closely and discussed his suspicions **[T2/171:1]**, and whom he praised with "*considerable contribution*," lucidity and courtesy **[T2/117:10-15; 174:22-26]**: "***Madam President:*** *(...) You are an experienced telecom carrier and have had very close involvement in this project. Have you yourself had the opportunity to observe that there were embezzlement, circumstances which could be consistent with allegations of corruption?* **M. K Touray** *(interpretation): No, absolutely not*." **[T3/251:8-16]**; "***Madam President****: Your answer to my first question was that you yourself did not see any circumstances that were consistent with a phenomenon of corruption or embezzlement? M. K Touray (interpretation): No, definitely not.*" **[T3/252:3-6]**.

232. The evidence on this point is therefore contradictory and does not allow the conclusions sought by the Respondents to be drawn.

233. With regard to the thirteen checks deposited by the Respondents **[Exhibit R-28]** as well as Amendment no. 3 **[Exhibit R-29]**, the Arbitral Tribunal notes that the Respondents' arguments also boil down to the application of the maxim *res ipsa loquitur* (and therefore the reversal of the burden of proof) for these indices without demonstrating how these elements may constitute corruption **[Post-hearing note no. 2 Respondents ¶43]**. In any event, the Arbitral Tribunal accepts that the cheque reconciliation table filed by GVG explains the basis for this reconciliation **[Exhibits 74.1-74.3]** and notes that, in Amendment no. 3 having been replaced by another contract, there is no need to declare it void and rejects the Respondents' request in this regard.

234. Examination of the pleadings of the parties and of the documents lodged in the file, as well as of the hearing of witnesses, leads the Arbitral Tribunal to the conclusion that the information at its disposal does not indicate a cluster of serious, precise and consistent indications of corruption on the part of GVG in order to obtain by these means the Partnership Agreement.

235. The Tribunal, while having dismissed each of the indicia of corruption alleged by the Respondents and considered them separately, questioned the possible different conclusions that could have resulted from bringing them together they were not convinced that these disparate elements were such as to constitute a coherent and convergent whole that could establish the alleged corruption.

236. For these reasons, the Respondents' counterclaim for a declaration that the Partnership Agreement is void because of a corruption pact is dismissed.

237. The Tribunal having dismissed the Respondents' requests to have the Partnership Agreement declared void, it therefore rejects their consecutive counterclaims for the restitution of the sums collected by GVG.

## V.    EXECUTION OF THE PARTNERSHIP AGREEMENT

238. The Arbitral Tribunal having determined that the Partnership Agreement is valid, the question arises as to whether, as claimed by GVG, it has been improperly terminated by the Respondents despite its perfect performance by GVG; or rather if, as the Respondents claim, the faulty performance of GVG justified termination or, alternatively, suspension.

### *V.1. Summary of the parties' positions*

#### V.1.a.  GVG

*V.1.a.(i). The Partnership Agreement and the obligations of the parties*

239. As a preliminary point, GVG recalls that the main purpose of the Partnership Agreement, and therefore GVG's essential obligation, was to "*[p]rovide and install control tools for the Guinean State, it providing the ability to view and invoice all local and international traffic for each carrier in real time,*" in accordance with the terms of Article 3.2, sub clause 2 of the Agreement, as well as the tools necessary to combat telephone fraud **[Summary and Response Memorandum ¶¶32; 465].**

240. GVG specifies that while the Partnership Agreement covered international and national traffic, the establishment of the national traffic control system was the subject of a separate contract between the parties, under which GVG does not make any claim **[Summary and Response Memorandum ¶33].**

241. GVG says that it undertook, within the framework of the Agreement, to put into operation and maintain a supervision system (IMS-STP Supervision System) of international calls to telephone carriers in Guinea by STP ("Signaling Transfer Point") centralizing the carriers' SS7 signaling links. This system required the installation of the following equipment **[Summary and Response Memorandum ¶34]:**

     a.    The "Main Data Processing Center," to store and process the call data of all carriers. As the infrastructure necessary to supply such a system is not perfectly reliable in Guinea, GVG also had to install two redundant platforms to avoid the

loss of information in the event of a breakdown: the IMS STP 1 platform on PTRA premises; and the IMS STP 2 platform at an carrier's;

b. The "Capture and Processing Subsystem" of SS7 signaling messages and management of signaling signals by STP, by means of which elements of the telephone network exchange information, making it possible to connect the IMS STP 1 and IMS-STP 2 platforms to each carrier;

c. The "Data Transport Subsystem," transmission interfaces placed at each carrier's and at each entry point of international traffic, necessary for the transport of data to the IMS-STP 1 and IMS-STP 2 platforms and synchronization of all the SS7 Signaling and Processing Subsystems distributed across the different networks.

242. The system installed by GVG also had to integrate quality of service management (**QoS**) tools allowing the collection of service quality data on the international interconnections received, as well as a fraud detection system allowing the detection, the identification and disconnection of fraudulent numbers carrying illegal international traffic to Guinean carriers **[Summary and Response Memorandum ¶35].**

243. Finally, under the terms of the Partnership Agreement, GVG was to provide training for PTRA staff, in order to enable them in the long term to take charge of the operations of a "Control and Surveillance Center," that GVG also had to set up, including the operations of the "Traffic Monitoring Unit" and the "System Maintenance Unit" **[Summary and Response Memorandum ¶36].**

244. GVG's obligations under the STP Project in accordance with the Agreement were as follows **[Summary and Response Memorandum ¶37]:**

a. The turnkey supply of means and services to control the flow of incoming international traffic as well as related management tools, including a new CDR ("Call Detail Records" or a call report for invoicing purposes);

b. Providing the resources necessary for the evaluation of the QoS of each carrier with a license to operate in Guinea for the traffic received by GVG installations;

c. Providing means for detecting telephone fraud;

d. Training PTRA staff;

e. Maintaining and upkeeping installations and equipment;

f. Monitoring price evolution in the call termination markets.

245. GVG adds that the Respondents, for their part, undertook to establish the technical-legal framework for interconnection between carriers, as well as to determine the new international interconnection tariffs and the new taxes applicable on incoming international calls. In addition, they were to assign the technical and legal staff necessary for the development of the technical-legal and regulatory framework allowing the establishment of "*an infrastructure of "Supervision of national and international interconnections" by centralizing and standardizing SS7 signaling system networks for carriers in Guinea*" under the terms of Article 3.1 of the Agreement and the annexed Responsibility Matrix **[Summary and Response Memorandum ¶¶38-40].**

*VI.a.(ii). GVG's remuneration*

246. GVG received remuneration on the income generated by international call flows, according to a rate in accordance with Annex 1 to the Agreement and established by means of the Order of May 29, 2009 **[Exhibit C-2].** This tariff for international traffic entering Guinea was USD 0.28 (28 cents) per minute, distributed as follows **[Summary and Response Memorandum ¶41]:**

   a. 16 cents to the local carrier;

   b. 3.5 cents to PTRA;

   c. 7 cents to "*the technical carrier who ensures the supply, commissioning, maintenance and training in use during the contractual period*";

   d. 1.5 cents "*for the financing assistance fund to connect Guinea to submarine cable, optical fiber and broadband*".

247. In view of the importance of its financial investment and the risks it assumed, GVG was therefore entitled, out of the USD 0.12 accruing to the Respondents, to a remuneration of USD 0.07 per minute for incoming international calls to Guinea. This amounts to 58% of the revenues collected by the State, in the range of tariffs of 30-60% generally applied by GVG in similar projects **[Summary and Response Memorandum ¶42].**

248. In accordance with the Decree, revenues due to the State on incoming international traffic to Guinea were invoiced on the basis of data collected by the IMS-STP Supervision System from which CDRs were extracted to establish monthly traffic reports. From these monthly reports, the PTRA cell responsible for billing and collection - also set up and trained by GVG - was to issue monthly invoices at USD 0.12 for each minute of incoming international call, then ensure receipt and payment by each carrier. The Respondents undertook to proceed "*to the repayment of the share due to [GVG] no later than 15 days after the due date and the receipt of the invoice*" **[Summary and Response Memorandum ¶43].**

249. GVG adds that the Respondents have never disputed that the STP-IMS supervision system was put into operation from September 2009, allowing the State to collect revenue from incoming international calls to Guinea as of this date; invoices were indeed paid during the debates demonstrating the effective deployment of the said System **[Summary and Response Memorandum ¶465].**

250. The IMS-STP Supervision System, fully funded by GVG at the cost of an initial investment of USD 12,645,000 **[Exhibit C-43]**, enabled the State to invoice on the basis of the minutes captured by the said System for the period from September 2009 to September 2015 (date of GVG's departure from Guinea) gross revenues of USD 212,260,733.53 and net of USD 149,328,320.84 **[Exhibit C-49; Summary and Response Memorandum ¶¶524-528].**

251. In addition, the Respondents have themselves recognized the perfect performance by GVG of its contractual obligations on numerous occasions and in several forms: first by mail **[Exhibits C-44; C-45; Summary and Response Memorandum ¶¶508-509]**; by an official attestation on the skills and technical expertise of GVG **[Exhibit C-5; Summary and Response Memorandum ¶510]**; through the involvement of GVG in events organized for the promotion of the telecommunications sector in Guinea to present and promote the STP Project **[Exhibit C-48; Summary and Response Memorandum ¶511].**

252. Upon the arrival of Mr. Diaby as Director General of the PTRA in March 2011, he ceased, upon his arrival, the settlement of invoices issued by GVG, alleging in particular a non-compliant execution of GVG within the framework of the STP Project. In this context, the Minister invited GVG to participate in a technical evaluation from April 12, 2011 **(Mid-term review) [Exhibit C-28; Summary and Response Memorandum ¶¶60-61; 515].**

253. The Mid-term review lasted from April 2011 to May 2012 and was jointly conducted by the parties. The Performance Report of May 11, 2012 **[Exhibit C-6]** attests to the perfect execution of the Partnership Agreement by GVG, as well as additional requests from the Respondents that GVG agreed to satisfy **[Summary and Response Memorandum ¶¶65-74; 516-523].**

*V.1.a.(iii).    The alleged breaches of GVG as alleged by the Respondents*

254. On the technical points raised by the Respondents as being breaches by GVG of its contractual obligations, GVG pleads the following:

255. GVG's technical assistance in establishing the regulatory framework was fully provided by GVG and enabled the implementation of the IMS-STP supervision system within the 90 days provided for under the terms of the Order **[Summary and Response Memorandum ¶¶474-475].**

256. The IMS-STP supervision system was fully implemented in August 2009 and became operational from September 2009. From that date, the viewing and invoicing of all incoming

international traffic was effective, which is not disputed by the Respondents **[Summary and Response Memorandum ¶¶476–477]**. The Respondents' criticisms of the lack of supervision of "on-net" traffic (that is to say, where calls are made in an carrier's network without interconnection with another carrier) are without subject, "on-net" traffic not being part of the Agreement **[Summary and Response Memorandum ¶478].**

257. In accordance with its obligations under the Agreement, GVG installed a first set of tools to measure the quality of service of carriers in the IMS-STP supervision system, which worked perfectly from the start-up of the STP project in September 2009.

258. The progress report on the Action Plan decided in August 2011 (dated November 2, 2011) confirms on page 2, point 2, that the tool is available and operational **[Exhibit R-7; T1/63:1–15].** This tool allowed the collection of QoS service data on interconnections carrying international traffic flows.

259. With the arrival of Mr. Diaby, the new administration of the PTRA indicated that it interpreted this commitment as relating to the provision of a separate QoS control system for all the telecommunications carrier networks in Guinea. Since the parties could not reach an agreement on this question of contractual interpretation, GVG agreed to acquire and install a new QoS system at its own expense for an amount of USD 2.4 million even though it considered that this request coming from the Respondents exceeded the framework of its contractual obligations under the terms of the Agreement **[Summary and Response Memorandum ¶¶479–483]**. This second tool was indeed supplied and installed as evidenced by the acceptance report of February 22, 2012 **[Exhibit C-65]** and the Performance Report of May 11, 2012 **[Exhibit C-6]**.

260. The implementation and perfect operation of the applications integrating the CDR collection mechanism and the production of invoices is amply demonstrated by the fact that the Respondents were able to collect revenues from September 2009 and throughout the period of their relations with GVG without any interruption, which has never been disputed by the Respondents. The failure to set up a CDR comparison tool, criticized today by the Respondents, was not part of the Agreement. It concerns national traffic and the new GVG offer including the installation of a passive solution **[Summary and Response Memorandum ¶¶484–486]**.

261. The 2009-2014 IMS Project Status Report indicates that the IMS-STP supervision system prevented the fall in tariffs, allowing the State to collect new income as indicated in the IMS Project Report 2009-2014 **[Exhibit C-4; Summary and Response Memorandum ¶¶487–488].**

262. The training plan for PTRA staff drawn up by GVG was to be established over the entire contractual period in order to allow a gradual transfer of skills and the PTRA agents' management of the operation of the IMS-STP Supervision System upon expiration of the Agreement. This training began as early as 2010, as GVG gave priority during the first months of operation to setting up the technological infrastructure and stabilizing its operation, as well

as to delivering the accurate data required by the State. Between May 2010 and August 2012 GVG provided 7 training courses, the detailed list of which is provided in the Project Status Report **[Exhibit C-4]**. The Performance Report **[Exhibit C-6]** also notes that the training plan was satisfied by GVG with the exception of two training sessions scheduled for May and June 2012 and provided on these dates. The training plan accepted by GVG in March 2014 constitutes a new obligation which could not be executed due to the improper termination of the contractual relations by the Respondents **[Summary and Response Memorandum ¶¶489-495]**.

263. The anti-fraud system was implemented during the installation of the IMS-STP supervision system in September 2009. Its objective was the detection, identification and disconnection of fraudulent numbers used to route illegal international traffic to Guinean carriers. GVG's obligation was to install this fraud detection and data supply system to the PTRA, which then had to coordinate with the carriers to dismantle the routes taken by fraudulent calls by removing the SIMs concerned. From September 2009 to May 2014, this anti-fraud system allowed the detection of 186,490 fraudulent lines as indicated in the Report **[Exhibit C-4]**. The Performance Report, for its part, did not note any comments regarding the anti-fraud system. During the discussions between the parties leading to the Action Plan decided in March 2014 **[Exhibit C-9]**, GVG undertook to provide a "SIM Box Locator" at its own expense. The Respondents do not dispute that this is a new commitment by GVG outside the Partnership Agreement. In any event, the table annexed to the Action Plan decided in March 2014 mentions that the lack of efficiency observed was due to the delay in the systematic disconnection of fraudulent numbers by carriers, the responsibility for the dismantling of which lies with the PTRA **[Summary and Response Memorandum ¶¶496-500]**.

264. The Performance Report describes the perfect performance by GVG of its obligations in respect to the maintenance of installations and equipment **[Summary and Response Memorandum ¶¶501-503].**

265. The Performance Report **[Exhibit C-6]** notes that the financing of the acquisition of radio frequency spectrum management has been completed to the satisfaction of the parties by means of a financial agreement, according to which the Respondents decided to acquire the spectrum monitoring tool themselves, GVG reimbursing its price up to USD 2.35 million **[Exhibit C-6; T1/63 17-23; Summary and Response Memorandum ¶¶504-507].**

*V.1.a.(iv). Services provided outside the Partnership Agreement*

266. GVG recalls that it has not only perfectly fulfilled its obligations contained in the Partnership Agreement but has also agreed to provide certain additional services at its own expense **[Summary and Response Memorandum ¶¶60; 67; 85; 529]:**

    a.   The financing of two vehicles dedicated to the STP Project;

    b.   Upgrading electrical installations;

    c.   Payment of the Internet connection and colocation charges for the IMS-STP 2 platform at Cellcom;

    d.   The installation of a second QoS tool at a cost of USD 2.4 million at the Respondents' request;

    e.   The transfer of the IMS-STP 2 platform from Cellcom to Orange;

    f.   Installation of a SIM Box location system;

    g.   Study and submission of technical offers for a passive mode supervision system, as well as a system for controlling pricing and revenues from "Airtime" sales.

### *V.1.a.(v). The Respondents' non-resolution of the Agreement*

267. The Respondents have never implemented, nor have they ever intended to implement, the resolutory clause of the Agreement by operation of law under Article 5 thereof, which provides that "*[i]n the event of a breach by one of the Parties of any of its obligations under this Agreement which is not remedied by the defaulting Party within a period of one month from the date of the initial receipt of a registered letter with acknowledgement of receipt sent by the complaining Party providing notice of the breaches in question, this Agreement shall be terminated by operation of law, without prejudice to any damages that may be claimed from either of the Parties.*" **[Exhibit C-1; Summary and Response Memorandum ¶¶549-552].**

268. The Respondents have never had any real reason which could have justified a termination of the Agreement. In fact, no termination of the Agreement has ever taken place. The Respondents simply ceasing to settle the invoices issued by GVG as of May 2014. The very behavior of the Respondents, who by way of example requested a technical-commercial proposal from GVG by letter dated May 15, 2015, is incompatible with that of a party who considers that its co-contractor has failed in his obligations **[Exhibit C-12; Summary and Response Memorandum ¶553].**

269. It is by their letter dated August 6, 2015 that the Respondents indicate for the first time their desire to put an end to their contractual relations with GVG because of their dissatisfaction on the technical and relational level. However, this letter does not correspond to the notification required by Article 5 of the Agreement **[Summary and Response Memorandum ¶555]:**

    a.   It is not a registered letter with acknowledgment of receipt;

    b.   The alleged breaches of contract are not mentioned for the purpose of redress, the letter merely announces the end of the contractual relationship in May 2014;

    c.   The letter does not explain the reasons for stopping payment of GVG's invoices;

      d.   No mention is made of termination for poor performance.

*V.1.a.(vi). Non-suspension of contractual relations*

270. The Respondents invoke the suspension of the Agreement in accordance with its Article 9, which provides that "*Each of the Parties may, without prejudice and without compensation to the other Party, suspend the performance of the Agreement (...) in the event that the performance of the Agreement is likely to result in the violation of a law or any other equal provisions in force.*"

271. However, the Respondents make no mention of Article 9 of the Agreement or of an alleged violation of the PPC in their letter dated August 6, 2015, and for good reason, since they considered that the Agreement had ended in May 2014. The Partnership Agreement has therefore not been suspended **[Summary and in Response Memorandum ¶¶557-561].**

## V.1.b.  The Respondents

272. In the alternative to their action for the nullity of the Agreement, the Respondents plead for the termination of the Agreement at the fault of GVG for improper performance of its obligations.

273. The Respondents rely on the PTRA's letter to GVG of August 6, 2015 **[Exhibit C-6]** stating that GVG's services were insufficient under the Agreement **[Statement of Rejoinder ¶497]**.

274. Difficulties related to the performance of its obligations by GVG have necessitated on two occasions, in 2011 and 2014, an assessment by the PTRA of GVG's performance of its obligations in respect of the Agreement **[Statement of Rejoinder ¶498].**

275. On February 4, 2011, the PTRA sent GVG a termination notice **[Exhibit R-6]**, which was followed by an evaluation procedure **[Statement of Rejoinder ¶499].**

276. On November 3, 2011, the PTRA and GVG signed a first report specifying the actions and commitments taken to finalize the outstanding points relating to the local installation of applications and supervision tools; measuring the quality of service; the spectrum management system; and the solution for the migration of national traffic. These shortcomings related to essential elements of the Partnership Agreement, which had been concluded to allow the PTRA to have the appropriate technological means to cross-check the carriers' tax returns and to better understand the new technologies relating to interconnection of carriers **[Exhibit R-7; Statement of Rejoinder ¶¶500-501].**

277. The report of May 11, 2012 pointed to performance difficulties on the quality of service, the system still not being operational nearly three years after the signing of the Agreement, and training having been postponed. It was found that prior to the evaluation leading to this report, the PTRA staff had not received the necessary training and that GVG had full control over the operations. GVG had not provided the PTRA with the means of assessing the quality of service of each carrier, nor had it financed the acquisition of equipment for monitoring and

managing the radio-frequency spectrum, contrary to its commitments **[Exhibit C-6; Statement of Rejoinder ¶502].**

278. A new evaluation was conducted in 2014, and an Action Plan established on March 26, 2014 **[Exhibit C-9]**. To this plan were added PTRA's observations to GVG on the difficulties in carrying out GVG's obligations **[Exhibit R-8; Statement of Rejoinder ¶503].**

279. This shows that, almost five years after the conclusion of the Partnership Agreement, GVG still had not fulfilled a number of its obligations, in particular **[Statement of Rejoinder ¶504]:**

   a. The obligation to supply and install control tools which had only been partially fulfilled, the system not supervising on-net traffic;

   b. The obligations to provide the means to assess the quality of service of each carrier, the means to monitor the flow of local telephone traffic and the balances due between local carriers, which were not met until 2012;

   c. The obligation to provide the tools necessary for the production of international interconnection invoices to each carrier, which was only partially carried out. GVG had to put a tool in place to give more visibility on the comparison of CDRs, which was not done;

   d. GVG neglected the objective of fighting fraud. The volume of fraud detected by the new geolocation tool, which was intended to locate Simboxes, turned out to be lower than the volume of fraud detected by each of the carriers present on the market who had developed their own tool. The system developed by GVG did not include functionality allowing the detection of fraudulent numbers, which was the ultimate goal of the fight against fraud. GVG's negligence had significant financial repercussions for the PTRA, GVG itself having estimated the loss of revenue due to fraud for the Guinean State and carriers at USD 23 million **[Exhibit C-4]**;

   e. GVG overcharged its equipment and services, in particular the SS7 probes;

   f. The training of PTRA staff, one of GVG's obligations under the Partnership Agreement, was carried out with much delay. In 2014, PTRA staff had still not obtained access to the system that would have enabled them to track incidents.

280. This led the PTRA to recall, in its letter dated August 6, 2015 **[Exhibit C-15]**, the following points **[Statement of Rejoinder ¶505]**:

   a. 9 of GVG's 14 obligations under the Agreement were not fulfilled or were fulfilled late;

    b.    Several intermediate Action Plans were drawn up, but the majority of the points remained without tangible results;

    c.    After acknowledging the unfair nature of the financial clauses of the Agreement, GVG's remuneration was reduced;

    d.    GVG overcharged or attempted to overcharge the prices of equipment and services;

    e.    GVG refused to integrate the PTRA's technicians into actual operations and maintenance activities;

    f.    No serious offer from GVG was received to switch from an intrusive to a passive system, despite requests from the PTRA to this effect since 2012;

    g.    GVG was very far from its objectives for the fight against fraud, the software was not received until 2014.

281. The Respondents request the Arbitral Tribunal to declare the ipso jure termination of the Partnership Agreement **[Statement of Rejoinder ¶¶524-525]**.

282. GVG also displayed disloyalty in the performance of its services, its behavior showing that it was part of a fraud scheme. This behavior is so serious as to justify the termination of the contractual relations to the detriment of GVG, as notified by PTRA. GVG cannot claim any compensation for the period after said termination **[Statement of Rejoinder ¶523]**.

283. In the alternative, the Respondents plead for the suspension of the contractual relations under Article 9 of the Agreement, according to which "*Each of the Parties may, without prejudice and without compensation to the other Party, suspend the performance of the Agreement (...) in the event that the performance of the Agreement is likely to result in the violation of a law or any other similar provisions in force.*"

284. The suspension of contractual relations took place because the Agreement was signed in violation of the PPC, because it was obtained by means of a corruption pact, and in any case, because of the very terms of the PTRA's letter of August 6, 2015. **[Exhibit C-15; Statement of Rejoinder ¶¶538-541].**

## *V.2. Analysis*

285. On the question of the performance by GVG of its contractual obligations, the Arbitral Tribunal finds at first sight that, as it recalled earlier, the Respondents do not dispute that the IMS-STP Supervision System provided by GVG has allowed the Guinean State to invoice, on the basis of the minutes captured by the said System for the period from September 2009 to September 2015 (date of GVG's departure from Guinea), gross revenues of USD 212,260,733.53 and net of USD 149,328,320.84 **[Exhibit C-49].**

286. For the Tribunal, these instructive results clearly demonstrate that the System provided by GVG under the Agreement was in working order during the entirety of this period and that it met the contractual requirements for control and supervision of incoming international traffic, optimization of the tax revenues generated by this traffic and the endowment of tools and technological means necessary for the management by the State of this traffic, stipulated in the Agreement.

287. The Arbitral Tribunal then notes that, as explained by Mr. Touray during his hearing **[T3/240]**, it is not only common practice but sound management that a project of the scope of the STP Project, taking place over a number of years and containing a significant element of innovation, is subject to *ad hoc* updates (in particular by means of evaluations such as the Mid-term review) in order to verify that the objectives are met and if needs evolve, and to make the necessary corrections.

288. It is from this angle that the Arbitral Tribunal sees the Mid-term review and the Report resulting therefrom, and not as proof of contractual breaches on the part of GVG of such gravity that they can justify termination of the Agreement, all the less since the Report states the Respondents' satisfaction on several points of verification.

289. It is also important to stress that some of the points raised in the Mid-term review concerned national and non-international traffic **[Summary and Response Memorandum ¶518]**. The 2009-2014 Project Status Report **[Exhibit C-4]** and the March 2014 Action Plan, which focuses almost entirely on domestic traffic **[Exhibit C-9]** also support the conclusion that GVG has properly implemented its commitments.

290. It follows that, to the extent that the Respondents may have had certain criticisms to make regarding the progress of the Project, these criticisms never led to and were not likely to lead to the termination of the Agreement. The evidence on file establishes that solutions were discussed and implemented by the Parties such that the System continued to meet the objectives of the Agreement, to be operational and to generate significant revenues for the State, until the departure of GVG.

291. Furthermore, the Respondents never denounced the Agreement, whether on the basis of breaches by GVG of its contractual obligations or for another reason, as confirmed by Mr. Diaby and Ms. Kaba at the hearing **[Mr. Diaby T2/150:27-155:21; Ms. Kaba T3/263:19-26; 278:33-35-279:3].**

292. Finally, the Respondents' letter of August 6, 2015 could not have effected the suspension of contractual relations under Article 9 of the Agreement, as this letter did not mention such suspension, as the Respondents stated in any event that they considered that the Agreement had ended in May 2014.

293. For the reasons set out above supporting the conclusions of the Arbitral Tribunal concerning the absence of violation of the PPC and the absence of evidence of corruption, there was no further suspension of the contractual relations on these bases.

294. The Arbitral Tribunal is therefore of the opinion and rules that there is no basis for concluding that GVG has breached its contractual obligations or that there has been a valid termination of the Agreement. The termination of the Agreement by the Respondents is therefore unfounded and improper. Consequently, the Tribunal also rejects the Respondents' alternative claim for payment of USD 10,000,000 for improper performance by GVG of its obligations.

## VI.    VALIDITY OF THE AMENDMENT OF JULY 6, 2009 AND OF THE ADDENDUM OF JULY 10, 2012

### *VI.1. Summary of the parties' positions*

### VI.1.a. GVG

295. Article 2 of the Partnership Agreement provides that it is entered into for an initial period of 5 years, automatically renewable for two years: "*This Agreement is entered into for an initial period of sixty (60) months from the date of signature by the two parties. The Agreement is automatically renewable for a successive period of 2 years unless expressly terminated in writing by either party within 12 months before the end of the Agreement*" **[Exhibit C-1].** It follows that under the Partnership Agreement, it was to be renewed at the end of the initial contractual period of 5 years (May 22, 2014), unless expressly terminated, addressed in writing by one of the parties to the other party 12 months before the contractual term, i.e. no later than May 22, 2013 **[Summary and Response Memorandum ¶¶44–45; 531].**

#### *VI.1.a. (i). The Amendment*

296. The initial duration of 5 years was extended by an additional 12 months by agreement of the parties under the terms of the Amendment of July 6, 2009, in return for the financing by GVG of USD 1.2 million for the construction of a building "*intended to house the equipment objects* [of the Agreement]*, part of its personnel as well as any other equipment belonging to it or belonging to the Ministry of Telecommunications and New Information Technologies.*" **[Exhibit C-3**]. Consequently, the initial term of the Agreement was extended from May 22, 2014 to May 22, 2015 **[Summary and Response Memorandum ¶¶47–48]**.

297. Article 3 of the Amendment providing that the other provisions of the Agreement would remain "*fully applicable*," the Agreement was to automatically renew on May 22, 2015 for a period of two years, unless either party expressly denounces it to the other party twelve months beforehand, that is to say no later than May 22, 2014. As no denunciation had been sent to GVG by that date, the Agreement was therefore extended until May 22, 2017 **[Summary and Response Memorandum ¶¶49; 531].**

298. GVG was financed by 12 monthly instalments of USD 100,000 over the course of one year (by way of deduction from the remuneration to be received by GVG under the Agreement, with the exception of the first instalment, which was the subject of a bank transfer from GVG, duly received by the Minister). **[Exhibit C-53; Summary and Response Memorandum ¶50].**

299. These payments by deduction of the invoices from GVG's shares were agreed between GVG and the Minister given the systematically delayed payment of said invoices **[Exhibit C-62; Summary and Response Memorandum ¶535].**

300. It is therefore indisputable that the Amendment was entered into between the parties and executed by GVG. The absence of an express mention of the monthly deduction of USD 100,000 from the invoices issued by GVG is not proof of the non-performance of the Amendment, the invoices strictly reporting only the income related to international traffic entering Guinea to serve as a basis for the State to calculate its own fees **[Summary and Response Memorandum ¶¶532-536].**

### VI.1.a.(ii). The automatic renewal of the Agreement

301. The Respondents contend that the implied renewal clause in the Agreement is illegal and that GVG is therefore prohibited from availing itself of the non-performance of the Agreement beyond its initial period. They plead the principle of French administrative law that "*the automatic renewal clauses contained in public procurement contracts*" are in principle illegal and that, consequently, "*no damage, and therefore no right to compensation, can be born, for the contracting partner of the administration, of the automatic renewal of a contract at the end of the initial duration agreed by the parties*." **[Exhibit CL-61; Summary and Response Memorandum ¶¶540-541].**

302. Even supposing that French administrative law would apply in this case, which is not the case, this illegality in principle does not include the automatic renewal clause here in question. The *Commune de Païta* jurisprudence **[Exhibit CL-62]** limits the illegality of the automatic renewal clauses to those contained in "*a contract which, by reason of its nature and amount, can be concluded only after the obligations of publicity and competitive tendering provided for by the applicable regulations have been complied with*," such clauses allowing the conclusion of a new contract without compliance with those obligations **[Summary and Response Memorandum ¶542].**

303. However, the Partnership Agreement can be legally concluded by mutual agreement, the automatic renewal clause is therefore legal, and with it the renewal of the contract resulting from its implementation, the conditions of mutual agreement having been fulfilled on the renewal date. In any event, even assuming that the automatic renewal or its implementation was illegal, jurisprudence considers that it is not an irregularity involving a defect of gravity as the judge should, as an exception to the requirement of loyalty in contractual relations, dismiss this new contract **[Exhibit CL-63; Summary and Response Memorandum ¶¶543-544].**

304. Finally, when, as an exception, the administrative judge dismisses a contract due to the illegality of its content or a particularly serious defect, thus refusing to settle the dispute on the contractual ground, the contracting partner of the administration retains the possibility of obtaining compensation on the basis of unjust enrichment and/or quasi-judicial administrative responsibility **[Exhibits CL-64, CL-65; Summary and Response Memorandum ¶545].**

*VI.1.a.(iii). The Addendum*

305. Since the beginning of the implementation of the STP Project, GVG had been experiencing difficulties in obtaining payment of its invoices, most of which had been paid late. This situation worsened particularly with the arrival of Mr. Diaby as Director General of the PTRA after the coming to power of President Alpha Condé, the Respondents simply ceasing to settle the invoices issued by GVG, while under Annex I to the Agreement, the quotas due on the international tariff were to be paid "*15 days after the due date and the receipt of the invoice*" by the Respondents **[Summary and Response Memorandum ¶¶61-62]**. Mr. Baker, in his attestation, explains that although GVG continued to provide services in accordance with its obligations under the Agreement, the Respondents' arrears amounted to more than USD 13 million **[Attestation no. 1 by Mr. Baker ¶¶39-41].**

306. Mr. Baker organized a meeting with President Condé in an attempt to resolve the situation. The President indicated that he would not hesitate to terminate GVG's contract if the latter did not meet Mr. Diaby's requests made following his instructions, and in particular to a substantial reduction in the claim and the share of GVG. It is in this context that GVG was forced to sign the Addendum **[Attestation by Mr. Touray 119; Summary and Response Memorandum ¶¶75-78].**

307. Under the Addendum **[Exhibit C-7]**, the Respondents acknowledge that "[GVG] *has carried out the Action Plan agreed between the parties relating to the obligations mentioned in the "PERFORMANCE REPORT ON CONTRACTUAL OBLIGATIONS BETWEEN GVG AND THE PTRA, DATED May 14, 2012*'". They acknowledge their duty to GVG **[Summary and Response Memorandum ¶81]:**

    a.    The sum of USD 13,237,182.60 for "*invoices accumulated from September 2009 to December 31, 2011*";

    b.    The sum of USD 2,206,906 for the "*balance of the share of international traffic in Sotelgui*" for the period from September 2009 to December 31, 2011.

308. Despite the Respondents' acknowledgments, GVG had to agree to reduce the PTRA's debt from USD 13,237,182.60 to USD 2 million; renounce the income corresponding to the remainder of the share of Sotelgui's international traffic, ie USD 2,206,906; and reduce the fees to be paid by PTRA to GVG under the Agreement from USD 0.07 to USD 0.025 per minute of international incoming call retroactive to April 1, 2011 **[Summary and Response Memorandum ¶82].**

309. In return for these very important concessions, GVG requested Mr. Diaby to undertake the terms of the Addendum to extend the Agreement for two more years. Mr. Diaby indicated that he could not commit himself in writing without the President's instructions, but he promised that the Agreement would not be terminated 12 months before the expiration (May 22, 2014) and would be renewed for a further two years after the expiration (May 22, 2017) **[Summary and Response Memorandum ¶83].**

310. The substantial waivers on the part of GVG were therefore agreed without any real counterpart on the part of the Respondents (apart from a general reference to the "*strengthening of the partnership*" between the parties), in the sense that the duration of the Partnership Agreement (which extended at the time of the signing of the Addendum until May 22, 2015 with the possibility of automatic renewal of 2 years) had not been contractually extended in order to guarantee GVG additional revenues **[Summary and Response Memorandum ¶¶575-580].**

311. Consequently, and with regard to Articles 643, 649 and 664 of the Guinean Civil Code, GVG's obligation to consent to the reductions and renunciations imposed by the Respondents is devoid of cause and therefore null and the obligation of the Respondents to "strengthening the partnership" is just as void, for lack of purpose **[Summary and Response Memorandum ¶¶581-596].**


**VI.1.b. The Respondents**

*VII.b.(i).    The Amendment*

312. The Amendment does not appear in the archives of the PTRA, which received a copy of it through its exchanges with GVG in 2014 **[Exhibit R-2]**. The Amendment was also never executed by GVG, the accounting documents of the PTRA showing no deduction on GVG's

invoices from September 2009 to September 2010. The question of the validity of the Amendment therefore arises **[Exhibits R-3, R-4, R-5; Statement of Rejoinder ¶¶58-64].**

*VI.1.b.(ii). Illegality of the automatic renewal clause*

313. The Respondents having amply demonstrated that the Agreement cannot constitute a contract by mutual agreement, it follows that the automatic renewal clause cannot escape its congenital illegality resulting from non-observance of the rules governing the awarding of public contracts **[Statement of Rejoinder ¶¶509-515].**

314. As for the possibility of GVG obtaining compensation on the basis of quasi-contractual or quasi-tort liability, if this can exist in theory, this course of action is drastically closed as soon as the contracting party is guilty of acts likely to vitiate the administration's consent **[Exhibit RL-47]**. This remedy is also closed to the contracting party who is guilty, prior to the conclusion of the contract, of fraudulent acts tainting the fraudulent contract, such as the corruption pact **[Exhibits RL-57, RL-58; Statement of Rejoinder ¶¶516-519].**

315. In any event, if the Tribunal were to decide that GVG was justified in seeking compensation in the quasi-tort field, it would be appropriate, in assessing this compensation, to take into account the fault attributable to GVG, which could not ignore the need to initiate a publicity and competitive bidding process. It is also important to remember that Guinean law does not recognize any possibility of a public person being challenged by his or her contracting partner in the event of a violation of the PPC **[Statement of Rejoinder ¶¶520-522].**

*VI.1.b.(iii). The Addendum*

316. Following the Contractual Obligations Performance Report **[Exhibit C-6]**, the parties signed the Addendum, GVG agreeing to reduce its alleged claim on the PTRA for the services allegedly rendered since the conclusion of the Agreement from USD 13 million to USD 2 million. In doing so, GVG agreed to reduce the price of its services by approximately 85%. For the future, GVG agreed to reduce the price of its share by approximately 65% **[Statement of Rejoinder ¶¶90-92].**

317. The Addendum never constituted anything other than a price revision agreement, therefore an act modifying the contract, and not a transaction which, according to GVG, would be void for want of providing for reciprocal concessions. If the Agreement and the Amendment were not canceled, the Addendum would necessarily apply, and GVG's claims for damages based exclusively on the Agreement would be dismissed **[Statement of Rejoinder ¶¶542-549].**

318. At no time did the President of the Republic of Guinea interfere in the negotiations of the Addendum, and at no time was an extension of the duration of the Agreement promised by the PTRA as part of the negotiations. If the new distribution proposed by the PTRA was not appropriate to GVG, it could choose to terminate the Agreement, and especially as the amount of its initial investment, valued at USD 7.5 million under the Order **[Exhibit C-2]** had largely paid for itself at the time. In reality, the new distribution provided for in the Addendum still

allowed GVG to collect a comfortable margin, failing which it would not have accepted it **[Statement of Rejoinder ¶¶454-455].**

## *VI.2. Analysis*

319. The positions of the Parties can therefore be summarized as follows: GVG requests (i) confirmation of the validity of the Amendment; and (ii) the nullity of the Addendum. The Respondents argue of (i) the inexistence/non-performance/invalidity of the Amendment; and (ii) in the alternative, the validity of the Addendum (primarily, the invalidity of the Agreement resulting in the nullity of the subsequent agreements.

### VI.2.a. The Amendment

320. With regard to the validity of the Amendment, the Tribunal first notes that the Amendment bears the signature of Mr. Camara on behalf of the PTRA, this signature also appearing on the Partnership Agreement.

321. The Arbitral Tribunal also notes that the Respondents claim that the validity of the Amendment is questioned on the following two bases: (i) they did not have a copy of the Amendment in their archives; and (ii) the invoices issued by GVG do not show deductions of USD 100,000 per month for one year.

322. None of this contradicts the fact that the building which is the subject of the Amendment was constructed, which the Respondents do not dispute **[Attestation no. 1 by Mr. Baker ¶¶37-38]**. It is reasonable to conclude that the building was indeed financed by the deductions reported by GVG. The Tribunal adds that the Respondents do not prove that the Addendum would be a forgery and that relying on the fact that they would not find any trace of it in their archives does not in any way constitute proof.

323. Consequently, the Arbitral Tribunal sees no reason to doubt the validity of the Amendment or its execution, and accepts that by its terms the duration of the Partnership Agreement has been extended by one year, therefore until May 22, 2015.

### VI.2.b. Automatic renewal

324. On the question of the validity of the automatic renewal clause, the Arbitral Tribunal notes that the position of the Respondents amounts to seeking the annulment of the said clause on the basis of the absence of a call for competition under the PPC, despite the fact that neither

the Partnership Agreement, nor the Subah contract which was concluded in replacement of the Agreement, included a call for competition or a request for proposals. This being the case, it is difficult to conceive on what basis the sole operation of the automatic renewal clause should be subject to such a condition on pain of cancellation, as an exception to the requirement of loyalty in contractual relations. The Respondents have not provided any clarification on this subject.

325. The Respondents based part of their arguments on French administrative law **[Statement of Rejoinder ¶511 et seq.]** which the Claimant itself considered in the alternative **[Summary and Response Memorandum ¶541 et seq.]**; the Tribunal will refer to it for this reason. The Tribunal takes note of the case-law of the French State Council according to which, even supposing that the Agreement falls under the aegis of the PPC and that the automatic renewal clause or its implementation was unlawful, that is not an irregularity involving a defect of such gravity that the Tribunal should, by way of exception to the requirement of fairness in contractual relations, set aside the new contract for the settlement of the present dispute **[Exhibit CL-63].**

326. The Arbitral Tribunal accepts from this jurisprudence the importance given to the principle of fairness of contractual relations in the assessment of the elements of the dispute, as notably stated in the *Commune de Béziers* judgment **[Exhibit CL-50]** in these terms: "*Considering, first of all, that the parties to an administrative contract may bring an action of full judicial review challenging the validity of the contract which binds them; that it is then for the court, when it notes the existence of irregularities, to assess their importance and consequences, after having verified that the irregularities relied on by the parties are those which they may, having regard to the requirement of fairness of contractual relations, invoke before it; that it is for the court, after having taken into consideration the nature of the illegality committed and having regard to the objective of stability of contractual relations, either to decide that further performance of the contract is possible, possibly subject to regularization measures taken by the public entity or agreed between the parties, or to pronounce, where appropriate with deferred effect, after having ascertained that its decision will not unduly prejudice the public interest, the termination of the contract or, solely because of an irregularity invoked by one of the parties or of its own motion, relating to the unlawful nature of the content of the contract or to a particularly serious defect relating in particular to the conditions under which the parties gave their consent, the annulment of the contract; Considering, secondly, that, where the parties submit to the court a dispute relating to the performance of the contract binding them, it is in principle incumbent on the court, having regard to the requirement of fairness in contractual relations, to enforce the contract; that, however, only if it finds an irregularity invoked by one of the parties or discovered by it of its own motion, relating to the unlawfulness of the content of the contract or to a particularly serious defect relating in particular to the conditions under which the parties gave their consent, it must set aside the contract and cannot settle the dispute on the contractual ground.*"

327. The Arbitral Tribunal, in its assessment of the elements of the present dispute, holds that, even assuming that the competitive process required by the PPC would apply in the present case, the absence of competition, both for the award of the Agreement itself and for the award of the Subah contract, is not relevant, as well as the Respondents' silence as to the need for such a competitive process throughout the contractual relationship with GVG and until the commencement of the arbitration proceedings, are elements which militate in favor of compliance with the requirement of fairness in the contractual relationship. The Tribunal adds that in the absence of corruption as judged above, the Respondents have not established that the Agreement is vitiated by a "*defect of particular gravity relating in particular to the conditions in which the parties have given their consent*" justifying the rejection of the contract.

328. Consequently, the Arbitral Tribunal rules that the Partnership Agreement has been validly renewed for a period of two years until May 22, 2017.


**VI.2.c. The Addendum**

329. On the question of the nullity of the Addendum for want of cause, the Arbitral Tribunal notes that the text of the Addendum qualifies it as being an "*amendment*" modifying the contracts concluded between the parties which "*remains from now on the law of the parties on all the modified clauses*".

330. The Arbitral Tribunal therefore considers the Addendum as a price revision agreement, an amendment to the contract, and not a transaction which would be void for want of providing for reciprocal concessions.

331. As for the signing of the Addendum under duress, the Arbitral Tribunal notes that this signing took place at a time when relations between GVG and PTRA were tense and in a context where the invoices unpaid by the PTRA accumulated from the start of the Project up to more than USD 13 million. Evidence on file indicates that GVG made the decision to accept a revision of the financial terms of the Agreement on a commercial basis in order to manage PTRA's debt and to find common ground on the distribution key, with a view to avoiding termination of the Agreement and allowing the Project to continue **[Mr. Baker T2/189:5-24].**

332. For the Arbitral Tribunal, the renegotiation of an agreement under the threat of termination constitutes a situation which, however unpleasant it may be, is part of the risks of a company such as the STP Project, and not a constraint likely to invalidate the Addendum. Even supposing that GVG had no real choice but to sign this Addendum, the fact remains that GVG then executed it and that it avails itself of it several times in its pleadings **[see for example Summary and Response Memorandum 63, 73, 81, 91].**

333. The Tribunal rules that the Addendum is valid and that its terms apply.

## VII.    DAMAGES

### *VII.1. Summary of the parties' positions*

**VII.1.a.GVG**

334. On the basis of the nullity of the Addendum, and in application of Articles 682 and 683 of the Guinean Civil Code, GVG requests compensation for its damage (i) in respect of invoices paid at the rate of USD 0.025 per minute instead of USD 0.07; and (ii) for outstanding payments and outstanding invoices for the entire contractual period, at the same rate of USD 0.07 **[Summary and Response Memorandum ¶573].**

335. GVG also requests the reimbursement of all of its costs incurred during transactional negotiations **[Summary and Response Memorandum ¶574].**

336. For the period from September 1, 2009 to December 31, 2011, the Respondents acknowledged that, under the Addendum, they owed the sum of USD 13,237,182.60. The Respondents having paid the sum of USD 2 million under the Addendum, GVG requests payment of the remainder of USD 11,237,182.60 **[Summary and Response Memorandum ¶601].**

337. For the period from January 1, 2012 to May 31, 2015, GVG issued the following invoices, calculated on the basis of the rate of USD 0.025 per minute **[Exhibit C-52; Summary and Response Memorandum ¶602]:**

| | **2012** | **2013** | **2014** | **2015** |
|---|---|---|---|---|
| **January** | 699,333.26 | 679,322.13 | 653,615.30 | 587,012.44 |
| **February** | 657,990.38 | 617,900.41 | 566,389.51 | 562,937.85 |
| **March** | 665,059.77 | 708,897.68 | 620,035.82 | 637,386.28 |
| **April** | 646,679.97 | 640,937.23 | 595,119.73 | 607,993.32 |
| **May** | 657,868.11 | 693,749.62 | 600,855.03 | 627,164.76 |
| **June** | 633,474.02 | 672,474.89 | 576,601.52 | |
| **July** | 684,302.42 | 707,420.43 | 583,408.14 | |
| **August** | 676,922.91 | 730,493.18 | 540,232.59 | |

| | | | |
|---|---|---|---|
| **September** | 638,619.62 | 658,114.68 | 519,623.83 |
| **October** | 669,060.40 | 695,592.33 | 522,039.85 |
| **November** | 620,034.75 | 628,370.46 | 486,305.59 |
| **December** | 671,471.78 | 658,524.42 | 573,735.36 |
| **TOTAL** | **7,920,817.39** | **8,091,797.46** | **6,837,962.27** | **3,022,494.65** |

338. For this period, a distinction must be made between two periods **[Summary and Response Memorandum ¶603]:**

    a. From January 1, 2012 to May 31, 2014, the invoices issued according to the above table were settled on the basis of the Addendum rate (USD 0.025). GVG requests the difference between this rate and the rate of USD 0.07 agreed under the Agreement;

    b. From June 1, 2014 to May 31, 2015, the invoices issued according to the above table remained unpaid. GVG requests payment of these invoices, but at the rate of USD 0.07 per minute.

339. For the period from January 1, 2012 to May 31, 2014, GVG invoiced the total amount of USD 19,048,630.24, applying the rate imposed by the Respondents of USD 0.025. GVG today requests, on the basis of the invoices paid for the said period, the difference between the total amount thus invoiced and the amount which should have been invoiced under the tariff initially provided for, namely USD 0.07 (USD 53,336,164.67). Consequently, GVG claims damages for outstanding payments for the period from January 1, 2012 to May 31, 2014 in the amount of USD 34,287,534 (USD 53,336,164.67 minus USD 19,048,630.24 already paid) **[Summary and Response Memorandum ¶604].**

340. For the period from June 1, 2014 to May 31, 2015, GVG invoiced, applying the rate imposed (USD 0.025) under the Addendum, the total amount of USD 6,824,441.28, which amount has never been settled by the Respondents. GVG today requests payment of its invoices, the amount of which should be recalculated by applying the rate initially agreed (USD 0.07), ie the sum of USD 19,108,436.28 **[Summary and Response Memorandum ¶605].**

341. Finally, and concerning the period from June 1, 2015 to May 22, 2017, during which GVG could no longer issue invoices, the Respondents having prohibited them from accessing the PTRA site where the IMS-STP 1 platform was installed, it claims damages for outstanding payments, the amount of which will be calculated on the average of the invoices it had previously established, as follows **[Summary and Response Memorandum ¶606]:**

    a. The average of a monthly invoice being USD 631,050.53 (the total invoice amount of USD 25,873,071.77 divided by the 41 months invoiced according to the table above);

b.  The daily average invoiced being USD 20,868 (the annual average invoiced in 2012, 2013 and 2014, i.e. the sum of USD 7,616,859, divided by 365 days);

c.  The Respondents, applying the tariff imposed on GVG under the Addendum (USD 0.025), owed the total amount of USD 14,973,258.19 for this period (USD 631,050.53 x 23 months, corresponding to the period from June 1, 2015 to April 30, 2017, or USD 14,514,162.19, to which should be added the sum of USD 459,096 corresponding to the period from May 1 to May 22, 2017, calculated by multiplying the daily average of USD 20,868 by 22).

342. However, and as explained above, due to the nullity of the Addendum, GVG claims for the period from June 1, 2015 to May 22, 2017, and therefore applying the initial rate of USD 0.07, the sum of USD 41,925,122.32 **[Summary and Response Memorandum ¶607].**

343. In summary, GVG claims, as outstanding payments by the Respondents for the entire contractual period, the following amounts **[Summary and Response Memorandum ¶608]:**

a.  USD 11,237,182.60, corresponding to the amount by which the Respondents' debt has been reduced under Articles 2 and C of the Addendum;

b.  USD 34,287,534, corresponding to outstanding payments during the period from January 1, 2012 to May 31, 2014, according to the table above indicating the monthly amounts invoiced by GVG (by applying the rate imposed at USD 0.025), recalculated by applying the rate initially agreed (USD 0.07);

c.  USD 19,108,436.28, corresponding to invoices unpaid by the Respondents during the period from June 1, 2014 to May 31, 2015, applying the rate initially agreed (USD 0.07);

d.  USD 41,925,122.32, corresponding to an estimate of the amounts due for the period from June 1, 2015 to May 22, 2017 (calculated on the basis of reported traffic and therefore the average of the amounts invoiced by GVG according to the table above), applying the rate of USD 0.07.

344. GVG therefore claims damages for outstanding payments for the entire contractual period in the total amount of USD 106,558,275.20 **[Summary and Response Memorandum ¶609]**.

345. GVG also requests, within the framework of the present proceedings, reimbursement of the costs which it had to incur during the process of contractual negotiations which were not successful, the Respondents having decided to award the contract to one of their competitors, with whom they negotiated in parallel. These costs are estimated at USD 150,000.00 **[Summary and Response Memorandum¶610].**

346. The Respondents will also be ordered to pay interest on arrears from August 2015 with capitalization on the above-mentioned amounts at the rate that will be deemed appropriate by the Arbitral Tribunal **[Summary and Response Memorandum ¶611].**

347. GVG also requests that the Respondents be ordered to pay all costs relating to the arbitration, including the fees and expenses of lawyers as well as the fees and expenses of any expert engaged by GVG in the context of these proceedings **[Summary and Response Memorandum ¶612].**

348. In its Post-hearing notes no. 1 and no. 2 **[¶52]**, GVG requests that the Respondents' *"unlimited bad faith,"* in particular in the context of corruption allegations, be taken into account in the calculation of its damages and invokes the terms of Article 684 of the Guinean Civil Code, to the effect that "*damages, distinct from those due for non-performance or delay in performance, may also be claimed in case of manifest bad faith of the debtor.*"

**VII.1.b. The Respondents**

349. Conversely, GVG must be condemned in the event of nullity to the restitution of the sums unduly collected, that is to say the sum of USD 48,093,160.00 to be completed, GVG being unable to derive any benefit from its own turpitude **[Post-hearing note no. 2].**

350. In the alternative, if the agreements invoked by GVG in support of its requests were not canceled, order GVG for wrong performance to pay damages in compensation for the damage suffered as a result of GVG's behavior for an amount of USD 10 million, to be completed **[Post-hearing note no. 2; Statement of Rejoinder ¶537].**

351. In any event, GVG's challenge to the morality of the PTRA and the Republic of Guinea cases, as well as GVG's numerous denigrating allegations against them in its pleadings, cause the Respondents to suffer substantial moral prejudice, which cannot be less than USD 100,000 for each of them **[Post-hearing note no. 2; Statement of Rejoinder ¶550].**

352. In addition, GVG's manifest fraud in Guinean public procurement regulations constitutes the one and only support for the claims made by GVG in the context of this arbitration procedure. This procedure is therefore undoubtedly abusive. The damage suffered by each of the Respondents cannot be estimated, having regard to the seriousness of GVG's behavior, to be less than USD 100,000 **[Post-hearing note no. 2; Statement of Rejoinder ¶551].**

353. In any event, GVG must be ordered to bear all of the costs relating to the arbitration, including the fees and expenses of lawyers and the fees and expenses of any expert appointed by the Respondents for the needs of this procedure.

354. GVG's latest request that the Arbitral Tribunal take into account the alleged bad faith of the Respondents in the calculation of the damages comes as no surprise. The same applies to the claim for compensation for costs incurred by GVG in the process of unsuccessful contractual

negotiations with the PTRA, while the Partnership Agreement, in its Article 6, excludes any compensation for indirect damage **[Post-hearing note no. 2 ¶ 61].**

355. Thus also, in the context of the economic crimes committed by GVG, of its main claim relating to the amount of the alleged outstanding payments during the contractual period, in addition to the default interest from August 2015 with capitalization of interest **[Post-hearing note no. 2 ¶ 62].**

## *VII.2. Analysis*

### VII.2.a. Outstanding payments for the contractual period

356. With regard to the conclusions of the Arbitral Tribunal in terms of the contractual liability of the Respondents, the validity of the Agreement, and that of the Amendment and the Addendum, and therefore in application of the binding force of the GVG's claim, that is to say, for the payment of invoices issued under the Partnership Agreement between September 1, 2009 and May 31, 2015 and remained unpaid, same as for the payment of the amounts that would have been invoiced for the period from June 1, 2015 to May 22, 2017 as damages.

357. These amounts will therefore be calculated at the Addendum rate, ie USD 0.025 per minute as from April 1, 2011 and not at the original rate of USD 0.07 per minute.

358. GVG's claim on this count is therefore upheld in the following terms:

    a. **The sum of USD 6,824,441.28**, corresponding to outstanding invoices by the Respondents during the period from June 1, 2014 to May 31, 2015, applying the rate of USD 0.025 under the Addendum;

    b. **The sum of USD 14,973,258.19**, corresponding to the estimate of the amounts due for the period from June 1, 2015 to May 22, 2017, applying the rate of USD 0.025.

359. The claim of USD 11,237,182.60, corresponding to the amount by which the Respondents' debt has been reduced under Articles 2 and C of the Addendum, is rejected; that of USD 34,287,534, corresponding to outstanding payments during the period from January 1, 2012 to May 31, 2014, recalculated by applying the rate of USD 0.07; and that of USD 41,925,122.32 corresponding to the estimate of the amounts due for the period from June 1, 2015 to May 22, 2017, applying the rate of USD 0.07.

360. The Tribunal also rejects GVG's claim for reimbursement of the costs estimated at USD 150,000.00 which it would have incurred during the process of contractual negotiations which were unsuccessful, this sum being neither explained nor justified, in principle or in amount.

361. As to GVG's request that the Respondents' "*unlimited bad faith*" under Article 684 of the Guinean Civil Code be taken into account in the calculation of its damages, to the effect that "*damages, distinct from those due for non-performance or delay in performance, shall be awarded, may also be requested in case of manifest bad faith on the part of the Debtor,*" the Arbitral Tribunal finds that it has not been substantiated, as GVG has neither quantified its request nor provided any authorities that could guide the Tribunal in its assessment of the financial measure of "*unlimited bad faith*" alleged against the Respondents. This request, insofar as it is upheld, is therefore rejected.

362. GVG claims **[Summary and Response Memorandum ¶611]** that the sums due be increased by "*interest on arrears from August 2015 with capitalization on the abovementioned amounts at the rate that will be deemed appropriate by the Arbitral Tribunal*". On this point the Respondents do not respond otherwise than by requesting a total rejection of GVG's requests, do not express themselves precisely on the starting point of interest and neither do they contest the power left to the Tribunal to fix the appropriate rate.

363. The Tribunal considers that the interest should run not from the time when the termination was considered to be abusive, i.e. August 6, 2015, as GVG wishes, but only from the date on which the Claimant gave notice to the Respondents to comply. It is indeed from the moment a party claims its rights that the delay in performance takes effect from the point of view of interest. However, in the absence of a specific formal notice, it is the legal claim, i.e. the Request for Arbitration, that is equivalent to a formal notice and this one is dated December 8, 2016, since it contains such a claim.

364. For the sake of completeness, the Tribunal notes that the solution it chooses corresponds to the provisions of Guinean law, chosen by the Parties as the applicable law, since Article 681 of the Guinean Civil Code[3] provides that interest accrued count from the formal notice and that Article 722 al. 2 of the same Code[4] considers (in relation to the penal clause, but in general terms) that the summons to appear in court is equivalent to a formal notice.

365. The sums due by the Respondents will therefore bear interest from December 8, 2016 and until full payment.

366. The parties have said little about the interest rate to be used. GVG leaves it to the discretion of the Tribunal, and the Respondents, who have not proposed an applicable rate, at no time having contested this discretion left to the Tribunal. The Tribunal therefore considers that the parties have abandoned to it the free determination of the rate to be used. The interest rate that seems reasonable to the Tribunal is that of 2%, which is slightly higher than the French legal rate (0.86%), but lower than the savings rate quoted on the website of the Guinean Central Bank (2.79%).

---

[3] Article 681 of the Guinean Civil Code: "*Damages due, for example, within the meaning of Article 673 above, can only be due after a formal notice has been given to the debtor to fulfil his or her obligation*".
[4] Article 722 al. 2 of the Guinean Civil Code:  "*A subpoena is equivalent to a formal notice*".

367. The Tribunal rejects the capitalization request, GVG not justifying the source in Guinean law chosen by the Parties, or even in "*the relevant commercial practice*," the application of which in this case could have been envisaged on the basis of Article 21(2) of the ICC Rules.

## D. THE ARBITRATION COSTS

### I.    SUMMARY OF THE PARTIES' POSITIONS

368. Under the terms of the note concerning its claim for the arbitration costs, GVG claims, supporting documents:

    a.   USD 452,500.00 for the provision paid to the ICC;

    b.   EUR 429,435.40 for the fees and disbursements of its external counsel and consultants in connection with the conduct of this arbitration;

    c.   EUR 14,836.00 for the logistics of the hearings (room rental, transcription, translation and meals);

    d.   EUR 23,391.16 for travel expenses relating to the hearings and preparation of witnesses and hearings;

    e.   7.5% of the amount of the future award representing the additional fees for GVG's counsel;

    f.   Interest on arrears capitalized quarterly on said sums at the rate that the Tribunal considers appropriate, from the date of the award until full payment.

369. GVG requests that the Tribunal, in its decision regarding the costs of the arbitration, take into account "*the procedural bad faith of the Respondents who delayed the constitution of the Arbitral Tribunal and the signing of the Terms of Reference; produced Professor Train's legal consultation in extremis; and produced new exhibits two days prior to the hearings, which resulted in the production of two Post-hearing notes whose contents, which should have been limited to the thirteen checks, were not respected by the Respondents*."

370. The Respondents, for their part, claim a total of EUR 919,800.57, with supporting documents, distributed as follows:

    a.   EUR 419,565.50 for lawyers' fees;

    b.   EUR 34,788.06 for costs and disbursements;

      c.   EUR 12,947.01 for client travel expenses;

      d.   EUR 452,500.00 for the ICC fees.

371. The Respondents add that they oppose with the most extreme vigor the granting of the additional fee claimed by GVG and that only costs incurred with certainty must be taken into account.

## II.    ANALYSIS

372. The Arbitral Tribunal notes that GVG prevails in these proceedings up to USD 21,797,699.47, or approximately 20% of its total claim which amounts to USD 106,558,275.20.

373. The Arbitral Tribunal also held that the Respondents' counterclaim for nullity was entirely inadmissible.

374. Consequently, the Arbitral Tribunal, pursuant to Article 37 of the Regulations and in the exercise of its discretion in apportioning the costs of the arbitration, rejects the Respondents' claim for their costs in this arbitration, and awards GVG's claim for costs up to 20% of its costs. The Tribunal specifies that the Court fixed the arbitration costs at USD 891,000.00.

375. In calculating the costs of GVG, the Arbitral Tribunal is entitled to the additional fee of 7.5% of the principal sums recovered, which it considers reasonable and standard practice for disputes of this nature. The Arbitral Tribunal calculates the additional fee at USD 1,634,827.46. Only 20% of this amount will be charged to the Respondents, i.e. USD 326,965.49.

376. The Arbitral Tribunal therefore partially grants GVG's claim for its costs and, by applying the rate of 20% to the sums in question, establishes the amount as follows:

      a.   USD 90,500.00 for the ICC fees;

      b.   EUR 85,887.08 for fees and disbursements;

      c.   EUR 2,967.20 for logistics costs;

      d.   EUR 4,678.23 for travel expenses;

      e.   USD 326,965.49 for the additional fee.

377. These sums will bear interest at the rate of 2% per year from the date of this Award, until full payment. The Arbitral Tribunal rejects the request for quarterly capitalization of interest for late payment for the reasons set out above with regard to the prejudice.

378. The decisions of the Tribunal relating to the allocation of defense and arbitration costs make it possible to take into consideration the weakness of some of the Respondents' arguments as well as their production in extremis of certain documents.

## E. COUNTERCLAIMS

379. As a result of that which has been decided on the main claims, the counterclaims are dismissed.

## F. THE DECISION

380. The Arbitral Tribunal, for the reasons set out above and after hearing the parties and deliberating, issues the following Final Award:

    a.   **RULES** that the arbitration clause contained in Article 17 of the Partnership Agreement is valid, **REJECTS** the Respondents' request for the cancellation of said arbitration clause, and therefore **REAFFIRMS** its *subject matter jurisdiction* to hear this dispute;

    b.   **RULES** that the two Respondents are parties to the Partnership Agreement, **RULES** that these proceedings have been validly constituted against the two Respondents, and therefore **REAFFIRMS** its personal jurisdiction to hear this dispute;

    c.   **RULES** that the Partnership Agreement is lawful and **REJECTS** the Respondents' counterclaims for the invalidity of the said Partnership Agreement as well as for restitution, damages and any other financial claim by the Respondents;

    d.   **RULES** that GVG has fulfilled its obligations with regard to the Partnership Agreement and that the Respondents have improperly terminated the said Agreement;

    e.   **RULES** that the Amendment and the Addendum are both lawful and have full effect;

    f.   **ORDERS** the Respondents to pay GVG the following sums as compensation for its loss, said sums bearing simple interest at the rate of 2% per annum as of December 8, 2016 and until full payment by the Respondents:

        (i).   **USD 6,824,441.28** corresponding to invoices outstanding by the Respondents during the period from June 1, 2014 to May 31, 2015, applying the rate of USD 0.025 under the Addendum;

        (ii).   **USD 14,973,258.19** corresponding to the estimate of the amounts due for the period from June 1, 2015 to May 22, 2017, applying the rate of USD 0.025;

    g.   **REJECTS** GVG's other claims;

h. **ORDERS** the Respondents to pay to GVG the following sums, said sums bearing simple interest at the rate of 2% per annum from the date of this Award until full payment by the Respondents:

    (i). **USD 90,500.00** for the ICC fees;

    (ii). **EUR 85,887.08** for fees and disbursements;

    (iii). **EUR 2,967.20** for logistics costs;

    (iv). **EUR 4,678.23** for travel expenses;

    (v). **USD 326,965.49** for the additional fee.

1. **REJECTS** the Respondents' claims relating to the costs of arbitration and defense.

Date: July 18, 2019

Jurisdiction of arbitration: Paris, France

Signature:

**Professor Charles Jarrosson**
(Co-Arbitrator)

**Carmen Núñez-Lagos, Esq.**
(Co-Arbitrator)

Sophie Nappert, Esq.
(President)