## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GLOBAL VOICE GROUP SA,

                    *Plaintiff*,
     v.

THE REPUBLIC OF GUINEA,

                    *Defendant*.

Civil Action No. 1:22-cv-02100

**EXHIBIT A (Part 3 – Pages 73-110) TO DECLARATION OF MARIANNE KECSMAR**

**CHAMBRE DE COMMERCE INTERNATIONALE**

**COUR INTERNATIONALE D'ARBITRAGE**

**(Règlement d'arbitrage CCI 2012)**

**Affaire no. 22467/DDA**

**ENTRE :**

GLOBAL VOICE GROUP S.A. (Seychelles)

**Demanderesse/**

**Défenderesse reconventionnelle**

Et

1.  AUTORITÉ DE RÉGULATION DES POSTES ET TÉLÉCOMMUNICATIONS DE LA GUINÉE (Guinée)
2.  LA RÉPUBLIQUE DE GUINÉE (Guinée)

**Défenderesses/**

**Demanderesses reconventionnelles**

---

**SENTENCE FINALE**

---

**Membres du Tribunal arbitral :**

Me Sophie Nappert (Président)

M. Le Professeur Charles Jarrosson (Co-Arbitre)

Me Carmen Núñez-Lagos (Co-Arbitre)

**Siège : Paris, France**

DANS LA PROCÉDURE OPPOSANT :

**Global Voice Group S.A.**, 1st Floor, #5 Dekk House, De Zippora Street, PO Box 456, Providence Industrial Estate, Mahé, République des Seychelles.

**Demanderesse / Défenderesse reconventionnelle**

Représentée par:

Me Marianne Kecsmar, avocat du cabinet Pellerin Kecsmar Mirza Avocats, 20, Rue des Pyramides 75001 Paris, France. Adresse email : marianne.kecsmar@pkm-avocats.com ;

et

Me Bassam Mirza, avocat au cabinet Pellerin Kecsmar Mirza Avocats, 11, Place de l'Étoile, Immeuble Wakf Al-Marouni, Beyrouth Centre-Ville 2011-8860, Liban. Adresse email : bassam.mirza@pkm-avocats.com ;

et

M. Bertrand Madsen, au cabinet Madsen Law P.C., 1115 Broadway, 11th Floor, New York, NY 10010. Adresse email: bmadsen@madsenlawpc.com.


À


**L'Autorité de Régulation des Postes et Télécommunications de Guinée**, Quartier Almamya, Commune de Kaloum, B.P: 1500, Conakry, République de Guinée.

et

**La République de Guinée**

**Défenderesses / Demanderesses reconventionnelles**

Représentées par:

Me Sena Agbayissah, avocat au cabinet Hughes Hubbard & Reed LLP, 5-7, rue de Monttessuy 75007 Paris, France. Adresse email : sena.agbayissah@hugheshubbard.com.


Devant le Tribunal arbitral composé de :

Me Sophie Nappert, Président, 3 Verulam Buildings, Gray's Inn, Londres WC1R 5NT,

Royaume-Uni. Adresse email : snappert@3vb.com ;

M. Le Professeur Charles Jarrosson, Co-Arbitre, 15, rue Alphonse de Neuville, 75017 Paris, France. Adresse email : charles.jarrosson@wanadoo.fr ;

Me Carmen Núñez-Lagos, Co-Arbitre, 125, avenue de Villiers, 75017 Paris, France. Adresse email : carmen.nunezlagos@orange.fr.

# TABLE DES MATIÈRES

**A.  RAPPEL DES FAITS** ...........................................................................................................6

   **I.      LES PARTIES** ..........................................................................................................6

   **II.     LA CLAUSE D'ARBITRAGE ET LA LOI APPLICABLE** ..................................6

   **III.    RÉSUMÉ DU LITIGE** .............................................................................................7

   **IV.     LA PROCÉDURE ARBITRALE** ...........................................................................12

      *IV.1.    Bref rappel de la procédure et constitution du Tribunal arbitral* ................................13

      *IV.2.    Les écritures des parties* ..........................................................................................16

      *IV.3.    Les attestations des témoins* .....................................................................................16

      *IV.4.    Le rapport d'expertise* ..............................................................................................16

      *IV.5.    Les ordonnances procédurales* ................................................................................17

      *IV.6.    L'audience au fond* ..................................................................................................17

      *IV.7.    La clôture des débats* ...............................................................................................18

      *IV.8.    Le Règlement d'arbitrage* ........................................................................................18

**B.  LES RÉCLAMATIONS DES PARTIES** ..................................................................18

   **I.      RÉCLAMATIONS DE LA DEMANDERESSE** ..................................................18

   **II.     RÉCLAMATIONS DES DÉFENDERESSES** .....................................................19

**C.  L'ANALYSE ET LA DÉCISION DU TRIBUNAL** ................................................20

   **I.      RÉSERVES PRÉLIMINAIRES** ...........................................................................20

      *I.1.    Résumé des positions des parties* .............................................................................20

      *I.2.    Analyse* ....................................................................................................................21

   **II.     COMPÉTENCE DU TRIBUNAL ARBITRAL** ..................................................22

      *II.1.    Compétence ratione materiae* ..................................................................................22

         **II.1.a.    Résumé des positions des parties** ..............................................................22

         **II.1.b.    Analyse** .....................................................................................................23

      *II.2.    Compétence ratione personae* ..................................................................................25

         **II.2.a.    Résumé des positions des parties** ..............................................................25

         **II.2.b.    Analyse** .....................................................................................................27

   **III.    NULLITÉ DE LA PROCÉDURE ENGAGÉE À L`ENCONTRE DE L`ÉTAT** ..........29

      *III.1.    Sur la forme* ...........................................................................................................29

         **III.1.a.    Résumé des positions des parties** ............................................................29

         **III.1.b.    Analyse** ....................................................................................................30

      *III.2.    Sur le fond* ..............................................................................................................30

         **III.2.a.    Résumé des positions des parties** ............................................................30

         **III.2.b.    Analyse** ....................................................................................................31

**IV.     VALIDITÉ OU INVALIDITÉ DE L`ACCORD DE PARTENARIAT** .........................**32**

*IV.1.     Résumé des positions des parties* ...........................................................32

*IV.2.     Analyse* ...........................................................................................................32

**IV.2.a.     Exception d'irrecevabilité de l'action en nullité fondée sur la violation du CMP pour cause de prescription** .........................................................32

**IV.2.b.     Nullité pour violation du CMP** .................................................................33

**IV.2.c.     Exception d'irrecevabilité de l'action en nullité pour pacte de corruption pour cause de prescription** ................................................................36

**IV.2.d.     Nullité pour pacte de corruption** .............................................................36

*IV.2.d.(i).     Charge de la preuve.  Standard de la preuve* .....................................37

*IV.2.d.(ii).     Résumé de la position des Défenderesses* ........................................37

*IV.2.d.(iii).     Résumé de la position de GVG* ........................................................38

*IV.2.d.(iv).     Analyse* ...........................................................................................40

**V.     EXÉCUTION DE L`ACCORD DE PARTENARIAT** ..............................................**43**

*V.1.     Résumé des positions des parties* .............................................................43

**V.1.a.     GVG** ...........................................................................................................43

*V.1.a.(i).     L`Accord de Partenariat et les obligations des parties* ......................43

*V.1.a.(ii).     La rémunération de GVG* ................................................................45

*V.1.a.(iii).     Les prétendus manquements de GVG tels qu`allégués par les Défenderesses* ..46

*V.1.a.(iv).     Les services fournis hors Accord de Partenariat* ..............................48

*V.1.a.(v).     La non-résolution de l`Accord par les Défenderesses* .......................49

*V.1.a.(vi).     La non-suspension des relations contractuelles* ................................50

**V.1.b.     Les Défenderesses** ....................................................................................50

*V.2.     Analyse* ...........................................................................................................52

**VI.     VALIDITÉ DE L'AVENANT DU 6 JUILLET 2009 ET DE L'ADDENDUM DU 10 JUILLET 2012** ............................................................................................54

*VI.1.     Résumé des positions des parties* ...........................................................54

**VI.1.a.     GVG** .........................................................................................................54

*VI.1.a.(i).     L'Avenant* ......................................................................................54

*VI.1.a.(ii).     La reconduction tacite de l'Accord* ................................................55

*VI.1.a.(iii).     L'Addendum* ...............................................................................56

**VI.1.b.     Les Défenderesses** ..................................................................................57

*VI.1.b.(i).     L'Avenant* ......................................................................................57

*VI.1.b.(ii).     Illégalité de la clause de tacite reconduction* ..................................58

*VI.1.b.(iii).     L'Addendum* ...............................................................................58

*VI.2.     Analyse* ...........................................................................................................59

**VI.2.a.     L'Avenant** .................................................................................................59

**VI.2.b.     La tacite reconduction** ...........................................................................59

**VI.2.c.   L'Addendum** ..................................................................................................61

**VII.   LE PRÉJUDICE** ..............................................................................................**62**

*VII.1.      Résumé des positions des parties* ...............................................................62

**VII.1.a.   GVG** ......................................................................................................62

**VII.1.b.   Les Défenderesses** ..............................................................................65

*VII.2.      Analyse* .......................................................................................................66

**VII.2.a.   Impayés pour la période contractuelle** ..............................................66

**D.   LES FRAIS DE L'ARBITRAGE** ..........................................................................68

**I.        RÉSUMÉ DES POSITIONS DES PARTIES** ....................................................**68**

**II.       ANALYSE** .........................................................................................................**69**

**E.   LES DEMANDES RECONVENTIONNELLES** .....................................................70

**F.   LE DISPOSITIF** .....................................................................................................70

## A. RAPPEL DES FAITS

## I.    LES PARTIES

1. **La Demanderesse**, Global Voice Group S.A. (« **la Demanderesse** » ou « **GVG** ») est une société de droit seychellois, au capital de USD 100.000, dont le siège social est situé au 1st Floor, #5 Dekk House, De Zippora Street, PO Box 456, Providence Industrial Estate, Mahé, République des Seychelles, immatriculée sous le numéro 022185. GVG est un fournisseur de technologies de pointe et de systèmes de protection des finances et de génération de revenus liés aux flux et opérations de télécommunications. GVG a été créée en 2005 lorsque ses deux actionnaires ont décidé de transférer leurs activités basées auparavant en Haïti vers les Seychelles, en raison de l'expansion internationale du groupe.

2. Les Défenderesses sont :

    a. L'Autorité de Régulation des Postes et Télécommunications de Guinée (« **ARPT** ») est une personne morale de droit public, régie par le statut défini par la loi guinéenne L/2005/018/AN du 8 septembre 2005, relative à la réglementation générale des télécommunications. L'ARPT est placée sous la tutelle du Ministre chargé des télécommunications ; et

    b. La République de Guinée (« **État** » ou « **Guinée** »).

## II.    LA CLAUSE D'ARBITRAGE ET LA LOI APPLICABLE

3. Aux termes de l'article 17 de l'accord de partenariat conclu le 22 mai 2009 entre GVG et APRT (« **l'Accord de Partenariat** ou **l'Accord** ») **[Pièce C-1]** :

    « *A défaut d'accord amiable entre les Parties dans un délai de six (6) mois suivant la date de survenance du litige, tout différend de toute nature, y incluant les Annexes et les éventuels avenants, susceptibles de s'élever entre elles, sera soumis à la compétence exclusive du Règlement d'arbitrage de la Chambre de Commerce International de Paris par un ou plusieurs arbitres nommés conformément à ce Règlement* ».

4. L'article 17.1 de l'Accord de Partenariat stipule que : « *[I]e présent Contrat est soumis aux lois de la République de Guinée* » **[Pièce C-1]**.

## III.    RÉSUMÉ DU LITIGE

5. Le résumé suivant se fonde sur les écritures des parties, tel qu'indiqué dans les références entre crochets.

6. En 2002, GVG arrivait sur le marché des télécommunications en Guinée en concluant un contrat avec la Société Guinéenne des Télécommunications (« **Sotelgui** ») portant sur une activité de « *wholesale carrier* » [**Mémoire récapitulatif et en Réponse ¶¶25-26**].

7. Le 8 septembre 2005, la Guinée adoptait la loi L/2005/018/AN établissant l'ARPT sous la tutelle du Ministre chargé des télécommunications. L'ARPT a pour mission, entre autres, de veiller au respect par les opérateurs de téléphonie des dispositions du texte précité, de prendre les mesures nécessaires pour faire assurer la continuité du service, de délivrer les licences et autorisations et de planifier et gérer les fréquences. [**Mémoire récapitulatif et en Réponse ¶¶20-21 ; Mémoire en Duplique ¶¶37-40 ; Pièce C-32**].

8. Le 6 octobre 2006, GVG et Sotelgui signaient un contrat d'assistance technique et de prestation de services avec fourniture de matériel pour la gestion de la passerelle internationale de la Sotelgui, aux termes duquel GVG prenait en charge « *la gestion de la totalité du réseau de transport international et de la facturation du trafic international pour SOTELGUI [...]* » [**Mémoire récapitulatif et en Réponse ¶27 ; Pièce C-41**].

9. Le 22 décembre 2009, le Président de la Guinée M. Lansana Conté décédait. Le 24 décembre 2009, le pouvoir étatique était saisi par les forces militaires [**Mémoire en Duplique ¶47**].

10. Le 22 mai 2009, GVG et ARPT concluaient l'Accord de Partenariat pour une durée de 5 ans, ayant pour objet de « *fixer le cadre général d'un partenariat technologique visant à assister l'ARPT dans le processus de modernisation de ses structures de contrôle et de supervision des réseaux de signalisation national et international en Guinée* ». L'Accord de Partenariat fut également signé « [p]*our le Ministère des Télécommunications [e]t des Nouvelles Technologies de l'Information* » par le Ministre de l'époque, M. Mathurin Banghoura [**Mémoire récapitulatif et en Réponse ¶¶30-31 ; Mémoire en Duplique ¶47 ; Pièce C-1**].

11. En exécution de l'Accord de Partenariat (Annexe 1), au 29 mai 2009 le Ministre des Télécommunications et des Nouvelles Technologies de l'Information et le Ministre à la Présidence Chargé de l'Économie et des Finance établissaient un Arrêté (« **Arrêté** ») « *fixant le tarif international de la destination République de Guinée et quotes-parts à reverser à l'autorité de régulation des postes et télécommunications et aux opérateurs locaux des réseaux de télécommunications ouverts au public* » [**Mémoire récapitulatif et en Réponse ¶41 ; Mémoire en Duplique ¶55 ; Pièce C-2**].

12. GVG allègue qu'au 6 juillet 2009, GVG et ARPT concluaient un Avenant (« **Avenant** ») portant la durée initiale de l'Accord de Partenariat à six ans. Aux termes de l'Avenant, GVG s'engageait à

financer à la hauteur de USD 1.200.000 (en versant mensuellement une somme de USD 100.000) la construction d'un bâtiment destiné à abriter les équipements objets de l'Accord de Partenariat, une partie du personnel de l'ARPT ainsi que tout autre équipement lui appartenant ou appartenant au Ministère des Télécommunications et des Nouvelles Technologies de l'information. La somme payée par GVG au titre de l'Avenant devait venir en déduction de la rémunération que devait percevoir GVG au titre de l'Accord de Partenariat. Les Défenderesses mettent en question l'authenticité de cet Avenant **[Mémoire récapitulatif et en Réponse ¶47 ; Mémoire en Duplique ¶¶58-64 ; Pièce C-3]**.

13. En août 2009, GVG mettait en place un Système de supervision IMS-STP, devenu opérationnel en septembre 2009 en donnant la possibilité à l'ARPT de collecter des revenus après cette date **[Mémoire récapitulatif et en Réponse ¶¶51, 56 ; Pièce C-23]**.

14. À la fin de l'année 2009, GVG offrait deux laboratoires informatiques interscolaires à l'occasion de l'inauguration du Centre de Contrôle et de Supervision du Trafic de l'ARPT **[Mémoire récapitulatif et en Réponse ¶460 ; Mémoire en Duplique ¶423 ; Pièces C 24-25]**.

15. GVG produit un Certificat daté du 18 janvier 2010 émis par le Ministre des Télécommunication des Nouvelles Technologies de l'Information attestant le paiement de la 1ère tranche (au mois de septembre 2009) au titre de l'Avenant concernant la construction du siège du contrôle de trafic téléphonique national et international de l'ARPT. Néanmoins, les Défenderesses invoquent le caractère douteux de ce certificat et en contestent l'authenticité **[Mémoire récapitulatif et en Réponse ¶230 ; Mémoire en Duplique ¶¶486-489 ; Pièce C-53]**.

16. Le 11 mai 2010, le nouveau Directeur de l'ARPT, M. Morlaye Youla, indiquait à GVG le compte sur lequel effectuer un virement de USD 151.800 pour l'achat de deux véhicules **[Mémoire récapitulatif et en Réponse ¶¶60, 460 ; Mémoire en Duplique ¶72 ; Pièce C-46]**.

17. Par lettre du 9 juillet 2010, le Directeur de l'ARPT, M. Morlaye Youla, remerciait GVG pour son invitation à Cape Town en Afrique du Sud à l'occasion du Sommet Africa Network en soulignant *« la qualité de l'accueil et l'attention toute particulière dont nous avons fait l'objet durant notre séjour »*. Dans la même lettre, le Directeur de l'ARPT félicitait GVG *«pour la qualité, le sérieux et l'expertise que vous nous apportez dans le cadre des accords d'assistance qui vous lient à notre institution »* **[Mémoire récapitulatif et en Réponse ¶¶58, 509 ; Mémoire en Duplique ¶74 ; Pièce C-44]**.

18. Le 15 juillet 2010, le Directeur de l'ARPT disait dans un courrier, *« Global Voice Group a livré pour le Centre de contrôle et de Supervision du Trafic, des solutions STP redondantes de grandes qualités. Le niveau du support que nous fournit Global Voice Group, autant pour la gestion de la collecte des données de signalisation, que pour la facturation et la lutte anti-fraude, nous a permis d'obtenir de très bons résultats en seulement dix (10) mois d'activité »* **[Mémoire récapitulatif et en Réponse ¶509 ; Mémoire en Duplique ¶¶70-75 ; Pièce C-45]**.

19. À la fin de 2009, la Guinée élisait un nouveau Président, M. Alpha Condé. Par la suite, M. Oyé Guilavogui était nommé en tant que nouveau Ministre des Télécommunications et des Nouvelles Technologies de l'Information **[Mémoire récapitulatif et en Réponse ¶61 ; Mémoire en Duplique ¶81]**.

20. Le 2 décembre 2010, ARPT émettait une communication faisant référence aux services de GVG en ces termes : « *du lancement du projet à la mise en place des infrastructures, en passant par la formation du personnel, nous avons hautement apprécié les compétences uniques et le professionnalisme exemplaire de Global Voice Group S.A. Nous recommandons vivement les services de ce groupe à nos homologues des autres gouvernements et Autorités de Régulation* » **[Mémoire récapitulatif et en Réponse ¶510 ; Mémoire en Duplique ¶¶70-75 ; Pièce C-5]**.

21. Par lettre du 28 décembre 2010, GVG félicitait Monsieur Oyé Guilavogui pour sa nomination en tant que Ministre **[Mémoire récapitulatif et en Réponse ¶231 ; Mémoire en Duplique ¶82 ; Pièce C-27]**.

22. Le 4 février 2011, l'ARPT adressait un courrier intitulé « *Révision de contrat et préavis de résiliation* », faisant état d'un courrier du 3 février 2011 de Me Boucabar Sow, Avocat à la Cour, relatif à un « *arrangement sous seing privé portant sur une spéculation pour la facilitation de signature* [d'un arrêté] *fixant tarif de terminaison en Guinée et obtention des exonérations douanières* », et invitant GVG « *à soutenir ce dossier devant l'Agent Judiciaire de l'État le Jeudi 10 février 2011* » **[Mémoire récapitulatif et en Réponse ¶539 ; Mémoire en Duplique ¶83 ; Pièce R-6]**.

23. Par lettre du 10 février 2011, le Ministre impliquait GVG au sein d'événements organisés pour la promotion du secteur des communications **[Mémoire récapitulatif et en Réponse ¶511 ; Pièce C-48]**.

24. Par courrier du 22 mars 2011, M. Moustapha Mamy Diaby, nouveau Directeur Général de l'ARPT, invitait GVG à participer « *à une évaluation à partir du 12 avril 2011* » **[Mémoire récapitulatif et en Réponse ¶515 ; Mémoire en Duplique ¶¶84-85 ; Pièce C-28]**.

25. À partir d'avril 2011 jusqu'en mai 2012, l'activité de GVG a fait l'objet d'une évaluation « Mid-term review » par l'ARPT **[Mémoire récapitulatif et en Réponse ¶¶65-66 ; Mémoire en Duplique ¶¶84-88]**.

26. Le 3 novembre 2011, l'ARPT et GVG signaient un premier rapport précisant les actions et engagements pris par GVG pour finaliser les points en suspens portant sur : (i) l'installation en local des applications et outils de supervision ; (ii) la mesure de la qualité de service ; (iii) le système de gestion du spectre et ; (iv) la solution pour la migration du trafic national **[Mémoire en Duplique¶87 ; Pièce R-7]**.

27. Le 11 mai 2012, Madame Aminata Camara Kaba pour le compte de l'ARPT et GVG signaient un Rapport d'exécution des obligations contractuelles entre l'ARPT et GVG (« **Rapport**

**d'exécution** ») détaillant les résultats de l'évaluation menée conjointement sur les performances contractuelles et la mise en œuvre des obligations de l'Accord de Partenariat **[Mémoire récapitulatif et en Réponse ¶69 ; Mémoire en Duplique ¶502 ; Pièce C-6]**.

28. Le 10 juin 2012, M. Katim Touray pour le compte de GVG et M. Diaby pour le compte de l'ARPT signaient un Addendum à l'Accord de Partenariat (« **Addendum** ») stipulant que GVG « *a exécuté le plan d'actions convenu entre les parties relatif aux obligations mentionnées dans le* » Rapport d'exécution. En vertu de l'Addendum l'ARPT devait à GVG un reliquat de USD 13.237.182,60 aux factures accumulées de septembre 2009 au 31 décembre 2011. Aux termes de l'Addendum : (i) GVG renonçait aux revenus (USD) correspondant au reliquat de la quote-part du trafic international de Sotelgui pour la période allant de septembre 2009 au 31 décembre 2011 ; (ii) GVG réduisait la dette de l'ARPT à USD 2 millions, qui devait être payée au plus tard le 30 juin 2012; (iii) les droits à verser par l'ARPT à GVG étaient réduits de USD 0,07 à USD 0,025/minute de façon rétroactive, à compter du 1er avril 2011**[Mémoire récapitulatif et en Réponse ¶¶79-82 ; Mémoire en Duplique ¶¶90-92 ; Pièce C-7]**.

29. Le 28 mars 2014, un plan d'action était signé entre l'ARPT et GVG prévoyant un bilan des actions mises en place par GVG, ainsi que des futurs engagements **[Mémoire récapitulatif et en Réponse ¶¶467, 494 ; Mémoire en Duplique ¶¶94-95 ; Pièces C-9, R-8]**.

30. En mai 2014, l'ARPT a interrompu le règlement des factures de GVG. L'ARPT considère que l'Accord de Partenariat a pris fin à compter du 22 mai 2014 **[Mémoire récapitulatif et en Réponse ¶530 ; Mémoire en Duplique ¶99 ; Pièce C-11]**.

31. Par email du 18 juin 2014, l'ARPT informait GVG que leurs relations contractuelles avaient pris fin le 22 mai 2014 **[Mémoire en Duplique ¶¶97 ; Pièce R-9]**.

32. Le 10 juillet 2014 GVG écrivait à l'ARPT l'informant de la reconduction de l'Accord de Partenariat pour une durée de deux ans en vertu de l'Avenant du 6 juillet 2009, sauf préavis de douze mois, et de la venue d'une délégation de GVG au cours de la première semaine d'août 2014 pour poursuivre les discussions **[Mémoire récapitulatif et en Réponse ¶90 ; Mémoire en Duplique ¶99 ; Pièce R-2]**.

33. Par lettre du 15 juillet 2014, l'ARPT affirmait qu'« *il n'a jamais été cas d'un avenant relatif à une contribution de GVG à la construction d'un bâtiment à fortiori une prolongation de la durée du contrat initiale. Par conséquent, nous considérons que cet avenant est réputé n'avoir jamais existé* » **[Mémoire récapitulatif et en Réponse ¶90 ; Pièce C-10]**.

34. Par lettre du 15 juillet 2014, l'ARPT sollicitait que GVG lui adresse un rapport dressant le bilan de l'exécution de l'Accord de Partenariat. GVG adressait ce rapport en juillet 2014 **[Mémoire en Duplique ¶98 ; Pièces C-4, R-10]**.

35. Par lettre du 24 novembre 2014, l'ARPT affirmait que « [c]*onformément aux dispositions de l'accord de partenariat du 22 mai 2009, ces factures sont hors de la période contractuelle qui a*

*pris fin le 22 mai 2014, pour cela nous ne pouvons honorer le paiement desdites factures »* **[Mémoire récapitulatif et en Réponse ¶92 ; Mémoire en Duplique ¶99 ; Pièce C-11]**.

36. Par lettre du 8 mai 2015, GVG indiquait à l'ARPT *« Nous adressons nos vives* [sic] *remerciements à l'ARPT pour sa parfaite collaboration. (…) Vue* [sic] *la consolidation des relations au cours des années et dans le souci de faire aboutir nos discussions, GVG propose une reconduction tacite du contrat qui nous lie à votre entité. »* **[Mémoire en Duplique ¶100 ; Pièce R-11]**.

37. Par lettre du 15 mai 2015, l'ARPT rappelait qu'elle avait déjà clarifié sa position concernant la demande de GVG de reconduction de l'Accord de Partenariat. L'ARPT ajoutait qu'il avait été demandé à GVG en mars 2014 de présenter *« une proposition technico-commerciale »* pour *« [u]n système de vérification de la tarification des opérateurs de téléphonie »* et *« [u]n système de supervision des revenus des opérateurs »* **[Mémoire récapitulatif et en Réponse ¶93 ; Mémoire en Duplique ¶101 ; Pièce C-12]**.

38. Par lettre du 2 juillet 2015, GVG réclamait le règlement de ses factures restées impayées depuis plus de 13 mois pour un montant de plus de USD 6 millions **[Mémoire récapitulatif et en Réponse ¶94 ; Mémoire en Duplique ¶102 ; Pièce C-13]**.

39. Par lettre du 9 juillet 2015, l'ARPT contestait les termes de la lettre de GVG en rappelant les manquements de GVG à ses engagements contractuels retranscrits dans les rapports de 2011 et 2014 **[Mémoire récapitulatif et en Réponse ¶94 ; Mémoire en Duplique ¶104 ; Pièces C 14, R-13]**.

40. Le 24 juillet 2015 le Ministre des Postes, Télécommunications et des Nouvelles Technologies de l'Information, M. Guilavogui, invitait GVG à une réunion dans la semaine du 27 juillet 2015 afin de trouver une solution à l'amiable : *« [j]'ai échangé avec le Conseil National de Régulation des Postes et Télécommunications et la Direction Générale c'est pourquoi je vous invite à une rencontre dans la semaine du 27 juillet 2015 à Conakry afin que nous trouvions une solution à l'amiable »* **[Mémoire récapitulatif et en Réponse ¶242 ; Mémoire en Duplique ¶106 ; Pièce C-30]**.

41. Par lettre du 27 juillet 2015, GVG contestait les termes de la lettre de l'ARPT du 9 juillet 2015 et indiquait que *« pour nous, notre contrat n'expire que le 22 mai 2017 »* 16) **[Mémoire récapitulatif et en Réponse ¶97 ; Mémoire en Duplique ¶105 ; Pièce C-16]**.

42. Une réunion entre GVG et l'ARPT s'est tenue le 3 août 2015. À la suite de cette réunion, GVG, par lettre du 4 août 2015, présentait une nouvelle offre commerciale à l'ARPT. Par lettre du même jour, GVG faisait référence aux *« difficultés avec lesquelles elle réalisait l'inventaire des équipements et matériels appartenant à l'ARPT »* **[Mémoire récapitulatif et en Réponse ¶98 ; Mémoire en Duplique ¶¶107-109 ; Pièce C-17, R-14]**.

43. Le 6 août 2015, l'ARPT transmettait une lettre à GVG en mentionnant *« [qu'à] la demande de Monsieur le Ministre d'État en charge des Télécommunications nous vous avons reçu pour vous signifier une fois encore l'ensemble de ces points et vous avez vous-même reconnu que vos premiers*

*contrats ont tous été mal faits. Au vu de tout ce qui précède, nous vous réitérons notre non satisfaction, tant sur le plan technique que relationnel. Comme vous le savez également, vos prestations actuelles ne correspondent pas à nos besoins de contrôle, de sécurité et de lutte contre la fraude ; et ne comptons plus continuer la collaboration avec vous ».* La lettre ajoutait également que « [s]*ur les 14 points inscrits dans le contrat de base, comme étant les obligations de GVG, 64% (9 points sur 14) n'ont pas été réalisés à temps ou pas du tout »* **[Mémoire récapitulatif et en Réponse ¶¶239, 471-472, 521, 555, 557-560 ; Mémoire en Duplique ¶¶110, 209, 497, 505, 540 ; Pièce C-15].**

44. Le 24 août 2015, le Ministre invitait GVG à une réunion dans la semaine du 31 août 2015 afin de finaliser les négociations pour une résolution amiable de la situation **[Mémoire récapitulatif et en Réponse ¶242 ; Mémoire en Duplique ¶210 ; Pièce C-31].**

45. Le 8 septembre 2015, le Ministre et le Président du Conseil National de Régulation des Postes et Télécommunications établissaient une proposition de résolution à l'amiable qui prévoyait « [l]*e payement intégral et en une fois de la somme 300.000 dollars par mois pour un montant total de 3.900.000 dollars représentant les treize (13) mois. Le payement de 6.824.441 dollars réclamé par GVG au titre des honoraires sur la base de 2.5 cents dollars par minutes de communications internationale entrant, sur la base d'un échéancier étalé sur cinq (5) ans avec 10 payements espacés de six (06) mois. Il reste entendu que ce montant sera confirmé sur la base des CSR »*. Par lettre du 14 septembre 2015, GVG refusait cette offre **[Mémoire récapitulatif et en Réponse ¶242 ; Mémoire en Duplique ¶114-115 ; Pièces C-19, C-20].**

46. Le 20 novembre 2015, l'ARPT concluait avec la société Subah Infosolutions Limited (« **Subah** »), un « *Contrat de services pour la supervision des trafics internationaux et nationaux, la certification des revenus des opérateurs, la surveillance de la tarification et la lutte contre la fraude »* (« **Contrat Subah** »). **[Mémoire récapitulatif et en Réponse ¶¶566-571 ; Mémoire en Duplique ¶¶526-536 ; Pièce R-30].** Le Contrat Subah a été conclu sans appel d'offre. Il stipule également une clause d'arbitrage CCI en son article 10.3.

47. En janvier 2016, M. Diaby entrait en fonction comme Ministre des Postes, Télécommunications et de l'Économie numérique.

48. Le 3 mai 2016, les Conseils de GVG adressaient une lettre de mise en demeure à l'ARPT de payer la somme de USD 103.171.862,66, en l'absence d'un accord entre les parties avant le 30 juin 2016 **[Mémoire récapitulatif et en Réponse ¶101 ; Mémoire en Duplique ¶118 ; Pièce C-21].**

## IV.    LA PROCÉDURE ARBITRALE

### *IV.1.    Bref rappel de la procédure et constitution du Tribunal arbitral*

49. Par courrier en date du 13 décembre 2016, le Secrétariat de la CCI (« **le Secrétariat** ») accusait réception de la Demande d'arbitrage datée du 8 décembre 2016 et reçue le 9 décembre 2016.

50. Par courrier en date du 28 décembre 2016, le Secrétariat transmettait la Demande d'arbitrage aux Défenderesses, les informant entre autres qu'elles disposaient d'un délai de 30 jours à compter du jour suivant la réception de cette correspondance pour répondre à la Demande, ainsi que de la possibilité pour elles de solliciter une prorogation de ce délai en faisant part de leurs commentaires sur le nombre d'arbitres et, si nécessaire, en désignant un arbitre (article 5(2) du Règlement d'arbitrage CCI 2012 (« **le Règlement** »).

51. Par courrier en date du 14 février 2017, le Secrétariat informait les parties que la Demande d'arbitrage avait été reçue par les Défenderesses via DHL le 30 décembre 2016 et que par conséquent, le délai de 30 jours pour soumettre une Réponse à la Demande d'arbitrage avait expiré le 31 janvier 2017 sans que cette Réponse ait été soumise. Le Secrétariat ajoutait que conformément à l'article 6(3) du Règlement, l'arbitrage poursuivrait son cours malgré l'absence de Réponse ; qu'en l'absence de commentaires de la part des Défenderesses, la Cour constituerait le Tribunal arbitral (article 12(2) du Règlement) et fixerait le lieu de l'arbitrage (article 18(1) du Règlement).

52. Par courrier en date du 17 février 2017, l'ARPT accusait réception du courrier du Secrétariat en date du 14 février 2017, exprimait son étonnement et transmettait un courrier en date du 6 août 2015 qu'elle avait adressé au Président Directeur-Général de GVG.

53. Par courrier en date du 18 avril 2017, le Secrétariat informait les parties que la Cour, en date du 13 avril 2017 :
    a. Décidait de soumettre le présent arbitrage à trois arbitres (article 12(2) du Règlement) ;
    b. Fixait Paris (France) comme lieu de l'arbitrage (article 18(1) du Règlement) ;
    c. Notait la désignation de Monsieur le Professeur Jarrosson en qualité de co-arbitre désigné par la Demanderesse ;
    d. Invitait les Défenderesses à désigner un co-arbitre dans un délai de 15 jours, à défaut de quoi la Cour serait invitée à prendre les mesures nécessaires pour constituer le Tribunal arbitral.

54. Par courrier en date du 6 juillet 2017, le Secrétariat informait le Tribunal arbitral et les parties que la Cour, à cette même date :
    a. Avait confirmé Charles Jarrosson en qualité de co-arbitre sur désignation de la Demanderesse (article 13(1) du Règlement) ;
    b. Avait nommé directement Carmen Núñez-Lagos en qualité de co-arbitre en lieu et place des Défenderesses n'ayant pas désigné de co-arbitre (article 13(4)(a) du Règlement) ;

c.  Avait nommé directement Sophie Nappert en qualité de président du Tribunal arbitral (article 13(4)(a) du Règlement).

55. Par courrier en date du 6 juillet 2017, le Secrétariat transmettait le dossier au Tribunal arbitral.

56. Par courriel en date du 11 juillet 2017, également transmis aux Défenderesses par messagerie, le Tribunal arbitral, par son président, prenait contact avec les parties afin de convoquer la conférence sur la gestion de la procédure (article 24 du Règlement).

57. Par courriel en date du 19 juillet 2017, les conseils de la Demanderesse répondaient au courriel ci-dessus et informaient le Tribunal arbitral de la venue au dossier du cabinet Hughes Hubbard à titre de conseil de l'ARPT.

58. Par courriel en date du 19 juillet 2017, Maîtres Sena Agbayissah et Marc Henry du cabinet Hughes Hubbard confirmaient leur mandat de représentation de l'ARPT dans le présent arbitrage et transmettaient un courrier en date du 6 juillet 2017 adressé au Secrétariat, par lequel ils sollicitaient un délai de 30 jours, soit jusqu'au 4 août 2017, pour soumettre la Réponse de l'ARPT et son choix de co-arbitre.

59. Par courriel en date du 20 juillet 2017, les conseils de la Demanderesse s'opposaient à l'octroi du délai sollicité par les conseils de l'ARPT, au motif notamment que les Défenderesses avaient reçu toute notification utile pour soumettre leur Réponse et désigner leur co-arbitre mais n'en avaient rien fait.

60. Par courriel en date du 28 juillet 2017, également expédié à l'État par messagerie, le Tribunal arbitral, après avoir pris contact avec le Secrétariat et après délibération, informait les parties que, dans la mesure où les Défenderesses avaient été informées en temps utile du déroulement de la procédure, où le Tribunal arbitral avait été valablement constitué et sauf intervention de la Cour, il lui apparaissait que la procédure arbitrale dût suivre son cours et que se tienne la conférence sur la gestion de la procédure afin de conclure l'Acte de Mission.  Le Tribunal arbitral constatait également que les Défenderesses auraient toute opportunité de soumettre leur position au sein de l'Acte de Mission et de leurs écritures.  Les conseils de la Demanderesse ayant indiqué leurs disponibilités pour la conférence, notamment pour le 4 septembre, le Tribunal arbitral sollicitait les disponibilités des Défenderesses.

61. Par courriel en date du 31 juillet 2017, Me Henry accusait réception de la communication du Tribunal arbitral et l'informait d'un retour dans les meilleurs délais.

62. Par courriel en date du 7 août 2017, le Tribunal arbitral relançait les Défenderesses.

63. Par courriel en date du 11 août 2017, Me Agbayissah accusait réception de la communication du Tribunal arbitral et l'assurait d'un retour dès que possible.

64. Par courriel en date du 14 août 2017, également transmis à l'État par messagerie, le Tribunal arbitral informait les parties qu'en l'absence de retour des Défenderesses d'ici le 18 août 2017, la conférence procédurale aurait lieu le 4 septembre 2017.

65. Par courriel en date du 29 août 2017 adressé aux parties, le Tribunal arbitral confirmait la tenue de la conférence procédurale le 4 septembre 2017 à 14.30 heure de Paris, sauf indication par les conseils d'une autre disponibilité, et faisait circuler les coordonnées téléphoniques. Le Tribunal arbitral invitait également les conseils à se rapprocher pour tenter de convenir d'un calendrier procédural et de faire part au Tribunal arbitral de l'issue de leurs discussions le 1er septembre 2017.

66. Par courriel en date du 29 août 2017, les conseils de la Demanderesse confirmaient leur disponibilité pour la conférence procédurale.

67. Par courriel en date du 30 août 2017, le Tribunal arbitral faisait circuler un projet d'Acte de Mission aux parties et au Secrétariat.

68. Par courriel en date du 1er septembre 2017, les conseils de la Demanderesse faisaient circuler un projet de calendrier procédural, les conseils des Défenderesses leur ayant fait part qu'ils n'étaient pas encore en mesure d'en discuter.

69. Par courriel en date du 1er septembre 2017, le Tribunal arbitral faisait circuler un agenda pour la conférence téléphonique du 4 septembre, et priait les conseils des Défenderesses de bien vouloir indiquer s'ils avaient l'intention d'y participer.

70. Par courriel en date du 4 septembre 2017, Me Henry confirmait la participation des conseils des Défenderesses à la conférence téléphonique.

71. La conférence procédurale s'est tenue le 4 septembre 2017 à 14.30 heure de Paris, en présence du Tribunal arbitral et des conseils des parties.

72. Par subséquent courriel en date du 4 septembre 2017, le Tribunal arbitral confirmait que les conseils des parties guinéennes avaient convenu d'informer le Tribunal arbitral et la Demanderesse de l'état de leur mandat, et des intentions des Défenderesses quant à leur participation à cet arbitrage, d'ici le 15 septembre 2017.

73. Par courriel en date du 18 septembre 2017, le Tribunal arbitral priait les conseils des Défenderesses de bien vouloir donner suite au courriel ci-dessus.

74. Par courriel en date du 19 septembre 2017, Me Agbayissah et Me Henry transmettaient leur mandat de représentation de l'État pour les fins du présent arbitrage.

75. Par courriel en date du 20 septembre 2017, le Tribunal arbitral accusait réception du mandat de représentation des conseils des Défenderesses, notait que toutes les parties en présence participaient à la procédure arbitrale par la voix de leurs conseils respectifs, et invitait les parties à définir leurs positions respectives au sein du projet d'Acte de Mission d'ici le 27 septembre 2017.

76. Par courriel en date du 25 septembre 2017, les conseils de la Demanderesse transmettaient le résumé des prétentions de la Demanderesse pour fin d'insertion dans l'Acte de Mission.

77. Par courriel en date du 28 septembre 2017, le Tribunal arbitral accordait aux Défenderesses un délai supplémentaire jusqu'au 13 octobre pour produire le résumé de leurs prétentions et leurs observations sur le projet d'Acte de Mission et de calendrier procédural.

78. Par courriel en date du 12 octobre 2017, les conseils des parties transmettaient leurs observations communes sur le projet d'Acte de Mission ainsi qu'un calendrier procédural dont elles avaient convenu.

79. Par courriel en date du 13 octobre 2017, les conseils des Défenderesses transmettaient le résumé des prétentions des Défenderesses pour fin d'insertion dans l'Acte de Mission.

80. L'Acte de Mission, signé par les représentants des parties et par les membres du Tribunal arbitral, est daté du 16 octobre 2017.

## *IV.2.*   *Les écritures des parties*

81. Le 30 janvier 2018, GVG déposait son Mémoire en Demande **[Mémoire en Demande].**

82. Le 30 avril 2018 les Défenderesses déposaient leur Mémoire en Défense **[Mémoire en Défense]**.

83. Le 31 juillet 2018, GVG déposait son Mémoire récapitulatif et en Réponse **[Mémoire récapitulatif et en Réponse]**.

84. Le 31 octobre 2018, les Défenderesses déposaient leur Mémoire en Duplique **[Mémoire en Duplique]**.

85. Les 4 et 11 février 2019 les parties déposaient leurs Notes post-audiences.

86. Le 1er mars 2019, les parties déposaient leurs Notes relatives aux frais de l'arbitrage.

## *IV.3.*   *Les attestations des témoins*

87. La Demanderesse a soumis les attestations suivantes :
   a.   Attestation de témoin de Katim Touray en date du 30 janvier 2018 ;
   b.   Attestation de témoin no.1 de Patrice Baker en date du 30 janvier 2018 ;
   c.   Attestation de témoin no. 2 de Patrice Baker en date du 31 juillet 2018.

88. Les Défenderesses ont soumis les attestations suivantes :
   a.   Attestation de témoin de Aminata Camara Kaba en date du 30 avril 2018 ;
   b.   Attestation de témoin de Diaby Moustapha Many en date du 30 avril 2018 ;
   c.   Attestation de témoin de Mamadou Lamarana Bah en date du 30 avril 2018.

## *IV.4.*   *Le rapport d'expertise*

89. Au soutien de leur Mémoire en Duplique, les Défenderesses déposaient une consultation du Professeur François-Xavier Train **[Pièce RL-34]**.

### IV.5.    *Les ordonnances procédurales*

90. Au cours de la procédure arbitrale le Tribunal a émis les ordonnances procédurales suivantes :

    a.   Ordonnance de procédure no. 1 (Calendrier procédural) du 29 Octobre 2017 ;

    b.   Ordonnance de procédure no. 2 (Redfern Schedule) du 17 mai 2018 ;

    c.   Ordonnance de procédure no. 3 (Marche à suivre de l'audience au mérite) du 10 décembre 2018.

### IV.6.    *L'audience au fond*

91. L'audience au fond s'est tenue du 28 au 30 janvier 2019 au « Hearing Center » de la CCI à Paris. L'ordre de jour de l'audience, convenue entre les parties et le Tribunal arbitral, était le suivant :

    a.   Le 28 janvier 2019 :

        (i).   Ouverture de la procédure ;

        (ii).   Questions relatives à la procédure ;

        (iii).   Plaidoirie introductive de Me Agbayissah sur les questions préliminaires (Défenderesses) ;

        (iv).   Plaidoirie introductive de Me Mirza sur les questions préliminaires (Demanderesse) ;

        (v).   Plaidoirie introductive de Me Kecsmar sur le fond (Demanderesse) ;

        (vi).   Plaidoirie introductive de Me Agbayissah sur le fond (Défenderesses).

    b.   Le 29 janvier 2019 :

        (i).   Ouverture de la procédure ;

        (ii).   Questions relatives à la procédure ;

        (iii).   Audition de M. Diaby (interrogatoire par Me Agbayissah, contre-interrogatoire par Me Kecsmar, ré-interrogatoire par Me Agbayissah) ;

        (iv).   Audition de M. Parker (interrogatoire par Me Kecsmar, contre-interrogatoire par Me Agbayissah ; ré-interrogatoire par Me Kecsmar).

    c.   Le 30 janvier 2019 :

        (i).   Ouverture de la procédure;

        (ii).   Audition de M. Touray (contre-interrogatoire par Me Agbayissah) ;

        (iii).   Audition de Madame Kaba (contre-interrogatoire par Me Kecsmar, ré-interrogatoire par Me Agbayissah) ;

        (iv).   Plaidoirie de clôture par Me Kecsmar ;

        (v).   Plaidoirie de clôture par M. Agbayissah ;

(vi). Questions relatives à la procédure.

### *IV.7.*   *La clôture des débats*

92. Par email en date du 2 mars 2019 le Tribunal arbitral déclarait la clôture des débats conformément à l'article 27 du Règlement d'arbitrage de la CCI 2012.

### *IV.8.*   *Le Règlement d'arbitrage*

93. La présente procédure d'arbitrage est régie par le Règlement d'arbitrage de la CCI de 2012.  La Cour a fixé le délai pour rendre la sentence finale au 30 avril 2019 lors de sa session du 2 novembre 2017.  Ce délai a été porté au 31 mai 2019 le 18 avril 2019 ; au 28 juin 2019 le 9 mai 2019 et au 31 juillet 2019 le 13 juin 2019.

## B.  LES RÉCLAMATIONS DES PARTIES

94. Les réclamations des Parties sont rappelées ci-dessous.

## I.     RÉCLAMATIONS DE LA DEMANDERESSE

95. Dans son Mémoire récapitulatif et en Réponse, GVG récapitule l'ensemble de ses réclamations mentionnées dans le Mémoire en demande **[Mémoire en Demande ¶386]**. Elle demande au Tribunal **[Mémoire récapitulatif et en Réponse ¶613]** :

   a.  Rejeter la demande des Défenderesses tendant à l'annulation de la clause d'arbitrage contenue à l'article 17 de l'Accord de Partenariat et par conséquent, se déclarer compétent ;

   b.  Dire et juger que la République de Guinée est partie à l'Accord de Partenariat et partant à la clause d'arbitrage qu'il contient ;

   c.  Rejeter les demandes reconventionnelles des Défenderesses en nullité de l'Accord de Partenariat, en restitution et en dommages et intérêts ainsi que toute autre demande ;

   d.  Dire et juger que les Défenderesses ont abusivement résilié l'Accord de Partenariat ;

   e.  Prononcer la nullité de l'Addendum ;

f. Indemniser, en conséquence, GVG de l'intégralité de son préjudice subi à hauteur de USD 106.558.275,20 au titre des impayés pendant la période contractuelle en sus des intérêts de retard à compter d'août 2015 avec capitalisation sur les montants susvisés au taux qu'il sera jugé approprié par le Tribunal arbitral, à quoi il conviendrait de rajouter les frais engagés par GVG pendant les négociations transactionnelles estimés à USD 150.000, en sus des intérêts de retard ;

g. Condamner les Défenderesses au paiement de tous les frais relatifs à l'arbitrage, incluant les honoraires et frais d'avocats ainsi que les honoraires et frais de tout expert engagé par GVG dans le cadre de la présente procédure.

## II.    RÉCLAMATIONS DES DÉFENDERESSES

96. Dans leur Mémoire en Duplique, les Défenderesses récapitulent l'ensemble de leurs demandes mentionnées dans le Mémoire en Défense **[Mémoire en Défense ¶300]**. Elles demandent au Tribunal **[Mémoire en Duplique ¶554]** :

a. À titre liminaire, de se déclarer incompétent *rationae materiae* pour connaître des demandes de GVG à l'encontre à la fois de l'ARPT et de la République de Guinée, et de les rejeter en conséquence ;

b. Subsidiairement, si le Tribunal ne se reconnaissait pas incompétent *rationae materiae*, de se déclarer incompétent à l'encontre de la République de Guinée, et de rejeter en conséquence les demandes de GVG à son encontre ;

c. À titre principal, de prononcer la nullité de l'action engagée à l'encontre de la République de Guinée et de rejeter en conséquence les demandes de GVG à son encontre ;

d. À titre principal, de dire et juger GVG irrecevable en ses demandes vis-à-vis de l'ARPT et subsidiairement vis-à-vis de la République de Guinée, et de les rejeter en conséquence,

e. Subsidiairement, de dire et juger mal fondées les demandes de GVG, et de les rejeter en conséquence ;

f. À titre subsidiaire, de prononcer la résiliation de l'Accord de Partenariat aux torts exclusifs de GVG ;

g. Reconventionnellement, de condamner GVG en cas de nullité à restituer les sommes indûment perçues, soit la somme de USD 48.093.160, à parfaire, GVG ne pouvant tirer un quelconque bénéfice de sa propre turpitude ; subsidiairement de condamner GVG pour mauvaise exécution au paiement de dommages et intérêts en réparation du préjudice subi du fait du comportement de GVG, pour un montant de USD 10.000.000 à parfaire ;

h.  En tout état de cause, de condamner GVG au paiement à chacune des Défenderesses de la somme de USD 100.000 en réparation du préjudice moral subi par chacune d'elle du fait des allégations contenues dans les écritures de GVG ;

i.  De condamner GVG au paiement à chacune des Défenderesses de la somme de USD 100.000 pour procédure abusive ;

j.  En tout état de cause, de condamner GVG à supporter l'intégralité des frais relatifs à l'arbitrage, en ce compris les honoraires et frais d'avocats ainsi que les honoraires et frais de tout expert missionné par les Défenderesses pour les besoins de la présente procédure.

## C.  L'ANALYSE ET LA DÉCISION DU TRIBUNAL

## I.      RÉSERVES PRÉLIMINAIRES

### *I.1.  Résumé des positions des parties*

97. Le Tribunal arbitral rappelle brièvement les réserves émises par les Défenderesses quant à la constitution du Tribunal arbitral par la Cour d'une part, et quant au délai imparti pour produire l'exposé sommaire de leur position pour les fins de l'Acte de Mission d'autre part **[Mémoire en Défense ¶¶86-91]**.

98. En ce qui a trait à la constitution du Tribunal arbitral, l'ARPT et la Guinée estiment que celle-ci contrevient au principe d'égalité de traitement des parties, dans la mesure où GVG a librement désigné un co-arbitre mais s'est opposée à ce que l'ARPT et la Guinée puissent elles aussi exercer ce droit.

99. Les Défenderesses ajoutent que cette situation est d'autant plus contestable dans le contexte actuel d'un arbitrage multipartite dans lequel les Défenderesses se voient imposer un arbitre conjoint, alors que leurs positions respectives et leurs intérêts auraient pu être disjoints.  Par conséquent, la seule solution équitable aurait été de voir désigner l'ensemble du Tribunal arbitral par l'institution d'arbitrage.

100. Pour sa part, GVG, après un rappel de la chronologie des échanges entre les conseils des parties et le Secrétariat **[Mémoire récapitulatif et en Réponse ¶¶103-104]**, constate que la Demande d'arbitrage du 8 décembre 2016 a été reçue par les Défenderesses le 30 décembre 2016 et que celles-ci ont bénéficié de nombreux reports de délai octroyés par le Secrétariat leur permettant d'exposer leurs prétentions et de désigner leur co-arbitre, ce qu'elles n'ont pas fait.  Le Tribunal arbitral n'a finalement été constitué que le 6 juillet 2017 et l'Acte de Mission signé le 16 octobre 2017, de telle

sorte que les Défenderesses ont en fait disposé de six mois pour désigner leur co-arbitre, délai qui excède largement les 30 jours prévus au Règlement [**Mémoire récapitulatif et en Réponse ¶¶110-111**].

101. GVG ajoute que, contrairement à ce qu'indiquent les Défenderesses, elle ne leur a pas refusé la faculté de désigner un co-arbitre, leur demandant au contraire de faire une proposition, laquelle demande est restée sans suite.  La participation de l'État à la procédure n'a été confirmée que le 19 septembre 2017 [**Mémoire récapitulatif et en Réponse ¶112**].

102. Pour ce qui est du délai prescrit par le Tribunal arbitral pour la production de l'exposé sommaire de la position des Défenderesses aux fins de l'Acte de Mission, l'ARPT et la Guinée soulignent que leurs conseils n'ont pu s'investir dans la présente procédure qu'à compter du 19 septembre 2017, date de production du mandat de représentation de l'État.  Or le Règlement prévoit un délai minimal de 30 jours pour permettre à la partie défenderesse de répondre à la demande d'arbitrage.  Le délai imposé par le Tribunal arbitral étant inférieur au standard prévu par le Règlement, les Défenderesses ont produit leur exposé sommaire sous réserve de pouvoir l'amplifier et le compléter avec de nouveaux moyens et prétentions à tout moment de la procédure [**Mémoire en Défense ¶87**].

103. GVG répond que les Défenderesses ont disposé d'un délai de 10 mois pour produire leur exposé sommaire et qu'en tout état de cause, elles ont eu toute opportunité nécessaire pour présenter leurs arguments conformément au calendrier procédural convenu entre les parties [**Mémoire récapitulatif et en Réponse ¶¶107-108**].

## *I.2. Analyse*

104. Quant aux réserves émises sur la validité de la constitution du Tribunal arbitral, il apparaît au Tribunal qu'il s'agit là d'une question qui relève éminemment de la compétence de la Cour, laquelle, sur présentation de la position des parties, a pris sa décision en application du Règlement. Il n'appartient pas au Tribunal d'en rejuger.  Tout au plus, le Tribunal relève qu'à aucun moment l'ARPT et l'État guinéen n'ont fait état d'intérêts divergents qui auraient pu justifier la nomination par l'institution d'arbitrage de l'ensemble des arbitres.

105. Par ailleurs, le Tribunal arbitral prend acte du fait que la Cour, en prenant sa décision, n'a pas empiété sur les questions soulevées par les Défenderesses au regard de la compétence du Tribunal à connaître du présent litige, questions qui seront abordées ci-après.

106. Quant aux réserves relatives au délai imparti aux Défenderesses pour produire l'exposé sommaire de leurs prétentions aux fins de l'Acte de Mission, le Tribunal arbitral constate que les Défenderesses ont fait plein usage des occasions de faire valoir leur position dans leurs écritures pré- et post-audience, ainsi que lors de l'audience même, de telle sorte que le prétendu vice de procédure qu'elles soulèvent, à supposer même qu'il existe, ne leur a causé aucun grief.

107. Le Tribunal en conclut que pour ce qui a trait aux aspects procéduraux relevant de sa compétence, les droits des Défenderesses ont été respectés tout au long de cet arbitrage et que les réserves qu'elles expriment n'ont aucune incidence sur sa validité. En outre, le Tribunal rappelle qu'en ce qui concerne la procédure suivie devant lui, il a interrogé les Parties, à la fin de l'audience des plaidoiries du 30 janvier 2019, sur les éventuelles remarques qu'elles auraient à faire **[T3/61:9-15]**. Elles ont toutes deux répondu qu'elles n'avaient aucun commentaire à faire.

## II.    COMPÉTENCE DU TRIBUNAL ARBITRAL

108. À titre liminaire, les Défenderesses font valoir que le Tribunal arbitral est incompétent pour connaître du présent litige, d'abord *ratione materiae* pour violation du Code guinéen des Marchés Publics (« **CMP** ») ; mais également *ratione personae* en ce qui concerne l'État.

### *II.1.  Compétence ratione materiae*

#### II.1.a. Résumé des positions des parties

109. Les Défenderesses font valoir que le droit applicable à l'Accord de Partenariat est le droit guinéen en vertu de son article 17. Or l'Accord de Partenariat tombe sous le régime du CMP dont les termes sont impératifs, et dont l'article 77 prévoit que les litiges entre personnes morales de droit public guinéennes et titulaires étrangers de marchés publics soient soumis à un arbitrage *ad hoc*. Ceci rend l'article 17 de l'Accord de Partenariat et la présente procédure incompatible avec les dispositions impératives du CMP **[Mémoire en Duplique ¶¶127-137]**.

110. GVG soutient que les Défenderesses ne peuvent être admises à invoquer la violation du CMP et du droit national guinéen au regard de la jurisprudence française **[Pièces CL-1 à CL-6]**, explicitée par la doctrine **[Pièce CL-7]**, selon laquelle un État ne peut se prévaloir de son droit national ou de la loi du contrat pour se soustraire *a posteriori* à un arbitrage dont il a convenu **[Mémoire récapitulatif et en Réponse ¶¶147-157]**.

111. Concernant la jurisprudence *Dalico* invoquée par GVG, les Défenderesses arguent que la règle visant l'autonomie de la clause d'arbitrage par rapport à toute loi étatique est spécifique au droit français et ne constitue pas une règle transnationale. Cette jurisprudence est notamment justifiée par la volonté de favoriser l'arbitrage et l'arbitrabilité des litiges. Or il ne s'agit pas pour les Défenderesses de revendiquer la compétence des tribunaux internes guinéens, mais le respect d'une procédure d'arbitrage *ad hoc* prévue spécialement par le droit guinéen pour les contrats de marchés publics conclus avec des entreprises étrangères **[Mémoire en Duplique ¶¶145-151]**.

112. Au soutien de leur argumentaire, les Défenderesses invoquent une doctrine critique de l'approche adoptée par l'arrêt *Dalico* et ses suites, prônant une compréhension fonctionnelle, et non conceptuelle, de cette jurisprudence **[Pièces RL-1 à RL-3]**.

113. Elles ajoutent qu'il n'y a pas lieu d'appliquer les règles matérielles du droit français de l'arbitrage international en l'espèce, le seul lien avec le droit français étant le siège de l'arbitrage, fixé de façon fortuite par l'institution vu le silence de l'Accord de Partenariat sur le sujet. Par ailleurs, la sentence n'a pas vocation à être exécutée en France **[Mémoire en Duplique ¶¶155-158]**.

114. Avec leur Mémoire en Duplique, les Défenderesses ont déposé l'Avis de Droit du Professeur François-Xavier Train traitant de ces questions, et notamment de la jurisprudence *Dalico* et des lois de police de la *lex contractus* **[Pièce RL-34]**.

115. Le Professeur Train fonde son Avis sur la prémisse que le CMP s'applique au présent litige à raison de l'élection du droit guinéen comme *lex contractus* et, partant, que s'applique également la clause d'arbitrage de l'article 77 du CMP par référence à une loi de police nationale **[Pièce RL-34 ¶7]**. Le Professeur Train ajoute que « *cette disposition impérative ne peut être neutralisée sur le fondement de la jurisprudence* Dalico, *dès lors qu'elle ne peut pas être assimilée à une loi locale interdisant le recours à l'arbitrage pour une raison ou pour une autre, ou soumettant la convention d'arbitrage à des conditions de validité excessivement restrictives.* » **[Pièce RL-34 ¶28 (1)]**.

116. En Réponse, par voie de plaidoirie introductive à l'audience, GVG fait notamment valoir qu'il n'existe pas d'incompatibilité entre l'article 77 du CMP et l'article 17 de l'Accord de Partenariat **[T1/29:1-25]** ; que le Professeur Train n'explique pas en quoi l'article 77 du CMP serait une loi de police **[T1/32:32-33:8]** ; et que le contrat Subah, ayant succédé à l'Accord de Partenariat au profit d'un compétiteur de GVG, contient lui aussi une clause d'arbitrage CCI en son article 10.3 **[T1/33:9-17 ; Pièce R-30]**.


**II.1.b. Analyse**

117. Le Tribunal arbitral constate à titre liminaire que l'Avis du Professeur Train est fondé sur le présupposé que l'Accord de Partenariat tombe sous l'égide du CMP, présupposé qui n'est pas explicité dans l'Avis mais que les Défenderesses ont étayé dans leur Mémoire en Duplique **[Mémoire en Duplique ¶¶269-282]** et plaidoiries introductives à l'audience **[T1/11:22-15:32]**.

118. GVG plaide pour sa part que le régime du CMP ne trouve pas application, l'Accord de Partenariat constituant une délégation de service public, subsidiairement relevant du régime des marchés négociés de gré à gré et non des marchés publics **[Mémoire récapitulatif et en Réponse ¶¶313-352 ; T1/70:21-73:9]**.

119. L'Avis du Professeur Train repose également sur le fondement d'un second présupposé, à savoir la qualification de la procédure arbitrale de l'article 77 du CMP comme arbitrage *ad hoc*, qu'il met en opposition avec l'arbitrage institutionnel CCI prévu à l'Accord de Partenariat, ce qui à son avis

rend les deux clauses incompatibles : « *L'arbitrage* ad hoc *et l'arbitrage institutionnel obéissent en effet à un régime assez nettement différent, en raison précisément de l'intervention d'une institution d'arbitrage qui peut se substituer aux parties dans un certain nombre de cas, différence qui est particulièrement prégnante au stade de la constitution du Tribunal arbitral* » **[Pièce RL-34 ¶9 ; note 6]**.

120. Sur ce point, GVG plaide l'absence de toute incompatibilité, l'article 77 du CMP faisant référence à l'arbitrage au sens générique de terme, sans pour autant prescrire un type d'arbitrage particulier, qu'il soit *ad hoc* ou institutionnel **[T1/27:20-28:14]**.

121. Il n'apparaît pas nécessaire à la détermination de la compétence *ratione materiae* du Tribunal d'avoir à se prononcer sur la qualification de l'Accord de Partenariat car, même en admettant que le CMP trouverait application, la présente procédure ne présente aucune incompatibilité avec les termes de l'article 77 du CMP qui se lit ainsi : « *Dans le cadre des Grands Marchés Publics, ou litiges survenant entre l'autorité contractante et un entrepreneur, un fournisseur, un industriel ou un prestataire de services de droit étranger doivent être soumis à l'arbitrage dans les conditions établies ci-après :*

- *Les parties audit arbitrage sont l'autorité contractante et le titulaire du marché ;*
- *Le Tribunal arbitral se compose de trois arbitres désignés, le premier par l'autorité contractante, le deuxième par le titulaire étranger du marché et le troisième par accord des parties.*

*En cas de décès ou de démission de l'un des arbitres commis, son successeur est désigné conformément aux dispositions du présent article applicables à la nomination de l'arbitre qui l'a précédé, et ledit successeur a les pouvoirs et obligations de son prédécesseur* ».

122. Ces termes sont en effet laconiques, largement cadrés et tout aussi compatibles avec une procédure dont la gestion est assurée par une institution (telle, en l'occurrence, la CCI) qu'avec une procédure *ad hoc* (régie par exemple par le règlement de la CNUDCI). Le Tribunal prend note par ailleurs que l'article 77 demeure silencieux sur les modalités de la constitution du Tribunal arbitral lorsqu'une partie s'abstient de désigner un arbitre (comme ce fut le cas en l'espèce pour les Défenderesses). À cet égard, il importe de rappeler que l'arbitrage *ad hoc* comme l'arbitrage institutionnel prévoient que cet arbitre est alors nommé, soit par une autorité de nomination pour l'arbitrage *ad hoc,* soit par l'institution dans le cas de l'arbitrage institutionnel. Par conséquent, rien dans la constitution du présent Tribunal arbitral ne viole les termes de l'article 77 du CMP.

123. À titre surabondant, le Tribunal relève que l'arbitrage CCI est d'autant moins contraire à l'ordre public guinéen que l'article 134 du CMP, dans sa version de 2012[1], envisage à nouveau le recours à l'arbitrage en termes tout aussi généraux que le CMP sous l'empire duquel était passé l'Accord de Partenariat conclu avec GVG.  Or, le contrat Subah **[Pièce R-30]**, conclu le 24 novembre 2015 et qui a succédé à l'Accord de Partenariat ici en cause, a inclus dans son article 10.3 une clause d'arbitrage qui renvoie précisément à l'arbitrage de la CCI, sans que sa validité ait été remise en cause.

124. Le Tribunal considère en conséquence qu'il est compétent *ratione materiae* pour connaître du présent arbitrage et rejette l'exception d'incompétence soulevée par les Défenderesses sous ce chef.


## II.2.  *Compétence ratione personae*


### II.2.a. Résumé des positions des parties

125. Les Défenderesses soutiennent que le Tribunal arbitral doit se déclarer incompétent à l'égard de l'État qui, bien qu'il ait signé l'Accord de Partenariat comme autorité de tutelle, n'a pas consenti à y être partie ni n'a été impliqué dans sa conclusion, son exécution, ou sa rupture **[Mémoire en Duplique ¶168]**.

126. Les Défenderesses font valoir l'absence de consentement direct de l'État au motif que la seule signature de l'État comme autorité de tutelle ne suffit pas à en faire une partie à l'Accord en l'absence d'une manifestation claire, expresse et non-équivoque de sa volonté d'y adhérer **[Mémoire en Duplique ¶¶169-174 ; Pièces RL-6 et RL-15]**.

127. En l'espèce, le contenu de l'Accord de Partenariat, tout comme celui de l'Avenant ou de l'Addendum, ne fait aucune mention de l'État **[Mémoire en Duplique ¶¶176-178]**, ni ne met d'obligation à la charge de l'État **[Mémoire en Duplique ¶¶183-185]**.

128. L'adoption de l'arrêté du 29 mai 2009 fixant le tarif international **[Pièce C-2]** ne peut conférer qualité de partie à l'État, la fonction de celui-ci se limitant à publier les normes conçues et élaborées par l'ARPT **[Mémoire en Duplique ¶¶189-193]**.

129. Les pièces au dossier, notamment le Rapport d'exécution des obligations contractuelles **[Pièce C-6]** et les factures adressées uniquement à l'ARPT **[Pièces R-4 ; C-52-1 ; C-52-2 et C-52-3]**, démontrent bien que l'État n'était pas impliqué dans l'exécution de l'Accord et que seules GVG et l'ARPT y sont parties **[Mémoire en Duplique ¶¶194-199]**.

---

[1] Art. 134 du CMP de 2012 : « *Tout litige qui aura fait préalablement l'objet d'un recours hiérarchique et qui n'aura pas été réglé amiablement dans les quinze (15) jours ouvrables suivant l'introduction du recours, sera porté, conformément au droit et aux stipulations contractuelles applicables, devant les juridictions ou les instances arbitrales compétentes* ».

130. Quant aux courriers invoqués par GVG en faveur de l'implication de l'État dans l'exécution de l'Accord, une majorité émane de GVG elle-même et n'a par conséquent aucune valeur probante **[Pièces C-24 à C-27 ; Mémoire en Duplique ¶¶200-201]**.

131. La lettre de Monsieur le Ministre Oyé Guilavogui traduit une maladresse de rédaction qui n'est confirmée par aucun autre élément du dossier **[Pièce C-28 ; Mémoire en Duplique ¶202]**.

132. Enfin la lettre de l'ARPT du 16 juillet 2012 ne fait que rappeler que le représentant de l'État a signé l'Accord **[Pièce C-29 ; Mémoire en Duplique ¶203]**, ce qu'il a fait en tant qu'autorité de tutelle.

133. Par ailleurs, d'autres documents viennent confirmer la position des Défenderesses, notamment un état d'avancement signé entre l'ARPT et GVG (sans intervention de l'État) le 3 novembre 2011 afin de préciser les actions et engagements pris pour finaliser certains points en suspens **[Pièce R-7 ; Mémoire en Duplique ¶204]**, de même que la mise en demeure de GVG du 3 mai 2016 précédant la Demande d'arbitrage, adressée à l'ARPT seule **[Pièce C-21 ; Mémoire en Duplique ¶¶205]**.

134. En ce qui a trait à la fin des relations contractuelles entre GVG et l'ARPT, le Ministre des télécommunications n'est intervenu que comme autorité de médiation, et à la demande de GVG **[Mémoire en Duplique ¶¶206-212]**.

135. Pour sa part, GVG rappelle les enseignements doctrinaux et jurisprudentiels à l'effet que la volonté des parties, telle qu'exprimée à travers l'ensemble des circonstances de la cause, permet de résoudre la question de savoir si une entité a ou non consenti à être partie à une clause d'arbitrage **[Mémoire récapitulatif et en Réponse ¶¶180-197]**. GVG cite notamment l'arrêt *Dallah*, CA Paris, Arrêt du 17 février 2011 **[Pièce CL-19]**, où la clause d'arbitrage a été étendue à l'État pakistanais, lequel n'avait ni signé ni approuvé le contrat, sur la base de son comportement dans les relations contractuelles **[Mémoire récapitulatif et en Réponse ¶¶194-195 ; T1/35:7-10]**.

136. GVG ne prétend pas que la signature de l'Accord par l'État lui confère à elle seule qualité de partie ; cependant elle soutient qu'il s'agit d'une circonstance importante démontrant que l'État avait connaissance de la clause d'arbitrage. Le caractère tripartite de l'Accord est en outre établi par le fait qu'il a été signé en trois exemplaires **[Mémoire récapitulatif et en Réponse ¶202]** et notamment par la mention, au procès-verbal de réunion du 6 octobre 2009, de GVG et du Ministre des Télécommunications et des Nouvelles Technologies de l'Information comme parties à l'Accord **[Pièce C-22 ; Mémoire récapitulatif et en Réponse ¶205]**.

137. GVG invoque l'étroite imbrication de l'État et de GVG et leur indissociable désignation au sein des pièces au dossier comme étant les bénéficiaires des moyens technologiques que devait mettre en place GVG dans le cadre de l'Accord de Partenariat **[Mémoire récapitulatif et en Réponse ¶¶211-216]**.

138. GVG invoque également la participation active de l'État tout au long du processus contractuel. Les conditions financières de l'Accord, dans l'Arrêté du 29 mai 2009, démontrent bien que l'État a négocié et convenu de la clé de répartition des revenus avec GVG. L'Arrêté par ailleurs ajoute en son article 10 des obligations nouvelles à la charge de GVG, non prévues aux termes de l'Accord **[Pièce C-2 ; Mémoire récapitulatif et en Réponse ¶¶218-225]**.

139. L'État a également participé à l'exécution de l'Accord de Partenariat, telles que le démontrent les responsabilités qui lui sont attribuées au sein de la Matrice des Responsabilités annexée à l'Accord, lesquelles exigent l'intervention active du Ministre dans le processus contractuel **[Mémoire récapitulatif et en Réponse ¶¶226-228]**.

140. Par ailleurs, le premier versement au titre de l'Avenant à l'Accord a été adressé directement à l'État **[Mémoire récapitulatif et en Réponse ¶¶229-230]**.

141. GVG fait également valoir qu'en tout état de cause, l'État a indirectement consenti à l'Accord de Partenariat par le biais de l'ARPT, elle-même émanation de l'État et agissant comme son mandataire **[Mémoire récapitulatif et en Réponse ¶¶246-280]**.

142. Sur ce point, les Défenderesses, bien qu'elles ne nient pas l'appartenance de l'ARPT à l'appareil étatique guinéen, invoquent l'article 24 de la Loi L/2005/018/AL **[Pièces C-32 ; RL-9]** à l'effet que l'ARPT est une autorité administrative indépendante, agissant au nom de l'État sans pour autant relever de l'autorité du gouvernement. Elles ajoutent que la position de GVG mène au résultat absurde que l'État serait nécessairement partie à tout contrat qui serait passé par l'ARPT **[Mémoire en Duplique ¶¶215-217]**.

143. Les Défenderesses ajoutent que GVG n'apporte pas la preuve que l'État aurait donné à l'ARPT le pouvoir de conclure l'Accord de Partenariat en son nom et compte, et que dans le cadre d'un véritable mandat le Ministre n'aurait pas signé l'Accord **[Mémoire en Duplique ¶¶218-221 ; 235]**.

144. Quant à la Matrice des Responsabilités invoquée par GVG, les Défenderesses disent qu'elles ne la connaissent pas et qu'en tout état de cause, les responsabilités dévolues dans cette Matrice au Ministre des Postes et Télécommunications procèdent de ses devoirs d'autorité de tutelle ainsi que de l'environnement de l'Accord de Partenariat, plutôt que du contenu de celui-ci **[Mémoire en Duplique ¶¶238-240]**.

**II.2.b. Analyse**

145. Le Tribunal relève tout d'abord que les deux Parties s'expliquent sur la question de sa compétence *ratione personae* en se référant, outre au droit guinéen, en grande partie au droit français, droit du siège de l'arbitrage (**Mémoire récapitulatif et en Réponse ¶¶ 180 et s. ; Mémoire en Duplique ¶¶171 et s.**). Le Tribunal situera son raisonnement également sur ces terrains. Tel que l'enseignent la jurisprudence et la doctrine dont fait état GVG dans ses écritures, dont notamment l'arrêt *Dallah* précité **[Pièce CL-19]**, la question de savoir si l'État a ou non consenti à être lié par l'Accord de

Partenariat et sa convention d`arbitrage procède d`un examen de son comportement au cours des relations contractuelles, au regard des éléments déposés au dossier.

146. Pour reprendre les termes des écritures de GVG, cet examen fait état de circonstances démontrant l'étroite imbrication de l'État et de l'ARPT comme bénéficiaires des moyens technologiques que devait mettre en place GVG dans le cadre de l'Accord de Partenariat. En outre, l`Accord a été un instrument nécessaire à la mise en œuvre d'une nouvelle politique fiscale en Guinée et permis à l'État guinéen de recouvrer quelques USD 212 millions de revenus fiscaux **[Pièce C-1, Préambule ; T1/59:24-29 ; Monsieur Diaby T2/123:19-26 ; Mémoire récapitulatif et en Réponse ¶¶213-216]**.

147. Le Tribunal constate également la participation active de l`État tout au long du processus contractuel, de sa conclusion à sa rupture, en passant par son exécution.

148. <u>Au stade de la conclusion de l`Accord</u>, le Tribunal constate que l`Arrêté Ministériel du 29 octobre 2009, émis conformément au point 10 de la Matrice des Responsabilités attribuant cette étape à l`État, vient compléter les termes de l`Accord en en précisant les conditions financières. Le Tribunal partage la position de GVG selon laquelle l`Accord de Partenariat ne peut se concevoir sans l`Arrêté **[Mémoire récapitulatif et en Réponse ¶223]**.

149. <u>Au stade de l`exécution de l`Accord</u>, ici encore l`Arrêté Ministériel place non moins de douze responsabilités spécifiques à la charge de l`État, que ce soit sous l`intitulé « Signature et Implantation » (Points 1, 2, 5, 6) ; sous « Phase de Lancement du Projet » (Points 1 à 7 et Point 10) ; ou enfin sous « Logistique » (Points 4 et 6). Le Tribunal ajoute que ces responsabilités mises à la charge de l`État étaient essentielles à la mise en marche et au bon déroulement de l`Accord. Le Tribunal ne peut donc que rejeter l`argumentation des Défenderesses à l`effet que l`Accord « *n`impose aucune obligation à la Guinée* » comme étant incompatible avec cet ensemble de faits **[Mémoire en Duplique ¶¶179-187]**.

150. Les pièces versées au dossier font également état de l`intervention active de l`État au cours de l`exécution de l`Accord. À titre indicatif, le Tribunal relève le Procès-Verbal de réunion entre les opérateurs GSM, le MTNTI et la Direction générale de l`ARPT du 6 octobre 2009 **[Pièce C-22]**, qui prend note du fait que « *le but de cette rencontre est d`informer les opérateurs de la signature d`une convention entre la* [GVG] *et le* [MTNTI] *relative à l`écoulement du trafic international entrant/sortant* ». Cette formulation concorde avec les termes du courrier du 22 mars 2011 de Monsieur le Ministre Oyé Guilavogui à GVG (« *Dans le cadre de notre relation contractuelle, nous vous invitons à une évaluation à partir du 12 avril 2011* ») **[Pièce C-28]** de même que ceux du courrier du 16 juillet 2012 de l`ARPT à GVG («*Toutefois, nous sommes prêts à reconsidérer notre décision à condition que vous teniez compte des réalités qui ont toujours existées* [sic] *bien avant la signature du protocole d`accord entre l`État Guinéen et GVG …* » **[Pièce C-29]**.

151. <u>Au stade de la fin de l'Accord</u>, le Tribunal constate l'implication de l'État, tant au stade de la fin de la collaboration entre GVG et l'ARPT **[Pièce C-15 ; Mémoire récapitulatif et en Réponse ¶¶237-239]** qu'au cours des tentatives de règlement à l'amiable **[Pièces C-16 ; C-19 ; C-20 ; C-30 ; C-31 ; Mémoire récapitulatif et en Réponse ¶242]**.

152. Le Tribunal considère que les éléments qui précèdent établissent clairement que l'État était partie prenante à l'Accord de Partenariat et que, il se considérait non seulement lié par ses termes et par la convention d'arbitrage qu'il contient, mais qu'il se savait aussi bénéficiaire des outils et services fournis dans le cadre de l'Accord et de leur contribution à la meilleure organisation du système fiscal guinéen.

153. Le Tribunal décide par conséquent qu'il est compétent *ratione personae* en ce qui concerne l'État et rejette l'exception d'incompétence soulevée par les Défenderesses sous ce chef.

## III. NULLITÉ DE LA PROCÉDURE ENGAGÉE À L'ENCONTRE DE L'ÉTAT

### *III.1. Sur la forme*

**III.1.a. Résumé des positions des parties**

154. Les Défenderesses font valoir que la procédure engagée par GVG à l'encontre de l'État est nulle faute d'avoir été signifiée à l'Agent judiciaire de l'État, seul habilité par la loi guinéenne **[Pièce RL-4 : Décret guinéen 083/PRG/SGG portant attributions et organisation de l'Agence Judiciaire de l'État du 5 mai 1997]** à recevoir les citations, assignations ou requêtes introductives d'instance servies ou notifiées à l'État, sous peine de nullité **[Mémoire en Duplique ¶¶244-249]**.

155. Les Défenderesses rappellent que le cabinet Hughes Hubbard LLP, qui les représente, a d'abord été mandaté verbalement et par le Ministre des Postes et Télécommunications et par l'Agent judiciaire de l'État, ces mandats verbaux ayant été régularisés par écrit le 14 septembre 2017 pour le Ministre, et le 15 octobre 2018 pour l'Agent judiciaire **[Pièces C-64 ; R-26 ; Mémoire en Duplique ¶¶255-256]**.

156. Ces régularisations, tout comme la volonté de GVG de considérer que l'État est représenté par le Ministre et par l'Agent judiciaire, ne sauraient cependant rendre valable une demande d'arbitrage initialement nulle **[Mémoire en Duplique ¶¶265-267]**.

157. Pour sa part, GVG souligne que l'Acte de Mission signé par les parties, tout comme le mandat initialement produit par les Défenderesses **[Pièce C-26]**, énoncent clairement que l'État est représenté pour les fins de la présente procédure par le Ministre des Postes, Télécommunications et de l'Économie Numérique. Citant un arrêt de la Cour d'appel de Paris du 15 mai 2012, *Me Sylvain*

*X c/ L`État de Côte d`Ivoire* [**Pièce CL-34**], GVG plaide que l'État ne saurait, sans se contredire au détriment de GVG, d'une part produire un mandat attestant que l'État est représenté par le Ministre des Postes et Télécommunications puis consentir à un Acte de Mission reprenant cette attestation ; et d'autre part soutenir par la suite que ce même Ministre n'a pas pouvoir pour représenter l'État [**Mémoire récapitulatif et en Réponse ¶¶125-127**].

158. GVG ajoute que la demande en nullité des Défenderesses est mal fondée au regard du Règlement de la CCI, lequel ne sanctionne pas de nullité une erreur dans la désignation du représentant légal de la personne morale attraite en arbitrage ; et qu'en tout état de cause, même en supposant que le droit guinéen soit applicable à une telle question procédurale, le Décret sur lequel s'appuient les Défenderesses ne concerne que les procédures judiciaires, et non la procédure arbitrale [**Mémoire récapitulatif et en Réponse ¶¶128-138**].

159. GVG conclut enfin qu'elle accepte que, comme le disent maintenant les Défenderesses, l'État est représenté et par le Ministre et par l'Agent judiciaire [**Mémoire récapitulatif et en Réponse ¶139**].

**III.1.b. Analyse**

160. Le Tribunal relève d`entrée de jeu que la *ratio legis* des règles relatives à l'assignation repose sur la nécessité de s'assurer que l'État est bien informé de la procédure menée à son encontre.

161. En tout état de cause, même si l'on devait se trouver dans une situation où le Décret RL-4 s'appliquerait, les éléments de fait qui ressortent du dossier conduisent à écarter une nullité de principe qui a été couverte par chacune des Parties : l'une (GVG) par le fait qu'elle indique considérer qu'elle s'adresse désormais aussi à l'Agent Judiciaire et l'autre (les Défenderesses) parce que le mandat verbal de l`État a été suivi d'un mandat écrit produit en cours de procédure et daté du 15 octobre 2018, faisant suite au mandat donné par l`ARPT le 14 septembre 2017.

162. Il apparaît également manifeste au Tribunal, au regard des termes des mandats conférés aux conseils des Défenderesses et de l`Acte de Mission, que permettre à l`État de se dédire pour subséquemment invoquer la nullité de la procédure à son encontre violerait les principes fondamentaux du devoir de loyauté procédurale tel que le rappellent l`arrêt *Me X c/ l`État de Côte d`Ivoire* [**Pièce CL-34**] ainsi que les autorités citées par les Défenderesses [**Pièce RL-14**].

163. Le recours en nullité des Défenderesses sous ce chef est par conséquent rejeté.

## III.2. *Sur le fond*

**III.2.a. Résumé des positions des parties**

164. Les Défenderesses soutiennent que GVG est irrecevable en son action pour cause de violation de l`article 2 du Décret d`application du CMP du 3 novembre 1997 en ce que le cocontractant d`une

personne publique dont le contrat de marché public n'est pas passé, approuvé et notifié conformément au CMP n'a pas d'action en exécution des engagements financiers contre l'autorité publique contractante en droit guinéen **[Pièce R-1 ; Mémoire en Duplique ¶¶280-282]**.

165. Les Défenderesses invoquent l'extrait suivant de l'article 2 du Décret au soutien de l'exception d'irrecevabilité qu'elles soulèvent : « *Les marchés publics doivent être passés, approuvés et notifiés avant tout commencement d'exécution. Tout marché non approuvé par l'autorité compétente ne saurait engager financièrement l'État – aussi, sauf dans le cas prévu à l'article 27.2.5 du Code des marchés publics, s'il commence à recevoir un début d'exécution, ce ne peut être qu'aux risques et périls de l'entrepreneur, du fournisseur, de l'industriel, ou du prestataire de services concerné.* »

166. À l'audience, les conseils de GVG plaident que l'article 2 du Décret ne fait pas mention d'irrecevabilité et que par conséquent l'exception d'irrecevabilité soulevée par les Défenderesses n'a aucun fondement. Dans la mesure où la requête des Défenderesses en irrecevabilité est reliée à leur demande reconventionnelle en nullité pour violation du CMP, les arguments développés par GVG à cet égard valent également pour l'irrecevabilité **[T1/49:27-48:11]**.

### III.2.b. Analyse

167. Même dans l'hypothèse où le CMP trouverait application, le Tribunal arbitral constate que les Défenderesses n'étayent pas dans quelle mesure l'article 2 du Décret constituerait une fin de non-recevoir à la réclamation de GVG, autrement que par référence aux termes « *Tout marché non approuvé par l'autorité compétente ne saurait engager financièrement l'État ; aussi – sauf dans le cas prévu à l'article 27.2.5 du Code des Marchés Publics, s'il commence à recevoir un début d'exécution, ce ne peut être qu'aux risques et périls de l'entrepreneur, du fournisseur, de l'industriel ou du prestataire de services concerné* ». Les Défenderesses ne citent aucune source faisant autorité pouvant éclairer le Tribunal sur la question.

168. L'article 2 ne fait effectivement pas mention d'irrecevabilité ou d'une autre mesure pouvant sanctionner le prestataire de services autrement que de dire que la passation du marché se fait « *à ses risques et périls* », sans que la signification de ces termes ne soit autrement explicitée. Si sanction il y a, elle vise de façon explicite les agents de l'Administration, tel qu'en fait état le troisième alinéa de l'article 2 du Décret : « *Les agents de l'Administration qui interviennent dans la passation ou l'exécution d'un tel marché sont passibles des sanctions prévues à l'article 78 du code des marchés publics* ». Quant à l'article 79 du CMP, intitulé « *Fautes Commises par le Candidat ou le Titulaire du Marché Public* » sous le Titre 6, lui-même intitulé « *Des sanctions des atteintes à la règlementation des marchés publics* », dont les Défenderesses n'ont d'ailleurs pas cherché à invoquer l'application, il ne fournit pas davantage d'éclaircissement sur ce point.

169. Pour ces motifs, le Tribunal arbitral est d'avis que les Défenderesses, sur lesquelles repose la charge de prouver leurs allégations, n'ont pas démontré en quoi l'article 2 du Décret peut constituer

une fin de non-recevoir à la réclamation de GVG et rejette par conséquent l'exception d'irrecevabilité sous ce chef.

## IV.    VALIDITÉ OU INVALIDITÉ DE L'ACCORD DE PARTENARIAT

### IV.1. *Résumé des positions des parties*

170. Par voie de demande reconventionnelle, les Défenderesses recherchent la nullité de l'Accord de Partenariat, d'abord sur la base de la violation des dispositions impératives du CMP et notamment, dans le cas du marché public que constitue l'Accord de Partenariat, la nécessité de procéder à un appel d'offres avant l'attribution de ce marché public **[Mémoire en Duplique ¶¶285-412]** ; et en second lieu pour cause de pacte de corruption **[Mémoire en Duplique ¶¶413-492]**.

171. En conséquence, les Défenderesses demandent à titre reconventionnel la restitution de l'intégralité des sommes perçues par GVG, qu'elles chiffrent à USD 48.093.160,00 de même que des dommages et intérêts qu'elles évaluent à USD 10 millions **[Mémoire en Duplique ¶¶493-495 ; 554]**.

172. GVG plaide : (i) à titre principal, que l'action en nullité est prescrite et donc irrecevable **[Mémoire récapitulatif et en Réponse ¶¶287-312]** ; (ii) à titre subsidiaire, que le CMP est inapplicable à l'Accord de Partenariat **[Mémoire récapitulatif et en Réponse ¶¶313-327]** ; (iii) à titre très subsidiaire, à supposer que le CMP soit applicable, que l'Accord de Partenariat relève de la catégorie des marchés conclus de gré à gré, et non des marchés conclus sur appel d'offres **[Mémoire récapitulatif et en Réponse ¶¶328-352]** ; (iv) à titre infiniment subsidiaire, à supposer que l'Accord de Partenariat ne relève pas de la catégorie des marchés conclus de gré à gré, que les Défenderesses ne sauraient se prévaloir aujourd'hui de la nullité de l'Accord de Partenariat, se contredisant ainsi au détriment de GVG **[Mémoire récapitulatif et en Réponse ¶¶353-397]**.

173. Sur l'action en nullité de l'accord pour cause de pacte de corruption, GVG plaide la prescription à titre principal ; et le mal-fondé de cette action **[Mémoire récapitulatif et en Réponse ¶¶398-463]**.

### IV.2. *Analyse*

#### IV.2.a. Exception d'irrecevabilité de l'action en nullité fondée sur la violation du CMP pour cause de prescription

174. Le Tribunal arbitral fait droit à l'exception d'irrecevabilité que soulève GVG sur le fondement de l'article 770 du Code civil guinéen **[Pièce RL-11]**.

175. Le CMP n'ayant pas prévu de voie d'action en nullité de contrat pour non-respect de la procédure d'appel d'offres, c'est le droit commun qui doit être appliqué, c'est-à-dire l'article 770 qui prévoit que l'action en nullité d'un contrat se prescrit par cinq ans :

*« Sous réserve de ce qui sera examiné à la section traitant 'De la prescription' dans tous les cas où une action en nullité ou en rescision d'une convention n'est pas limitée à un moindre temps par la loi, cette action peut être engagée durant cinq ans Cette période de temps court :*

*- pour la violence, du jour où elle a cessé ;*

*- pour l'erreur ou le dol, du jour où ils ont été découverts ;*

*- pour un mineur, du jour de son émancipation ou de sa majorité ;*

*- pour un majeur protégé, du jour où il a eu connaissances des actes le lésant, alors qu'il avait acquis la possibilité de les refaire valablement. »*

176. L'Accord de Partenariat ayant été conclu le 22 mai 2009 et l'Avenant le 6 juillet 2009, l'action en nullité pour contrariété au CMP intentée reconventionnellement par les Défenderesses le 13 octobre 2017 est donc prescrite.

177. Les Défenderesses soutiennent pour leur part que la prescription trentenaire est applicable, la nullité invoquée par GVG ne procédant pas du droit des obligations, mais constituant une nullité spécifique fondée sur l'article 37.3 du CMP. Cet article prévoit que « [l]*es Marchés publics qui n'ont pas été approuvés conformément aux dispositions du présent chapitre sont nuls et de nul effet, ainsi que tous les actes accomplis pour leur exécution ».*

178. La lecture que fait le Tribunal arbitral de l'article 37.3 du CMP ne fait pas obstacle à l'application de l'article 770 du Code civil guinéen ; le fait demeure que le CMP ne prévoit pas de voie d'action en nullité d'un contrat, ni ne fait état d'une limite de temps pour intenter cette action qui soit inférieure (ni même supérieure) à cinq ans. L'article 770, qui traite expressément de l'action en nullité contractuelle et qui intéresse la prescription *extinctive*, a donc vocation à s'appliquer, plutôt que les dispositions concernant la prescription trentenaire applicable à la prescription acquisitive.

179. Dans son état au moment de la conclusion de l'Accord de Partenariat, le Code civil guinéen ne comportait aucune disposition spécifique à la nullité absolue et ne pouvait donc prévoir de délai trentenaire à son égard. Le Code ne distinguant pas entre les divers types de nullité, le Tribunal ne voit pas de raison de distinguer là où la loi elle-même ne distingue pas. En conséquence, le Tribunal écarte également l'argument des Défenderesses tendant à considérer qu'une prescription trentenaire était applicable.

**IV.2.b. Nullité pour violation du CMP**

180. Nonobstant les conclusions qui précèdent concernant l'exception d'irrecevabilité de l'action en nullité pour cause de prescription, et à titre surabondant, le Tribunal arbitral tient à faire état de ce qui suit quant à la question de la nullité de l'Accord pour cause de violation du CMP.

181. La question de l'application ou non du CMP à l'Accord de Partenariat et sa qualification comme relevant soit de la catégorie des marchés conclus sur appel d'offres, soit des marchés conclus de gré à gré, ont fait l'objet de plaidoiries écrites **[Mémoire récapitulatif et en Réponse ¶¶313-352 ; Mémoire en Duplique ¶¶285-292 ; 314-372]** et orales **[T1/11:21-19:13 ; 22:8-23:12 ; 70:21-73:9]** élaborées de la part des parties, que le Tribunal a considérées avec beaucoup d'attention.

182. Après un examen attentif des argumentaires, le Tribunal arbitral conclut que cette démonstration, aussi instructive qu'elle soit, élude le cœur du débat sur la validité ou non de l'Accord de Partenariat.

183. En effet, la question essentielle qui sous-tend la détermination de la validité ou non de l'Accord de Partenariat est celle de savoir si les Défenderesses, qui jusqu'à présent n'ont jamais contesté la validité de la passation de l'Accord au regard du CMP, qui ont signé, renégocié et exécuté l'Accord sans se référer au CMP, peuvent *ex post facto* exciper de l'application du CMP et, en le supposant applicable, du non-respect de leur propre réglementation.

184. Cette question relève d'abord d'un examen des circonstances entourant la passation de l'Accord et de l'intention des parties au moment de cette passation.

185. Cette question relève également du devoir de bonne foi et de loyauté des parties dans l'exécution de leur entente contractuelle, principe consacré en droit guinéen : « *La force obligatoire des conventions a un double fondement : - Une idée morale, le respect de la parole donnée – Un intérêt économique, la nécessité du crédit. Ce double fondement implique qu'elles doivent être contractées de bonne foi et qu'elles obligent non seulement au respect des clauses qui y sont exprimés, mais aussi à tout ce que l'équité, l'usage ou la Loi leur donnent d'après nature.* » **[Article 669 du Code civil guinéen ; Mémoire récapitulatif et en Réponse ¶364]**.

186. Sur la question des circonstances entourant la passation de l'Accord, le Tribunal arbitral fait les constatations suivantes.  La première, c'est que le contrat Subah du 20 novembre 2015, dont la validité n'est pas contestée et qui a remplacé l'Accord de Partenariat **[Pièce R-30]**, n'a pas davantage fait l'objet d'une mise en concurrence préalable selon les termes du CMP de 2012.  Les Défenderesses expliquent que le contrat Subah a été passé sans appel d'offres conformément à l'article 11.4 de la loi du 11 octobre 2012 fixant les règles régissant la passation, le contrôle et la régulation des marchés publics et délégations de service public, ce texte permettant que le marché soit passé par entente directe « *dans le cas d'extrême urgence, pour les travaux, fourniture ou service que l'autorité contractante doit faire exécuter en lieu et place de l'entrepreneur, du fournisseur ou du prestataire défaillant.* » **[Mémoire en Duplique ¶535 ; T3/290:10-13]**.

187. Le Tribunal arbitral constate également que le CMP contient des dispositions semblables en ses articles 27.2(4) et 24.2(5) **[Pièce R-1]**.  Il en retient que l'État est habilité, dans certaines circonstances, à outrepasser l'étape de l'appel d'offres.

188. Or, il ressort clairement de l'audition de Monsieur Diaby qu'en 2009, au moment de la passation de l'Accord de Partenariat, la République de Guinée était soumise au régime militaire et dans un état de profonde instabilité politique **[T2/165:25]**. Le Tribunal arbitral conçoit que de telles circonstances participent elles aussi de l'état d'urgence prévu aux termes du CMP, se traduisant par une recherche de stabilité par tous les moyens, expliquant aisément que l'Accord de Partenariat n'ait pas fait l'objet d'une mise en concurrence. Il convient de préciser que la référence à l'urgence existait également dans le CMP de 1997 applicable en l'espèce [cité dans le **Mémoire récapitulatif et en Réponse ¶332**] et qu'elle se double d'autres arguments [**Mémoire récapitulatif et en Réponse ¶333**].

189. Le Tribunal arbitral considère donc que, comme pour le contrat Subah qui lui a succédé, les circonstances de l'époque de la signature de l'Accord de Partenariat justifiaient que la procédure d'appel d'offres du CMP soit écartée. Il en résulte que, tout au long de la durée de l'Accord, ce dernier n'était pas soumis aux exigences du CMP, ce qui concorde entièrement avec le fait que les Défenderesses n'en ont jamais invoqué l'application pendant la durée de leurs relations contractuelles avec GVG.

190. Monsieur Diaby a poursuivi son témoignage en disant que son arrivée en fonction à l'ARPT en 2011, une fois le régime militaire évincé, a été marquée par le souci de « *réajuster les choses, venir vers la normalité et construire un écosystème dynamique* » plutôt que par la prise de procédures envers les anciens dirigeants ou envers GVG **[Monsieur Diaby T2/165:20-166:17 ; 168:8-12 ; 172:18-31]**. Le Tribunal constate effectivement que, même au stade où les Défenderesses se disaient insatisfaites des termes et de l'exécution de l'Accord, elles n'ont jamais fait état d'une prétendue nullité de l'Accord pour faute de mise en concurrence, la volonté de Monsieur Diaby étant plutôt de rechercher le maintien de l'Accord et un ajustement de ses termes via notamment l'Addendum de 2012 **[Monsieur Diaby T2/160:9-24]**.

191. Dans de telles circonstances, le Tribunal conclut que les parties ont écarté l'application du CMP pour ce qui a trait à l'Accord.

192. Par ailleurs, le Tribunal arbitral considère que l'article 669 du Code civil guinéen précité trouve pleinement application et qu'il serait contraire à sa lettre et à son esprit que de permettre à l'État de se dédire en invoquant pour la première fois, à la faveur de cet arbitrage, la nullité de l'Accord.

193. Le Tribunal ajoute qu'il ne s'agit pas ici de confondre le devoir de bonne foi et de loyauté contractuelles avec le principe de l'*estoppel*. Il n'est nul besoin d'avoir recours au principe de l'*estoppel* pour conclure que la position des Défenderesses, qui invoquent longtemps après les faits la prétendue nullité au regard du droit guinéen de l'Accord de Partenariat dont elles ont bénéficié au cours de cinq années avec des revenus bruts de l'ordre de USD 212 millions **[Pièce C-49 ; T3/277:13-18 ; Attestation no. 1 de Monsieur Baker ¶61**] sans que la validité de cet Accord soit remise en cause et sans qu'il soit jamais dénoncé **[Monsieur Diaby T2/150:27-155:21 ; Madame**

**Kaba T3/263:19-26 ; 278:33-35-279:3]**, est contraire à leur devoir de bonne foi et de loyauté contractuelles.

194. De même il n'est pas nécessaire d'invoquer la confirmation de l'Accord par les Défenderesses de par leur exécution de celui-ci sans protestation quant à sa validité **[T1/103:10-27]**, bien qu'il apparaisse évident, au regard des faits et pièces au dossier, que cette confirmation a eu lieu.

195. Pour ces motifs, la demande d'annulation des Défenderesses pour cause de violation du CMP est rejetée. Il n'est par conséquent pas nécessaire pour le Tribunal arbitral de se prononcer sur les autres arguments des Parties sous ce chef.

**IV.2.c. Exception d'irrecevabilité de l'action en nullité pour pacte de corruption pour cause de prescription**

196. Le Tribunal arbitral prend note que la Constitution guinéenne du 7 mai 2010 dispose expressément dans son Préambule que la corruption et les crimes économiques sont imprescriptibles **[T1/84:11-16 ; T3/289:16-19]**.[2]

197. Bien que la Constitution soit postérieure à l'Accord et à l'Avenant, le Tribunal arbitral considère d'une part que la règle posée par la Constitution guinéenne est d'ordre public guinéen et s'applique immédiatement et d'autre part que l'imprescriptibilité de la nullité pour cause de pacte de corruption découle du fait que la corruption est contraire à l'ordre public international, tel qu'explicité ci-dessous.

198. Par conséquent, l'exception d'irrecevabilité pour cause de prescription est rejetée.

**IV.2.d. Nullité pour pacte de corruption**

199. La lutte contre la corruption relève de l'ordre public international, ainsi qu'en témoignent les importantes conventions interétatiques dont elle est l'objet, telle la Convention des Nations Unies contre la Corruption **[Pièce RL-16 ; Mémoire en Duplique ¶¶414-416]**.

200. La lutte contre la corruption est également inscrite au Code pénal guinéen de 1998 en ses articles 191 à 194, qui reflètent le consensus international en la matière **[Pièce RL-18 ; Mémoire en Duplique ¶¶417-419]**.

201. Comme il l'a clairement exprimé à l'audience, le Tribunal arbitral est extrêmement sensible à la gravité de ces allégations **[T1/89:6-11]**.

---

[2] Constitution guinéenne http://mjp.univ-perp.fr/constit/gn2010.htm : « ...*le peuple de Guinée ... Réaffirme ... - sa volonté de promouvoir la bonne gouvernance et de lutter résolument contre la corruption et les crimes économiques. Ces crimes sont imprescriptibles.* »

*IV.2.d.(i).    Charge de la preuve.  Standard de la preuve*

202. Les Défenderesses, qui les invoquent, ont la charge de prouver les éléments de corruption – le renversement du fardeau de la preuve, prôné par une certaine doctrine, est rejeté par la jurisprudence, tel que l'indique le Professeur Emmanuel Gaillard dans son récent article sur le sujet **[Pièce RL-55 ¶33]**.

203. Sur la question du standard qu'il convient d'appliquer à la preuve de ces allégations, le Tribunal arbitral fait siens les propos du Professeur Gaillard : « *On constate que, si la majorité des tribunaux arbitraux a exigé jusqu'à présent une preuve `claire et convaincante` des faits de corruption allégués, les arbitres semblent de plus en plus enclins à adopter une approche flexible et à s'éloigner des standards de preuve élevés.  Cette discussion est en réalité passablement théorique, les arbitres possédant dans tous les cas un large pouvoir d'appréciation du caractère convaincant ou non de la preuve qui leur est soumise sans qu'ils soient particulièrement influencés par la discussion abstraite du standard de preuve requis.* » **[Pièce RL-55 ¶34]**.

204. Le Tribunal fonde par conséquent son examen des allégations des Défenderesses sur les principes jumelés du fait qu'elles ont la charge de la preuve, et que cette preuve doit convaincre de l'existence de corruption selon une prépondérance des probabilités, par voie de faisceau « *d'indices graves, précis et concordants* », tel que l'enseigne la Cour d'appel de Paris dans son arrêt *République du Kirghizistan c/ Belokon* **[Pièce CL-60]**, tout en prenant en compte le caractère occulte propre aux actes de corruption.  Le Tribunal précise que les références non exclusives qu'il fait au droit français le sont notamment parce qu'il s'agit du droit du siège, droit auquel serait soumis le contrôle de la sentence le cas échéant et que l'article 41 du Règlement d'arbitrage invite les arbitres à faire « *tous leurs efforts pour que la sentence soit susceptible de sanction légale* ».

205. Le Tribunal a également exercé sa faculté d'interroger directement les témoins afin de les sonder sur ces questions **[T2/181:14-183:7 ; T3/251:8-252:6]**.

206. Les Défenderesses ont soulevé de nouveaux indices de corruption tout au long de la procédure arbitrale, et ce jusqu'en cours d'audience et dans les Notes post-audiences.  Le Tribunal rappellera dans un premier temps l'essentiel des positions respectives des parties.  Il exposera ensuite son analyse.

*IV.2.d.(ii).    Résumé de la position des Défenderesses*

207. Au soutien de leurs allégations de corruption par GVG dans le cadre de l'Accord de Partenariat, les Défenderesses ont insisté sur le « modèle économique » qui sous-tend ce dernier.  Dans son essence, leur argumentaire sur ce point revient à dire que, de par sa nature même, l'Accord ne peut que découler d'un pacte de corruption, au regard des circonstances dans lequel il a été passé et des retombées économiques qu'il a générées au profit de GVG : « *Un État qui signe un contrat avec un privé, et un fonctionnaire qui accepte, sur la base d'une analyse de risque absolument improbable,*

*comme ce qui vient de nous être indiqué. Aucune rigueur là-dedans. Et on nous dit que le fonctionnaire accepte de donner 60% des revenus que l'État peut tirer de cette affaire. Il les donne au privé. C'est du jamais-vu. Je pense que ce modèle-là, il est nécessairement consubstantiel avec la corruption. Ce n'est pas possible, sinon. Aucun fonctionnaire, aucune personne normalement constituée dans ce monde ne peut accepter de signer un contrat de cette nature-là. C'est impossible. C'est totalement impossible. »* **[T1/82:27-83 :6. Au même effet, T1/83:10-22 ; T1/86:19-25 ; T1/91:16-23 ; Note post-audiences no. 1 Défenderesses ¶¶51-54]**.

208. Prenant en compte un tel modèle économique et les circonstances politiques entourant la passation de l'Accord, les Défenderesses invoquent également un faisceau d'indices, qui selon elles convergent vers l'inévitable conclusion que l'Accord de Partenariat est entaché de corruption.

209. Ainsi dans leur Mémoire en Duplique, les Défenderesses s'appuient sur les circonstances suivantes, circonstances dont elles arguent qu'elles forment un faisceau qui converge vers l'indication d'un pacte de corruption **[Mémoire en Duplique ¶¶470-492]** :

    a. Attribution de voitures hors Accord de Partenariat ;

    b. Contournement des règles du marché public ;

    c. Absence de justification économique du prix du contrat ;

    d. Connivence avec des agents publics ;

    e. Dons et cadeaux excessifs ;

    f. Mauvaise réputation de GVG, telle que relatée par la presse ;

    g. Faux documents produits par GVG dans cet arbitrage.

210. Le samedi 26 janvier 2019, deux jours avant le début de l'audience, les Défenderesses ont fait état d'un nouvel élément s'ajoutant au faisceau d'indices, soit un jeu de treize chèques déposé à l'audience comme **[Pièce R-28]**. Les Défenderesses arguent que leur émission est dépourvue de cause ; que le bénéficiaire des chèques était M. Ismaïla N'Diaye, le « représentant pays » de GVG en Guinée, à titre personnel ; que ces chèques étaient non barrés ; et que les explications de GVG à leur sujet sont mensongères **[Note post-audiences no. 1 Défenderesses ¶¶28-49]**.

211. Au deuxième jour de l'audience, les Défenderesses, au cours du contre-interrogatoire de Monsieur Patrice Baker, ont produit l'Avenant no. 3 à l'Accord du 22 mai 2009 **[Pièce R-29]**, dont elles arguent dans leur Note post-audiences no. 1 qu'il est infondé dans son existence ; frauduleux dans son objet ; et constitutif d'un outil de prédation sur les deniers publics guinéens ; et elles en demandent par conséquent l'annulation **[Note post-audiences no. 1 Défenderesses ¶¶6-21 ; 65-70]**.

*IV.2.d.(iii).    Résumé de la position de GVG*

212. À ce qui précède, GVG oppose que les affirmations des Défenderesses, quoique péremptoires, sont fausses et se situent à un niveau de généralité tel qu'elles sont insuffisantes pour satisfaire à la