**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

GLOBAL VOICE GROUP SA,

                    *Plaintiff*,

    v.

THE REPUBLIC OF GUINEA,


                    *Defendant*.

Civil Action No. 1:22-cv-02100

**EXHIBIT A (Part 4 – Pages 111-145) TO DECLARATION OF MARIANNE KECSMAR**

charge de la preuve qui leur incombe.  GVG présente d'ailleurs des explications démontrant que les circonstances évoquées par les Défenderesses n'ont rien à voir avec quelque pacte de corruption que ce soit.

213. Ainsi, les relations cordiales entretenues par Monsieur Laurent Lamothe, PDG de GVG à l'époque de la signature de l'Accord, avec Monsieur Nfa Ousmane Camara, Directeur Général de l'ARPT à l'époque, sont explicitées dans l'Attestation no.1 de Monsieur Baker **[¶¶18-20]**.  Ces relations cordiales se sont d'ailleurs maintenues avec les successeurs de Monsieur Camara, Messieurs Laminé Diallo et Morlay Youla.  Aucun de ces successeurs, y compris Monsieur Diaby lors de son arrivée à la tête de l'ARPT en mars 2011, n'a jamais fait état d'un soupçon quelconque sur l'obtention du Projet STP par GVG **[Mémoire récapitulatif et en Réponse ¶445]**.

214. La nomination de Monsieur Camara le 26 novembre 2012 comme consul honoraire de Haïti en Guinée (poste non rémunéré) a été prononcée, non par Monsieur Lamothe, mais par le Président de la République de Guinée, lui-même élu en 2010 à la suite d'élections démocratiques **[Pièce C-51]**. Cette nomination n'aurait pas eu lieu si des soupçons avaient pesé sur Monsieur Camara.  Il est inconcevable que Monsieur Camara ait octroyé le Projet STP à GVG sur la promesse d'une telle nomination en 2009, époque à laquelle Monsieur Lamothe n'occupait aucune fonction ministérielle en Haïti **[Mémoire récapitulatif et en Réponse ¶¶445-446]**.

215. La prétendue violation des exigences de passation d'appel d'offres du CMP, à supposer qu'elle soit avérée, est insuffisante à elle seule pour établir un pacte de corruption, ainsi que le rappelle la Cour d'appel de Paris dans son arrêt *République démocratique du Congo* **[Pièce CL-51 ; Mémoire récapitulatif et en Réponse ¶¶448-449]**.

216. Quant à la rémunération contractuelle de GVG, elle n'est pas exorbitante au vu de l'ampleur de son investissement, de la durée du contrat et de la prise en charge des risques financiers et de stabilité politique par GVG **[Mémoire récapitulatif et en Réponse ¶¶451-452]**.  Le fait pour GVG d'avoir subséquemment accepté de revoir cette rémunération à la baisse par voie de l'Addendum ne prouve pas le contraire, au regard des circonstances particulières entourant la signature de l'Addendum et l'impact qu'un désaccord avec l'ARPT aurait provoqué sur les affaires de GVG en Afrique **[Mémoire récapitulatif et en Réponse ¶¶453-454]**.

217. Les prétendus dons et félicitations « suspects » (comprenant des lettres de félicitations, invitation à un congrès professionnel, don de deux laboratoires informatiques scolaires médiatisés, financement contre facture de deux véhicules dans le cadre du Projet STP) sont intervenus postérieurement à la conclusion de l'Accord de Partenariat.  Aucun des successeurs de Monsieur Camara à la tête de l'ARPT, ni aucun des Ministres ayant succédé à Monsieur Bangoura, n'a jamais fait état de soupçons de corruption de la part de GVG.  Ces accusations sont apparues pour la première fois dans le cadre du présent arbitrage **[Mémoire récapitulatif et en Réponse ¶¶460-462]**.

218. Les treize chèques et l`Avenant no. 3 produits *in extremis* et de mauvaise foi par les Défenderesses concernent le paiement par l`ARPT des quotes-parts revenant à GVG pour le trafic de téléphonie nationale, ce qui n`est pas contesté par les Défenderesses ni ne forme le sujet des demandes de GVG dans cette procédure **[Pièces R-28 ; R-29 ; Note post-audiences no. 1 GVG]**.  Quoi qu`il en soit, GVG a déposé un tableau de réconciliation des sommes faisant l'objet des chèques, qui en explique le fondement **[Pièces C-74.1 ; C-74.2 ; C-74.3 ; C-75]**.

219. L`Avenant no. 3 a de toute façon été annulé et remplacé par un autre contrat à tarif fixe, et dans le cadre de l`Addendum du 10 juin 2012 les sommes perçues par GVG ont été remboursées, ce qui est admis par les Défenderesses.  Leur demande d`annulation de l`Avenant no. 3 est donc sans objet **[Note post- audiences no. 2 GVG ¶¶20-33]**.

220. Les documents dont les Défenderesses ont prétendu, à diverses étapes de la procédure, qu`ils étaient des faux (et par ce fait même indices de corruption) sont : l`Avenant à l`Accord du 6 juillet 2009 **[Pièce C-3]** ; le Certificat du Ministère du 18 janvier 2010 relatif au paiement effectué par GVG au titre de l`Avenant à l`Accord **[Pièce C-53]** ; et la Matrice des Responsabilités en annexe à l`Accord **[Pièce C-1]**.  Or les Défenderesses ont par la suite développé une argumentation reposant précisément sur ces documents, démontrant ainsi l`incohérence de leur position **[Note post-audiences no. 2 GVG ¶¶2-3]**.

### IV.2.d.(iv).    Analyse

221. Le Tribunal constate d`abord que l'allégation des Défenderesses à l`effet que le « modèle économique » qui sous-tend l`Accord de Partenariat ne peut qu`être consubstantiel avec la corruption revient à plaider un renversement du fardeau de la preuve **[T1/95:31-33]**, obligeant GVG à justifier les tenants et aboutissants de l`Accord.  Tel qu`indiqué dans les remarques introductives ci-dessus, la pratique arbitrale internationale rejette le renversement du fardeau de la preuve de corruption, approche que le Tribunal adopte également.

222. Par ailleurs, le Tribunal prend note de l`investissement initial de GVG de quelque USD 13 millions, des coûts de l`opération à sa charge, de même que des risques qu`elle seule a assumés dans ce Projet **[Attestation no. 1 de Monsieur Baker ¶¶32-36 ; Monsieur Baker T2/188:1-25]**, notamment le risque pays associé aux investissements en Guinée, dont les deux parties sont d`accord pour dire qu`il compte parmi les plus élevés du monde **[T1/74:1-2 ; 81:31-33]**.

223. Au regard d`un tel investissement et endossement des risques, le Tribunal constate que les Défenderesses, sur lesquelles repose le fardeau de la preuve, n`ont pas démontré à quelle aune l`Accord de Partenariat, en vigueur pendant cinq années et rapportant d`importants revenus à l`État, procède d`un modèle économique abusif ; ni comment ce modèle est en lui-même indicatif de corruption.  Au cours du contre-interrogatoire de Monsieur Baker **[T2/199:6-201:5]**, le conseil des

Défenderesses a fait état de chiffres et pourcentages, sans pour autant que ceux-ci soient étayés d'aucune façon qui permette au Tribunal ou à GVG de vérifier leur fondement de façon précise.

224. Le Tribunal conclut que les Défenderesses n'ont pas démontré le bien-fondé de leurs allégations de modèle économique abusif de manière précise et concordante. Cet indice est donc écarté.

225. Pour ce qui a trait aux autres éléments mis de l'avant par les Défenderesses comme étant indicatifs de corruption, ils ne satisfont pas davantage le test de gravité, de précision et de concordance ; ceci en dépit de l'utilisation par les Défenderesses d'un vocabulaire hautement imagé à l'égard de GVG (Monsieur Diaby a parlé de « *banditisme* » **[T2/180:5-6]** ; les remarques de clôture ont fait état d' « *escroquerie* » **[T3/286:28-34]** et de « *blanchiment d'argent* » **[T3/288:28-29]**). Il s'agit plus exactement d'une liste de facteurs disparates et étalés dans le temps (et donc non concordants), qui en restent au stade d'allégations générales sans être prouvés (et donc non précis).

226. Les Défenderesses plaident ainsi la mauvaise réputation de GVG telle que rapportée dans une presse dont les sources ne sont pas vérifiées (« *Mauvaise réputation de GVG, telle que relatée par la presse* ») ; certains dons et cadeaux octroyés <u>après</u> la passation de l'Accord (dont les deux voitures), dont il n'est pas démontré comment ils ont pu influencer l'obtention de l'Accord (« *Dons et cadeaux excessifs* » « *Attribution de voitures hors Accord de Partenariat* » ) ; de même que la soi-disant falsification de documents déposés par GVG au dossier de cette procédure (« *Faux documents produits par GVG dans cet arbitrage* ») sans qu'apparaisse un lien qui pourrait relier ces éléments à la signature de l'Accord au profit de GVG plutôt qu'avec ses compétiteurs.

227. Quant au don par GVG de deux laboratoires informatiques scolaires, il s'agit pour le Tribunal d'une opération de mécénat exclusive de toute corruption, courante dans le cadre d'investissements de l'envergure du Projet STP, même si une telle opération était indirectement destinée à donner une bonne image de GVG.

228. Pour l'invitation en 2010 faite à Monsieur Morlaye Youla, alors Directeur de l'ARPT,  d'assister à un sommet professionnel en Afrique du Sud **[Pièce C-44]**, le Tribunal constate, d'une part que le fait que l'invitation ait été officielle rend peu vraisemblable l'argument des Défenderesses selon lequel il s'agirait « *d'avantages indus* », et d'autre part que cet argument met en cause la probité de Monsieur Youla, en laquelle l'État guinéen a suffisamment foi pour promouvoir Monsieur Youla au rang de Secrétaire Général du Ministère mené par Monsieur Diaby, fonction qu'il occupe encore actuellement **[T2/183:10-12]**.

229. Quant à l'attribution des deux véhicules, le Tribunal relève que la Pièce C-46 est, d'une part, une lettre officielle de Monsieur Youla, alors Directeur de l'ARPT, qui indique le 10 mai 2010 le numéro de compte sur lequel verser les fonds qui serviront à acquérir les véhicules convenus, et d'autre part, le reçu officiel du 13 mai 2010 attestant la bonne réception des fonds.  Il est difficile pour le Tribunal d'admettre que pour corrompre tel ou tel fonctionnaire en lui offrant des véhicules une société lui aurait écrit officiellement pour connaître le numéro de compte à créditer (lequel ne

comporte pas le nom du bénéficiaire) et que le Directeur adjoint de l'ARPT aurait adressé un reçu officiel sur papier à en-tête.

230. Quant au « *Contournement des règles du marché public* », le Tribunal a rejeté cet argumentaire pour les raisons qui précèdent.

231. Enfin, en ce qui a trait à la « *Connivence avec des agents publics* », le témoignage de Monsieur Diaby, qui fait état de versements d'argent par GVG à des fonctionnaires de l'État et de tentatives de corruption à son propre égard, est contredit non seulement par Monsieur Baker **[Attestation no. 2 de Monsieur Baker ¶45]**, mais également et sans hésitation par Monsieur Touray, avec lequel Monsieur Diaby a étroitement travaillé et discuté de ses soupçons **[T2/171:1]**, et dont il loue l' « *apport considérable* », la lucidité et la courtoisie **[T2/117:10-15 ; 174:22-26]** : « *Mme le Président : (...) Vous êtes un opérateur dans le domaine des télécoms expérimenté et vous avez eu une implication très proche de ce projet. Vous-même, avez-vous eu l'occasion de constater qu'il y avait des malversations, des circonstances qui pourraient être consistantes avec des allégations de corruption ? M. K Touray (interprétation) : Non, absolument pas.* » **[T3/251:8-16]** ; « *Mme le Président : Votre réponse à ma première question était que vous n'avez pas vu vous-même de circonstances qui étaient consistantes avec un phénomène de corruption ou de malversation ? M. K Touray (interprétation) : Non, définitivement non.* » **[T3/252:3-6]**.

232. La preuve sur ce point est donc contradictoire et ne permet pas de tirer les conclusions recherchées par les Défenderesses.

233. En ce qui a trait aux treize chèques déposés par les Défenderesses **[Pièce R-28]** ainsi qu'à l'Avenant no. 3 **[Pièce R-29]**, le Tribunal arbitral constate que pour ces indices également l'argumentaire des Défenderesses se résume à l'application de la maxime *res ipsa loquitur* (et donc au renversement du fardeau de la preuve) sans démontrer en quoi ces éléments peuvent être constitutifs de corruption **[Note post-audiences no. 2 Défenderesses ¶43]**. Quoi qu'il en soit, le Tribunal arbitral accepte que le tableau de réconciliation des sommes faisant l'objet des chèques, déposé par GVG, en explique le fondement **[Pièces 74.1-74.3]** et constate que, l'Avenant no. 3 ayant été remplacé par un autre contrat, il n'y a pas lieu d'en prononcer la nullité et rejette la demande des Défenderesses à cet égard.

234. L'examen des écritures des parties et des pièces déposées au dossier, de même que de l'audition des témoins, conduit le Tribunal arbitral à la conclusion que l'information dont il dispose ne fait pas état d'un faisceau d'indices graves, précis et concordants indicatifs de corruption de la part de GVG aux fins d'obtenir par ces moyens l'Accord de Partenariat.

235. Le Tribunal, bien qu'ayant écarté chacun des indices de corruption allégués par les Défenderesses et envisagés séparément, s'est interrogé sur la possible conclusion différente qui aurait pu résulter de leur réunion et n'a pas été convaincu que ces éléments disparates étaient de nature à constituer un tout cohérent et convergent qui pourrait établir la corruption alléguée.

236. Pour ces motifs, la demande reconventionnelle des Défenderesses en nullité de l'Accord du Partenariat pour cause de pacte de corruption est rejetée.

237. Le Tribunal ayant rejeté les demandes des Défenderesses tendant à faire déclarer nul l'Accord de Partenariat, il rejette par là-même leurs demandes reconventionnelles consécutives tendant à la restitution des sommes perçues par GVG.

## V.    EXÉCUTION DE L'ACCORD DE PARTENARIAT

238. Le Tribunal arbitral ayant déterminé que l'Accord de Partenariat est valide, se pose la question de savoir si, comme le prétend GVG, il a été résilié de façon abusive par les Défenderesses en dépit de sa parfaite exécution par GVG ; ou plutôt si, tel que les Défenderesses l'invoquent, l'exécution fautive de GVG en a justifié la résiliation ou, subsidiairement, la suspension.

### *V.1. Résumé des positions des parties*

**V.1.a. GVG**

*V.1.a.(i).    L'Accord de Partenariat et les obligations des parties*

239. À titre liminaire, GVG rappelle que l'objet principal de l'Accord de Partenariat, et donc l'obligation essentielle de GVG, était de « [f]*ournir et installer des outils de contrôle pour l'État Guinéen, lui donnant la capacité de visualiser et de facturer la totalité du trafic local et international de chaque opérateur en temps réel* », selon les termes de l'article 3.2, tiret 2 de l'Accord, ainsi que des outils nécessaires pour lutter contre la fraude téléphonique **[Mémoire récapitulatif et en Réponse ¶¶32 ; 465]**.

240. GVG précise qu'alors que l'Accord de Partenariat visait le trafic international et national, la mise en place du système de contrôle du trafic national a fait l'objet d'un contrat séparé entre les parties, au titre duquel GVG ne fait aucune réclamation **[Mémoire récapitulatif et en Réponse ¶33]**.

241. GVG dit qu'elle s'est engagée, dans le cadre de l'Accord, à mettre et à maintenir en opération un système de supervision (**Système de Supervision IMS-STP**) des appels internationaux des opérateurs téléphoniques en Guinée par STP (« Signaling Transfer Point » / « Point de Transfert de Signalisation ») centralisant les liens de signalisation SS7 des opérateurs.  Ce système nécessitait l'installation des équipements suivants **[Mémoire récapitulatif et en Réponse ¶34]** :

a. Le « Centre Principal de Traitement des Données », pour stocker et traiter les données d'appel de tous les opérateurs.  Les infrastructures nécessaires à l'alimentation d'un tel système n'étant pas parfaitement fiables en Guinée, GVG a aussi dû installer deux

plates-formes redondantes pour éviter des pertes d`information dans l`éventualité d`une panne : la plate-forme IMS STP 1 dans les locaux de l`ARPT ; et la plate-forme IMS-STP 2 chez un opérateur ;

    b.   Le « Sous-système de Capture et de Traitement » des messages de signalisation SS7 et de gestion des signaux de signalisation par STP, par lequel les éléments du réseau téléphonique échangent des informations, et permettant de relier les plates-formes IMS STP 1 et IMS-STP 2 à chaque opérateur ;

    c.   Le « Sous-système de Transport des Données », interfaces de transmissions placées chez chaque opérateur et dans chaque point d`entrée du trafic international, nécessaires au transport des données vers les plates-formes IMS-STP 1 et IMS-STP 2 et à la synchronisation de l`ensemble des Sous-systèmes de Capture et de Traitement de signalisations SS7 répartis dans les différents réseaux.

242. Le système installé par GVG devait également intégrer des outils de gestion de qualité de service (**QoS**) permettant la collecte des données de qualité des services sur les interconnexions internationales captées, ainsi qu`un système de détection de fraude permettant la détection, l`identification et la déconnexion des numéros frauduleux acheminant du trafic international illégal vers les opérateurs guinéens [**Mémoire récapitulatif et en Réponse ¶35**].

243. Enfin, aux termes de l`Accord de Partenariat, GVG devait assurer la formation du personnel de l`ARPT, afin de leur permettre à terme une prise en charge des opérations d`un « Centre de Contrôle et de Surveillance », que GVG devait également mettre en place, comprenant les opérations de l` « Unité de Surveillance du Trafic » et de l` « Unité de Maintenance du Système » [**Mémoire récapitulatif et en Réponse ¶36**].

244. Les obligations de GVG dans le cadre du Projet STP conformément à l`Accord étaient les suivantes [**Mémoire récapitulatif et en Réponse ¶37**] :

    a.   La fourniture clé en main des moyens et services de contrôle des flux de trafic international entrant ainsi que des outils de gestion y afférents, y compris un nouveau mécanisme de collecte de CDR (« Call Detail Records », soit un compte-rendu d`appel permettant la facturation) ;

    b.   La fourniture des moyens nécessaires à l`évaluation de la QoS de chaque opérateur disposant d`une licence d`exploitation en Guinée pour le trafic capté par les installations de GVG ;

    c.   La fourniture des moyens de détection de la fraude téléphonique ;

    d.   La formation du personnel de l`ARPT ;

    e.   L`entretien et la maintenance des installations et équipements ;

    f.   La surveillance de l`évolution des prix des marchés de terminaison d`appels.

245. GVG ajoute que les Défenderesses, de leur côté, se sont engagées à établir le cadre technico-légal de l'interconnexion entre les opérateurs, ainsi qu'à déterminer les nouveaux tarifs d'interconnexion internationale et les nouvelles taxes applicables sur les appels internationaux entrants. Par ailleurs, elles devaient affecter le personnel technique et juridique nécessaire à l'élaboration du cadre technico-légal et réglementaire permettant la mise en place « *d'une infrastructure de « Supervision des interconnexions nationales et internationales » par la centralisation et la normalisation des réseaux de signalisation SS7 des opérateurs en Guinée* » selon les termes de l'article 3.1 de l'Accord et de la Matrice des responsabilités y annexée **[Mémoire récapitulatif et en Réponse ¶¶38-40]**.

### V.1.a.(ii).    La rémunération de GVG

246. GVG touchait une rémunération sur les revenus générés par les flux d'appels internationaux, selon un tarif conforme à l'Annexe 1 de l'Accord et établi au moyen de l'Arrêté du 29 mai 2009 **[Pièce C-2]**. Ce tarif du trafic international entrant en Guinée était de USD 0,28 (28 cents) la minute, réparti comme suit **[Mémoire récapitulatif et en Réponse ¶41]** :

    a.  16 cents à l'opérateur local ;

    b.  3,5 cents à l'ARPT ;

    c.  7 cents à « l'*opérateur technique qui assure la fourniture, la mise en service, la maintenance et la formation à l'utilisation durant la période contractuelle* » ;

    d.  1,5 cents « *pour le fonds d'aide au financement pour le raccordement de la Guinée au câble sous-marin, à la fibre optique et à la large bande* ».

247. Au regard de l'importance de son investissement financier et des risques qu'elle prenait à sa charge, GVG avait donc droit, sur les USD 0,12 revenant aux Défenderesses, à une rémunération de USD 0,07 sur chaque minute d'appel international entrant en Guinée. Ceci revient à 58% des revenus collectés par l'État, dans la fourchette des tarifs de 30-60% généralement pratiqués par GVG dans des projets similaires **[Mémoire récapitulatif et en Réponse ¶42]**.

248. Conformément à l'Arrêté, la facturation des revenus dus à l'État sur le trafic international entrant en Guinée se faisait sur la base des données collectées par le Système de supervision IMS-STP dont furent extraits des CDR permettant l'établissement de bilans mensuels de trafic. À partir de ces bilans mensuels, la cellule de l'ARPT chargée de la facturation et du recouvrement – également mise en place et formée par GVG – devait émettre des factures mensuelles à USD 0,12 sur chaque minute d'appel international entrant, puis s'assurer de leur réception et de leur règlement par chaque opérateur. Les Défenderesses se sont engagées à procéder « *au reversement de la part due à* [GVG] *au plus tard 15 jours après l'échéance et l'encaissement de la facture* » **[Mémoire récapitulatif et en Réponse ¶43]**.

249. GVG ajoute que les Défenderesses n'ont jamais contesté que le Système de supervision STP-IMS a été mis en opération à partir de septembre 2009, permettant à l'État de collecter des revenus sur les appels internationaux entrants en Guinée dès cette date ; ont en effet été versées aux débats des factures démontrant le déploiement effectif dudit Système **[Mémoire récapitulatif et en Réponse ¶465]**.

250. Le Système de supervision IMS-STP, intégralement financé par GVG au prix d'un investissement initial de USD 12.645.000 **[Pièce C-43]**, a permis à l'État de facturer sur la base des minutes captées par ledit Système pour la période allant de septembre 2009 à septembre 2015 (date de départ de GVG de Guinée) des revenus bruts de USD 212.260.733,53 et nets de USD 149.328.320,84 **[Pièce C-49 ; Mémoire récapitulatif et en Réponse ¶¶524-528]**.

251. Par ailleurs, les Défenderesses ont elles-mêmes reconnu la parfaite exécution par GVG de ses obligations contractuelles à de nombreuses reprises et sous plusieurs formes : d'abord par courrier **[Pièces C-44 ; C-45 ; Mémoire récapitulatif et en Réponse ¶¶508-509]** ; par voie d'une attestation officielle sur les compétences et l'expertise technique de GVG **[Pièce C-5 ; Mémoire récapitulatif et en Réponse ¶510]** ; par l'implication de GVG au sein d'événements organisés pour la promotion du secteur des télécommunications de la Guinée pour présenter et mettre de l'avant le Projet STP **[Pièce C-48 ; Mémoire récapitulatif et en Réponse ¶511]**.

252. À l'arrivée de Monsieur Diaby au poste de Directeur Général de l'ARPT en mars 2011, celui-ci a cessé, dès son arrivée, le règlement des factures émises par GVG en alléguant notamment une exécution non conforme de GVG dans le cadre du Projet STP. Dans ce contexte, le Ministre a invité GVG à participer à une évaluation technique à partir du 12 avril 2011 (**Mid-term review**) **[Pièce C-28 ; Mémoire récapitulatif et en Réponse ¶¶60-61 ; 515]**.

253. La Mid-term review a duré d'avril 2011 à mai 2012 et a été conjointement menée par les parties. Le Rapport d'exécution du 11 mai 2012 **[Pièce C-6]** atteste de la parfaite exécution de l'Accord de Partenariat par GVG, de même que des demandes supplémentaires des Défenderesses que GVG a accepté de satisfaire **[Mémoire récapitulatif et en Réponse ¶¶65-74 ; 516-523]**.

*V.1.a.(iii).    Les prétendus manquements de GVG tels qu'allégués par les Défenderesses*

254. Sur les points techniques soulevés par les Défenderesses comme étant des manquements de GVG à ses obligations contractuelles, GVG plaide ce qui suit :

255. L'assistance technique de GVG pour établir le cadre règlementaire a été pleinement fournie par GVG et a permis la mise en opération du Système de supervision IMS-STP dans les 90 jours prévus aux termes de l'Arrêté **[Mémoire récapitulatif et en Réponse ¶¶474-475]**.

256. Le Système de supervision IMS-STP a été entièrement réalisé en août 2009 pour devenir opérationnel dès septembre 2009. À partir de cette date, la visualisation et la facturation de la totalité du trafic international entrant ont été effectives, ce qui n'est pas contesté par les

Défenderesses **[Mémoire récapitulatif et en Réponse ¶¶476-477]**.    Les critiques des Défenderesses à l'égard de l'absence de supervision du trafic « on-net » (c'est-à-dire où les appels se font dans le réseau d'un opérateur sans interconnexion avec un autre opérateur) sont sans objet, le trafic « on-net » ne faisant pas partie de l'Accord **[Mémoire récapitulatif et en Réponse ¶478]**.

257. Conformément à ses obligations aux termes de l'Accord, GVG a installé un premier ensemble d'outils de mesure de la qualité de service des opérateurs dans le Système de supervision IMS-STP, lequel a parfaitement fonctionné dès la mise en opération du projet STP en septembre 2009.

258. L'état d'avancement du plan d'action décidé en août 2011 (daté du 2 novembre 2011) confirme en sa page 2, point 2, que l'outil est disponible et opérationnel **[Pièce R-7 ; T1/63:1-15]**.  Cet outil a permis la collecte de données de services QoS sur les interconnexions portant les flux du trafic international.

259. Avec l'arrivée de Monsieur Diaby, la nouvelle administration de l'ARPT a signifié qu'elle interprétait cet engagement comme portant sur la fourniture d'un système distinct de contrôle de la QoS de l'ensemble des réseaux des opérateurs de télécommunications en Guinée.  Les parties ne pouvant trouver d'entente sur cette question d'interprétation contractuelle, GVG a accepté d'acquérir et d'installer un nouveau système de QoS à ses seuls frais pour un montant de USD 2,4 millions alors même qu'elle considérait que cette demande des Défenderesses dépassait le cadre de ses obligations contractuelles aux termes de l'Accord **[Mémoire récapitulatif et en Réponse ¶¶479-483]**.  Ce second outil a bien été fourni et installé comme en atteste le procès-verbal de réception du 22 février 2012 **[Pièce C-65]** et le Rapport d'exécution du 11 mai 2012 **[Pièce C-6]**.

260. La mise en place et l'opération parfaite des applications intégrant le mécanisme de collecte de CDR et de production de factures est amplement démontrée par le fait que les Défenderesses ont pu collecter des revenus à compter du mois de septembre 2009 et pendant toute la période de leurs relations avec GVG sans aucune interruption, ce qui n'a jamais été contesté par les Défenderesses.  Le défaut de mettre en place un outil de comparaison des CDR, reproché aujourd'hui par les Défenderesses, ne faisait pas partie de l'Accord.  Il concerne le trafic national et la nouvelle offre de GVG intégrant l'installation d'une solution passive **[Mémoire récapitulatif et en Réponse ¶¶484-486]**.

261. Le Bilan du projet IMS 2009-2014 indique que le Système de supervision IMS-STP a permis la prévention de la chute des tarifs, permettant à l'État d'encaisser de nouveaux revenus tel qu'indiqué au Bilan du Projet IMS 2009-2014 **[Pièce C-4 ; Mémoire récapitulatif et en Réponse ¶¶487-488]**.

262. Le plan de formation du personnel de l'ARPT établi par GVG devait s'établir sur toute la durée contractuelle en vue de permettre un transfert de compétences graduel et la prise en charge par les agents de l'ARPT de l'exploitation du Système de supervision IMS-STP à l'expiration de l'Accord.  Cette formation a commencé dès 2010, GVG ayant donné priorité, pendant les premiers mois

d'exploitation, à la mise en place de l'infrastructure technologique et à la stabilisation de son fonctionnement ainsi qu'à la livraison des données précises dont l'État avait besoin. Entre mai 2010 et août 2012 GVG a assuré 7 formations dont la liste détaillée est fournie au Bilan du Projet **[Pièce C-4]**. Le Rapport d'exécution **[Pièce C-6]** fait également constate également que le plan de formation a été satisfait par GVG à l'exception de deux formations programmées pour mai et juin 2012 et fournies à ces dates. Le plan de formation accepté par GVG en mars 2014 constitue une nouvelle obligation qui n'a pu être exécutée en raison de la résiliation abusive des relations contractuelles par les Défenderesses **[Mémoire récapitulatif et en Réponse ¶¶489-495]**.

263. Le système anti-fraude a été mis en place lors de l'installation du Système de supervision IMS-STP en septembre 2009. Son objectif était la détection, l'identification et la déconnexion des numéros frauduleux utilisés pour acheminer du trafic international illégal vers les opérateurs guinéens. L'obligation de GVG était d'installer ce système de détection de fraude et de fourniture des données à l'ARPT, laquelle devait ensuite coordonner avec les opérateurs pour démanteler les routes prises par les appels frauduleux en supprimant les SIM concernés. De septembre 2009 à mai 2014, ce système anti-fraude a permis la détection de 186,490 lignes frauduleuses tel qu'il est indiqué au Bilan **[Pièce C-4]**. Le Rapport d'exécution, quant à lui, ne relève aucune remarque au sujet du système anti-fraude. Lors des discussions entre les parties aboutissant au Plan d'actions décidé en mars 2014 **[Pièce C-9]**, GVG s'est engagée à fournir un « SIM Box Locator » à ses propres frais. Les Défenderesses ne contestent pas qu'il s'agit d'un nouvel engagement de GVG hors Accord de Partenariat. En tout état de cause, le tableau annexé au Plan d'actions décidé en mars 2014 mentionne que l'absence d'efficacité constatée venait du retard dans la déconnexion systématique des numéros frauduleux par les opérateurs, démantèlement dont la responsabilité incombe à l'ARPT **[Mémoire récapitulatif et en Réponse ¶¶496-500]**.

264. Le Rapport d'exécution fait état de la parfaite exécution par GVG de ses obligations au titre de la maintenance des installations et de l'équipement **[Mémoire récapitulatif et en Réponse ¶¶501-503]**.

265. Le Rapport d'exécution **[Pièce C-6]** constate que le financement de l'acquisition de gestion du spectre des fréquences radioélectriques a été complété à la satisfaction des parties par le biais d'un accord financier, selon lequel les Défenderesses ont décidé d'acquérir elles-mêmes l'outil de contrôle du spectre, GVG remboursant son prix à hauteur de USD 2,35 millions **[Pièce C-6 ; T1/63 17-23 ; Mémoire récapitulatif et en Réponse ¶¶504-507]**.

*V.1.a.(iv).   Les services fournis hors Accord de Partenariat*

266. GVG rappelle qu'elle a non seulement parfaitement exécuté ses obligations contenues à l'Accord de Partenariat mais a également accepté d'apporter certains services supplémentaires à ses propres frais **[Mémoire récapitulatif et en Réponse ¶¶60 ; 67 ; 85 ; 529]** :

a.  Le financement de deux véhicules dédiés au Projet STP ;

b.  La remise à niveau des installations électriques ;

c.  Le paiement des charges de connexion Internet et de colocation de la plate-forme IMS-STP 2 chez Cellcom ;

d.  L'installation d'un deuxième outil de QoS au coût de USD 2,4 millions à la demande des Défenderesses ;

e.  Les travaux de transfert de la plate-forme IMS-STP 2 de Cellcom à Orange ;

f.  L'installation d'un système de localisation de SIM Box ;

g.  L'étude et la soumission des offres techniques pour un système de supervision en mode passif, ainsi qu'un système pour le contrôle de la tarification et des revenus de la vente « Airtime ».

### *V.1.a.(v).    La non-résolution de l'Accord par les Défenderesses*

267. Les Défenderesses n'ont jamais mis en œuvre, ni n'ont jamais eu l'intention de mettre en œuvre, la clause résolutoire de plein droit de l'Accord en vertu de son article 5, qui prévoit que « [e]*n cas de manquement par l'une des Parties à l'une ou l'autre de ses obligations au titre du présent Contrat non réparé par la Partie défaillante dans un délai d'un mois à compter de la date de première présentation d'une lettre recommandée avec accusé de réception adressée par la Partie plaignante notifiant les manquements en cause, le présent Contrat sera résilié de plein droit, sans préjudice de tous dommages intérêts éventuels qui pourraient être réclamés à l'une ou l'autre des Parties.* » **[Pièce C-1 ; Mémoire récapitulatif et en Réponse ¶¶549-552]**.

268. Les Défenderesses n'ont jamais eu de motifs réels qui auraient pu justifier une résiliation de l'Accord.  En fait, aucune résiliation de l'Accord n'a jamais eu lieu.  Les Défenderesses cessant tout simplement de régler les factures émises par GVG à compter du mois de mai 2014.  Le comportement même des Défenderesses, qui à titre d'exemple demandaient une proposition technico-commerciale à GVG par courrier en date du 15 mai 2015, est incompatible avec celui d'une partie qui considère que son co-contractant a failli à ses obligations **[Pièce C-12 ; Mémoire récapitulatif et en Réponse ¶553]**.

269. C'est par leur courrier du 6 août 2015 que les Défenderesses indiquent pour la première fois leur volonté de mettre un terme à leurs relations contractuelles avec GVG en raison de leur insatisfaction sur le plan technique et relationnel.  Cependant ce courrier ne correspond pas à la notification exigée par l'article 5 de l'Accord **[Mémoire récapitulatif et en Réponse ¶555]** :

a.  Il ne s'agit pas d'une lettre recommandée avec accusé de réception ;

b.  Les prétendus manquements contractuels n'y sont pas mentionnés dans le but d'être réparés, le courrier se bornant à annoncer la fin des relations contractuelles en mai 2014 ;

c.  Le courrier n'explique pas les raisons de l'arrêt de paiement des factures de GVG ;

d.  Aucune mention n'est faite de résiliation pour mauvaise exécution.

### V.1.a.(vi).    La non-suspension des relations contractuelles

270. Les Défenderesses invoquent la suspension de l'Accord aux termes de son article 9, qui prévoit que « *Chacune des Parties pourra, sans préjudice et sans indemnisation de l'autre Partie, suspendre l'exécution du Contrat (...) dans l'hypothèse où l'exécution du Contrat est susceptible d'entraîner la violation d'une loi ou de toutes autres dispositions légales en vigueur.* »

271. Or les Défenderesses ne font aucunement état de l'article 9 de l'Accord ou d'une prétendue violation du CMP dans leur courrier du 6 août 2015, et pour cause, étant donné qu'elles considéraient que l'Accord avait pris fin en mai 2014.  L'Accord de Partenariat n'a donc pas été suspendu **[Mémoire récapitulatif et en Réponse ¶¶557-561]**.

### V.1.b.  Les Défenderesses

272. Á titre subsidiaire à leur action en nullité de l'Accord, les Défenderesses plaident la résiliation de l'Accord aux torts de GVG pour mauvaise exécution de ses obligations.

273. Les Défenderesses invoquent le courrier de l'ARPT à GVG du 6 août 2015 **[Pièce C-6]** faisant état de l'insuffisance des prestations de GVG au titre de l'Accord **[Mémoire en Duplique ¶497]**.

274. Les difficultés liées à l'exécution de ses obligations par GVG ont nécessité à deux reprises, en 2011 et 2014, une évaluation par l'ARPT de l'exécution par GVG de ses obligations au titre de l'Accord **[Mémoire en Duplique ¶498]**.

275. Le 4 février 2011, l'ARPT envoyait à GVG un préavis de résiliation **[Pièce R-6]**, qui fut suivi d'une procédure d'évaluation **[Mémoire en Duplique ¶499]**.

276. Le 3 novembre 2011, l'ARPT et GVG ont signé un premier rapport précisant les actions et engagements pris pour finaliser les points en suspens portant sur l'installation en local des applications et outils de supervision ; la mesure de la qualité de service ; le système de gestion du spectre ; et la solution pour la migration du trafic national.  Ces défaillances portaient sur des éléments essentiels de l'Accord de Partenariat, lequel avait été conclu pour permettre à l'ARPT de disposer des moyens technologiques appropriés pour contre vérifier les déclarations de revenus es opérateurs et de mieux appréhender les nouvelles technologies relatives à l'interconnexion des opérateurs **[Pièce R-7 ; Mémoire en Duplique ¶¶500-501]**.

277. Le rapport du 11 mai 2012 pointait des difficultés d'exécution sur la qualité de service, le système n'étant toujours pas opérationnel près de trois ans après la signature de l'Accord, et des formations ayant été repoussées.  Il s'est avéré qu'avant l'évaluation menant à ce rapport, le personnel de l'ARPT n'avait pas bénéficié des formations conséquentes et que GVG avait l'entier contrôle du fonctionnement des opérations.  GVG n'avait pas fourni à l'ARPT les moyens d'évaluer la qualité

de service de chaque opérateur, ni n'avait financé l'acquisition du matériel de contrôle et de gestion du spectre des fréquences radioélectriques contrairement à ses engagements **[Pièce C-6 ; Mémoire en Duplique ¶502]**.

278. Une nouvelle évaluation a été conduite en 2014, et un plan d'action établi le 26 mars 2014 **[Pièce C-9]**.  À ce plan étaient jointes les observations de l'ARPT à GVG sur les difficultés d'exécution des obligations de GVG **[Pièce R-8 ; Mémoire en Duplique ¶503]**.

279. De ceci, il ressort que, près de cinq ans après la conclusion de l'Accord de Partenariat, GVG n'avait toujours pas exécuté un certain nombre de ses obligations, notamment **[Mémoire en Duplique ¶504]** :

    a. L'obligation de fournir et d'installer des outils de contrôle qui n'a été réalisée qu'en partie, le système ne supervisant pas le trafic on-net ;

    b. Les obligations de fournir les moyens d'évaluer la qualité de service de chaque opérateur, les moyens de contrôler le flux du trafic téléphonique local et les balances dues entre opérateurs locaux, qui n'ont été satisfaites qu'en 2012 ;

    c. L'obligation de fournir les outils nécessaires à la production des factures d'interconnexions internationales à chaque opérateur, qui n'a été réalisée qu'en partie.  GVG devait mettre en place un outil pour donner plus de visibilité sur la comparaison des CDR, ce qui n'a pas été fait ;

    d. GVG a négligé l'objectif de lutte contre la fraude.  Le volume de fraude détecté par le nouvel outil de géolocalisation, qui devait permettre de localiser les Simbox, s'est révélé inférieur au volume de fraude détecté par chacun des opérateurs présents sur le marché qui avaient développé leur propre outil.  Le système développé par GVG ne comportait pas de fonctionnalité permettant la détection des numéros frauduleux, ce qui était pourtant la finalité ultime de la lutte contre la fraude.  La négligence de GVG a eu des répercussions financières importantes pour l'ARPT, GVG elle-même ayant estimé à USD 23 millions la perte de revenu due à la fraude pour l'État guinéen et les opérateurs **[Pièce C-4]** ;

    e. GVG a surfacturé ses équipements et prestations, et notamment les probes SS7 ;

    f. La formation du personnel de l'ARPT, l'une des obligations de GVG au titre de l'Accord de Partenariat, a été réalisée avec beaucoup de retard.  En 2014, le personnel de l'ARPT n'avait toujours pas obtenu les accès au système qui leur aurait permis de suivre les incidents.

280. Ceci a conduit l'ARPT à rappeler, dans sa lettre du 6 août 2015 **[Pièce C-15]**, les points suivants **[Mémoire en Duplique ¶505]** :

    a. 9 des 14 obligations de GVG au titre de l'Accord n'ont pas été exécutées ou l'ont été tardivement ;

b. Plusieurs plans d'action intermédiaires ont été élaborés mais la majorité des points est restée sans résultats tangibles ;

c. Après avoir reconnu le caractère abusif des clauses financières de l'Accord, la rémunération de GVG a été revue à la baisse ;

d. GVG a surfacturé ou tenté de surfacturer les prix des équipements et services ;

e. GVG a refusé d'intégrer les techniciens de l'ARPT aux activités réelles d'opération et de maintenance ;

f. Aucune offre sérieuse de GVG n'a été reçue pour passer d'un système intrusif à un système passif, malgré les demandes de l'ARPT à cet effet depuis 2012 ;

g. GVG était très loin de ses objectifs pour le volet de lutte contre la fraude, le logiciel n'ayant été reçu qu'en 2014.

281. Les Défenderesses demandent au Tribunal arbitral de constater la résiliation de plein droit de l'Accord de Partenariat **[Mémoire en Duplique ¶¶524-525]**.

282. GVG a en outre fait preuve de déloyauté dans l'exécution de ses prestations, son comportement démontrant qu'il s'est inscrit dans un plan de fraude. Ces comportements sont d'une gravité telle qu'ils justifient la fin des relations contractuelles aux torts de GVG, telle que notifiée par l'ARPT. GVG ne saurait réclamer aucune indemnité pour la période postérieure à ladite résiliation **[Mémoire en Duplique ¶523]**.

283. À titre très subsidiaire, les Défenderesses plaident la suspension des relations contractuelles en vertu de l'article 9 de l'Accord, selon lequel « *Chacune des Parties pourra, sans préjudice et sans indemnisation de l'autre Partie, suspendre l'exécution du Contrat (…) dans l'hypothèse où l'exécution du Contrat est susceptible d'entraîner la violation d'une loi ou de toutes autres dispositions légales en vigueur.* »

284. La suspension des relations contractuelles a eu lieu de par la passation de l'Accord en violation du CMP, de son obtention au moyen d'un pacte de corruption, et en tout état de cause, de par les termes même de la lettre de l'ARPT du 6 août 2015 **[Pièce C-15 ; Mémoire en Duplique ¶¶538-541]**.

## *V.2. Analyse*

285. Sur la question de l'exécution par GVG de ses obligations contractuelles, le Tribunal arbitral constate à prime abord que, comme il l'a rappelé plus avant, les Défenderesses ne contestent pas que le Système de supervision IMS-STP fourni par GVG a permis à l'État guinéen de facturer, sur la base des minutes captées par ledit Système pour la période allant de septembre 2009 à septembre 2015 (date de départ de GVG de Guinée), des revenus bruts de USD 212.260.733,53 et nets de USD 149.328.320,84 **[Pièce C-49]**.

286. Pour le Tribunal, ces résultats édifiants démontrent bien que le Système fourni par GVG aux termes de l'Accord était en état de fonctionnement durant toute cette période et qu'il rencontrait les exigences contractuelles de contrôle et de supervision du trafic international entrant, d'optimisation des revenus fiscaux générés par ce trafic et de dotation d'outils et moyens technologiques nécessaires à la gestion par l'État de ce trafic, stipulées dans l'Accord.

287. Le Tribunal arbitral constate ensuite que, comme l'a expliqué Monsieur Touray au cours de son audition **[T3/240]**, il est non seulement de pratique courante mais de saine gestion qu'un projet de l'envergure du Projet STP, se déroulant sur un certain nombre d'années et comportant un important élément d'innovation, fasse l'objet de mises aux point ponctuelles (notamment par voie d'évaluations telle la Mid-term review) afin de vérifier que les objectifs soient rencontrés et si les besoins évoluent, et d'apporter les rectifications qui s'imposent.

288. C'est sous cet angle que le Tribunal arbitral voit la Mid-term review et le Rapport qui en découle, et non comme preuve de manquements contractuels de la part de GVG d'une gravité telle qu'ils puissent justifier la résiliation de l'Accord, et ce d'autant moins que le Rapport fait état de la satisfaction des Défenderesses sur plusieurs points de vérification.

289. Il importe également de souligner que certains des points abordés dans la Mid-term review concernaient le trafic national et non international **[Mémoire récapitulatif et en Réponse ¶518]**. Le bilan du projet 2009-2014 **[Pièce C-4]** et le plan d'action de mars 2014, qui vise presque intégralement le trafic national **[Pièce C-9]** viennent également soutenir la conclusion selon laquelle GVG a correctement exécuté ses engagements.

290. Il s'ensuit que, dans la mesure où les Défenderesses auraient pu avoir certaines critiques à émettre quant au déroulement du Projet, ces critiques n'ont jamais conduit et n'étaient pas susceptibles de conduire à la résiliation de l'Accord. Les éléments portés au dossier établissent que des solutions ont été débattues et instaurées par les Parties, de telle sorte que le Système a continué à rencontrer les objectifs de l'Accord, à être opérationnel et à rapporter d'importants revenus à l'État, jusqu'au départ de GVG.

291. Par ailleurs, les Défenderesses n'ont jamais dénoncé l'Accord, que ce soit sur la base de manquements par GVG à ses obligations contractuelles ou pour un autre motif, tel que confirmé par Monsieur Diaby et Madame Kaba à l'audience **[Monsieur Diaby T2/150:27-155:21 ; Madame Kaba T3/263:19-26 ; 278:33-35-279:3]**.

292. Enfin, le courrier des Défenderesses du 6 août 2015 ne saurait avoir opéré la suspension des relations contractuelles aux termes de l'article 9 de l'Accord, ce courrier ne faisant pas état d'une telle suspension, les Défenderesses disant de toute façon qu'elles considéraient que l'Accord avait pris fin en mai 2014.

293. Pour les motifs énoncés plus avant étayant les conclusions du Tribunal arbitral concernant l'absence de violation du CMP et l'absence de preuve de corruption, il n'y a pas eu davantage de suspension des relations contractuelles sur ces bases.

294. Le Tribunal arbitral est par conséquent d'avis et juge qu'il n'existe aucun fondement pour conclure au manquement par GVG à ses obligations contractuelles ou à une résiliation valable de l'Accord. La résiliation de l'Accord par les Défenderesses est donc sans fondement et abusive. Le Tribunal rejette en conséquence également la demande présentée à titre subsidiaire par les Défenderesses et tendant à se voir verser la somme de USD 10.000.000 pour mauvaise exécution par GVG de ses obligations.

## VI.    VALIDITÉ DE L'AVENANT DU 6 JUILLET 2009 ET DE L'ADDENDUM DU 10 JUILLET 2012

### *VI.1.  Résumé des positions des parties*

**VI.1.a. GVG**

295. L'article 2 de l'Accord de Partenariat prévoit que celui-ci est conclu pour une durée initiale de 5 ans, tacitement renouvelable pour deux ans : « *Le présent Contrat est conclu pour une durée initiale de soixante (60) mois à compter de la date de signature par les deux parties. Le contrat est renouvelable par tacite reconduction pour une période successive de 2 ans sauf dénonciation expresse et écrite par l'une ou l'autre partie dans un délai de 12 mois avant la fin du contrat* » **[Pièce C-1]**. Il en résulte qu'aux termes de l'Accord de Partenariat, celui-ci devait se renouveler au terme de la période contractuelle initiale de 5 ans (22 mai 2014), sauf dénonciation expresse, adressée par écrit par l'une des parties à l'autre partie 12 mois avant le terme contractuel, soit au plus tard le 22 mai 2013 **[Mémoire récapitulatif et en Réponse ¶¶44-45 ; 531]**.

#### *VI.1.a.(i).    L'Avenant*

296. La durée initiale de 5 ans a été prolongée de 12 mois supplémentaires par accord des parties aux termes de l'Avenant du 6 juillet 2009, en contrepartie du financement par GVG à hauteur de USD 1,2 millions de la construction d'un bâtiment « *destiné à abriter les équipements objets* [de l'Accord], *une partie de son personnel ainsi que tout autre équipement lui appartenant ou appartenant au Ministère des Télécommunications et des Nouvelles Technologies de l'Information.* » **[Pièce C-3]**. Par conséquent le terme initial de l'Accord passait du 22 mai 2014 au 22 mai 2015 **[Mémoire récapitulatif et en Réponse ¶¶47-48]**.

297. L'article 3 de l'Avenant prévoyant que les autres stipulations de l'Accord resteraient « *pleinement applicables* », l'Accord devait automatiquement se renouveler au 22 mai 2015 pour une période de deux ans, sauf dénonciation expresse adressée par une des parties à l'autre partie douze mois auparavant, soit au plus tard le 22 mai 2014. Aucune dénonciation n'ayant été adressée à GVG à cette date, l'Accord a donc été reconduit jusqu'au 22 mai 2017 [**Mémoire récapitulatif et en Réponse ¶¶49 ; 531**].

298. Le financement de GVG a été effectué par 12 versements mensuels de USD 100.000 au cours d'une année (par voie de déduction de la rémunération que devait percevoir GVG aux termes de l'Accord, à l'exception du premier versement qui a fait l'objet d'un virement bancaire de la part de GVG, dûment réceptionné par le Ministre) [**Pièce C-53 ; Mémoire récapitulatif et en Réponse ¶50**].

299. Ces versements par déduction des factures sur les quotes-parts de GVG ont été convenus entre GVG et le Ministre étant donné le paiement systématiquement retardé desdites factures [**Pièce C-62 ; Mémoire récapitulatif et en Réponse ¶535**].

300. Il est donc incontestable que l'Avenant a été conclu entre les parties et exécuté par GVG. L'absence de mention expresse de la déduction mensuelle de USD 100.000 sur les factures émises par GVG n'est pas une preuve de l'inexécution de l'Avenant, les factures ne faisant strictement état que des seuls revenus liés au trafic international entrant en Guinée afin de servir de base à l'État pour calculer ses propres redevances [**Mémoire récapitulatif et en Réponse ¶¶532-536**].

*VI.1.a.(ii).   La reconduction tacite de l'Accord*

301. Les Défenderesses soutiennent que la clause de reconduction tacite figurant dans l'Accord est illégale et qu'il est donc interdit à GVG de se prévaloir de la non-exécution de l'Accord au-delà de sa période initiale. Elles plaident le principe de droit administratif français voulant que « *les clauses de tacite reconduction contenues dans les contrats de la commande publique* » sont en principe illégales et que, par conséquent, « *aucun préjudice, et donc aucun droit à l'indemnité, ne peut naître, pour le cocontractant de l'administration, de l'absence de reconduction tacite d'un contrat à l'issue de la durée initiale convenue par les parties.* » [**Pièce CL-61 ; Mémoire récapitulatif et en Réponse ¶¶540-541**].

302. Même à supposer que le droit administratif français s'appliquerait en l'espèce, ce qui n'est pas le cas, cette illégalité de principe n'englobe pas la clause de tacite reconduction ici en cause. La jurisprudence *Commune de Païta* [**Pièce CL-62**] limite l'illégalité des clauses de tacite reconduction à celles qui sont contenues dans « *un contrat qui, en raison de sa nature et de son montant, ne peut être passé qu'après que les obligations de publicité et de mise en concurrence prévues par la réglementation applicable ont été respectées* », de telles clauses permettant la

passation d'un nouveau contrat sans que soient respectées ces obligations **[Mémoire récapitulatif et en Réponse ¶542]**.

303. Or l'Accord de Partenariat pouvant être légalement conclu de gré à gré, la clause de tacite reconduction est donc légale, et avec elle le renouvellement du contrat résultant de sa mise en œuvre, les conditions de gré à gré ayant été remplies à la date du renouvellement. En tout état de cause, même à supposer que la clause de tacite reconduction ou sa mise en œuvre ait été illégale, la jurisprudence considère qu'il ne s'agit pas d'une irrégularité comportant un vice de gravité telle que le juge devrait, par exception à l'exigence de loyauté des relations contractuelles, écarter ce nouveau contrat **[Pièce CL-63 ; Mémoire récapitulatif et en Réponse ¶¶543-544]**.

304. Enfin, lorsque par exception le juge administratif écarte un contrat en raison de l'illégalité de son contenu ou d'un vice d'une particulière gravité, refusant ainsi de régler le litige sur le terrain contractuel, le cocontractant de l'administration garde la possibilité d'obtenir une indemnisation sur le fondement de l'enrichissement sans cause et/ou de la responsabilité administrative quasi-délictuelle **[Pièces CL-64, CL-65 ; Mémoire récapitulatif et en Réponse ¶545]**.

### VI.1.a.(iii).   L'Addendum

305. Depuis le début de la mise en exécution du Projet STP, GVG rencontrait des difficultés à obtenir le règlement de ses factures, la plupart n'ayant été payées qu'avec retard. Cette situation s'est particulièrement aggravée avec l'arrivée de Monsieur Diaby au poste de Directeur Général de l'ARPT après l'arrivée au pouvoir du Président Alpha Condé, les Défenderesses cessant tout simplement de régler les factures émises par GVG, alors qu'aux termes de l'Annexe I de l'Accord, les quotes-parts dues sur le tarif international devaient être payées « *15 jours après l'échéance et l'encaissement de la facture* » par les Défenderesses **[Mémoire récapitulatif et en Réponse ¶¶61-62]**. Monsieur Baker, dans son attestation, explique que bien que GVG continuait à fournir des services conformément à ses obligations aux termes de l'Accord, l'impayé des Défenderesses a atteint une somme dépassant les USD 13 millions **[Attestation no. 1 de Monsieur Baker ¶¶39-41]**.

306. Monsieur Baker a organisé une réunion avec le Président Condé dans une tentative de débloquer la situation. Le Président a indiqué qu'il n'hésiterait pas à mettre fin au contrat de GVG si cette dernière ne satisfaisait pas aux demandes de Monsieur Diaby faites suivant ses instructions, et notamment à une réduction substantielle de la créance et de la quote-part de GVG. C'est dans ce contexte que GVG a été contrainte de signer l'Addendum **[Attestation de Monsieur Touray ¶19 ; Mémoire récapitulatif et en Réponse ¶¶75-78]**.

307. Aux termes de l'Addendum **[Pièce C-7]**, les Défenderesses reconnaissent que « [GVG] *a exécuté le plan d'actions convenu entre les parties relatif aux obligations mentionnées dans le* « *RAPPORT D'EXÉCUTION DES OBLIGATIONS CONTRACTUELLES ENTRE GVG ET L'ARPT, EN DATE*

*DU 14 Mai 2012 » »*. Elles reconnaissent devoir à GVG **[Mémoire récapitulatif et en Réponse ¶81]** :

    a. La somme de USD 13.237.182,60 au titre des « *factures accumulées de septembre 2009 au 31 décembre 2011* » ;

    b. La somme de USD 2.206.906 au titre du « *reliquat de la quote-part du trafic international de Sotelgui* » pour la période allant de septembre 2009 au 31 décembre 2011.

308. En dépit desdites reconnaissances des Défenderesses, GVG a dû accepter de réduire la dette de l'ARPT de USD 13.237.182,60 à USD 2 millions ; renoncer aux revenus correspondant au reliquat de la quote-part du trafic international de Sotelgui, soit USD 2.206.906 ; et réduire les droits que devait verser l'ARPT à GVG aux termes de l'Accord de USD 0,07 à USD 0,025 par minute d'appel international entrant de façon rétroactive à compter du 1er avril 2011 **[Mémoire récapitulatif et en Réponse ¶82]**.

309. En contrepartie de ces renonciations très importantes, GVG a demandé à Monsieur Diaby qu'il s'engage aux termes de l'Addendum à prolonger l'Accord de deux années supplémentaires. Monsieur Diaby a indiqué ne pouvoir s'engager par écrit sans les instructions du Président, mais il a promis que l'Accord ne serait pas dénoncé 12 mois avant son terme (soit au 22 mai 2014) et se reconduirait pour une période de deux années supplémentaires après son terme (soit au 22 mai 2017) **[Mémoire récapitulatif et en Réponse ¶83]**.

310. Les renonciations substantielles de la part de GVG ont donc été convenues sans réelle contrepartie concrète de la part des Défenderesses (mis à part une référence générale au « *renforcement du partenariat* » entre les parties), au sens où la durée de l'Accord de Partenariat (qui s'étendait au moment de la signature de l'Addendum jusqu'au 22 mai 2015 avec possibilité de tacite reconduction de 2 ans) n'a pas été contractuellement étendue afin de garantir à GVG des revenus supplémentaires **[Mémoire récapitulatif et en Réponse ¶¶575-580]**.

311. En conséquence, et au regard des articles 643, 649 et 664 du Code civil guinéen, l'obligation de GVG de consentir aux réductions et renonciations imposées par les Défenderesses est dépourvue de cause et donc nulle et l'obligation des Défenderesses de « *renforcer le partenariat* » est tout aussi nulle, faute d'objet **[Mémoire récapitulatif et en Réponse ¶¶581-596]**.

## VI.1.b. Les Défenderesses

### VI.1.b.(i).    L'Avenant

312. L'Avenant ne figure pas dans les archives de l'ARPT, qui en a reçu copie à la faveur de ses échanges avec GVG en 2014 **[Pièce R-2]**. L'Avenant n'a par ailleurs jamais été exécuté par GVG, les documents comptables de l'ARPT ne démontrant aucune déduction sur les factures de GVG de

septembre 2009 à septembre 2010.  La question de la validité de l'Avenant se pose donc **[Pièces R-3, R-4, R-5 ; Mémoire en Duplique ¶¶58-64]**.

### VI.1.b.(ii).     *Illégalité de la clause de tacite reconduction*

313. Les Défenderesses ayant amplement démontré que l'Accord ne saurait constituer un contrat de gré à gré, il en résulte que la clause de tacite reconduction ne saurait échapper à son illégalité congénitale qui résulte de la non-observation des règles de la passation de la commande publique **[Mémoire en Duplique ¶¶509-515]**.

314. Quant à la possibilité pour GVG d'obtenir indemnisation sur le fondement de la responsabilité quasi-contractuelle ou quasi-délictuelle, si celle-ci peut exister en théorie, cette voie d'action est drastiquement fermée dès lors que le cocontractant s'est rendu coupable d'agissements de nature à vicier le consentement de l'administration **[Pièce RL-47]**.  Cette voie de recours est également fermée au cocontractant qui s'est rendu coupable, antérieurement à la conclusion du contrat, d'agissements frauduleux entachant le contrat de dol, tel le pacte de corruption **[Pièces RL-57, RL-58 ; Mémoire en Duplique ¶¶516-519]**.

315. En tout état de cause, si le Tribunal devait décider que GVG était fondée à demander réparation sur le terrain quasi-délictuel, il conviendra, dans l'appréciation de cette indemnisation de tenir compte de la faute imputable à GVG, qui ne pouvait ignorer la nécessité de l'engagement d'une procédure de publicité et de mise en concurrence.  Il importe également de rappeler que la loi guinéenne ne reconnaît aucune possibilité de mise en cause financière d'une personne publique par son cocontractant en cas de violation du CMP **[Mémoire en Duplique ¶¶520-522]**.

### VI.1.b.(iii).    *L'Addendum*

316. Suite au Rapport d'exécution des obligations contractuelles **[Pièce C-6]**, les parties ont signé l'Addendum, GVG acceptant de réduire sa prétendue créance sur l'ARPT pour les services prétendument rendus depuis la conclusion de l'Accord de USD 13 millions à USD 2 millions. Ce faisant, GVG a accepté de réduire le prix de ses prestations d'environ 85%.  Pour l'avenir, GVG a accepté de réduire le prix de sa quote-part d'environ 65% **[Mémoire en Duplique ¶¶90-92]**.

317. L'Addendum n'a jamais constitué qu'un accord de révision de prix, donc un acte modificatif du contrat, et non une transaction qui selon GVG serait nulle faute de prévoir des concessions réciproques.  Si l'Accord et l'Avenant n'étaient pas annulés, l'Addendum trouverait nécessairement à s'appliquer, et les demandes de dommages-intérêts de GVG fondés exclusivement sur l'Accord être rejetées **[Mémoire en Duplique ¶¶542-549]**.

318. À aucun moment le Président de la République de Guinée ne s'est immiscé dans les négociations de l'Addendum, et à aucun moment une prolongation de la durée de l'Accord n'a été promise par l'ARPT dans le cadre des négociations.  Si la nouvelle répartition proposée par l'ARPT ne convenait

pas à GVG, elle pouvait faire le choix de résilier l'Accord, et ce d'autant plus que le montant de son investissement initial, évalué à USD 7,5 millions au titre de l'Arrêté **[Pièce C-2]** avait largement été rentabilisé à l'époque.  En réalité, la nouvelle répartition prévue par l'Addendum permettait encore à GVG de percevoir une marge confortable, à défaut de quoi elle ne l'aurait pas acceptée **[Mémoire en Duplique ¶¶454-455]**.

## VI.2. *Analyse*

319. Les positions des Parties peuvent donc se résumer comme suit : GVG demande (i) confirmation de la validité de l'Avenant ; et (ii) la nullité de l'Addendum.  Les Défenderesses arguent de (i) l'inexistence/inexécution/invalidité de l'Avenant ; et (ii) à titre subsidiaire, la validité de l'Addendum (à titre principal, la nullité de l'Accord entraînant la nullité des accords subséquents).

## VI.2.a. L'Avenant

320. Pour ce qui a trait à la validité de l'Avenant, le Tribunal constate tout d'abord que l'Avenant porte la signature de Monsieur Camara pour le compte de l'ARPT, cette signature figurant également sur l'Accord de Partenariat.

321. Le Tribunal arbitral prend également note que les Défenderesses plaident que la validité de l'Avenant est mise en cause sur les deux bases suivantes : (i) elles n'avaient pas copie de l'Avenant dans leurs archives ; et (ii) les factures émises par GVG ne font pas état des déductions de USD 100.000 par mois pendant un an.

322. Rien de ceci ne contredit le fait que le bâtiment faisant l'objet de l'Avenant a été construit, ce que les Défenderesses ne contestent pas **[Attestation no. 1 de Monsieur Baker ¶¶37-38]**.  Il est raisonnable d'en conclure que le bâtiment a bien été financé par voie des déductions dont fait état GVG. Le Tribunal ajoute que les Défenderesses ne prouvent pas que l'Addendum serait un faux et que s'appuyer sur le fait qu'elles n'en retrouveraient pas trace dans leurs archives ne constitue en aucun cas une preuve.

323. Par conséquent, le Tribunal arbitral ne voit aucun motif de douter de la validité de l'Avenant ou de son exécution, et accepte que par ses termes la durée de l'Accord de Partenariat a été prolongée d'un an, soit jusqu'au 22 mai 2015.

## VI.2.b. La tacite reconduction

324. Sur la question de la validité de la clause de tacite reconduction, le Tribunal arbitral constate que la position des Défenderesses revient à rechercher l'annulation de ladite clause sur la base d'absence de mise en concurrence aux termes du CMP, et ce malgré le fait que ni l'Accord de Partenariat, ni

le contrat Subah qui a été conclu en remplacement de l'Accord, n'ont comporté de mise en concurrence ou d'appel d'offres. Ceci étant, il est difficile de concevoir sur quelle base la seule opération de la clause de tacite reconduction devrait être soumise à une telle condition sous peine d'annulation, par exception à l'exigence de loyauté des relations contractuelles. Les Défenderesses n'ont pas fourni d'éclaircissements à ce sujet.

325. Les Défenderesses ont fondé une partie de leur argumentation sur le droit administratif français **[Mémoire en Duplique ¶511 et s.]** que la Demanderesse a elle-même envisagé à titre subsidiaire **[Mémoire récapitulatif et en Réponse ¶541 et s.]** ; le Tribunal s'y référera pour cette raison. Le Tribunal prend note de la jurisprudence du Conseil d'État français selon laquelle, même à supposer que l'Accord tombe sous l'égide du CMP et que la clause de tacite reconduction ou sa mise en œuvre ait été illégale, il ne s'agit pas là d'une irrégularité comportant un vice d'une gravité telle que le Tribunal devrait, par exception à l'exigence de loyauté des relations contractuelles, écarter ce nouveau contrat pour le règlement du présent litige **[Pièce CL-63]**.

326. Le Tribunal arbitral retient de cette jurisprudence l'importance donnée au principe de loyauté des relations contractuelles dans l'appréciation des éléments du litige, tel qu'en fait notamment état l'arrêt *Commune de Béziers* **[Pièce CL-50]** en ces termes : « *Considérant, en premier lieu, que les parties à un contrat administratif peuvent saisir le juge d'un recours de plein contentieux contestant la validité du contrat qui les lie ; qu'il appartient alors au juge, lorsqu'il constate l'existence d'irrégularités, d'en apprécier l'importance et les conséquences, après avoir vérifié que les irrégularités dont se prévalent les parties sont de celles qu'elles peuvent, eu égard à l'exigence de loyauté des relations contractuelles, invoquer devant lui ; qu'il lui revient, après avoir pris en considération la nature de l'illégalité commise et en tenant compte de l'objectif de stabilité des relations contractuelles, soit de décider que la poursuite de l'exécution du contrat est possible, éventuellement sous réserve de mesures de régularisation prises par la personne publique ou convenues entre les parties, soit de prononcer, le cas échéant avec un effet différé, après avoir vérifié que sa décision ne portera pas une atteinte excessive à l'intérêt général, la résiliation du contrat ou, en raison seulement d'une irrégularité invoquée par une partie ou relevée d'office par lui, tenant au caractère illicite du contenu du contrat ou à un vice d'une particulière gravité relatif notamment aux conditions dans lesquelles les parties ont donné leur consentement, son annulation ; Considérant, en second lieu, que, lorsque les parties soumettent au juge un litige relatif à l'exécution du contrat qui les lie, il incombe en principe à celui-ci, eu égard à l'exigence de loyauté des relations contractuelles, de faire application du contrat ; que, toutefois, dans le cas seulement où il constate une irrégularité invoquée par une partie ou relevée d'office par lui, tenant au caractère illicite du contenu du contrat ou à un vice d'une particulière gravité relatif notamment aux conditions dans lesquelles les parties ont donné leur consentement, il doit écarter le contrat et ne peut régler le litige sur le terrain contractuel* ».

327. Le Tribunal arbitral, dans son appréciation des éléments du présent litige, retient que, même en supposant que la mise en concurrence exigée par le CMP trouverait application en l'espèce, l'absence de mise en concurrence, et pour la passation de l'Accord lui-même, et pour celle du contrat Subah, de même que le silence des Défenderesses quant à la nécessité d'une telle mise en concurrence tout au long des relations contractuelles avec GVG et jusqu'à l'engagement de la procédure arbitrale, constituent des éléments qui militent en faveur du respect de l'exigence de loyauté dans les relations contractuelles. Le Tribunal ajoute qu'en l'absence de corruption tel que jugé plus avant, les Défenderesses n'ont pas établi que l'Accord soit entaché d'un *« vice d'une particulière gravité relatif notamment aux conditions dans lesquelles les parties ont donné leur consentement »* justifiant que le contrat soit écarté.

328. Par conséquent, le Tribunal arbitral dit et juge que l'Accord de Partenariat a été valablement reconduit pour une durée de deux ans jusqu'au 22 mai 2017.

**VI.2.c. L'Addendum**

329. Sur la question de la nullité de l'Addendum pour défaut de cause, le Tribunal arbitral constate que le texte de l'Addendum le qualifie comme étant un *« avenant »* modifiant les contrats passés entre les parties qui *« reste désormais la loi des parties sur toutes les clauses modifiées »*.

330. Le Tribunal arbitral considère par conséquent l'Addendum comme un accord de révision de prix, modificatif du contrat, et non une transaction qui serait nulle faute de prévoir des concessions réciproques.

331. Quant à la passation de l'Addendum sous la contrainte, le Tribunal arbitral prend note que cette passation a eu lieu à une époque où les relations entre GVG et l'ARPT étaient tendues et dans un contexte où les factures impayées par l'ARPT s'accumulaient depuis le début du Projet jusqu'à concurrence de plus de USD 13 millions. Les éléments au dossier indiquent que GVG a pris la décision d'accepter une révision des termes financiers de l'Accord sur une base commerciale afin de gérer la dette de l'ARPT et de trouver un terrain d'entente sur la clé de répartition, dans le souci d'éviter que l'Accord ne soit résilié et de permettre au Projet de continuer **[Monsieur Baker T2/189:5-24]**.

332. Pour le Tribunal arbitral, la renégociation d'une entente sous la menace de résiliation constitue une situation qui, pour désagréable qu'elle soit, fait partie des risques d'une entreprise telle que le Projet STP, et non une contrainte de nature à invalider l'Addendum. À supposer même que GVG n'ait pas véritablement eu d'autre choix que de signer cet Addendum, il reste que GVG l'a ensuite exécuté et qu'elle s'en prévaut à diverses reprises dans ses écritures **[voir par exemple Mémoire récapitulatif et en Réponse ¶¶ 63, 73, 81, 91]**.

333. Le Tribunal dit et juge que l'Addendum est valide et que ses termes trouvent application.

# VII.    LE PRÉJUDICE

## VII.1. *Résumé des positions des parties*

### VII.1.a. GVG

334. Sur la base de la nullité de l'Addendum, et en application des articles 682 et 683 du Code civil guinéen, GVG demande réparation de son préjudice (i) au titre des factures payées au taux de USD 0,025 par minute au lieu de USD 0,07 ; et (ii) au titre des impayés et des factures restées impayées pour toute la période contractuelle, au même taux de USD 0,07 **[Mémoire récapitulatif et en Réponse ¶573]**.

335. GVG demande en outre d'être remboursée de tous ses frais engagés au cours des négociations transactionnelles **[Mémoire récapitulatif et en Réponse ¶574]**.

336. Pour la période du 1ᵉʳ septembre 2009 au 31 décembre 2011, les Défenderesses ont reconnu devoir, aux termes de l'Addendum, la somme de USD 13.237.182,60.  Les Défenderesses ayant versé la somme de USD 2 millions aux termes de l'Addendum, GVG demande paiement du reliquat de USD 11.237.182,60 **[Mémoire récapitulatif et en Réponse ¶601]**.

337. Pour la période du 1ᵉʳ janvier 2012 au 31 mai 2015, GVG a émis les factures suivantes, calculées sur la base du tarif de USD 0,025 la minute **[Pièce C-52 ; Mémoire récapitulatif et en Réponse ¶602]** :

|           | **2012**     | **2013**     | **2014**     | **2015**     |
|-----------|--------------|--------------|--------------|--------------|
| **Janvier**   | 699.333,26 | 679.322,13 | 653.615,30 | 587.012,44 |
| **Février**   | 657.990,38 | 617.900,41 | 566.389,51 | 562.937,85 |
| **Mars**      | 665.059,77 | 708.897,68 | 620.035,82 | 637.386,28 |
| **Avril**     | 646.679,97 | 640.937,23 | 595.119,73 | 607.993,32 |
| **Mai**       | 657.868,11 | 693.749,62 | 600.855,03 | 627.164,76 |
| **Juin**      | 633.474,02 | 672.474,89 | 576.601,52 |            |
| **Juillet**   | 684.302,42 | 707.420,43 | 583.408,14 |            |
| **Août**      | 676.922,91 | 730.493,18 | 540.232,59 |            |
| **Septembre** | 638.619,62 | 658.114,68 | 519.623,83 |            |

| | | | | |
|---|---|---|---|---|
| **Octobre** | 669.060,40 | 695.592,33 | 522.039,85 | |
| **Novembre** | 620.034,75 | 628.370,46 | 486.305,59 | |
| **Décembre** | 671.471,78 | 658.524,42 | 573.735,36 | |
| **TOTAL** | **7.920.817,39** | **8.091.797,46** | **6.837.962,27** | **3.022.494,65** |

338. Pour cette période, il convient de distinguer deux périodes **[Mémoire récapitulatif et en Réponse ¶603]** :

    a. Du 1er janvier 2012 au 31 mai 2014, les factures émises selon le tableau ci-haut ont été réglées sur la base du tarif de l'Addendum (USD 0,025). GVG demande la différence entre ce taux et le taux de USD 0,07 convenu aux termes de l'Accord ;

    b. Du 1er juin 2014 au 31 mai 2015, les factures émises selon le tableau ci-haut sont demeurées impayées. GVG demande paiement de ces factures, mais au taux de USD 0,07 par minute.

339. Concernant la période allant du 1er janvier 2012 au 31 mai 2014, GVG a facturé la somme totale de USD 19.048.630,24, en appliquant le tarif imposé par les Défenderesses à USD 0,025. GVG demande aujourd'hui sur la base des factures versées pour ladite période la différence entre le montant total ainsi facturé et le montant qui aurait dû être facturé en application du tarif initialement prévu, soit à USD 0,07 (USD 53.336.164, 67). Par conséquent, GVG réclame des dommages et intérêts au titre des impayés pour la période allant du 1er janvier 2012 au 31 mai 2014, la somme de USD 34.287.534 (USD 53.336.164,67 dont il faut soustraire la somme de USD 19.048.630,24 déjà payée) **[Mémoire récapitulatif et en Réponse ¶604]**.

340. Concernant la période allant du 1er juin 2014 au 31 mai 2015, GVG a facturé, en appliquant le tarif imposé (USD 0,025) aux termes de l'Addendum, la somme totale de USD 6.824.441,28, laquelle somme n'a jamais fait l'objet de règlement de la part des Défenderesses. GVG demande aujourd'hui le paiement de ses factures dont il convient de recalculer le montant en appliquant le taux initialement convenu (USD 0,07), soit la somme de USD 19.108.436, 28 **[Mémoire récapitulatif et en Réponse ¶605]**.

341. Enfin, et concernant la période du 1er juin 2015 au 22 mai 2017, pendant laquelle GVG ne pouvait plus émettre de factures, les Défenderesses leur ayant interdit d'accéder au site de l'ARPT où était installée la plate-forme IMS-STP 1, celle-ci réclame des dommages et intérêts au titre des impayés, dont le montant sera calculé sur la moyenne des factures qu'elle avait établies auparavant, comme suit **[Mémoire récapitulatif et en Réponse ¶606]** :

    a. La moyenne d'une facture mensuelle étant de USD 631.050,53 (la somme totale facturée de USD 25.873.071,77 divisée par les 41 mois facturés selon le tableau ci-haut) ;

    b.   La moyenne journalière facturée étant de USD 20.868 (la moyenne annuelle facturée en 2012, 2013 et 2014, soit la somme de USD 7.616.859, divisée par 365 jours) ;

    c.   Les Défenderesses, en appliquant le tarif imposé à GVG aux termes de l'Addendum (USD 0,025), devaient le montant total de USD 14.973.258,19 pour cette période (USD 631.050,53 x 23 mois, correspondant à la période du 1er juin 2015 au 30 avril 2017, soit USD 14.514.162,19, auquel il convient d'ajouter la somme de USD 459.096 correspondant à la période du 1er mai au 22 mai 2017, calculée en multipliant la moyenne journalière de USD 20.868 par 22).

342. Cependant, et comme exposé ci-avant, en raison de la nullité de l'Addendum, GVG réclame pour la période allant du 1er juin 2015 au 22 mai 2017, et donc en appliquant le tarif initial de USD 0,07, la somme de USD 41.925.122,32 **[Mémoire récapitulatif et en Réponse ¶607]**.

343. En résumé, GVG réclame, à titre des impayés par les Défenderesses pour toute la période contractuelle, les montants suivants **[Mémoire récapitulatif et en Réponse ¶608]** :

    a.   USD 11.237.182,60, correspondant au montant dont a été réduite la dette des Défenderesses aux termes des articles 2 et C de l'Addendum ;

    b.   USD 34.287.534, correspondant aux impayés pendant la période allant du 1er janvier 2012 au 31 mai 2014, selon le tableau ci-haut indiquant les montants mensuels facturés par GVG (en appliquant le tarif imposé à USD 0,025), recalculés en appliquant le tarif initialement convenu (USD 0,07) ;

    c.   USD 19.108.436,28, correspondant aux factures impayées par les Défenderesses pendant la période allant du 1er juin 2014 au 31 mai 2015, en appliquant le taux initialement convenu (USD 0,07) ;

    d.   USD 41.925.122,32, correspondant à une estimation des montants dus pour la période allant du 1er juin 2015 au 22 mai 2017 (calculés sur la base du trafic déclaré et donc de la moyenne des montants facturés par GVG selon le tableau ci-haut, en appliquant le tarif de USD 0,07).

344. GVG réclame donc des dommages et intérêts au titre des impayés pour toute la période contractuelle d'un montant total de USD 106.558.275,20 **[Mémoire récapitulatif et en Réponse ¶609]**.

345. GVG demande également dans le cadre de la présente procédure le remboursement des frais qu'elle a dû engager pendant le processus des négociations contractuelles qui n'ont pas pu aboutir, les Défenderesses ayant décidé d'accorder le marché à un de leurs concurrents, avec lequel elles ont négocié en parallèle. Ces frais sont estimés à USD 150.000,00 **[Mémoire récapitulatif et en Réponse ¶610]**.

346. Les Défenderesses seront également condamnées à payer des intérêts de retard à compter d'août 2015 avec capitalisation sur les montants susvisés au taux qu'il sera jugé approprié par le Tribunal arbitral **[Mémoire récapitulatif et en Réponse ¶611]**.

347. GVG sollicite également la condamnation des Défenderesses au paiement de tous les frais relatifs à l'arbitrage, incluant les honoraires et frais d'avocats ainsi que les honoraires et frais de tout expert engagé par GVG dans le cadre de la présente procédure **[Mémoire récapitulatif et en Réponse ¶612]**.

348. Dans ses Notes post-audiences no. 1 et no. 2 **[¶52]**, GVG demande que soit prise en compte « *la mauvaise foi sans limite* » des Défenderesses, notamment dans le contexte des allégations de corruption, dans le calcul de son préjudice et invoque les termes de l'article 684 du Code civil guinéen, à l'effet que « *des dommages et intérêts, distincts de ceux dus pour inexécution ou retard dans l'exécution, peuvent être également demandés en cas de mauvaise foi manifeste du débiteur.* »

**VII.1.b.    Les Défenderesses**

349. Reconventionnellement, GVG devra être condamnée en cas de nullité à la restitution des sommes indûment perçues, soit la somme de USD 48.093.160,00 à parfaire, GVG ne pouvant tirer aucun bénéfice de sa propre turpitude **[Note post-audiences no. 2]**.

350. À titre subsidiaire, si les accords invoqués par GVG au soutien de ses demandes n'étaient pas annulés, condamner GVG pour mauvaise exécution au paiement de dommages et intérêts en réparation du préjudice subi du fait du comportement de GVG pour un montant de USD 10 millions, à parfaire **[Note post-audiences no. 2 ; Mémoire en Duplique ¶537]**.

351. En tout état de cause, la mise en cause par GVG de la moralité en affaire de l'ARPT et de la République de Guinée comme les nombreuses allégations dénigrantes de GVG à leur endroit dans ses écritures font subir aux Défenderesses un préjudice moral caractérisé qui ne saurait être inférieur pour chacune d'elle à USD 100.000 **[Note post-audiences no. 2 ; Mémoire en Duplique ¶550]**.

352. Par ailleurs, la fraude manifeste de GVG à la réglementation guinéenne des marchés publics constitue le seul et unique support des demandes formées par GVG dans le cadre de la présente procédure d'arbitrage. Cette procédure est donc incontestablement abusive. Le préjudice subi par chacune des Défenderesses ne saurait être estimé, au regard de la gravité du comportement de GVG, à une somme inférieure à USD 100.000 **[Note post-audiences no. 2 ; Mémoire en Duplique ¶551]**.

353. En tout état de cause, GVG devra être condamnée à supporter l'intégralité des frais relatifs à l'arbitrage, en ce compris les honoraires et frais d'avocats ainsi que les honoraires et frais de tout expert missionné par les Défenderesses pour les besoins de la présente procédure.

354. La dernière demande de GVG consistant à solliciter du Tribunal arbitral qu'il prenne en compte la prétendue mauvaise foi des Défenderesses dans le calcul du préjudice, ne laisse pas de surprendre.

Il en est de même de la demande d'indemnisation des frais engagés par GVG dans le processus de négociations contractuelles inabouties avec l'ARPT, alors que l'Accord de Partenariat, dans son article 6, exclut toute indemnisation de dommages indirects **[Note post-audiences no. 2 ¶61]**.

355. Ainsi également, dans le contexte des crimes économiques commis par GVG, de sa demande principale relative au montant des prétendus impayés pendant la période contractuelle, en sus des intérêts de retard à compter du mois d'août 2015 avec capitalisation des intérêts **[Note post-audiences no. 2 ¶62]**.

## *VII.2. Analyse*

### VII.2.a.Impayés pour la période contractuelle

356. Au regard des conclusions du Tribunal arbitral sur le plan de la responsabilité contractuelle des Défenderesses, de la validité de l'Accord, et de celle de l'Avenant et de l'Addendum, et donc en application de la force obligatoire des contrats, il convient de faire droit partiellement à la réclamation de GVG, c'est-à-dire pour le paiement des factures émises au titre de l'Accord de Partenariat entre le 1er septembre 2009 et le 31 mai 2015 et demeurées impayées, de même que pour le paiement des montants qui auraient été facturés pour la période allant du 1er juin 2015 au 22 mai 2017 au titre de dommages et intérêts.

357. Ces sommes seront ainsi calculées au tarif de l'Addendum, soit USD 0,025 par minute à compter du 1er avril 2011 et non au tarif d'origine de USD 0,07 par minute.

358. Ainsi il est fait droit à la réclamation de GVG sous ce chef dans les termes suivants :
   a. **La somme de USD 6.824.441,28,** correspondant aux factures impayées par les Défenderesses pendant la période allant du 1er juin 2014 au 31 mai 2015, en appliquant le tarif de USD 0,025 au titre de l'Addendum ;
   b. **La somme de USD 14.973.258,19**, correspondant à l'estimation des montants dus pour la période allant du 1er juin 2015 au 22 mai 2017, en appliquant le tarif de USD 0,025.

359. Sont rejetées la réclamation de USD 11.237.182,60, correspondant au montant dont a été réduite la dette des Défenderesses aux termes des articles 2 et C de l'Addendum ; celle de USD 34.287.534, correspondant aux impayés pendant la période allant du 1er janvier 2012 au 31 mai 2014, recalculés en appliquant le tarif de USD 0,07 ; et celle de USD 41.925.122,32 correspondant à l'estimation des montants dus pour la période allant du 1er juin 2015 au 22 mai 2017, en appliquant le tarif de USD 0,07.

360. Le Tribunal rejette également la réclamation de GVG pour remboursement des frais estimés à USD 150.000,00 qu'elle aurait engagés pendant le processus des négociations contractuelles qui n'ont pas pu aboutir, cette somme n'étant ni explicitée ni justifiée, dans son principe ou dans son montant.

361. Quant à la demande de GVG que soit prise en compte dans le calcul de son préjudice « *la mauvaise foi sans limite* » des Défenderesses selon les termes de l'article 684 du Code civil guinéen, à l'effet que « *des dommages et intérêts, distincts de ceux dus pour inexécution ou retard dans l'exécution, peuvent être également demandés en cas de mauvaise foi manifeste du débiteur* », le Tribunal arbitral constate qu'elle n'a pas été étayée, GVG n'ayant ni chiffré sa demande, ni fourni d'autorités pouvant guider le Tribunal dans son évaluation de la mesure financière de « *la mauvaise foi sans limite* » alléguée à l'encontre des Défenderesses.  Cette demande, dans la mesure où elle est maintenue, est donc rejetée.

362. GVG réclame **[Mémoire récapitulatif et en Réponse ¶611]** que les sommes dues soient augmentées des « *intérêts de retard à compter d'août 2015 avec capitalisation sur les montants susvisés au taux qu'il sera jugé approprié par le Tribunal arbitral* ».  Sur ce point les Défenderesses ne répondent pas autrement qu'en en demandant le rejet total des demandes de GVG, ne s'expriment pas précisément sur le point de départ des intérêts et ne contestent pas non plus le pouvoir laissé au Tribunal de fixer le taux approprié.

363. Le Tribunal considère que les intérêts doivent courir à compter, non du moment où la résiliation a été considérée comme abusive, c'est-à-dire le 6 août 2015, comme le souhaite GVG, mais seulement à compter de la date à laquelle la Demanderesse a mis en demeure les Défenderesses de s'exécuter.  C'est en effet à partir du moment où une partie réclame ses droits que le retard dans l'exécution prend effet du pont de vue des intérêts.  Or, faute de mise en demeure spécifique, c'est la demande en justice, autrement dit la Requête en arbitrage, qui vaut mise en demeure et celle-ci date du 8 décembre 2016, puisqu'elle comporte une telle réclamation.

364. Le Tribunal relève à titre surabondant que la solution qu'il retient correspond aux dispositions du droit guinéen, choisi par les Parties comme droit applicable, puisque l'article 681 du Code civil guinéen[3] prévoit que les intérêts courent à compter de la mise en demeure et que l'article 722 al. 2 du même Code[4] considère (à propos de la clause pénale, mais en termes généraux) que l'assignation en justice vaut mise en demeure.

365. Les sommes dues par les Défenderesses porteront donc intérêt à compter du 8 décembre 2016 et jusqu'à parfait paiement.

366. Les parties se sont peu exprimées sur le taux d'intérêt à retenir.  GVG le laisse à l'appréciation du Tribunal, et les Défenderesses, qui n'ont pas proposé de taux applicable, n'ont à aucun moment contesté cette faculté laissée au Tribunal.  Le Tribunal considère donc que les parties lui ont

---

[3] Article 681 du Code civil guinéen : « *Les dommages et intérêts dus, par exemple, au sens de l'article 673 ci-dessus, ne peuvent l'être qu'après une mise en demeure faite au débiteur d'avoir à remplir son obligation* ».

[4] Article 722 al. 2 du Code civil guinéen : « *Une assignation en justice équivaut à une mise en demeure* ».

abandonné la libre fixation du taux à retenir. Le taux d'intérêt qui paraît raisonnable au Tribunal est celui de 2%, taux qui est un peu supérieur taux légal français (0,86%), mais inférieur au taux d'épargne cité sur le site de la Banque centrale guinéenne (2,79%).

367. Le Tribunal rejette la demande de capitalisation, GVG n'en justifiant pas la source dans le droit guinéen choisi par les Parties, ni même dans « *les usages du commerce pertinents* », dont l'application en l'espèce aurait pu être envisagée sur le fondement de l'article 21(2) du Règlement CCI.

## D.  LES FRAIS DE L'ARBITRAGE

## I.      RÉSUMÉ DES POSITIONS DES PARTIES

368. Aux termes de la note concernant sa réclamation pour les frais de l'arbitrage, GVG réclame, justificatifs à l'appui :

    a. USD 452.500,00 pour la provision versée à la CCI ;

    b. EUR 429.435,40 pour les honoraires et débours de ses conseils et consultants externes dans le cadre de la conduite de cet arbitrage ;

    c. EUR 14.836,00 pour la logistique des audiences (location des salles, transcription, traduction et repas) ;

    d. EUR 23.391,16 pour les frais de voyage relatifs aux audiences et à la préparation des témoins et des audiences ;

    e. 7.5% du montant de la sentence à venir représentant l'honoraire complémentaire des conseils de GVG ;

    f. Intérêts de retard capitalisés trimestriellement sur lesdites sommes au taux que le Tribunal jugera approprié, à compter de la date de la sentence jusqu'à parfait paiement.

369. GVG demande que le Tribunal, dans sa décision concernant les frais de l'arbitrage, prenne en compte « *la mauvaise foi procédurale des Défenderesses qui ont retardé la constitution du Tribunal arbitral et la signature de l'Acte de mission ; produit la consultation juridique du Professeur Train in extremis ; et produit de nouvelles pièces deux jours avant les audiences, ce qui a eu pour conséquence la production de deux Notes post-audiences dont le contenu, qui devait se limiter aux treize chèques, n'a pas été respecté par les Défenderesses.* »

370. Les Défenderesses, pour leur part, réclament un total de EUR 919.800,57, justificatifs à l'appui, réparti comme suit :

    a. EUR 419.565,50 pour les honoraires d'avocats ;

    b. EUR 34.788,06 pour les frais et débours ;

  c. EUR 12.947,01 pour les frais de voyage client ;

  d. EUR 452.500,00 pour la provision CCI.

371. Les Défenderesses ajoutent qu'elles s'opposent avec la plus extrême vigueur à l'octroi de l'honoraire complémentaire réclamé par GVG et que ne doivent être pris en compte que les frais encourus avec certitude.

## II. ANALYSE

372. Le Tribunal arbitral constate que GVG prévaut dans la présente procédure à hauteur de USD 21.797.699,47, soit environ 20% de sa réclamation totale qui se chiffre à USD 106.558.275,20.

373. Le Tribunal arbitral a par ailleurs jugé entièrement irrecevable la demande reconventionnelle des Défenderesses en nullité.

374. Par conséquent, le Tribunal arbitral, en application de l'article 37 du Règlement et dans l'exercice de son pouvoir discrétionnaire en matière de répartition des frais de l'arbitrage, rejette la réclamation des Défenderesses pour leurs frais dans cet arbitrage, et fait droit à celle de GVG à concurrence de 20% de ses frais. Le Tribunal précise que la Cour a fixé les frais de l'arbitrage à USD 891.000,00.

375. Dans le calcul des frais de GVG, le Tribunal arbitral fait droit à l'honoraire complémentaire de 7.5% des sommes principales recouvrées, qui lui apparaît raisonnable et de pratique courante pour les litiges de cette nature. Le Tribunal arbitral calcule l'honoraire complémentaire à USD 1.634.827,46. Seuls 20% de ce montant seront mis à la charge des Défenderesses, soit USD 326.965,49.

376. Le Tribunal arbitral fait donc droit partiellement à la réclamation de GVG pour ses frais et, en appliquant le taux de 20% aux sommes en cause, en établit le montant comme suit :

  a. USD 90.500,00 pour la provision CCI ;

  b. EUR 85.887,08 pour les honoraires et débours ;

  c. EUR 2.967,20 pour les frais de logistique ;

  d. EUR 4.678,23 pour les frais de voyage ;

  e. USD 326.965,49 pour l'honoraire complémentaire.

377. Ces sommes porteront intérêt au taux de 2% l'an à compter de la date de la présente Sentence et ce, jusqu'à parfait paiement. Le Tribunal arbitral rejette la demande de capitalisation trimestrielle des intérêts de retard pour les raisons évoquées ci-dessus en ce qui concerne le préjudice.

378. Les décisions du Tribunal relativement à la répartition des frais de défense et d'arbitrage permettent de prendre en considération la faiblesse de certains des arguments des Défenderesses de même que leur production *in extremis* de certaines pièces.

## E. LES DEMANDES RECONVENTIONNELLES

379. En conséquence de ce qui a été décidé à propos des demandes principales, les demandes reconventionnelles sont rejetées.

## F. LE DISPOSITIF

380. Le Tribunal arbitral, par les motifs ci-devant exposés et après audition des parties et délibération, rend la Sentence Finale suivante :

a. **DIT ET JUGE** que la clause d'arbitrage contenue à l'article 17 de l'Accord de Partenariat est valide, **REJETTE** la demande des Défenderesses tendant à l'annulation de ladite clause d'arbitrage, et par conséquent **RÉAFFIRME** sa compétence *ratione materiae* pour connaître du présent litige ;

b. **DIT ET JUGE** que les deux Défenderesses sont parties à l'Accord de Partenariat, **DIT ET JUGE** que la présente procédure a été valablement constituée envers les deux Défenderesses, et par conséquent **RÉAFFIRME** sa compétence *ratione personae* pour connaître du présent litige ;

c. **DIT ET JUGE** que l'Accord de Partenariat est licite et **REJETTE** les demandes reconventionnelles des Défenderesses en nullité dudit Accord de Partenariat ainsi qu'en restitution, en dommages et intérêts ainsi que toute autre demande financière des Défenderesses ;

d. **DIT ET JUGE** que GVG a rempli ses obligations au regard de l'Accord de Partenariat et que les Défenderesses ont abusivement résilié ledit Accord ;

e. **DIT ET JUGE** que l'Avenant et l'Addendum sont tous deux licites et ont plein effet ;

f. **CONDAMNE** les Défenderesses à verser à GVG les sommes suivantes en réparation de son préjudice, lesdites sommes portant intérêt simple au taux de 2% l'an à compter du 8 décembre 2016 et jusqu'à parfait paiement par les Défenderesses :

   (i). **USD 6.824.441,28** correspondant aux factures impayées par les Défenderesses pendant la période allant du 1er juin 2014 au 31 mai 2015, en appliquant le tarif de USD 0,025 au titre de l'Addendum ;

   (ii). **USD 14.973.258,19** correspondant à l'estimation des montants dus pour la période allant du 1er juin 2015 au 22 mai 2017, en appliquant le tarif de USD 0,025 ;

g. **REJETTE** les autres demandes de GVG ;

h. **CONDAMNE** les Défenderesses aux dépens, et leur **ORDONNE** de verser à GVG les sommes suivantes, lesdites sommes portant intérêt simple au taux de 2% l'an à compter de la date de la présente Sentence et jusqu'à parfait paiement par les Défenderesses :

   (i).   **USD 90.500,00** pour la provision CCI ;

   (ii).  **EUR 85.887,08** pour les honoraires et débours ;

   (iii). **EUR 2.967,20** pour les frais de logistique ;

   (iv).  **EUR 4.678,23** pour les frais de voyage ;

   (v).   **USD 326.965,49** pour l'honoraire complémentaire.

i. **REJETTE** les demandes des Défenderesses relatives aux frais d'arbitrage et de défense.

Date : 18 juillet 2019

Siège de l'arbitrage : Paris, France

Signature :

**M. Le Professeur Charles Jarrosson**

(Co-Arbitre)

**Me Carmen Núñez-Lagos**

(Co-Arbitre)

**Me Sophie Nappert**

(Président)



## CERTIFICATE OF ACCURACY

The undersigned, Luis R. de la Vega, President of Protranslating, appearing on behalf of Protranslating, an ISO 9001 and 17100 certified company, hereby states, to the best of his knowledge and belief, that the foregoing is an accurate translation from **French** into **English** of the document(s) titled:

    **-** INTERNATIONAL CHAMBER OF COMMERCE INTERNATIONAL COURT OF

    ARBITRATION (2012 ICC Arbitration Rules) Case no. 22467/DDA

_____

Luis R. de la Vega
President of Protranslating

State of Florida
Miami Dade County

The foregoing certificate was acknowledged before me on August 27, 2020 by Luis R. de la Vega, President of Protranslating, a Florida corporation, on behalf of the corporation. He is personally known to me.

_____
Notary Public

My commission expires:





2850 Douglas Rd. Coral Gables, Fl 33134 Ph: 305.371.7887 Fax 305.371.4816
www.protranslating.com