# EXHIBIT B

Los Angeles, CA
+1 323/823-7360

### TRANSLATOR AFFIDAVIT

I, Gregory Jackson, of 8484 Wilshire Blvd. #515, Beverly Hills, California 90211, am a qualified, professional translator for the French and English languages. My qualifications include more than 15 years as a full-time freelance French-English legal translator.

I herewith certify that the attached translation is, to the best of my knowledge and belief, a true and accurate translation from French into English of the attached excerpts and Terms of Reference from the International Court of Arbitration of the International Chamber of Commerce in Case No. 22467/DDA.

Signature

_____Gregory Jackson_____

Name

_____July 19, 2023_____

Date



ERICK ARIEL ESCOBAR
Notary Public - California
Los Angeles County
Commission # 2412740
My Comm. Expires Aug 12, 2026

**INTERNATIONAL CHAMBER OF COMMERCE**

**INTERNATIONAL COURT OF ARBITRATION**

**CASE No. 22467/DDA**

**BETWEEN:**

**GLOBAL VOICE GROUP S.A. (Seychelles)**

**Claimant**

**and**

**1. REGULATORY AUTHORITY FOR POST OFFICES AND**
**TELECOMMUNICATIONS OF GUINEA (Guinea)**
**2. THE REPUBLIC OF GUINEA (Guinea)**

**Respondents**

---

**TERMS OF REFERENCE**

**(ARTICLE 23 OF THE ICC ARBITRATION RULES 2012)**

---

## NAMES, COMPANY NAMES AND CONTACT DETAILS FOR THE PARTIES

1. The Claimant is the company incorporated under Seychelles law Global Voice Group S.A. (**GVG; the Claimant**), whose registered office is located at 1st Floor, #5 Dekk House, De Zippora Street, P.O. Box 456, Providence Industrial Estate, Mahé, Republic of Seychelles, registered under number 022185. GVG is 100% owned by its Managing Director, Mr. Patrice Baker, of Haitian nationality.

2. The Respondents are (1) the Regulatory Authority for Post Offices and Telecommunications of Guinea (**ARPT**), a legal person under public law governed by the special status defined by the Guinean Law L/2005/018/AN of September 8, 2005, relating to the General Telecommunications Regulations, represented by its Managing Director Mr. Oumar Said Koulibaly, and whose address is at Almamya District, Commune of Kaloum, B.P. 1500, Conakry, Republic of Guinea; and (2) the Republic of Guinea (**the State**) represented by His Excellency Mr. Moustapha Mamy Diaby, Minister of Post Offices, Telecommunications and the Digital Economy, and whose address is at Immeuble de la Poste, Quartier Almamya, B.P. 3000, Conakry, Republic of Guinea (together, **the Respondents**).

## ARBITRATION CLAUSE

3. Following GVG's offer for approval of an "Independent Signaling and Interconnection Service Provider" and an "Independent Operator Billing Service Provider" license, a Partnership Agreement between ARPT and GVG intervened on May 22, 2009 (**Partnership Agreement) [Exhibit No. 1, Request for Arbitration**].

4. Under Article 17 of the Partnership Agreement, entitled "Applicable Law – Dispute Resolution":

*"This Agreement is subject to the laws of the Republic of Guinea.*

*In the absence of an amicable agreement between the Parties within a period of six (6) months following the date on which the dispute arises, any dispute of any kind, including the Annexes and any amendments thereto, which may arise between them, shall be subject to the*

*exclusive jurisdiction of the Arbitration Rules of the International Chamber of Commerce of Paris by one or more arbitrators appointed in accordance with these Rules."*

## ADDRESSES OF THE PARTIES WHERE ANY NOTICES OR COMMUNICATIONS CAN BE VALIDLY GIVEN DURING THE ARBITRATION

5.  All notifications or communications to the parties during or relating to this arbitration shall be validly given by sending electronic mail (email) to the addresses appearing hereinafter, subject to the circumstances mentioned in paragraphs 9 and 10 hereinafter.

6.  For the Claimant, to its counsel: Marianne Kecsmar, Lawyer at the Paris and New York Bars, Pellerin Kecsmar Mirza Avocats, 20 rue des Pyramides 75001 Paris, France. Email: marianne.kecsmar@pkm-avocats.com; Bassam Mirza, Lawyer at the Bars of Paris and Beirut, Pellerin Kecsmar Mirza Avocats, 11 Place de l'Étoile, Immeuble Wakf Al-Marouni, Downtown Beirut 2011-8860, Lebanon.  Email: bassam.mirza@pkm-avocats.com.

7.  For the Respondents, to their counsel: Sena Agbayissah, Lawyer at the Bar of Paris, Hughes Hubbard & Reed LLP, 8, rue de Presbourg, 75116 Paris, France. Email: sena.agbayissah@hugheshubbard.com; Marc Henry, Lawyer at the Bar of Paris, Hughes Hubbard & Reed LLP, 8, rue de Presbourg, 75116 Paris, France. Email: marc.henry@hugheshubbard.com.

8.  Communications by e-mail for which the sender requires an acknowledgment of receipt will also be sent by courier to the above-mentioned addresses and will be deemed to have been received on the date of their delivery to the said addresses.

9.  Communications exceeding 20 pages will be sent both by e-mail and by courier. Communications not suitable for email format will be sent by courier.

10. Any change of address, postal or electronic, and any change of contact details will be immediately communicated to the parties, to the Arbitral Tribunal and to the Secretariat of the International Court of Arbitration of the International Chamber of Commerce

(**the Secretariat**).  In the absence of timely notification, the sending of communications in accordance with paragraphs 6 to 10 will be deemed valid.

11.  The deadlines set by the Arbitral Tribunal will be deemed respected if they were sent no later than before midnight (24:00) on the due date.

12.  The Secretariat team in charge of this arbitration is composed as follows:

| | |
|---|---|
| Diamana Diawara, Counselor | direct line: +33 1 49 53 29 51 |
| Constance Castres Saint-Martin, Deputy Counselor | direct line: +33 1 49 53 29 28 |
| Alya Ladjimi, Deputy Counselor | direct line: +33 1 49 53 30 37 |
| Aurélien Zuber, Deputy Counselor | direct line: +33 1 49 53 29 79 |
| Caroline Carlyle-Price, Assistant | direct line: +33 1 49 53 28 47 |
| Cameron McColl, Assistant | direct line : +33 1 49 53 29 72 |
| Marina Triebe-Gravel, Assistant | direct line: +22 1 49 53 29 46 |
| Facsimile | +33 1 49 53 57 75 |
| Email | ica2@iccwbo.org |

13.  Any communication by either party to the Arbitral Tribunal, or by the Arbitral Tribunal to the parties, shall be simultaneously transmitted to the Secretariat.

## NAMES, DESCRIPTIONS, AND CONTACT DETAILS FOR THE ARBITRAL TRIBUNAL

14.  The Arbitral Tribunal is composed of: (1) Mr. Charles Jarrosson, Professor at the University Panthéon-Assas, 15, rue Alphonse de Neuville, 75017, Paris, France, Email: charles.jarrosson@wanadoo.fr; confirmed by the International Court of Arbitration (**the Court**) on July 6, 2017, as Co-Arbitrator upon appointment by the Claimant; (2) Ms. Carmen Núñez-Lagos, Partner, Hogan Lovells (Paris) LLP, 17, avenue Matignon, CS 30027, 75378 Paris Cedex 08, France; Email: carmen.nunezlagos@hoganlovells.com; appointed directly by the Court on July 6, 2017, as Co-Arbitrator instead and in place of the Respondents who did not appoint a Co-Arbitrator; and (3) Ms. Sophie Nappert, 3 Verulam Buildings, Gray's Inn,

London WC1R 5NT, UK; Email: snappert@3vb.com; appointed directly by the Court on July 6, 2017, as Presiding Judge of the Arbitral Tribunal.

15. Any notice and communication to the Arbitral Tribunal, during or in connection with this arbitration, shall be deemed valid if simultaneously transmitted by email to the Co-Arbitrators and the Presiding Judge at their respective email addresses.

16. Paragraphs 5 to 12 apply to communications to the parties and to the Secretariat from the Arbitral Tribunal.

## BRIEF RECALL OF THE ARBITRAL PROCEEDING

17. By Letter dated December 13, 2016, the Secretariat acknowledged receipt of the Request for Arbitration dated December 8, 2016, and received on December 9, 2016.

18. By Letter dated December 28, 2016, the Secretariat sent the Request for Arbitration to the Respondents, informing them, among other things, that they had 30 days from the day following receipt of this correspondence to respond to the Request, as well as the possibility for them to request an extension of this deadline by providing their comments on the number of arbitrators and, if necessary, by appointing an arbitrator (Article 5(2) of the ICC Arbitration Rules 2012 (**the Rules**)).

19. By Letter dated February 14, 2017, the Secretariat informed the parties that the Request for Arbitration had been received by the Respondents via DHL on December 30, 2016, and that therefore the 30-day deadline to submit a response to the Request for Arbitration had expired on January 31, 2017, without such response having been submitted. The Secretariat added that, in accordance with Article 6(3) of the Rules, the arbitration would continue despite the absence of a response; that in the absence of comments from the Respondents, the Court would constitute the Arbitral Tribunal (Article 12(2) of the Rules) and would determine the place of arbitration (Article 18(1) of the Rules).

20. By Letter dated February 17, 2017, the ARPT acknowledged receipt of the Letter from the Secretariat dated February 14, 2017, expressed its astonishment and transmitted a

letter dated August 6, 2015, that it had sent to the Chairman and Chief Executive Officer of GVG.

21. By Letter dated April 18, 2017, the Secretariat informed the parties that the Court, on the date of April 13, 2017:

    **a.** Decided to submit this arbitration to three arbitrators (Article 12(2) of the Rules);

    **b.** Set Paris (France) as the place of arbitration (Article 18(1) of the Rules);

    **c.** Noted the appointment of Professor Jarrosson as Co-Arbitrator appointed by the Claimant;

    **d.** Asked the Respondents to appoint a co-arbitrator within a 15-day deadline, for lack of which the Court would be asked to take the necessary measures to constitute the Arbitral Tribunal.

22. By Letter dated July 6, 2017, the Secretariat informed the Arbitral Tribunal and the parties that the Court, on that same date had:

    **a.** Confirmed Charles Jarrosson as Co-Arbitrator upon appointment by the Claimant (Article 13(1) of the Rules);

    **b.** Directly appointed Carmen Núñez-Lagos as Co-Arbitrator instead and in place of the Respondents who had not appointed a co-arbitrator (Article 13(4)(a) of the Rules);

    **c.** Directly appointed Sophie Nappert as Presiding Judge of the Arbitral Tribunal (Article 13(4)(a) of the Rules).

23. By Letter dated July 6, 2017, the Secretariat transmitted the case file to the Arbitral Tribunal.

24. By Email dated July 11, 2017, also sent to the Respondents by courier, the arbitral tribunal, through its Presiding Judge, contacted the parties in order to convene the procedural management conference (Article 24 of the Rules).

25. By Email dated July 19, 2017, counsel for the Claimant replied to the above email and informed the Arbitral Tribunal that Hughes Hubbard had joined the case as counsel for the ARPT.

26. By Email dated July 19, 2017, Messrs. Sena Agbayissah and Marc Henry of the Hughes Hubbard firm confirmed their mandate to represent the ARPT in this arbitration and sent a Letter dated July 6, 2017, addressed to the Secretariat, by which they requested a 30-day deadline, i.e., until August 4, 2017, to submit the ARPT's response and its choice of co-arbitrator.

27. By Email dated July 20, 2017, counsel for the Claimant objected to the granting of the deadline requested by counsel for the ARPT, on the grounds, in particular, that the Respondents had received any useful notification to submit their response and to nominate their co-arbitrator but did not do so.

28. By Email dated July 28, 2017, also sent to the State by courier, the Arbitral Tribunal, after having contacted the Secretariat and after deliberation, informed the parties that, insofar as the Respondents had been informed in due time of the conduct of the proceedings, where the Arbitral Tribunal had been validly constituted and barring intervention by the Court, it appeared to it that the arbitral proceedings should follow their course and that the procedural management conference should be held in order to conclude the Terms of Reference. The Arbitral Tribunal also noted that the Respondents had had every opportunity to submit their position within the Terms of Reference and their written submissions. Counsel for the Claimant having indicated their availability for the conference, notably for September 4, the Arbitral Tribunal requested the Respondents' availability.

29. By Email dated July 31, 2017, Me. Henry acknowledged receipt of the communication from the Arbitral Tribunal and informed it of a return as soon as possible.

30. By Email dated August 7, 2017, the Arbitral Tribunal sent a reminder to the Respondents.

31. By Email dated August 11, 2017, Me. Agbayissah acknowledged receipt of the communication from the Arbitral Tribunal and assured it of a response as soon as possible.

32. By Email dated August 14, 2017, also sent to the State by courier, the Arbitral Tribunal informed the parties that in the absence of a response from the Respondents by August 18, 2017, the Procedural Conference would take place on September 4, 2017.

33. By Email dated August 29, 2017, addressed to the parties, the Arbitral Tribunal confirmed the holding of the Procedural Conference on September 4, 2017, at 2:30 p.m. Paris time,

except indication by the counsels of another availability, and circulated the telephone contact details. The Arbitral Tribunal also invited counsel to come together to try to agree on a procedural timetable and to inform the Arbitral Tribunal of the outcome of their discussions on September 1, 2017.

34. By Email dated August 29, 2017, counsel for the Claimant confirmed their availability for the Procedural Conference.

35. By Email dated August 30, 2017, the Arbitral Tribunal circulated a draft Terms of Reference to the parties and to the Secretariat.

36. By Email dated September 1, 2017, counsel for the Claimant circulated a draft Procedural Schedule, counsel for the Respondents having informed them that they were not yet in a position to discuss it.

37. By Email dated September 1, 2017, the Arbitral Tribunal circulated an agenda for the September 4 conference call, and asked counsel for the Respondents to indicate whether they intended to participate.

38. By Email dated September 4, 2017, Me. Henry confirmed the participation of counsel for the Respondents in the conference call.

39. The Procedural Conference was held on September 4, 2017, at 2:30 p.m. Paris time, in the presence of the Arbitral Tribunal and counsel for the parties.

40. By subsequent Email dated September 4, 2017, the Arbitral Tribunal confirmed that counsel for the Guinean parties had agreed to inform the Arbitral Tribunal and the Claimant of the status of their mandate, and of the Respondents' intentions with regard to their participation in this arbitration by September 15, 2017.

41. By Email dated September 18, 2017, the Arbitral Tribunal asked counsel for the Respondents to respond to the above email.

42. By Email dated September 19, 2017, Me. Agbayissah and Me. Henry transmitted their mandate to represent the State for the purposes of this arbitration.

43. By Email dated September 20, 2017, the Arbitral Tribunal acknowledged receipt of the mandate to represent from the counsel for the Respondents, noted that all the parties present participated in the arbitral proceedings through their respective counsel, and

asked the parties to define their respective positions in the draft Terms of Reference by September 27, 2017.

44. By Email dated September 25, 2017, counsel for the Claimant forwarded the summary of the Claimant's claims for inclusion in the Terms of Reference.

45. By Email dated September 28, 2017, the Arbitral Tribunal granted the Respondents additional time until October 13 to produce the summary of their claims and their comments on the draft Terms of Reference and Procedural Timetable.

46. By Email dated October 12, 2017, counsel for the parties transmitted their joint comments on the draft Terms of Reference as well as a procedural timetable which they had agreed upon.

47. By Email dated October 13, 2017, counsel for the Respondents forwarded the summary of the Respondents' claims for inclusion in the Terms of Reference.


## SUMMARY STATEMENT OF THE PARTIES' CLAIMS AND OF THE DECISIONS SOUGHT BY EACH OF THEM; AMOUNT OF ANY QUANTIFIED CLAIM; ESTIMATED PECUNIARY VALUE OF ANY OTHER CLAIMS

48. The Terms of Reference present a summary statement of the parties' claims for the purpose of facilitating the identification of the disputed points and the parties' proper understanding thereof and the Arbitral Tribunal and in accordance with Article 23(4) of the Rules.


## THE CLAIMANT

49. The Claimant presents its Statement of Facts and of its claims as follows:


## 1. The Contractual Relationship between the Claimant and the Respondents

50. GVG is a world-class provider of advanced technologies and systems for protecting finances and generating revenue related to telecommunications flows and operations. GVG's technological solutions enable their customers - who are exclusively States and governmental institutions, including regulatory authorities - to optimize telecommunications industry revenues, reduce international call fraud and to monitor network quality and integrity.

51. This is how three contractual documents materialized between GVG, on the one hand, and the Regulatory Authority for Post Offices and Telecommunications of Guinea (**ARPT**) and the Republic of Guinea (**State**), on the other hand, namely the Partnership Agreement (Section (**i**)), the Addendum to the Agreement (section (**ii**)) and the Addendum that was imposed by the Respondents (section (**iii**)).

## i)  The Partnership Agreement

52. The State wished to "*oversee the flow of local and international telephone traffic in order to adopt the most appropriate taxation system to meet the needs of the fiscal and socio-economic realities of the Republic of Guinea*" and in that respect it considered it necessary to endow the ARPT with "*adequate tools to enable it to play its role as the State regulator of the telecommunications sector*" (Preamble, Pg.2 of the Partnership Agreement).

53. It is in this context that the Partnership Agreement was entered into on May 22, 2009, between ARPT and GVG (**Partnership Agreement**). This Partnership Agreement was also signed "For the Ministry of Telecommunications and New Information Technologies" by the Minister in question (**Minister**).

54. Under the terms of the Partnership Agreement, it was provided that GVG, in return for its commitments, would receive compensation from the revenues generated by the flow of international calls, this compensation to be calculated from the international tariff on incoming calls to Guinea. This tariff was mentioned in Appendix I of the Partnership Agreement, then established by the State, following the signing and in execution of the

Partnership Agreement, by means of the Order adopted on May 29, 2009, *"setting the international tariff for the Republic of Guinea destination and the shares to be paid to the ARPT and the local operators of the telecommunications networks open to the public.* Under the terms of this Order, the tariff for international traffic entering Guinea was set at USD 28 cents per minute (Art. 2 of the Order); and this tariff was to be distributed as follows:

- USD 16 cents to the local operator;

- USD 3.5 cents to the ARPT;

- USD 7 cents to *"the technical operator that provides the supply, commissioning, maintenance and training in use during the contractual period"*;

- USD 1.5 cents *"for the financing assistance fund for connecting Guinea to the underwater, optical fiber, broadband cable."*

**55.** Consequently, under the terms of the Order and of Appendix 1 to the Partnership Agreement, GVG was entitled to compensation of US$ 0.07 on each minute of international calls entering Guinea.

**56.** Under the terms of Article 2 of the Partnership Agreement, it was provided that: *"This Contract is concluded for an initial period of sixty (60) months from the date of signature by both parties. The contract is renewable by tacit agreement for a successive period of 2 years unless expressly terminated in writing by either party within 12 months before the end of the contract."*

**57.** It follows therefrom, that under the terms of the Partnership Agreement, the latter was to be renewed at the end of the initial contractual period of 5 years (May 22, 2014), unless expressly terminated, sent in writing by one parties to the other party 12 months before the contractual term, i.e., no later than May 22, 2013.

## ii) The Addendum to the Agreement of July 6, 2009:

**58.** The ARPT wanted to construct a building *"intended to house the equipment covered by the aforementioned Agreement of May 22, 2009, and part of its staff as well as any other equipment belonging to it or belonging to the Ministry of Telecommunications and*

*New Information Technologies"* (Art. 1 of the Addendum to the Agreement). The cost of the work was USD 1.2 million. GVG agreed to finance the work to the tune of USD 1.2 million, by paying a monthly sum of USD 100,000, this sum to be deducted from the compensation that GVG was to receive under the Partnership Agreement (Art.1.2 of the Addendum to the Agreement).

59. It is in this perspective that the "Addendum to the Agreement of May 22, 2009, between the ARPT and GVG" was signed on July 6, 2009, by all the parties, including the Minister (**Addendum to the Agreement**). The Addendum to the Agreement was signed by GVG Telecom in the name and on behalf of GVG.

60. In return for the financing by GVG of the above-mentioned works, "the initial duration of the Basic Agreement concluded on May 22, 2009, between the ARPT and GVG, set at 5 (five) years, is extended to six years (6 years)" (Art. 1.1 of the Addendum to the Agreement). Consequently, the initial term of the Partnership Agreement changed from May 22, 2014, to May 22, 2015.

61. It was expressly provided in Article 3 of the Addendum to the Agreement that the other stipulations of the Partnership Agreement remained "fully applicable." Consequently, and under the terms of the aforementioned Article 2 of the Partnership Agreement, the latter was to be automatically renewed on May 22, 2015, for a period of 2 years, unless expressly terminated by one of the parties sent to the other party 12 months before the end of the contractual term, i.e., no later than May 22, 2014. No written termination was sent to GVG by this date. The Partnership Agreement was thus renewed until May 22, 2017.

62. In accordance with the Addendum to the Agreement, the sum of USD 100,000 was deducted monthly from GVG's invoice for one year (during the period from August 2009 to August 2010). GVG therefore paid the amount of USD 1.2 million to the benefit of the Respondents.

### iii)  The Addendum imposed by the Respondents

12

**63.** Since the beginning of the project's implementation, most of the invoices issued by GVG have remained unpaid.

**64.** Even though the Respondents acknowledged that *"Global Voice Group implemented the action plan agreed between the parties relating to the obligations mentioned in the "REPORT ON THE EXECUTION OF CONTRACTUAL OBLIGATIONS BETWEEN GVG AND THE ARPT, DATED MAY 14, 2012,"* they agreed to pay GVG's invoices only on the condition of reducing the financial consideration for GVG's intervention, also implying a waiver by the latter of a large part of the amounts due under the Partnership Agreement and remaining unpaid by the Respondents. It is in this context that the Addendum to the Partnership Agreement was signed on June 10, 2012 (**Addendum**).

**65.** Under the Addendum, the Respondents acknowledge the following:

- GVG *"implemented the action plan agreed to between the parties"* (Art. 1) ;

- the sum of USD 13,237,182.60 is due GVG for the "*invoices accumulated from September 2009 to December 31, 2011*" (Art. 2) ;

- the sum of USD 2,206,906.16 is due GVG for the "*residual portion of Sotelgui's international traffic share*" for the period from September 2009 to December 31, 2011 (Art. B) ;

- *"GVG had offered the ARPT the internet connection free of charge for which it bore the costs as well as the costs of co-location of the equipment at CELLCOM"* (Pg.3).

**66.** GVG therefore agreed under the terms of the Addendum to:

- reduce the ARPT's debt (with respect to the invoices accumulated from September 1, 2009, to December 31, 2011) by USD 11,237,182.60 – the ARPT's debt thus fell from USD 13,237,182.60 to USD 2 million (Art. 2, B and C);

- waive the income corresponding to the remainder of Sotelgui's share of the international traffic, namely USD 2,206,906.16 (Art. B);

13

- reduce the fees that the ARPT had to pay to GVG under the terms of the Partnership Agreement, from USD 0.07 to USD 0.025 (rate per minute of incoming international call), retroactively, as of April 1, 2011 (Art. 3).

67. These substantial waivers on the part of GVG were agreed to between the parties, under the terms of the Addendum, "IN ORDER TO STRENGTHEN THE PARTNERSHIP BETWEEN THE ARPT AND GLOBAL VOICE GROUP" (Addendum, Pg.2) and therefore without any real consideration on the part of the Respondents.

68. The sum of USD 2 million, in accordance with Article C of the Addendum, was paid to GVG before June 30, 2012.

## 2. <u>The Improper Termination of the Partnership Agreement by the Respondents</u>

69. Even as GVG continued to perform its contractual obligations (technical assistance/training/upkeep and maintenance) and studied, as well as made recommendations regarding the new technical solutions required by the Respondents, the latter stopped paying GVG's invoices as of May 2014. Since then, no payment has been made to GVG.

70. In fact, the Respondents considered, quite erroneously, that the Partnership Agreement expired on May 22, 2014, thus ignoring, on the one hand, the extension of the initial term of the Partnership Agreement by one additional year, until May 22, 2015, and on the other hand, the tacit renewal of the Partnership Agreement for a new period of 2 years (until May 22, 2017), the Respondents not having in any way expressly terminated this Agreement in writing, 12 months before the contractual term, i.e. no later than May 22, 2014.

71. The Respondents sent several confusing and contradictory explanations to GVG in support of their refusal to pay the Claimant's invoices:

- in a Letter dated July 15, 2014, the Respondents asserted in a peremptory manner that the Addendum to the Agreement was deemed to have never taken place;

- in a Letter dated November 24, 2014, the Respondents referred to an alleged expiry of the Partnership Agreement that would have terminated on May 22, 2014;

- in a Letter dated July 9, 2015, the Respondents for the first time raised the alleged poor performance on the Claimant's part, without however implementing the termination clause appearing in Article 5 of the Partnership Agreement.

72. Finally, by Letter dated August 6, 2015, the Respondents informed the Claimant of their decision to terminate their contractual relationship with GVG, in complete violation of the latter's contractual rights: "(…) *we reiterate to you our dissatisfaction, both technically and relationally. As you also know, your current services do not meet our oversight, security and anti-fraud needs; and we no longer intend to continue the collaboration with you*."

73. Moreover, there is no doubt that the Partnership Agreement was still in force and fully applicable between the parties, up until May 22, 2017:

- Under the terms of Article 2 of the Partnership Agreement, it was "*concluded for an initial period of sixty (60) months from the date of its signature by both parties*" and was *"renewable by tacit renewal for a successive period of 2 years unless expressly terminated in writing by either party within 12 months before the end of the contract."* Consequently and according to the terms of the aforementioned Agreement, it was initially concluded for a period running up to May 22, 2014.

- However, under the terms of the Addendum to the Agreement "*The initial term of the Basic Agreement concluded on May 22, 2009, between the ARTP and GVG, set at 5 (five) years, is extended to six (6) years*" (Art. 1, point 1 of the Addendum, Pg.2). It is recalled, moreover, under the terms of Article 3 of the Addendum, that *"The clauses of the Agreement of May 22, 2009, remain fully applicable."* As a result, the initial term of the Agreement was extended from May 22, 2014, to May 22, 2015. And, the ARTP not having expressly terminated the Agreement in writing no later than May 22, 2014, the latter was renewed for a period of 2 years, i.e., until May 22, 2017.

15

74. It follows therefrom that the Partnership Agreement never expired, so that the unilateral termination of the Agreement by the State and the ARPT was carried out in a completely abusive manner. GVG is now therefore entitled to obtain damages in compensation for its full loss, including all of the invoices that remained unpaid for the entire contractual period, as well as all of GVG's costs incurred during the transactional negotiation process.

75. The liquidated damages will be calculated on the basis of the Partnership Agreement and in particular by applying the tariff initially provided for in its Appendix I, namely the price of USD 0.07 that GVG was to receive for each minute of an incoming international call to Guinea; indeed, as will be demonstrated hereinafter, the Addendum and GVG's waivers made in this context are null and void.

## 3. <u>The Nullity of the Addendum</u>

76. It is recalled that GVG agreed, pursuant to the Addendum, to reduce its claim and waive its financial rights arising from the Partnership Agreement without any compensation from the Respondents.

77. The Addendum merely states that these reductions and waivers were agreed between the parties *"FOR THE PURPOSE OF STRENGTHENING THE PARTNERSHIP BETWEEN THE ARPT AND GLOBAL VOICE GROUP"* (Addendum, Pg.2).

78. However, this reference to the "strengthening of the partnership" does not correspond to any concrete counter-obligation assumed by the Respondents in return for GVG's reductions and waivers, in the sense that the duration of the Partnership Agreement, which extended from moment of the signing of the Addendum until May 22, 2015 (with the possibility of tacit renewal for 2 years in the absence of explicit prior termination) was not contractually extended so that additional income is guaranteed to GVG in return for its substantial waivers.

79. In reality, as indicated, GVG accepted these reductions and waivers in order that the Respondents would pay the unpaid invoices that had been due for several years (September 2009 to December 2011). GVG knew perfectly well that the lack of

signature of the Addendum that was imposed on it by the Respondents, would expose it to serious unpaid debts and would compromise the smooth pursuit of the Respondents' performance of the Partnership Agreement, who, because of their extensive government powers, were in strong position in Guinea compared to GVG.

80. Ultimately, the Addendum was imposed by the Respondents on GVG, who was therefore obliged to agree to significant reductions and waivers, without any consideration.

81. In this regard, Article 649 of the Guinean Civil Code provides that *"for an agreement to be legally valid, four essential conditions are required"* including *"a certain purpose forming the subject matter of the commitment"* and *"a lawful <u>cause</u>, which is to say that no text prohibits it."*

82. Under Article 664 of the said Code, the notion of "purpose" is specified as follows: *"the purpose of a contract must be [...] determined, which is to say clearly specified."* And Article 666 clarifies the concept of "cause" by stipulating that *"an obligation without cause, or based on a false or illegal cause, cannot have any effect. The cause, the determining motive for the obligation, is the end in view of which a person binds himself towards another*."

83. It follows that for a contract to be valid it is necessary that, on the one hand, the purpose of the obligation exists and is specified, and on the other hand, that the cause of the obligation exists.

84. However, in bilateral contracts under which *"the contracting parties reciprocally bind themselves to each other"* (Article 643 of the Guinean Civil Code), the cause of the obligation of each of the parties lies in the purpose of the other party's obligation. In other words, the performance owed by each contracting party serves as cause for the other's obligation. The cause of one party's obligation being the purpose of another's obligation, the obligation loses its cause when the counterparty defaults. Consequently, if one of the obligations is null and void for lack of cause, the other will be null and void for lack of purpose and the contract is entirely null and void.

85. In the present case, GVG's obligation consisting of the reductions and waivers granted is devoid of cause because the Respondents did not reciprocally undertake, it being specified that the peremptory reference to the "strengthening of the partnership" cannot serve as a

cause for GVG's obligation in the absence of a firm and specific commitment on the part of the Respondents to extend the initial term of the Partnership Agreement.

86. Also, the "obligation" of the Respondents to "strengthen the partnership" is devoid of purpose because this obligation does not correspond to any firm and precise commitment and therefore to no real consideration; it follows that the Respondents' obligation has no purpose or at the very least its purpose is not "*clearly specified*."

87. Consequently, GVG's obligation to consent to the aforementioned reductions and waivers is devoid of cause and therefore void and the Respondents' obligation to "strengthening the partnership" is just as invalid, for lack of purpose.

88. The Addendum will, under these conditions, be completely nullified and the Arbitral Tribunal can only declare the Addendum null and void.


### 4. <u>GVG's Compensation</u>

89. Pursuant to the principle that any damage resulting from a contractual fault must be compensated, GVG seeks compensation for its damage. The amount of this compensation must cover all of its damage, including the costs incurred by GVG during the negotiations carried out for the purpose of finding an amicable solution.

90. GVG is therefore claiming full compensation for the harm it has suffered, assessed on the date hereof except to be corrected, as follows:

- USD 11,237,182.60, corresponding to the amount by which ARPT's debt was reduced under Articles 2 and C of the Addendum;

- USD 2,206,906.16, corresponding to Sotelgui's debt waived by GVG under the terms of Article B of the Addendum;

- USD 34,292,234.11, corresponding to the difference between the amount invoiced (at 0.025 USD pursuant to the Addendum) and that initially agreed to (USD 0.07) and therefore due GVG for the period from January 1, 2012, to May 31, 2014;

- USD 24,017,685.81, corresponding to the amounts owed by the ARPT to GVG for the period from June 1, 2014, to August 31, 2015, calculated at the initially agreed upon rate (USD 0.07);

- USD 33,624,760.14, an estimate of the amounts due for the period from September 1, 2015, to May 22, 2017 (calculated on the basis of the traffic declared during the last fifteen months and the tariff of USD 0.07 and according to the amounts to be billed by GVG pursuant to the Partnership Agreement).

**91.** The total amount of the above claims is equal to USD 105,378,768.82.

**92.** It follows from what has just been stated that GVG is asking the Arbitral Tribunal in the context of these proceedings to:

- say and judge that the Respondents improperly terminated the Partnership Agreement;

- pronounce the Addendum null and void;

- order the Respondents to indemnify GVG for all of its damages suffered, estimated at USD 105,378,768.82, subject to correction, in addition to late interest;

- order the Respondents to pay all the costs relating to the arbitration, including attorneys' fees and expenses as well as the fees and expenses of any expert hired by GVG in connection with this proceeding.

**5.** **The Arbitration Clause as applied to the State**

**93.** The arbitration clause contained in Article 17 of the Partnership Agreement applies not only to the ARPT but also to the State that consented to be a party to the Partnership Agreement and therefore to the arbitration clause inserted therein.

**94.** The State's consent to be a party to the Partnership Agreement is sometimes directly expressed at the time of the conclusion of the Partnership Agreement, during its execution and its alleged termination (**Section (i)**); and sometimes indirectly through the ARPT which, as an emanation of the State, acted as the latter's agent (**Section (ii)**).

**i) The State directly consented to be Party to the Partnership Agreement**

95. The State's direct consent to be a party to the Partnership Agreement is deduced from the signature of the Minister, which was to both the Partnership Agreement and to the Addendum to the Agreement (paras. 87 to 92 of the Request for Arbitration).

96. It is deduced, then, from the very structure of the Partnership Agreement and the Addendum to the Agreement which include a close interweaving of the obligations/rights of the ARPT and of the Guinean State (para. 93 to 97 of the Request for Arbitration).

97. Lastly, it stems from the State's participation in drawing up the terms of the Partnership Agreement, in its execution and in the attempts to amicable settle the dispute arising from this Agreement (paras. 98 to 117 of the Request for Arbitration).

98. It follows from all of the foregoing that the State directly agreed to be party to the Partnership Agreement and therefore to the arbitration clause contained therein. The arbitration clause contained in Article 17 of the Partnership Agreement therefore applies not only to the ARPT but also to the State that has been the pivot for the contractual relationship since the conclusion of the Partnership Agreement, up until its supposed end.

## ii) The State indirectly consented to be a Party to the Partnership Agreement through its Emanation and Agent, the ARPT

99. The ARPT was acting in two ways: both as GVG's co-contracting party and as an agent of the State. It follows therefrom that the Partnership Agreement not only binds the ARPT – GVG's co-contracting party and agent of the State - but also the State, the ARPT's principal and therefore GVG's co-contracting party.

100.        ARPT's status as agent is deduced from its status as an emanation of the State (paras. 127 to 136 of the Request for Arbitration) as well as from the stipulations of the Partnership Agreement and the letters exchanged (paras 137 to 146 of the Request for Arbitration).

101.        Consequently, the State is committed to GVG under the mandate mechanism. Being bound by the stipulations of the Partnership Agreement, the arbitration clause contained therein then binds the State which by signing the Partnership Agreement had full knowledge thereof.

**THE RESPONDENTS**

102.      The Respondents present their Statement of Facts and their claims as follows:

103.      In accordance with the request from the Arbitral Tribunal, and pursuant to Article 23 of the ICC Rules of Arbitration, you will find hereinafter a summary statement of the position of the Regulatory Authority for the Post Offices and Telecommunications (ARPT) and the Republic of Guinea (hereinafter together "the Respondents") in response to the claims made by Global Voice Group SA in its Request for Arbitration (hereinafter "GVG" or "the Claimant"). As a preliminary point, we intend to reiterate the reservations expressed in previous communications on the respect for the Respondents' fundamental rights in this proceeding.

**Preliminary Reservations**

104.      It should be recalled that the ARPT and the Republic of Guinea produced their representation mandate in these proceedings on July 6 and September 19, 2017, respectively and that, consequently, their Counsels could only invest in the case file as of the latter date. The ICC Rules of Arbitration provide for a minimum period of 30 days to allow the defending party to produce its Response to the Request for Arbitration (Article 5 of the Rules). It appears that the deadline given by the Arbitral Tribunal to produce the Summary Statement of the Respondents' position is less than the standard provided for by the Rules. Under these conditions, the statement of the Respondents' position developed hereinafter can only be a summary statement likely to be revised, supplemented and developed with new pleas and claims at any time in the proceeding.

105.      Immediately after the ARPT's representation mandate was produced, then again when the Republic of Guinea's representation mandate was produced, the Respondents, through their Counsel, insisted on the importance for the parties in international arbitration to contribute to the constitution of the Arbitral Tribunal. Regardless of any difficulties and delays in the intervention of one or more Respondents in an arbitration

proceeding, the option given to the said parties to contribute to the constitution of the Arbitral Tribunal must always remain a priority.

106.    It is also a constant principle that the parties to an arbitral proceeding must be granted equal treatment in their contribution to the constitution of the Arbitral Tribunal. This principle of equality must be respected by the Claimant(s), who cannot demonstrate procedural disloyalty by refusing the Respondent(s) this fundamental right to the appointment of an arbitrator and indirectly therefore to the appointment of the Presiding Judge of the Arbitral Tribunal.

107.    In this case, the request for equal treatment was expressly made by the Respondents. This request was refused by the Claimant even though such an appointment could have been made within a very short time. This proceeding is therefore in the status of a Claimant party (GVG) having appointed an Arbitrator and of Respondents parties (ARPT and the Republic of Guinea) who have loyally decided to intervene and pay an arbitration provision of more than $300,000, while being denied by the Claimant the right to appoint an arbitrator and more generally to have the principle of equal treatment respected. The situation is all the more questionable in that it is a multi-party arbitration in which the Respondents are imposed a Joint Arbitrator even though their respective positions and their interests could be disjoined and in such a case, except to break equal treatment for the Claimant's benefit, the equitable solution is to have the entire Arbitral Tribunal appointed by the arbitration institution.

108.    The Respondents therefore renew their reservations on the appropriate nature of the constitution of the Arbitral Tribunal and the respect for the procedural principles of international public order in these arbitration proceedings, and to reserve the right to assert these reservations against any awards to come.

## Summary Statement of the Respondents' Position

109.    As will be explained hereinafter, this arbitration proceeding is particularly abusive in that it is based on a concealment of both Guinean public procurement law and the reality of GVG's conduct.

## LACK OF JURISDICTION OF THE ARBITRAL TRIBUNAL AND CORRELATIVE REJECTION OF GVG'S CLAIMS

### Lack of Jurisdiction *rationae materiae*

**110.**     The Partnership Agreement invoked by GVG (Exhibit C1) of May 22, 2009, (hereinafter "the Partnership Agreement") provides that it is subject *"to the laws of the Republic of Guinea"* (Article 17). This Agreement further provides that each party, and therefore in particular GVG, *"undertakes to comply with all the laws and regulations applicable to the performance of the Contract and not to use the Service for illegal purposes"* (Article 9). GVG cannot therefore claim to be ignorant of the laws of the Republic of Guinea.

**111.**     The technological partnership defined in Article 1 of the Partnership Agreement clearly fell within the definition of Guinean Public Procurement Contracts by combined application of Article 1 of the Public Procurement Code of the Republic of Guinea (hereafter after the "Code")[1] instituted by Law L/97/016/AN of June 3, 1997, and its implementing decrees, which it should be noted that it also expressly applies (see Articles 7, 25, and 77 of the Code) to public procurement contracts with foreign companies (Exhibit R 1), and Article 24 of Law L/2005/018/AL of September 8, 2005, creating the ARPT (Exhibit C 32).[2]

**112.**     According to Article 77 of the Public Procurement Code:

*"In the context of Major Public Procurement Contracts, or disputes arising between the contracting authority and a contractor, supplier, industrialist or a service provider under foreign law must be submitted to arbitration under the conditions set forth hereinafter:*

  - *The parties to said arbitration are the contracting authority and the holder of the public procurement contract;*

---

[1] *"Article 1: Definitions"* of the Guinean Public Procurement Code: *"1.1 Public Procurement Contracts are written contracts entered into under the conditions provided for in this code by the State, Public Authorities, State Companies, National Public Establishments and Mixed Economy Companies with majority public participation with a view to carrying out works, delivering supplies, performing industrial contracts and providing services."*

[2] Article 24 of Law L/2005/018/AL of September 8, 2005: "*The Regulatory Authority is a legal person governed by public law, independent, endowed with financial and management autonomy, governed by the special status defined by this law and placed under the supervision of the Minister responsible for Telecommunications.*"

- *The Arbitral Tribunal is made up of three appointed arbitrators, the first by the contracting authority, and the second by the foreign holder of the procurement contract and the third by agreement of the parties.*

*In the event of the death or resignation of one of the appointed arbitrators, his successor shall be appointed in accordance with the provisions of this article applicable to the appointment of the arbitrator who preceded him, and the said successor shall have the powers and obligations of his predecessor"*

113.    The Guinean Public Procurement Code therefore establishes an ad hoc arbitration proceeding to settle disputes between Guinean public legal persons, such as the ARPT, and foreign procurement contract holders. Such a proceeding is mandatory. It is imposed on the players in a Guinean public procurement contract, who cannot deviate from it. Consequently, the ICC arbitration clause contained in Article 17 of the Partnership Agreement (Exhibit C1) violates the Guinean Public Procurement Code. It is therefore necessarily null and void. By noting its nullity, the Arbitral Tribunal seized can only infer its lack of jurisdiction to hear GVG's claims. In any event, even if the Arbitral Tribunal does not conclude that the ICC arbitration clause in question is null and void, it can only find that according to the Public Procurement Code, the dispute before it falls within the scope of a mandatory ad hoc arbitration proceeding and can therefore only conclude that it lacks jurisdiction *rationae materiae*. Under these conditions, it will be necessary to reject all of GVG's requests.

## Lack of Jurisdiction *rationae personae*

114.    If in the extraordinary event that the Arbitral Tribunal does not declare itself lacking jurisdiction with regard to all of the parties and all of the claims, it must recognize itself as lacking jurisdiction with regard to the Republic of Guinea.

115.    Indeed, contrary to GVG's assertions, the Republic of Guinea was never a party to the Partnership Agreement and was content to refer to the agreement as the supervisory authority (see Article 24 of the Law – L/2005/018/AL of September 8, 2005 - Exhibit C32). It is, moreover, clear that the Addendum of June 10, 2012, which

merely revises downwards the price of GVG's services (Exhibit C7), does not mention the Republic of Guinea at any time and is signed only by the ARPT and GVG.

116.    The Republic of Guinea also did not participate in the performance of the disputed procurement contract. The exhibits produced by GVG do not demonstrate the contrary and in fact support the position of the Respondents, who will provide other documents to this effect.

117.    It is also completely inaccurate to assert that the ARPT is an emanation of the Guinean State. Indeed, in accordance with the aforementioned Article 24 of Law L/2005/018/AL of September 8, 2005 (Exhibit C32), "*the Regulatory Authority is an independent legal person governed by public law, endowed with financial and management autonomy, governed by the special status defined by this law and placed under the supervision of the Minister in Charge of Telecommunications.*" Law 2005/018/AN of August 13, 2015, confirmed this status by providing in its Article 9 that "*the ARPT is an independent administrative authority, endowed with legal personality and administrative and financial management autonomy. It is placed under the supervision of the Minister in charge of telecommunications / ICT. The regulatory function of the telecommunications / ICT sector is independent vis-à-vis political power, the operation of the utilities and the provision of telecommunications / ICT services,*" and to define an Independent Administrative Authority as "*an administrative body that acts in the name of the State without however coming under the authority of the government.*" The criteria for enforceability of an arbitration agreement against a third party (in this case the Republic of Guinea), are not therefore met. The Arbitral Tribunal can only *autonomy* declare itself lacking jurisdiction over the Republic of Guinea and reject all of the claims made by GVG against it.

## **SUBSIDIARILY, INADMISSIBILITY OF GVG TO ACT AND CORRELATIVE REJECTION OF ITS CLAIMS**

118.    The request for arbitration was filed on behalf of a company incorporated under Seychelles law called Global Voice Group S.A. (GVG) located at 1st Floor, #Dekk House,

De Zippora Street, PO Box 456, Providence Industrial Estate, Mahé, and 100% owned by Mr. Patrice Baker. This company is presented as the company that entered into the Partnership Agreement of May 22, 2009, then located at 1st Floor Allied Plaza Francis Rachel Street Victoria, Mahé c/o Global Voice Group, LLC 6300 Estate Frydenoj Suite D-1St. Thomas USVI 00802 and represented by its Chief Executive Officer Mr. Laurent Lamothe.

119.    However, no document has been produced in support of the Request for Arbitration to demonstrate the existence of GVG, nor to establish that the Claimant is indeed the company that entered into the Partnership Agreement.

120.    It is also stated in the Request for Arbitration (point 3) that a company governed by South African law, also called Global Voice Group SA, and also 100% owned by Mr. Patrice Baker, *"intervened on several occasions in the contractual relationship, subject of this proceeding, acting however exclusively in the name and on behalf of GVG.*" No document has been produced to demonstrate the existence of this company or that it acted exclusively in the name and on behalf of GVG.

121.    Based on the documents produced by GVG, the question of the admissibility of the Request for Arbitration therefore arises. Having failed to justify its admissibility to act, GVG can only be denied all of its claims.

## SUBSIDIARILY, ILL-FOUNDED AND CORRELATIVE REJECTION OF GVG'S CLAIMS

### Ill-Founding and Rejection of GVG's Claims against the Republic of Guinea

122.    GVG is seeking that the Republic of Guinea be ordered to pay liquidated damages corresponding to the compensation that it is supposedly due for its services in execution of the Partnership Agreement. However, contrary to GVG's peremptory assertions, and for the reasons expressed hereinabove, the Republic of Guinea is not a party to the Partnership Agreement.

123.    In addition, according to the Guinean Public Procurement Code (Article 2 of the Implementing Decree D/97/256/PRG/SGG of November 3, 1997, entitled "*Validity of Public Procurement Contracts*") :

*"Public procurement contracts must be awarded, approved and notified before any start of execution. Any contract not approved by the competent authority cannot financially commit the State; also – except in the case provided for in Article 27.2.5, of the Public Procurement Code, if it begins to receive a start of execution, it can only be at the risk and peril of the contractor, the supplier, the manufacturer or the service provider concerned.*

*The agents of the Administration who intervene in the award or the execution of such a public procurement contract are liable to the sanctions provided for in Article 79 of the Public Procurement Code"* (Exhibit R 1).

124.    Article 2 could not be clearer. Any contract concluded in violation of the provisions of the Code cannot financially commit the State. GVG, which has submitted the Partnership Agreement "*to the laws of the Republic of Guinea,*" cannot claim to be unaware of the provisions of the aforementioned Article 2. GVG is therefore manifestly ill-founded in requesting the condemnation of the Republic of Guinea.

**<u>Ill-founding and Rejection of GVG's Claims against the ARPT, and in the Alternative against the Republic of Guinea</u>**

**<u>*Ill-Founding and Dismissal of GVG's Claims for Invalidity of the Agreements upon which its Claims are Based, and Correlative Counterclaims*</u>**

**<u>*Invalidity of the Agreements*</u>**

**Invalidity due to Violation of the Public Procurement Code**

125.     As noted hereinabove, the public procurement contract covered by the Partnership Agreement is a public procurement contract and falls under the mandatory provisions of the Guinean Public Procurement Code. Such a contract could not therefore be validly concluded without respecting the conditions of eligibility for Public Procurement Contracts defined in Article 7 of the Code (Exhibit R 1). Moreover, such a contract could not be awarded without respecting the call for tender procedure, knowing that the Code is also applicable in the case of an international call for tenders (Article 25 of the Code). According to article 2 of the aforementioned Decree of November 3, 1997, *"public procurement contracts must be awarded, approved and notified before any start of execution. Any contract not approved by the competent authority cannot financially commit the State."* The agreements invoked by GVG (Partnership Agreement of May 22, 2009 – Exhibit C1 – and Addendum of July 6, 2009 – Exhibit C3) in support of its requests were entered into in flagrant violation of the Public Procurement Code and are therefore manifestly null and void. GVG is moreover aware of this insofar as it is careful not to quote the Code at any time in its pleadings.

126.     Under these conditions, the Arbitral Tribunal can only find the illegality of the agreements upon which GVG's claims are based, declare them null and void, and consequently reject the latter's claims.

**Invalidity due to Corruption Pact**

127.     It is well known that the Chairman and CEO of GVG (Mr. Laurent Lamothe) is very close to the former Managing Director of ARPT (Mr. Nfa Ousmane Camara) who signed the Partnership Agreement and the Addendum, and that following the appointment of Mr. Lamothe as Prime Minister of Haiti, Mr. Nfa Ousmane Camara was appointed by the latter Consul of Haiti in Guinea. Mr. Nfa Ousmane Camara has also been a regular employee of GVG since leaving his position at the ARPT.

128.     The Partnership Agreement and the Amendment are contemporaneous with the military coup that occurred in the Republic of Guinea after the death of President

Lansana Conté and which established a transition period. The signatories of this contract all left their positions following the change of regime that occurred after the democratic elections held in 2010.

129.    The links maintained between the CEO of the ARPT at the time and the Chairman of GVG, in addition to the very troubled and provisional political environment in which these two agreements were concluded, raise the strongest suspicions of the illegal allocation of the procurement contract to GVG.

130.    These suspicions become a certainty when it is noted that they were signed in flagrant violation of the procedures applicable to Guinean public procurement contracts, which demonstrates the collusion of the signatories to these agreements in order to make them avoid the oversight to which they should have been subjected according to the Public Procurement Code. The desire to defraud the said Code for concealment purposes can only be explained by the fact that the Partnership Agreement constitutes nothing more than a corruption pact. Moreover, a circumstance subsequent to the said Agreement supplements the demonstration of its illegality. Under the terms of the Addendum signed on June 10, 2012, with the new Director General of the ARPT (appointed by the democratic forces that succeeded the military junta) who became the current Minister of Telecommunications, GVG agreed to reduce the ARPT's alleged debt for the services allegedly rendered since the conclusion of the Partnership Agreement, from US$ 13,237,182 to US$ 2,000,000. GVG, in doing so, thus agreed to reduce the price of its services by approximately 85% without this appearing to pose any difficulty. GVG agreed in this same Addendum to reduce the price of its services in the future from US$ 0.07 per minute to US$ 0.025 per minute, i.e., a reduction of 65%. What company could agree to see the price of its services reduced in such proportions if the original price had not been set at an outrageously excessive and fraudulent level?

131.    Such a pact of corruption, detachable from the functions of the Director General of the ARPT, cannot bind the latter.

132.    Under these conditions, the Arbitral Tribunal can only find the illegality of the agreements upon which GVG's claims are based, declare them null and void, and consequently reject the latter's claims.

***Restitution and Liquidated Damages as a Result of the Invalid Nature of the Agreements invoked by GVG in Support of its Claims***

133.    As demonstrated hereinabove, the agreements upon which GVG bases its claims are null and void. As a result of this nullity, GVG should return to the ARPT all of the amounts received under the said agreements.

134.    The ARPT should also be entitled to seek damages for the loss suffered as a result of the fraud perpetrated by GVG. The ARPT reserves the right to set the amount of compensation it deems due in this regard at a later date.

***Ill-Founding and Rejection of GVG's Claims for Termination of the Contractual Relationship at GVG's Fault, and Compensation for the Damage suffered by the ARPT***

***Termination of the Contractual Relationship***

135.    As reported in the ARPT's Letter to GVG dated August 6, 2015 (Exhibit C15), the Claimant very insufficiently performed the services it had undertaken to provide under the terms of the Partnership Agreement and in consideration of which GVG claims to be able to seek damages. GVG has also shown disloyalty in the performance of its services, its behavior suggesting that it is part of a fraud plan. These breaches are of such seriousness that they justified the termination of the contractual relationship at the fault of GVG, as notified by the ARPT. GVG cannot therefore claim any compensation for the period after said termination.

136.    If, in the extraordinary event that the Arbitral Tribunal does not conclude that the Partnership Agreement is null and void, it should rule that the ARPT was justified in terminating the contractual relationship at the fault of GVG, in accordance with the automatic termination clause contained in Article 5 of the said Agreement. It would then be up to the Arbitral Tribunal to take note of this termination. In any case, if the Arbitral

Tribunal considered that the termination proceeding provided for by the parties was not respected, it would be up to it to pronounce the termination of the contractual relationship at the fault of GVG due to the latter's contractual breaches, first and foremost the serious breach of Article 9 of the Partnership Agreement. The contractual relationship having been terminated at the fault of GVG, the latter would be ill-founded to seek any compensation for its services.

### *Compensation for the ARPT's Damage*

137.    If, in some extraordinary circumstances, the agreements invoked by GVG in support of its claims were not annulled, the ARPT would therefore be entitled to seek compensation for the damage suffered as a result of GVG's conduct. The ARPT reserves the right to set the amount of compensation it deems it is due in this regard at a later date.

### *Ill-Founded and Rejection of GVG's Claims for Suspension of the Contractual Relationship*

138.    Article 9 of the Partnership Agreement provides that:

*"Each Party undertakes to comply with all the laws and regulations applicable to the performance of the Contract and not to use the Service for illegal purposes.*

***Each of the Parties may, without prejudice and without compensation to the other Party, suspend the performance of the Contract*** *in the event that such suspension is required by a court decision, an administrative or governmental authority or,* ***in the event that the performance of the Contract is likely to result in the violation of a law or any other equal provision in force"*** (emphasis added)

139.    In this case, for the reasons expressed above, the agreements invoked by GVG were entered into in violation of the Guinean Public Procurement Code. They

31

were also executed in violation of the said Code that contains in its Title 4, provisions relating to the execution of procurement contracts, relating in particular to the methods of payment of the price.

140.    If in the extraordinary event that it was considered that the contractual relationship between GVG and the ARPT was not terminated, it should be noted that in its Letter of August 6, 2015 (Exhibit C15), the ARPT indicated that it no longer "*expect*[ed] *to continue the collaboration with* [GVG]." For failure to characterize a termination, such wording would constitute the notification of a suspension of the contractual relationship within the meaning of the aforementioned Article 9, without this suspension justifying any compensation to GVG in accordance with said article.

141.    On a subsidiary basis, if it were found that the ARPT did not express its desire to suspend the contractual relationship on August 6, 2015, it would be appropriate to take note of the Respondents' request for suspension on the date hereof without any compensation to GVG whatsoever, in accordance with Article 9 of the Partnership Agreement.

### *Ill-Founding and Dismissal of GVG's Claims for Violation of the Provisions of the Addendum*

142.    If, in the extraordinary event that the Partnership Agreement and the Amendment invoked by GVG were not cancelled, GVG could not claim to set aside the application of the Addendum of June 10, 2012 (Exhibit C7) signed by the ARPT and GVG to improperly increase the amount of damages it seeks. GVG believes it can call into question the validity of the Addendum at the cost of a flagrant distortion of its purpose. According to GVG, this agreement would have constituted a transaction, which would be null and void for lack of provision for reciprocal concessions.

143.    In reality, the Addendum only ever constituted a price revision agreement. At no time is there any reference to a dispute between the parties that would be settled by the alleged transactional agreement that would constitute the Addendum. Quite on the

contrary, the Addendum is described as an "*amendment*" aimed at "*making changes to the contracts previously established between them.*" Then the Addendum refers to the ARPT's request for revision and renegotiation relating to the prices set in the Partnership Agreement in order to finally provide for a reduction in this price for the future and a reduction in the price for the services already performed. There is nothing in the Addendum to support the argument that this agreement would be anything other than a price reduction agreement. GVG's peremptory assertion to the contrary is legally absurd.

144.      If the Partnership Agreement and the Addendum were not cancelled, the Addendum that reduced the price of GVG's services would necessarily apply. GVG's claims for damages based exclusively on the prices set in the Partnership Agreement could only be rejected under these conditions. In any event, the damage allegedly suffered by GVG could only be assessed on the basis of the revised prices set in the Addendum.

### IN ANY CASE, CLAIMS FOR DAMAGES FOR MORAL DAMAGE AND ABUSE OF PROCESS

145.      GVG's questioning of the business morality of the ARPT and the Republic of Guinea, like the numerous denigrating allegations made by GVG against them in its pleadings, causes the Respondents to suffer characterized moral damage that cannot be less for each of them than US$ 100,000.

146.      Furthermore, GVG's manifest fraud against Guinean public procurement regulations constitutes the one and only support for the claims made by GVG in the context of this arbitration proceeding. This proceeding is therefore indisputably an abuse of process. The damage suffered by each of the Respondents cannot be estimated, in view of the seriousness of GVG's conduct, at a sum of less than US$ 100,000.

### IN ANY CASE, ORDER GVG TO PAY ALL THE COSTS RELATING TO THE ARBITRATION

147.        GVG should be ordered to bear all of the costs relating to the arbitration, including attorneys' fees and expenses as well as the fees and expenses of any expert commissioned by the Respondents for the purposes of this proceeding.

## Conclusion

148.        With regard to the foregoing, the Respondents ask the Arbitral Tribunal to:

a. Declare itself lacking jurisdiction to hear GVG's claims against both the ARPT and the Republic of Guinea, and reject them accordingly;

b. Alternatively, declare itself lacking jurisdiction to hear GVG's claims against the Republic of Guinea, and reject them accordingly;

c. Alternatively, declare and find GVG inadmissible in its claims against both the ARPT and the Republic of Guinea, and reject them accordingly;

d. Alternatively, declare and rule that GVG's claims against the ARPT and the Republic of Guinea are unfounded, and reject them accordingly;

e. As a counterclaim, order GVG in the event of nullity to return the sums unduly received and as damages, up to amounts that the Respondents will specify during the course of the arbitration proceedings; in the alternative, order GVG in the event of termination to pay damages up to an amount that the Respondents will specify during the course of the arbitration proceedings;

f. In any event, order GVG to pay each of the Respondents the sum of US$100,000 in compensation for the moral prejudice suffered by each of them as a result of the allegations contained in GVG's pleadings;

g. Order GVG to pay each of the Respondents the sum of US$100,000 for abuse of process;

h. In any event, order GVG to bear all the costs relating to the arbitration, including attorneys' fees and expenses as well as the fees

and costs of any expert commissioned by the Respondents for the purposes of this proceeding.

## ISSUES TO BE RESOLVED

**149.** The mission of the Arbitral Tribunal is to settle the dispute between the parties by ruling on the aforementioned claims and on the additional claims that may be presented in the parties' future written submissions in accordance with Article 23(4) of the Rules.

## APPLICABLE RULES

**150.** The applicable rules are the Rules of Arbitration of the International Chamber of Commerce, in force as of January 1, 2012.

## PLACE AND LANGUAGE OF THE ARBITRATION

**151.** On April 13, 2017, the Court set Paris (France) as the place of arbitration.

**152.** The Claimant wanted the language of the arbitration to be French. Since the Respondents made no comments in this regard, the Arbitral Tribunal determines that the language of the arbitral proceedings is French (Article 20 of the Rules).

## CONFIDENTIALITY

**153.** The parties undertake to ensure the confidentiality of this arbitration proceeding, in particular their writings and correspondence, the procedural orders, the documents and data produced by the parties during the arbitration, insofar as they are not already common knowledge, except and insofar as a disclosure would be necessary to fulfill a legal obligation of the party or to protect a

right, or to appeal an arbitration award or to obtain its enforcement in court.

**154.**     The obligation of confidentiality also applies to the Arbitrators and to any other person who provides services in the arbitral proceedings (Secretary of the Arbitral Tribunal, witnesses, etc.)

**155.**     The deliberations of the Arbitral Tribunal and the exchanges between arbitrators, of any nature whatsoever and on whatever medium, are confidential.

Date:  The October 16, 2017

Place of arbitration: Paris, France

_____

**For the Claimant**

_____

**For the Respondents**

36

**The Arbitral Tribunal:**

_____

**Charles Jarrosson, Co-Arbitrator**

_____

**Carmen Núñez-Lagos, Co-Arbitrator**

_____

**Sophie Nappert, Presiding Judge**

37

right, or to appeal an arbitration award or to obtain its enforcement in court.

**156.**     The obligation of confidentiality also applies to the Arbitrators and to any other person who provides services in the arbitral proceedings (Secretary of the Arbitral Tribunal, witnesses, etc.)

**157.**     The deliberations of the Arbitral Tribunal and the exchanges between arbitrators, of any nature whatsoever and on whatever medium, are confidential.

Date:  The October 16, 2017

Place of arbitration: Paris, France

[signature]
_____

**For the Claimant**

_____

**For the Respondents**

right, or to appeal an arbitration award or to obtain its enforcement in court.

**158.**     The obligation of confidentiality also applies to the Arbitrators and to any other person who provides services in the arbitral proceedings (Secretary of the Arbitral Tribunal, witnesses, etc.)

**159.**     The deliberations of the Arbitral Tribunal and the exchanges between arbitrators, of any nature whatsoever and on whatever medium, are confidential.

Date:  The October 16, 2017

Place of arbitration: Paris, France

_____

**<u>For the Claimant</u>**

[signature]     [signature]

_____

**<u>For the Respondents</u>**

**The Arbitral Tribunal:**


[signature]
_____

**Charles Jarrosson, Co-Arbitrator**


_____

**Carmen Núñez-Lagos, Co-Arbitrator**


_____

**Sophie Nappert, Presiding Judge** _____

**The Arbitral Tribunal:**

_____

**Charles Jarrosson, Co-Arbitrator**

_____

**Carmen Núñez-Lagos, Co-Arbitrator**

[signature]
_____

**Sophie Nappert, Presiding Judge**

**The Arbitral Tribunal:**

———————————————————

**Charles Jarrosson, Co-Arbitrator**

[signature]

———————————————————

**Carmen Núñez-Lagos, Co-Arbitrator**

———————————————————

**Sophie Nappert, Presiding Judge**

**CHAMBRE DE COMMERCE INTERNATIONALE**

**COUR INTERNATIONALE D'ARBITRAGE**

**AFFAIRE No. 22467/DDA**

**ENTRE :**

**GLOBAL VOICE GROUP S.A. (Seychelles)**

**Demanderesse**

**et**

1. **AUTORITÉ DE RÉGULATION DES POSTES ET TÉLÉCOMMUNICATIONS DE LA GUINÉE (Guinée)**
2. **LA RÉPUBLIQUE DE GUINÉE (Guinée)**

**Défenderesses**

---

**ACTE DE MISSION**

**(ARTICLE 23 DU RÈGLEMENT D'ARBITRAGE CCI 2012)**

---

**NOMS, DÉNOMINATIONS ET COORDONNÉES DES PARTIES**

1. La Demanderesse est la société de droit seychellois Global Voice Group S.A. (**GVG ; la Demanderesse**), dont le siège social est situé au 1st Floor, #5 Dekk House, De Zippora Street, P.O. Box 456, Providence Industrial Estate, Mahé, République des Seychelles, immatriculée sous le numéro 022185.  GVG est détenue à 100% par son Directeur Général Monsieur Patrice Baker, de nationalité haïtienne.

2. Les Défenderesses sont (1) l'Autorité de Régulation des Postes et Télécommunications de la Guinée (**ARPT**), personne morale de droit public régie par le statut particulier défini par la loi guinéenne L/2005/018/AN du 8 septembre 2005 relative à la règlementation générale des télécommunications, représentée par son Directeur Général Monsieur Oumar Said Koulibaly, et dont l'adresse est au Quartier Almamya, Commune de Kaloum, B.P. 1500, Conakry, République de Guinée ; et (2) la République de Guinée (**l'Etat**) représentée par Son Excellence Monsieur Moustapha Mamy Diaby,  Ministre des Postes, Télécommunications et de l'Économie Numérique, et dont l'adresse est à l'Immeuble de la Poste, Quartier Almamya, B.P. 3000, Conakry, République de Guinée (ensemble, **les Défenderesses**).

**CLAUSE D'ARBITRAGE**

3. Suite à l'offre de GVG pour l'homologation d'une licence de « Fournisseur de Service Indépendant de Signalisation et d'Interconnexion » et de « Fournisseur de Service Indépendant de Facturation des Opérateurs », un Accord de Partenariat entre ARPT et GVG est intervenu le 22 mai 2009 (**Accord de Partenariat**) [**Pièce No. 1, Demande d'arbitrage**].

4. Aux termes de l'Article 17 de l'Accord de Partenariat, intitulé « Loi applicable – Règlement des différends » :
   *«Le présent Contrat est soumis aux lois de la République de Guinée.*

   *À défaut d'accord amiable entre les Parties dans un délai de six (6) mois suivant la date de survenance du litige, tout différend de toute nature, y incluant les Annexes et les éventuels avenants, susceptibles de s'élever entre elles, sera soumis à la compétence*

2

*exclusive du Règlement d'arbitrage de la Chambre de Commerce internationale de Paris par un ou plusieurs arbitres nommés conformément à ce Règlement.* »

## ADRESSES DES PARTIES OÙ PEUVENT VALABLEMENT ÊTRE FAITES TOUTES NOTIFICATIONS OU COMMUNICATIONS AU COURS DE L'ARBITRAGE

5. Toutes notifications ou communications aux parties au cours du présent arbitrage ou relatives à celui-ci sont valablement faites par envoi de courrier électronique (email) aux adresses apparaissant ci-dessous, sous réserve des circonstances évoquées aux paragraphes 9 et 10 ci-dessous.

6. Pour la Demanderesse, à ses conseils : Marianne Kecsmar, Avocat aux Barreaux de Paris et de New York, Pellerin Kecsmar Mirza Avocats, 20 rue des Pyramides 75001 Paris, France. Email : marianne.kecsmar@pkm-avocats.com; Bassam Mirza, Avocat aux Barreaux de Paris et de Beyrouth, Pellerin Kecsmar Mirza Avocats, 11 Place de l'Étoile, Immeuble Wakf Al-Marouni, Beyrouth Centre-Ville 2011-8860, Liban. Email : bassam.mirza@pkm-avocats.com.

7. Pour les Défenderesses, à leurs conseils : Sena Agbayissah, Avocat au Barreau de Paris, Hughes Hubbard & Reed LLP, 8, rue de Presbourg, 75116 Paris, France. Email : sena.agbayissah@hugheshubbard.com; Marc Henry, Avocat au Barreau de Paris, Hughes Hubbard & Reed LLP, 8, rue de Presbourg, 75116 Paris, France. Email : marc.henry@hugheshubbard.com.

8. Les communications par courrier électronique pour lesquelles l'expéditeur exige un accusé de réception seront également expédiées par messagerie aux adresses sus-mentionnées et seront réputées reçues à la date de leur remise auxdites adresses.

9. Les communications excédant 20 pages seront expédiées et par courrier électronique et par messagerie. Les communications ne se prêtant pas au format email seront expédiées par messagerie.

10. Toute modification d'adresse, postale ou électronique, et tout changement de coordonnées seront immédiatement communiqués aux parties, au tribunal arbitral ainsi qu'au Secrétariat de la Cour internationale d'arbitrage de la Chambre de Commerce

3

Internationale (**le Secrétariat**).  En l'absence de notification en temps opportun, l'envoi de communications conformément aux paragraphes 6 à 10 sera réputé valable.

11. Les délais fixés par le tribunal arbitral seront respectés si les envois sont effectués au plus tard avant minuit (24h00) le jour de l'échéance.

12. L'équipe du Secrétariat en charge du présent arbitrage est composé comme suit:

| | |
|---|---|
| Diamana Diawara, Conseiller | ligne directe : +33 1 49 53 29 51 |
| Constance Castres Saint-Martin, Conseiller adjoint | ligne directe : +33 1 49 53 29 28 |
| Alya Ladjimi, Conseiller adjoint | ligne directe : +33 1 49 53 30 37 |
| | |
| Aurélien Zuber, Conseiller adjoint | ligne directe : +33 1 49 53 29 79 |
| Caroline Carlyle-Price, Assistante | ligne directe : +33 1 49 53 28 47 |
| Cameron McColl, Assistant | ligne directe : +33 1 49 53 29 72 |
| Marina Triebe-Gravel, Assistante | ligne directe : +22 1 49 53 29 46 |
| Télécopie | +33 1 49 53 57 75 |
| Courriel | ica2@iccwbo.org |

13. Toute communication par l'une ou l'autre des parties au tribunal arbitral, ou par le tribunal arbitral aux parties, sera simultanément transmise au Secrétariat.

## NOMS, DESCRIPTIONS ET COORDONNÉES DU TRIBUNAL ARBITRAL

14. Le tribunal arbitral est composé de : (1) Monsieur Charles Jarrosson, Professeur à l'Université Panthéon-Assas, 15, rue Alphonse de Neuville, 75017, Paris, France, Email : charles.jarrosson@wanadoo.fr; confirmé par la Cour Internationale d'Arbitrage (**la Cour**) en date du 6 juillet 2017 en qualité de coarbitre sur désignation de la Demanderesse; (2) Madame Carmen Núñez-Lagos, Associée, Hogan Lovells (Paris) LLP, 17, avenue Matignon, CS 30027, 75378 Paris Cedex 08, France; Email: carmen.nunezlagos@hoganlovells.com; nommée directement par la Cour en date du 6 juillet 2017 en qualité de coarbitre en lieu et place des Défenderesses qui n'ont pas désigné de coarbitre; et (3) Madame Sophie Nappert, 3 Verulam Buildings, Gray's Inn,

4

Londres WC1R 5NT, Royaume-Uni; Email:  snapper@3vb.com; nommée directement par la Cour en date du 6 juillet 2017 en qualité de président du tribunal arbitral.

15. Toute notification et communication au tribunal arbitral, en cours du présent arbitrage ou en relation avec celui-ci, seront réputées valables si elles sont transmises simultanément par courrier électronique aux coarbitres et au président à leurs adresses électroniques respectives.

16. Les paragraphes 5 à 12 s'appliquent aux communications aux parties et au Secrétariat émanant du tribunal arbitral.

## BREF RAPPEL DE LA PROCÉDURE ARBITRALE

17. Par courrier en date du 13 décembre 2016, le Secrétariat accusait réception de la Demande d'arbitrage datée du 8 décembre 2016 et reçue le 9 décembre 2016.

18. Par courrier en date du 28 décembre 2016, le Secrétariat transmettait la Demande d'arbitrage aux Défenderesses, les informant entre autres qu'elles disposaient d'un délai de 30 jours à compter du jour suivant la réception de cette correspondance pour répondre à la Demande, ainsi que de la possibilité pour elles de solliciter une prorogation de ce délai en faisant part de leurs commentaires sur le nombre d'arbitres et, si nécessaire, en désignant un arbitre (article 5(2) du Règlement d'arbitrage CCI 2012 (**le Règlement**)).

19. Par courrier en date du 14 février 2017, le Secrétariat informait les parties que la Demande d'arbitrage avait été reçue par les Défenderesses via DHL le 30 décembre 2016 et que par conséquent, le délai de 30 jours pour soumettre une réponse à la Demande d'arbitrage avait expiré le 31 janvier 2017 sans que cette réponse ait été soumise.  Le Secrétariat ajoutait que conformément à l'article 6(3) du Règlement, l'arbitrage poursuivrait son cours malgré l'absence de réponse ; qu'en l'absence de commentaires de la part des Défenderesses, la Cour constituerait le tribunal arbitral (article 12(2) du Règlement) et fixerait le lieu de l'arbitrage (article 18(1) du Règlement).

20. Par courrier en date du 17 février 2017, l'ARPT accusait réception du courrier du Secrétariat en date du 14 février 2017, exprimait son étonnement et transmettait un

courrier en date du 6 août 2015 qu'elle avait adressé au Président Directeur-Général de GVG.

21. Par courrier en date du 18 avril 2017, le Secrétariat informait les parties que la Cour, en date du 13 avril 2017 :

    **a.** Décidait de soumettre le présent arbitrage à trois arbitres (article 12(2) du Règlement) ;

    **b.** Fixait Paris (France) comme lieu de l'arbitrage (article 18(1) du Règlement) ;

    **c.** Notait la désignation de Monsieur le Professeur Jarrosson en qualité de coarbitre désigné par la Demanderesse ;

    **d.** Invitait les Défenderesses à désigner un coarbitre dans un délai de 15 jours, à défaut de quoi la Cour serait invitée à prendre les mesures nécessaires pour constituer le tribunal arbitral.

22. Par courrier en date du 6 juillet 2017, le Secrétariat informait le tribunal arbitral et les parties que la Cour, à cette même date :

    **a.** Avait confirmé Charles Jarrosson en qualité de coarbitre sur désignation de la Demanderesse (article 13(1) du Règlement) ;

    **b.** Avait nommé directement Carmen Núñez-Lagos en qualité de coarbitre en lieu et place des Défenderesses n'ayant pas désigné de coarbitre (article 13(4)(a) du Règlement);

    **c.** Avait nommé directement Sophie Nappert en qualité de président du tribunal arbitral (article 13(4)(a) du Règlement).

23. Par courrier en date du 6 juillet 2017, le Secrétariat transmettait le dossier au tribunal arbitral.

24. Par courriel en date du 11 juillet 2017, également transmis aux Défenderesses par messagerie, le tribunal arbitral, par son président, prenait contact avec les parties afin de convoquer la conférence sur la gestion de la procédure (article 24 du Règlement).

25. Par courriel en date du 19 juillet 2017, les conseils de la Demanderesse répondaient au courriel ci-dessus et informaient le tribunal arbitral de la venue au dossier du cabinet Hughes Hubbard à titre de conseil de l'ARPT.

6

26. Par courriel en date du 19 juillet 2017, Messieurs Sena Agbayissah et Marc Henry du cabinet Hughes Hubbard confirmaient leur mandat de représentation de l'ARPT dans le présent arbitrage et transmettaient un courrier en date du 6 juillet 2017 adressé au Secrétariat, par lequel ils sollicitaient un délai de 30 jours, soit jusqu'au 4 août 2017, pour soumettre la réponse de l'ARPT et son choix de coarbitre.

27. Par courriel en date du 20 juillet 2017, les conseils de la Demanderesse s'opposaient à l'octroi du délai sollicité par les conseils de l'ARPT, au motif notamment que les Défenderesses avaient reçu toute notification utile pour soumettre leur réponse et désigner leur coarbitre mais n'en avaient rien fait.

28. Par courriel en date du 28 juillet 2017, également expédié à l'Etat par messagerie, le tribunal arbitral, après avoir pris contact avec le Secrétariat et après délibération, informait les parties que, dans la mesure où les Défenderesses avaient été informées en temps utile du déroulement de la procédure, où le tribunal arbitral avait été valablement constitué et sauf intervention de la Cour, il lui apparaissait que la procédure arbitrale dût suivre son cours et que se tienne la conférence sur la gestion de la procédure afin de conclure l'Acte de Mission. Le tribunal arbitral constatait également que les Défenderesses auraient toute opportunité de soumettre leur position au sein de l'Acte de Mission et de leurs écritures. Les conseils de la Demanderesse ayant indiqué leurs disponibilités pour la conférence, notamment pour le 4 septembre, le tribunal arbitral sollicitait les disponibilités des Défenderesses.

29. Par courriel en date du 31 juillet 2017, Me Henry accusait réception de la communication du tribunal arbitral et l'informait d'un retour dans les meilleurs délais.

30. Par courriel en date du 7 août 2017, le tribunal arbitral relançait les Défenderesses.

31. Par courriel en date du 11 août 2017, Me Agbayissah accusait réception de la communication du tribunal arbitral et l'assurait d'un retour dès que possible.

32. Par courriel en date du 14 août 2017, également transmis à l'Etat par messagerie, le tribunal arbitral informait les parties qu'en l'absence de retour des Défenderesses d'ici le 18 août 2017, la conférence procédurale aurait lieu 4 septembre 2017.

33. Par courriel en date du 29 août 2017 adressé aux parties, le tribunal arbitral confirmait la tenue de la conférence procédurale le 4 septembre 2017 à 14.30 heure de Paris, sauf

7

indication par les conseils d'une autre disponibilité, et faisait circuler les coordonnées téléphoniques. Le tribunal arbitral invitait également les conseils à se rapprocher pour tenter de convenir d'un calendrier procédural et de faire part au tribunal arbitral de l'issue de leurs discussions le 1<sup>er</sup> septembre 2017.

34. Par courriel en date du 29 août 2017, les conseils de la Demanderesse confirmaient leur disponibilité pour la conférence procédurale.

35. Par courriel en date du 30 août 2017, le tribunal arbitral faisait circuler un projet d'Acte de Mission aux parties et au Secrétariat.

36. Par courriel en date du 1<sup>er</sup> septembre 2017, les conseils de la Demanderesse faisaient circuler un projet de calendrier procédural, les conseils des Défenderesses leur ayant fait part qu'ils n'étaient pas encore en mesure d'en discuter.

37. Par courriel en date du 1<sup>er</sup> septembre 2017, le tribunal arbitral faisait circuler un agenda pour la conférence téléphonique du 4 septembre, et priait les conseils des Défenderesses de bien vouloir indiquer s'ils avaient l'intention d'y participer.

38. Par courriel en date du 4 septembre 2017, Me Henry confirmait la participation des conseils des Défenderesses à la conférence téléphonique.

39. La conférence procédurale s'est tenue le 4 septembre 2017 à 14.30 heure de Paris, en présence du tribunal arbitral et des conseils des parties.

40. Par subséquent courriel en date du 4 septembre 2017, le tribunal arbitral confirmait que les conseils des parties guinéennes avaient convenu d'informer le tribunal arbitral et la Demanderesse de l'état de leur mandat, et des intentions des Défenderesses quant à leur participation à cet arbitrage, d'ici le 15 septembre 2017.

41. Par courriel en date du 18 septembre 2017, le tribunal arbitral priait les conseils des Défenderesses de bien vouloir donner suite au courriel ci-dessus.

42. Par courriel en date du 19 septembre 2017, Me Agbayissah et Me Henry transmettaient leur mandat de représentation de l'Etat pour les fins du présent arbitrage.

43. Par courriel en date du 20 septembre 2017, le tribunal arbitral accusait réception du mandat de représentation des conseils des Défenderesses, notait que toutes les parties en présence participaient à la procédure arbitrale par la voix de leurs conseils respectifs, et

8

invitait les parties à définir leurs positions respectives au sein du projet d'Acte de Mission d'ici le 27 septembre 2017.

44. Par courriel en date du 25 septembre 2017, les conseils de la Demanderesse transmettaient le résumé des prétentions de la Demanderesse pour fin d'insertion dans l'Acte de Mission.

45. Par courriel en date du 28 septembre 2017, le tribunal arbitral accordait aux Défenderesses un délai supplémentaire jusqu'au 13 octobre pour produire le résumé de leurs prétentions et leurs observations sur le projet d'Acte de Mission et de calendrier procédural.

46. Par courriel en date du 12 octobre 2017, les conseils des parties transmettaient leurs observations communes sur le projet d'Acte de Mission ainsi qu'un calendrier procédural dont elles avaient convenu.

47. Par courriel en date du 13 octobre 2017, les conseils des Défenderesses transmettaient le résumé des prétentions des Défenderesses pour fin d'insertion dans l'Acte de Mission.

## EXPOSÉ SOMMAIRE DES PRÉTENTIONS DES PARTIES ET DES DÉCISIONS SOLLICITÉES PAR CHACUNE D'ELLES ; MONTANT DE TOUTE DEMANDE QUANTIFIÉE ; ESTIMATION DE LA VALEUR PÉCUNIAIRE DE TOUTE AUTRE DEMANDE

48. L'Acte de Mission présente un exposé sommaire des prétentions des parties aux fins de faciliter l'identification des points litigieux et leur bonne compréhension par les parties et le tribunal arbitral et selon l'article 23(4) du Règlement.

## LA DEMANDERESSE

49. La Demanderesse présente son exposé des faits et de ses demandes ainsi :

1. **Les relations contractuelles entre la Demanderesse et les Défenderesses**

9

50. GVG est un fournisseur de classe mondiale de technologies de pointe et de systèmes de protection des finances et de génération de revenus liés aux flux et opérations de télécommunications. Les solutions technologiques de GVG permettent à leurs clients - qui sont exclusivement des Etats et des institutions gouvernementales, y compris les autorités de régulation - d'optimiser les revenus de l'industrie de télécommunications, de réduire la fraude liée aux appels internationaux et de contrôler la qualité et l'intégrité des réseaux.

51. C'est ainsi que trois documents contractuels se sont matérialisés entre GVG d'une part et l'Autorité de Régulation des Postes et Télécommunications de la Guinée (**ARPT**) et la République de Guinée (**Etat**) d'autre part, à savoir l'Accord de Partenariat (Section (**i**)), l'Avenant à l'Accord (section (**ii**)) et l'Addendum qui a été imposé par les Défenderesses (section (**iii**)).

### i) L'Accord de Partenariat

52. L'Etat souhaitait « *contrôler les flux de trafic téléphonique locaux et internationaux afin d'adopter le régime de taxation la plus appropriée aux besoins des réalités fiscaux et socio-économiques de la République de Guinée* » et dans cette perspective il considérait nécessaire de doter l'ARPT « *d'outils adéquats qui lui permette de jouer son rôle de régie de l'Etat dans le secteur de télécommunications* » (Préambule, p.2 de l'Accord de Partenariat).

53. C'est dans ce cadre que l'Accord de Partenariat est intervenu le 22 mai 2009 entre ARPT et GVG (**Accord de Partenariat**). Cet Accord de Partenariat fut également signé « Pour le Ministère des Télécommunications et des Nouvelles Technologies de l'Information » par le Ministre en question (**Ministre**).

54. Aux termes de l'Accord de Partenariat il était prévu que GVG, en contrepartie de ses engagements, touche une rémunération sur les revenus générés par les flux d'appels internationaux, cette rémunération devant être calculée sur le tarif international entrant en Guinée. Ce tarif fut mentionné en Annexe I de l'Accord de Partenariat, puis établi par l'Etat, suite à la signature et en exécution de l'Accord de Partenariat, au moyen de

10

l'Arrêté adopté le 29 mai 2009 « *fixant le tarif international de la destination République de Guinée et quotes-parts à reverser à l'ARPT et aux opérateurs locaux des réseaux de télécommunications ouvertes au public*. Aux termes de cet Arrêté, le tarif du trafic international entrant en Guinée était fixé à 28 cents USD la minute (art. 2 de l'Arrêté) ; et ce tarif devait être réparti comme suit :

- 16 cents USD à l'opérateur local ;

- 3,5 cents USD à l'ARPT ;

- 7 cents USD à « *l'opérateur technique qui assure la fourniture, la mise en service, la maintenance et la formation à l'utilisation durant la période contractuelle* » ;

- 1,5 cents USD « *pour le fonds d'aide au financement pour le raccordement de la Guinée au câble sous-marin, à la fibre optique et à la large bande* ».

55. Par conséquent, aux termes de l'Arrêté et de l'Annexe 1 de l'Accord de Partenariat, GVG avait droit à une rémunération de 0.07 USD sur chaque minute d'appel international entrant en Guinée.

56. Aux termes de l'article 2 de l'Accord de Partenariat, il était prévu que : « *Le présent Contrat est conclu pour une durée initiale de soixante (60) mois à compter de la date de signature par les deux parties. Le contrat est renouvelable par tacite reconduction pour une période successive de 2 ans sauf dénonciation expresse et écrite par l'une ou l'autre partie dans un délai de 12 mois avant la fin du contrat* ».

57. Il en résulte, qu'aux termes de l'Accord de Partenariat, celui-ci devait se renouveler au terme de la période contractuelle initiale de 5 ans (22 mai 2014), sauf dénonciation expresse, adressée par écrit par l'une des parties à l'autre partie 12 mois avant le terme contractuel, soit au plus tard au 22 mai 2013.

## ii) L'Avenant à l'Accord du 6 juillet 2009 :

58. L'ARPT souhaitait construire un bâtiment « *destiné à abriter les équipements objets de l'accord précité du 22 mai 2009, une partie de son personnel ainsi que tout autre équipements lui appartenant ou appartenant au Ministère des Télécommunications et*

*des Nouvelles Technologies de l'Information* » (art. 1 de l'Avenant à l'Accord). Le coût des travaux était de 1.2 millions USD. GVG a accepté de financer les travaux à hauteur de 1.2 millions USD, en versant mensuellement une somme de 100.000 USD, cette somme devant venir en déduction de la rémunération que devait percevoir GVG au titre de l'Accord de Partenariat (art.1.2 de l'Avenant à l'Accord).

59. C'est dans cette perspective que « l'Avenant à l'Accord du 22 mai 2009 entre l'ARPT et GVG » fut signé le 6 juillet 2009 par toutes les parties, y compris le Ministre (**Avenant à l'Accord**). L'Avenant à l'Accord fut signé par GVG Telecom au nom et pour le compte de GVG.

60. En contrepartie du financement par GVG des travaux susmentionnés, « la durée initiale de l'accord de base conclu le 22 mai 2009 entre l'ARPT et GVG fixée à 5 (cinq) ans est portée à six ans (6 ans) » (art. 1.1 de l'Avenant à l'Accord). Par conséquent, le terme initial de l'Accord de Partenariat passait du 22 mai 2014 au 22 mai 2015.

61. Il était expressément prévu à l'article 3 de l'Avenant à l'Accord que les autres stipulations de l'Accord de Partenariat restaient « *pleinement applicables* ». Par conséquent, et aux termes de l'article 2 précité de l'Accord de Partenariat, celui-ci devait automatiquement se renouveler au 22 mai 2015 pour une période de 2 ans, sauf dénonciation expresse adressée par l'une des parties à l'autre partie 12 mois avant le terme contractuel, à savoir au plus tard au 22 mai 2014. Aucune dénonciation écrite ne fut adressée à GVG à cette date. L'Accord de Partenariat fut ainsi reconduit jusqu'au 22 mai 2017.

62. Conformément à l'Avenant à l'Accord, la somme de 100.000 USD fut déduite chaque mois de la facture de GVG pendant une année (pendant la période de août 2009 à août 2010). GVG s'est donc acquitté du montant de 1.2 millions USD au bénéfice des Défenderesses.

### iii) L'Addendum imposé par les Défenderesses

12

**63.** Depuis le début de la mise en exécution du projet, la plupart des factures émises par GVG sont restées impayées.

**64.** Alors même que les Défenderesses ont reconnu que « *Global Voice Group a exécuté le plan d'actions convenu entre les parties relatif aux obligations mentionnées dans le* « *RAPPORT D'EXECUTION DES OBLIGATIONS CONTRACTUELLES ENTRE GVG ET L'ARPT, EN DATE DU 14 MAI 2012* », elles n'ont accepté de régler les factures de GVG qu'à condition de revoir à la baisse la contrepartie financière de l'intervention de GVG, impliquant également une renonciation de la part de cette dernière à une grosse partie des sommes dues au titre de l'Accord de Partenariat et restées impayées par les Défenderesses. C'est dans ce cadre que l'Addendum à l'Accord de Partenariat fut signé le 10 juin 2012 (**Addendum**).

**65.** Aux termes de l'Addendum, les Défenderesses reconnaissent le suivant :

- GVG a « *exécuté le plan d'actions convenu entre les parties* » (art. 1) ;

- la somme de 13.237.182, 60 USD est due à GVG au titre des « *factures accumulées de septembre 2009 au 31 décembre 2011* » (art. 2) ;

- la somme de 2.206.906, 16 USD est due à GVG au titre du « *reliquat de la quote-part du trafic international de Sotelgui* » pour la période allant de septembre 2009 au 31 décembre 2011(art. B) ;

- « *GVG avait offert gracieusement à l'ARPT la connexion internet dont elle supportait les charges ainsi que les charges de colocation des équipements chez CELLCOM* » (p.3).

**66.** GVG a donc accepté aux termes de l'Addendum de :

- réduire la dette de l'ARPT (au titre des factures accumulées du 1<sup>er</sup> septembre 2009 au 31 décembre 2011) de 11.237.182, 60 USD – la dette de l'ARPT passait ainsi de 13.237.182, 60 USD à 2 millions USD (art. 2, B et C) ;

- renoncer aux revenus correspondant au reliquat de la quote-part du trafic international de Sotelgui, à savoir 2.206.906, 16 USD (art. B) ;

- réduire les droits que devait verser l'ARPT à GVG aux termes de l'Accord de Partenariat, de 0.07 USD à 0.025 USD (tarif par minute d'appel international entrant), de façon rétroactive, à compter du 1er avril 2011 (art. 3).

**67.** Ces renonciations substantielles de la part de GVG ont été convenues entre les parties, aux termes de l'Addendum, « DANS LE BUT DE RENFORCER LE PARTENARIAT ENTRE L'ARPT ET GLOBAL VOICE GROUP » (Addendum, p.2) et donc sans réelle contrepartie de la part des Défenderesses.

**68.** La somme de 2 millions USD, conformément à l'article C de l'Addendum, a été réglée à GVG avant le 30 juin 2012.

## 2. La résiliation abusive de l'Accord de Partenariat par les Défenderesses

**69.** Alors même que GVG continuait à exécuter ses obligations contractuelles (assistance technique/formation/entretien et maintenance) et étudiait, ainsi que faisait des recommandations au sujet des nouvelles solutions techniques requises par les Défenderesses, celles-ci ont cessé de payer les factures de GVG à partir du mois de mai 2014. Depuis, aucun paiement n'est intervenu au bénéfice de GVG.

**70.** En effet, les Défenderesses considéraient, de manière parfaitement erronée, que l'Accord de Partenariat a expiré au 22 mai 2014, en ignorant ainsi d'une part, la prolongation de la durée initiale de l'Accord de Partenariat d'une année supplémentaire, jusqu'au 22 mai 2015, et d'autre part, la reconduction tacite de l'Accord de Partenariat pour une nouvelle période de 2 ans (jusqu'au 22 mai 2017), les Défenderesses n'ayant pas dénoncé de façon expresse et par écrit cet Accord, 12 mois avant le terme contractuel, à savoir au plus tard au 22 mai 2014.

**71.** Les Défenderesses ont adressé plusieurs explications confuses et contradictoires à GVG, au soutien de leur refus de régler les factures de la Demanderesse :

- dans un courrier en date du 15 juillet 2014, les Défenderesses ont affirmé de manière péremptoire que l'Avenant à l'Accord était réputé n'avoir jamais eu lieu;

14

- dans un courrier en date du 24 novembre 2014, les Défenderesses ont fait référence à une prétendue expiration de l'Accord de Partenariat qui aurait pris fin le 22 mai 2014;

- dans un courrier en date du 9 juillet 2015, les Défenderesses ont pour la première fois soulevé une prétendue mauvaise exécution de la part de la Demanderesse, sans pour autant mettre en œuvre la clause résolutoire figurant à l'article 5 de l'Accord de Partenariat.

72. Enfin, par courrier en date du 6 août 2015, les Défenderesses informent la Demanderesse de leur décision de mettre un terme à leurs relations contractuelles avec GVG, en parfaite violation des droits contractuels de cette dernière : « (…) *nous vous réitérons notre non satisfaction, tant sur le plan technique que relationnel. Comme vous le savez également, vos prestations actuelles ne correspondent pas à nos besoins de contrôle, de sécurité et de lutte contre la fraude ; et ne comptons plus continuer la collaboration avec vous* ».

73. Or, il ne fait aucun doute que l'Accord de Partenariat était toujours en vigueur et pleinement applicable entre les parties, jusqu'au 22 mai 2017 :

- Aux termes de l'article 2 de l'Accord de Partenariat, celui-ci a été « *conclu pour une durée initiale de soixante (60) mois à compter de la date de sa signature par les deux parties* » et était « *renouvelable par tacite reconduction pour une période successive de 2 ans sauf dénonciation expresse et écrite par l'une ou l'autre partie dans un délai de 12 mois avant la fin du contrat* ». Par conséquent et suivant les termes de l'Accord précité, celui-ci a été initialement conclu pour une période allant jusqu'au 22 mai 2014.

- Or, aux termes de l'Avenant à l'Accord « *La durée initiale de l'accord de base conclu le 22 mai 2009 entre l'ARTP et GVG fixée à 5 (cinq) ans est portée à six ans (6 ans)* » (art. 1, point 1 de l'Avenant, p.2). Il est rappelé, par ailleurs, aux termes de l'article 3 de l'Avenant, que « *Les clauses du contrat du 22 mai 2009 restent pleinement applicables* ». Il en résulte que la durée initiale de l'Accord a été portée du 22 mai 2014 au 22 mai 2015. Et, l'ARTP n'ayant pas dénoncé de façon expresse et par écrit l'Accord au plus tard au 22 mai 2014, celui-ci s'est trouvé renouvelé pour une période de 2 ans, à savoir jusqu'au 22 mai 2017.

15

**74.** Il en résulte que l'Accord de Partenariat n'a jamais expiré, si bien que la résiliation unilatérale de l'Accord par l'État et l'ARPT est intervenue de manière parfaitement abusive. GVG est donc aujourd'hui en droit d'obtenir des dommages et intérêts en réparation de son entier préjudice, incluant l'ensemble des factures restées impayées pour toute la période contractuelle, ainsi que tous les frais de GVG engagés pendant le processus des négociations transactionnelles.

**75.** Les dommages et intérêts seront calculés sur la base de l'Accord de Partenariat et en particulier en appliquant le tarif initialement prévu en son Annexe I, à savoir le prix de 0.07 USD que devait toucher GVG sur chaque minute d'appel international entrant en Guinée ; en effet, comme il sera démontré ci-après l'Addendum et les renonciations de GVG faites dans ce contexte sont nuls et non avenus.

## 3.  La nullité de l'Addendum

**76.** Il est rappelé que GVG a accepté, en vertu de l'Addendum, de réduire sa créance et de renoncer à ses droits financiers découlant de l'Accord de Partenariat sans aucune contrepartie de la part des Défenderesses.

**77.** L'Addendum se contente d'indiquer que ces réductions et renonciations ont été convenues entre les parties « *DANS LE BUT DE RENFORCER LE PARTENARIAT ENTRE L'ARPT ET GLOBAL VOICE GROUP* » (Addendum, p.2).

**78.** Or, cette référence au « renforcement du partenariat » ne correspond à aucune contre-obligation concrète assumée par les Défenderesses en contrepartie des réductions et renonciations de GVG, en ce sens que la durée de l'Accord de Partenariat qui s'étendait au moment de la signature de l'Addendum jusqu'au 22 mai 2015 (avec possibilité de tacite reconduction de 2 ans en l'absence d'une dénonciation expresse préalable) n'a pas été contractuellement étendue de sorte que des revenus supplémentaires soient garantis à GVG en contrepartie de ses renonciations substantielles.

**79.** En réalité, comme il a été indiqué, GVG a accepté ces réductions et renonciations afin que les Défenderesses s'acquittent des factures impayées et dues depuis plusieurs années (septembre 2009 à décembre 2011). GVG savait parfaitement que le défaut de signature

de l'Addendum qui lui a été imposé par les Défenderesses, l'exposait à de graves impayés et compromettait la fluide poursuite de l'exécution de l'Accord de Partenariat par les Défenderesses qui, du fait de leurs pouvoirs étatiques étendus, étaient en position de force par rapport à GVG en Guinée.

80. En définitive, l'Addendum a été imposé par les Défenderesses à GVG, qui de ce fait, était dans l'obligation de consentir à d'importantes réductions et renonciations, sans aucune contrepartie.

81. A ce titre, l'article 649 du Code civil guinéen dispose que « *pour qu'une convention soit légalement valable, quatre conditions essentielles sont requises* » dont « *un objet certain formant la matière de l'engagement* » et « *une cause licite, c'est à dire qu'aucun texte ne prohibe* ».

82. Aux termes de l'article 664 dudit Code, la notion d' « objet » est précisée comme suit : « *l'objet d'un contrat doit être [...] déterminé, c'est à dire bien précisé* ». Et l'article 666 précise la notion de « cause » en disposant que « *ne peut avoir aucun effet une obligation sans cause, ou fondée sur une cause fausse ou illicite. La cause, motif déterminant de l'obligation, est le but en en vue duquel une personne s'engage envers une autre* ».

83. Il en résulte que pour qu'un contrat soit valable il faut que, d'une part, l'objet de l'obligation existe et soit précisé, et d'autre part, que la cause de l'obligation existe.

84. Or, dans les contrats synallagmatiques en vertu desquels « *les contractants s'obligent réciproquement les uns envers les autres* » (article 643 du Code civil guinéen), la cause de l'obligation de chacune des parties réside dans l'objet de l'obligation de l'autre. En d'autres termes, la prestation due par chaque contractant sert de cause à l'obligation de l'autre. La cause de l'obligation de l'un étant l'objet de l'obligation de l'autre, l'obligation perd sa cause lorsque la contrepartie fait défaut. Par conséquent, si l'une des obligations est nulle faute de cause, l'autre le sera faute d'objet et le contrat est entièrement anéanti.

85. En l'espèce, l'obligation de GVG consistant dans les réductions et renonciations consenties est dépourvue de cause car les Défenderesses ne se sont pas engagés réciproquement, étant précisé que la référence péremptoire au « renforcement du partenariat » ne peut servir de cause à l'obligation de GVG en l'absence d'un engagement

17

ferme et précis de la part des Défenderesses d'étendre la durée initiale de l'Accord de Partenariat.

86. Aussi, l' « obligation » des Défenderesses de « renforcer le partenariat » est dépourvue d'objet car cette obligation ne correspond à aucun engagement ferme et précis et donc à aucune contrepartie réelle ; il en résulte que l'obligation des Défenderesses n'a pas d'objet ou à tout le moins son objet n'est pas « *bien précisé* ».

87. Par conséquent, l'obligation de GVG de consentir aux réductions et renonciations précitées est dépourvue de cause et donc nulle et l'obligation des Défenderesses de « renforcer le partenariat » est tout aussi nulle, faute d'objet.

88. L'Addendum sera, dans ces conditions, complètement anéanti et le Tribunal arbitral ne pourra que prononcer la nullité de l'Addendum.


## 4.  L'indemnisation de GVG

89. En application du principe selon lequel tout préjudice résultant d'une faute contractuelle doit être indemnisé, GVG demande la réparation de son préjudice. Le montant de cette indemnisation devra couvrir l'intégralité de son préjudice, y compris les frais engagés par GVG pendant les négociations menées en vue de trouver une solution à l'amiable.

90. GVG réclame, par conséquent, une compensation intégrale du préjudice dont elle a souffert, évalué au jour de la présente sauf à parfaire, comme suit :

- 11.237.182, 60 USD, correspondant au montant dont a été réduit la dette de l'ARPT aux termes des articles 2 et C de l'Addendum ;

- 2.206.906, 16 USD, correspondant à la dette de Sotelgui à laquelle a renoncé GVG aux termes de l'article B de l'Addendum ;

- 34.292.234, 11 USD, correspondant à la différence entre le montant facturé (à 0.025 USD en vertu de l'Addendum) et celui initialement convenu (0.07 USD) et donc dû à GVG pour la période allant du 1$^{er}$ janvier 2012 au 31 mai 2014 ;

- 24.017.685, 81 USD, correspondant aux montants dus par l'ARPT à GVG pour la période de 1$^{er}$ juin 2014 au 31 août 2015, calculés au tarif initialement convenu (0.07 USD) ;

18

- 33.624.760, 14 USD, une estimation des montants dus pour la période allant du 1$^{er}$ septembre 2015 au 22 mai 2017 (calculés sur la base du trafic déclaré pendant les quinze derniers mois et le tarif de 0.07 USD et en fonction des montants à facturer par GVG en application de l'Accord de Partenariat).

**91.** Le montant total des demandes ci-dessus est égal à 105.378.768, 82 USD.

**92.** Il résulte de ce qui vient d'être dit que GVG demande au Tribunal arbitral dans le cadre de la présente procédure de :

- dire et juger que Défenderesses ont abusivement résilié l'Accord de Partenariat;

- prononcer la nullité de l'Addendum;

- condamner les Défenderesses à indemniser GVG de l'intégralité de son préjudice subi estimé à 105.378.768, 82 USD sauf à parfaire, en sus des intérêts de retard ;

- condamner les Défenderesses au paiement de tous les frais relatifs à l'arbitrage, incluant les honoraires et frais d'avocats ainsi que les honoraires et frais de tout expert engagé par GVG dans le cadre de la présente procédure.

## 5.  **L'application de la clause d'arbitrage à l'Etat**

**93.** La clause d'arbitrage contenue à l'article 17 de l'Accord de Partenariat s'applique non seulement à l'ARPT mais également à l'Etat qui a consenti à être partie à l'Accord de Partenariat et par conséquent à la clause d'arbitrage y insérée.

**94.** Le consentement de l'Etat à être partie à l'Accord de Partenariat s'est exprimé tantôt directement au moment de la conclusion de l'Accord de Partenariat, au cours de son exécution et sa prétendue fin (**Section (i)**) ; et tantôt indirectement par le biais de l'ARPT qui, en tant qu'émanation de l'Etat, agissait comme mandataire de ce dernier (**Section (ii)**).

## i) l'Etat a directement consenti à être partie à l'Accord de Partenariat

95. Le consentement direct de l'Etat à être partie à l'Accord de Partenariat se déduit de la signature du Ministre qui a été apposée à la fois sur l'Accord de Partenariat ainsi que sur l'Avenant à l'Accord (paras. 87 à 92 de la Demande d'arbitrage).

96. Il se déduit, ensuite, de la structure même de l'Accord de Partenariat et de l'Avenant à l'Accord qui comportent une étroite imbrication des obligations/droits de l'ARPT et de l'Etat Guinéen (paras. 93 à 97 de la Demande d'arbitrage).

97. Il découle, enfin, de la participation de l'Etat à l'élaboration des termes de l'Accord de Partenariat, à l'exécution de celui-ci ainsi qu'aux tentatives de règlement à l'amiable du litige né de cet Accord (paras. 98 à 117 de la Demande d'arbitrage).

98. Il résulte de tout ce qui précède que l'Etat a directement consenti à être partie à l'Accord de Partenariat et partant à la clause d'arbitrage y contenue. La clause d'arbitrage contenue à l'article 17 de l'Accord de Partenariat s'applique donc non seulement à l'ARPT mais également à l'Etat qui a été le pivot des relations contractuelles depuis la conclusion de l'Accord de Partenariat jusqu'à sa prétendue fin.

**ii) L'Etat a indirectement consenti à être partie à l'Accord de Partenariat par le biais de son émanation et mandataire, l'ARPT**

99. L'ARPT agissait à double titre : à la fois comme cocontractant de GVG et comme mandataire de l'Etat. Il s'en suite que l'Accord de Partenariat lie non seulement l'ARPT - cocontractant de GVG et mandataire de l'Etat - mais aussi l'Etat, mandant de l'ARPT et par conséquent cocontractant de GVG.

100. La qualité de mandataire de l'ARPT se déduit de sa qualité d'émanation de l'Etat (paras. 127 à 136 de la Demande d'arbitrage) ainsi que des stipulations de l'Accord de Partenariat et des courriers échangés (paras. 137 à 146 de la Demande d'arbitrage).

101. Par conséquent, l'Etat est engagé auprès de GVG en vertu du mécanisme du mandat. Etant engagé par les stipulations de l'Accord de Partenariat, la clause d'arbitrage y contenue lie alors l'Etat qui en signant l'Accord de Partenariat en avait une parfaite connaissance.

## LES DÉFENDERESSES

**102.**      Les Défenderesses présentent leur exposé des faits et leurs demandes ainsi :

**103.**      Conformément à la demande du tribunal arbitral, et en application de l'article 23 du Règlement d'arbitrage de la CCI, vous trouverez ci-dessous un exposé sommaire de la position de l'Autorité de Régulation des Postes et Télécommunications (ARPT) et de la République de Guinée (ci-après ensemble « les Défenderesses ») en réponse aux demandes formulées par Global Voice Group SA dans sa Demande d'Arbitrage (ci-après « GVG » ou « la Demanderesse »). À titre liminaire, nous entendons réitérer les réserves exprimées dans des précédentes communications sur le respect des droits fondamentaux des Défenderesses dans cette procédure

## Réserves préliminaires

**104.**      Il convient de rappeler que l'ARPT et la République de Guinée ont produit leur mandat de représentation dans la présente procédure respectivement les 6 juillet et 19 septembre 2017 et que par voie de conséquence, leurs Conseils n'ont pu s'investir dans le dossier qu'à compter de cette dernière date. Le Règlement d'arbitrage ICC prévoit un délai minimal de 30 jours pour permettre à la partie défenderesse de produire sa Réponse à la Demande d'arbitrage (article 5 du Règlement). Il en ressort que le délai donné par le tribunal arbitral pour produire l'exposé sommaire de la position des Défenderesses est inférieur au standard prévu par le Règlement. Dans ces conditions, l'exposé de la position des Défenderesses développé ci-après ne pourra qu'être un exposé sommaire susceptible d'être révisé, complété et développé avec des moyens et prétentions nouvelles à tout moment de la procédure.

**105.**      Dès après la production du mandat de représentation de l'ARPT puis à nouveau à l'occasion de la production du mandat de représentation de la République de Guinée, les Défenderesses, par la voix de leurs Conseils, ont insisté sur l'importance pour les parties en matière d'arbitrage international de contribuer à la constitution du tribunal arbitral. Indépendamment des éventuelles difficultés et délais dans l'intervention d'une ou de plusieurs parties Défenderesses à une procédure d'arbitrage, la faculté donnée

auxdites parties de contribuer à la constitution du tribunal arbitral doit toujours rester une priorité.

106.        Il est par ailleurs de principe constant que les parties à une procédure arbitrale doivent se voir reconnaître une égalité de traitement dans leur contribution à la constitution du tribunal arbitral. Ce principe d'égalité doit être respecté par la ou les parties Demanderesses, lesquelles ne sauraient faire preuve de déloyauté procédurale en refusant à la ou les parties Défenderesses ce droit fondamental à la désignation d'un arbitre et indirectement donc à la désignation du Président du tribunal arbitral.

107.        En l'espèce, la demande d'égalité de traitement a été expressément formulée par les Défenderesses. Cette demande lui a été refusée par la Demanderesse alors même qu'une telle désignation aurait pu être réalisée dans des délais très courts. La présente procédure est donc en l'état d'une partie Demanderesse (GVG) ayant désigné un arbitre et de parties Défenderesses (l'ARPT et la République de Guinée) qui ont loyalement décidé d'intervenir et de payer une provision d'arbitrage de plus de 300.000 $, tout en se voyant refuser par la partie Demanderesse la faculté de désigner un arbitre et plus généralement de voir respecter le principe d'égalité de traitement. La situation est d'autant plus contestable qu'il s'agit d'un arbitrage multipartite dans lequel les Défenderesses se voient imposer un arbitre conjoint alors que leurs positions respectives et leurs intérêts auraient pu être disjoints et que dans un tel cas, sauf à rompre l'égalité de traitement au profit de la partie Demanderesse, la solution équitable est de voir désigner l'ensemble du tribunal arbitral par l'institution d'arbitrage.

108.        Les Défenderesses renouvellent donc leurs réserves sur la régularité de la constitution du Tribunal arbitral et le respect des principes procéduraux d'ordre public international dans la présente procédure d'arbitrage, et se réservent la faculté de faire valoir ces réserves contre toutes sentences à intervenir.

## Exposé sommaire de la position des Défenderesses

109.        Comme il sera exposé ci-après, la présente procédure d'arbitrage est particulièrement abusive en ce qu'elle repose sur une occultation à la fois du droit guinéen des marchés publics et de la réalité du comportement de GVG.

<u>**INCOMPÉTENCE DU TRIBUNAL ARBITRAL ET REJET CORRÉLATIF DES**</u>
<u>**DEMANDES DE GVG**</u>

<u>**Incompétence rationae materiae**</u>

**110.**     L'Accord de Partenariat invoqué par GVG (Pièce C1) du 22 mai 2009 (ci-après « l'Accord de Partenariat ») prévoit qu'il est soumis « *aux lois de la République de Guinée* » (article 17). Cet Accord prévoit en outre que chaque partie, et donc notamment GVG, « *s'engage à respecter toutes les lois et tous les règlements applicables à l'exécution du Contrat et à ne pas utiliser le Service à des fins illégales* » (article 9). GVG ne saurait donc prétendre avoir ignoré les lois de la République de Guinée.

**111.**     Le partenariat technologique défini à l'article 1 de l'Accord de Partenariat relevait à l'évidence de la définition des Marchés Publics guinéens par application combinée de l'article 1 du Code des Marchés Publics de la République de Guinée (ci-après le « Code »)[1] institué par la loi L/97/016/AN du 3 juin 1997 et ses décrets d'application, dont il faut relever qu'il s'applique également expressément (voir articles 7, 25 et 77 du Code) aux marchés publics passés avec des entreprises étrangères (Pièce R 1), et de l'article 24 de la loi L/2005/018/AL du 8 septembre 2005 ayant créé l'ARPT (Pièce C 32)[2].

**112.**     Selon l'article 77 du Code des Marchés Publics :

« *Dans le cadre des Grands Marchés Publics, ou litiges survenant entre l'autorité contractante et un entrepreneur, un fournisseur, un industriel ou un prestataire de services de droit étranger doivent être soumis à l'arbitrage dans les conditions établies ci-après :*

*-   Les parties audit arbitrage sont l'autorité contractante et le titulaire du marché ;*

---

[1] « *Article 1 : Définitions* » du Code des Marchés Publics guinéen : « *1.1 Les Marchés Publics sont des contrats écrits passés dans les conditions prévues au présent code par l'Etat, les Collectivités Publiques, les Sociétés d'Etat, les Etablissements Publics Nationaux et les Sociétés d'Economie Mixte à la participation publique majoritaire en vue de la réalisation de travaux, la livraison de fournitures, l'exécution de marchés industriels et la prestation de services* ».
[2] Article 24 de la loi L/2005/018/AL du 8 septembre 2005 : « *L'Autorité de Régulation est une personne morale de droit public, indépendante, dotée de l'autonomie financière et de gestion, régie par le statut particulier défini par la présente loi et placée sous la tutelle du Ministre chargé des télécommunications* ».

- *Le Tribunal arbitral se compose de trois arbitres désignés, le premier par l'autorité contractante, le deuxième par le titulaire étranger du marché et le troisième par accord des parties.*

*En cas de décès ou de démission de l'un des arbitres commis, son successeur est désigné conformément aux dispositions du présent article applicables à la nomination de l'arbitre qui l'a précédé, et ledit successeur a les pouvoirs et obligations de son prédécesseur »*

**113.** Le Code des Marchés Publics guinéen institue donc une procédure d'arbitrage ad hoc pour régler les différends entre les personnes morales de droit public guinéennes, telle que l'ARPT, et les titulaires étrangers de marchés. Une telle procédure est impérative. Elle s'impose aux acteurs d'un marché public guinéen qui ne sauraient y déroger. En conséquence, la clause d'arbitrage CCI contenue à l'article 17 de l'Accord de Partenariat (Pièce C1) viole le Code des Marchés Publics guinéen. Elle est donc nécessairement nulle. En constatant sa nullité, le Tribunal arbitral saisi ne pourra qu'en déduire son incompétence pour connaître des demandes de GVG. En tout état de cause, quand bien même le Tribunal arbitral ne conclurait pas à la nullité de la clause d'arbitrage CCI en cause, il ne pourra que constater que selon le Code des Marchés Publics, le différend dont il est saisi, relève d'une procédure d'arbitrage ad hoc impérative et ne pourra donc que conclure à son incompétence *rationae materiae*. Dans ces conditions, il y aura lieu de rejeter l'intégralité des demandes de GVG.

**Incompétence rationae personae**

**114.** Si par extraordinaire le tribunal arbitral ne se déclarait pas incompétent à l'endroit de toutes les parties et de toutes les demandes, il devra se reconnaître incompétent à l'endroit de la République de Guinée.

**115.** En effet, contrairement aux affirmations de GVG, la République de Guinée n'a jamais été partie à l'Accord de Partenariat et s'est contentée de viser l'accord en qualité d'autorité de tutelle (voir article 24 de la loi – L/2005/018/AL du 8 septembre 2005 - Pièce C32). Force est au demeurant de constater que l'Addendum du 10 juin 2012 qui se

24

contente de réviser à la baisse le prix des prestations de GVG (Pièce C7), ne mentionne à aucun moment la République de Guinée et n'est signé que par l'ARPT et GVG.

**116.** La République de Guinée n'a pas plus participé à l'exécution du marché litigieux. Les pièces produites par GVG ne démontrent pas le contraire et viennent en réalité conforter la position des Défenderesses, lesquelles communiqueront d'autres documents en ce sens.

**117.** Il est en outre parfaitement inexact d'affirmer que l'ARPT serait une émanation de l'Etat guinéen. En effet, conformément à l'article 24 précité de la loi L/2005/018/AL du 8 septembre 2005 (Pièce C32), « *l'Autorité de Régulation est une personne morale de droit public, indépendante, dotée de l'autonomie financière et de gestion, régie par le statut particulier défini par la présente loi et placé sous la tutelle du Ministre chargé des télécommunications* ». La loi 2005/018/AN du 13 août 2015, est venue confirmer ce statut en prévoyant à son article 9 que « *l'ARPT est une autorité administrative indépendante, dotée de la personnalité morale et de l'autonomie de gestion administrative et financière. Elle est placée sous la tutelle du Ministre en charge des télécommunications / TIC. La fonction de régulation du secteur des télécommunications / TIC, est indépendante vis-à-vis du pouvoir politique, de l'exploitation des réseaux et de la fourniture des services de télécommunications / TIC* », et définir une Autorité Administrative Indépendante comme « *un organisme administratif qui agit au nom de l'Etat sans pour autant relever de l'autorité du gouvernement* ». Les critères d'opposabilité d'une convention d'arbitrage à un tiers (en l'occurrence en l'espèce la République de Guinée), ne sont donc pas réunis. Le Tribunal arbitral ne pourra en conséquence que se déclarer incompétent à l'endroit de la République de Guinée et rejeter l'intégralité des demandes formées par GVG à son encontre.

## Subsidiairement, irrecevabilité à agir de GVG et rejet corrélatif de ses demandes

**118.** La demande d'arbitrage a été déposée au nom d'une société de droit seychellois dénommée Global Voice Group S.A. (GVG) sise au 1st Floor, #Dekk House, De

Zippora Street, PO Box 456, Providence Industrial Estate, Mahé, et détenue à 100% par Monsieur Patrice Baker. Cette société est présentée comme la société ayant conclu l'Accord de Partenariat du 22 mai 2009, alors sise 1st Floor Allied Plaza Francis Rachel Street Victoria, Mahé c/o Global Voice Group, LLC 6300 Estate Frydenoj Suite D-1St. Thomas USVI 00802 et représentée par son Président Directeur Général Monsieur Laurent Lamothe.

119.    Aucun document n'a toutefois été produit au soutien de la Demande d'Arbitrage pour démontrer l'existence de GVG pas plus que pour établir que la Demanderesse est bien la société qui a conclu l'Accord de Partenariat.

120.    Il est par ailleurs indiqué dans la Demande d'Arbitrage (point 3) qu'une société de droit d'Afrique du Sud, également dénommée Global Voice Group SA, et également détenue à 100% par Monsieur Patrice Baker, « *est intervenue à plusieurs reprises dans les relations contractuelles, objet de la présente procédure, agissant cependant exclusivement au nom et pour le compte de GVG* ». Aucun document n'est produit pour démontrer l'existence de cette société ni qu'elle aurait agi exclusivement au nom et pour le compte de GVG.

121.    En l'état des pièces produites par GVG, la question de la recevabilité de la Demande d'Arbitrage se pose donc. A défaut de justifier sa recevabilité à agir, GVG ne pourra qu'être déboutée de l'intégralité de ses demandes.

### SUBSIDIAIREMENT, MAL FONDÉ ET REJET CORRÉLATIF DES DEMANDES DE GVG

### Mal fondé et rejet des demandes de GVG à l'encontre de la République de Guinée

122.    GVG sollicite la condamnation de la République de Guinée à des dommages et intérêts correspondant à la rémunération soit disant due pour ses prestations en exécution de l'Accord de Partenariat. Or, contrairement aux affirmations péremptoires de GVG, et pour les raisons exprimées ci-dessus, la République de Guinée n'est pas partie à l'Accord de Partenariat.

**123.** En outre, selon le Code des Marchés Publics guinéen (article 2 du décret d'application D/97/256/PRG/SGG du 3 novembre 1997, intitulé « *Validité des Marchés* ») :

« *Les marchés publics doivent être passés, approuvés et notifiés avant tout commencement d'exécution. Tout marché non approuvé par l'autorité compétente ne saurait engager financièrement l'Etat ; aussi – sauf dans le cas prévu à l'article 27.2.5, du Code des Marchés Publics, s'il commence à recevoir un début d'exécution, ce ne peut être qu'aux risques et périls de l'entrepreneur, du fournisseur, de l'industriel ou du prestataire de services concerné.*

*Les agents de l'Administration qui interviennent dans la passation ou l'exécution d'un tel marché sont passibles des sanctions prévues à l'article 79 du Code des Marchés Publics* » (Pièce R 1).

**124.** L'article 2 ne saurait être plus clair. Tout marché conclu en violation des dispositions du Code ne saurait engager financièrement l'Etat. GVG qui a soumis l'Accord de Partenariat « *aux lois de la République de Guinée* » ne saurait prétendre ignorer les dispositions de l'article 2 précité. GVG est donc manifestement mal fondée à solliciter la condamnation de la République de Guinée.

## **Mal fondé et rejet des demandes de GVG à l'encontre de l'ARPT, et subsidiairement à l'endroit de la République de Guinée**

### *Mal fondé et rejet des demandes de GVG pour cause de nullité des accords fondant ses demandes, et demandes reconventionnelles corrélatives*

### *Invalidité des accords*

**Invalidité pour cause de violation du Code des Marchés Publics**

125.     Comme relevé ci-avant, le marché objet de l'Accord de Partenariat est un marché public et relevait des dispositions impératives du Code des Marchés Publics guinéen. Un tel marché ne pouvait donc être conclu valablement sans respecter les conditions d'admissibilité aux Marchés Publics définies à l'article 7 du Code (Pièce R 1). Un tel marché ne pouvait en outre être accordé sans respecter la procédure d'appel d'offres, sachant que le Code est également applicable au cas d'un appel d'offre international (article 25 du Code). Selon l'article 2 du décret du 3 novembre 1997 susvisé, « *les marchés publics doivent être passés, approuvés et notifiés avant tout commencement d'exécution. Tout marché non approuvé par l'autorité compétente ne saurait engager financièrement l'Etat* ». Les accords invoqués par GVG (Accord de Partenariat du 22 mai 2009 – Pièce C1 – et Avenant du 6 juillet 2009 – Pièce C3) au soutien de ses demandes ont été passés en violation flagrante du Code des Marchés Publics et sont donc manifestement nuls. GVG en a au demeurant conscience dans la mesure où elle se garde bien de citer le Code à un quelconque moment dans ses écritures.

126.     Le tribunal arbitral ne pourra dans ces conditions que constater l'illicéité des accords fondant les demandes de GVG, prononcer leur nullité, et rejeter en conséquence les prétentions de cette dernière.


**Invalidité pour cause de pacte de corruption**


127.     Il est de notoriété publique que le Président Directeur Général de GVG (Monsieur Laurent Lamothe) est très proche de l'ancien Directeur Général de l'ARPT (Monsieur Nfa Ousmane Camara) signataire de l'Accord de Partenariat et de l'Avenant, et qu'à la suite de la nomination de Monsieur Lamothe au poste de Premier Ministre de Haïti, Monsieur Nfa Ousmane Camara a été nommé par ce dernier Consul de Haïti en Guinée. Monsieur Nfa Ousmane Camara est en outre, depuis qu'il a quitté ses fonctions à l'ARPT, un collaborateur régulier de GVG.

128.     L'Accord de Partenariat et l'Avenant sont contemporains du coup d'Etat militaire survenu en République de Guinée après le décès du Président Lansana Conté et qui a

28

instauré une période de transition. Les signataires de ce contrat ont tous quitté leurs fonctions à la suite du changement de régime survenu après les élections démocratiques organisées en 2010.

**129.**     Les liens entretenus entre le Directeur Général de l'ARPT de l'époque et le Président de GVG, outre l'environnement politique très troublé et provisoire dans lequel ces deux accords ont été conclus, font peser les plus forts soupçons d'attribution illicite du marché à GVG.

**130.**     Ces soupçons deviennent une certitude quand on constate qu'ils ont été passés en violation flagrante des procédures applicables aux marchés publics guinéens, ce qui démontre la collusion des signataires de ces accords pour les faire échapper au contrôle auxquels ils auraient dû être soumis selon le Code des Marchés Publics. La volonté de fraude audit Code à des fins d'occultation ne peut s'expliquer que par le fait que l'Accord de Partenariat ne constitue rien d'autre qu'un pacte de corruption. Au demeurant, une circonstance postérieure audit Accord achève de démontrer son illicéité. Aux termes de l'Addendum signé le 10 juin 2012 avec le nouveau Directeur Général de l'ARPT (désigné par les forces démocratiques ayant succédé à la junte militaire) devenu l'actuel Ministre des télécommunications, GVG a accepté de réduire sa prétendue créance sur l'ARPT pour les services prétendument rendus depuis la conclusion de l'Accord de Partenariat, de 13.237.182 US$ à 2.000.000 US$. GVG a donc, ce faisant, accepté de réduire le prix de ses prestations d'environ 85 % sans que cela paraisse lui poser une quelconque difficulté. GVG acceptait dans ce même Addendum de réduire pour l'avenir le prix de ses prestations de 7US$ cents par minute à 2.5 US$ cents par minute, soit une réduction de 65 %. Quelle entreprise pourrait accepter de voir réduire le prix de ses prestations dans de telles proportions si le prix d'origine n'avait pas été fixé à un niveau outrageusement excessif et frauduleux ?

**131.**     Un tel pacte de corruption, détachable des fonctions du Directeur Général de l'ARPT, ne saurait engager cette dernière.

**132.**     Le tribunal arbitral ne pourra dans ces conditions que constater l'illicéité des accords fondant les demandes de GVG, prononcer leur nullité, et rejeter en conséquence les prétentions de cette dernière.

*__Restitution et dommages et intérêts en conséquence de la nullité des accords  invoqués par GVG au soutien de ses demandes__*

**133.**       Comme démontré ci-avant, les accords sur lesquels GVG fonde ses prétentions sont nuls. En conséquence de cette nullité, GVG devrait restituer à l'ARPT l'intégralité des montants perçus au titre desdits accords.

**134.**       L'ARPT serait par ailleurs fondée à solliciter des dommages et intérêts en réparation du préjudice subi du fait de la fraude perpétrée par GVG. L'ARPT se réserve de fixer ultérieurement le montant de la réparation qu'elle estime due à ce titre.

*__Mal fondé et rejet des demandes de GVG pour cause de résiliation aux torts de GVG des relations contractuelles, et réparation du préjudice subi par l'ARPT__*

*__Résiliation des relations contractuelles__*

**135.**       Comme il est rapporté dans la lettre de l'ARPT à GVG du 6 août 2015 (Pièce C15), la Demanderesse a très insuffisamment exécuté les prestations qu'elle s'était engagée à fournir aux termes de l'Accord de Partenariat et en considération desquelles GVG prétend pouvoir solliciter des dommages et intérêts. GVG a en outre fait preuve de déloyauté dans l'exécution de ses prestations, son comportement pouvant laisser supposer qu'il s'est inscrit dans un plan de fraude. Ces manquements sont d'une gravité telle qu'ils justifiaient la résiliation des relations contractuelles aux torts de GVG, telle que notifiée par l'ARPT. GVG ne saurait donc réclamer la moindre indemnité pour la période postérieure à ladite résiliation.

**136.**       Si par extraordinaire le tribunal arbitral ne concluait pas à la nullité de l'Accord de Partenariat, il devrait juger que l'ARPT était fondée à résilier les relations contractuelles aux torts de GVG, conformément à la clause de résiliation de plein droit contenue à l'article 5 dudit Accord. Il appartiendrait alors au tribunal arbitral de prendre acte de cette résiliation. En tout état de cause, si le tribunal arbitral considérait que la

procédure de résiliation prévue par les parties n'avait pas été respectée, il lui appartiendrait de prononcer la résiliation des relations contractuelles aux torts de GVG du fait des manquements contractuels de cette dernière, au premier chef desquels la violation grave de l'article 9 de l'Accord de Partenariat. Les relations contractuelles étant résiliées aux torts de GVG, cette dernière serait mal fondée à solliciter la moindre rémunération pour ses prestations.

### *Réparation du préjudice de l'ARPT*

**137.**    Si par extraordinaire les accords invoqués par GVG au soutien de ses demandes n'étaient pas annulés, l'ARPT serait donc fondée à solliciter la réparation du préjudice subi du fait du comportement de GVG. L'ARPT se réserve de fixer ultérieurement le montant de la réparation qu'elle estime due à ce titre.

### *Mal fondé et rejet des demandes de GVG pour cause de suspension des relations contractuelles*

**138.**    L'article 9 de l'Accord de Partenariat prévoit que :

« *Chaque Partie s'engage à respecter toutes les lois et tous les règlements applicables à l'exécution du Contrat et à ne pas utiliser le Service à des fins illégales.*

***Chacune des Parties pourra, sans préjudice et sans indemnisation de l'autre Partie, suspendre l'exécution du Contrat*** *dans l'hypothèse où une telle suspension est exigée par une décision judiciaire, une autorité administrative ou gouvernementale ou,* ***dans l'hypothèse où l'exécution du Contrat est susceptible d'entraîner la violation d'une loi ou de toutes autres dispositions égales en vigueur*** » (gras ajouté)

**139.**    En l'espèce, pour les raisons exprimées ci-avant, les accords invoqués par GVG ont été conclus en violation du Code des Marchés Publics guinéen. Ils ont

également été exécutés en violation dudit Code qui contient dans son titre 4 des dispositions relatives à l'exécution des marchés, portant en particulier sur les modalités de paiement du prix.

**140.** Si par extraordinaire il était considéré que les relations contractuelles entre GVG et l'ARPT n'ont pas été résiliées, il conviendrait de relever que dans sa lettre du 6 août 2015 (Pièce C15), l'ARPT a indiqué qu'elle ne « *compt*[ait] *plus continuer la collaboration avec* [GVG] ». A défaut de caractériser une résiliation, une telle formulation constituerait la notification d'une suspension des relations contractuelles au sens de l'article 9 précité, sans que cette suspension ne justifie une quelconque indemnisation de GVG conformément audit article.

**141.** Subsidiairement, s'il était jugé que l'ARPT n'a pas fait part de sa volonté de suspendre les relations contractuelles à la date du 6 août 2015, il y aurait lieu de prendre acte de la demande de suspension des Défenderesses à la date des présentes sans indemnisation de GVG quelle qu'elle soit conformément à l'article 9 de l'Accord de Partenariat.

### *Mal fondé et rejet des demandes de GVG pour cause de violation des dispositions de l'Addendum*

**142.** Si par extraordinaire l'Accord de Partenariat et l'Avenant invoqués par GVG n'étaient pas annulés, GVG ne pourrait prétendre écarter l'application de l'Addendum du 10 juin 2012 (Pièce C7) signé par l'ARPT et GVG pour augmenter abusivement le montant des dommages et intérêts qu'elle sollicite. GVG  croit pouvoir remettre en cause la validité de l'Addendum au prix d'une dénaturation flagrante de son objet. Selon GVG cet accord aurait constitué une transaction, laquelle serait nulle faute de prévoir des concessions réciproques.

**143.** En réalité l'Addendum n'a jamais constitué qu'un accord de révision de prix. A aucun moment il n'est fait référence à un différend entre les parties que viendrait régler le prétendu accord transactionnel que constituerait l'Addendum. Bien au contraire,

l'Addendum est qualifié d' « *avenant* » visant à « *apporter des modifications sur les contrats préalablement établis entre elles* ». Puis l'Addendum fait référence à la requête de révision et de renégociation de l'ARPT relative aux prix fixés dans l'Accord de Partenariat pour finalement prévoir une réduction de ce prix pour le futur et à une réduction du prix pour les prestations déjà exécutées. Rien dans l'Addendum ne permet de soutenir que cet accord serait autre chose qu'un accord de réduction de prix. L'affirmation péremptoire contraire de GVG est juridiquement aberrante.

**144.**     Si l'Accord de Partenariat et l'Avenant n'étaient pas annulés, l'Addendum venu réduire le prix des prestations de GVG trouverait nécessairement à s'appliquer. Les demandes de dommages et intérêts de GVG fondées exclusivement sur les prix fixés dans l'Accord de Partenariat ne pourraient dans ces conditions qu'être rejetées. En tout état de cause, le préjudice prétendument souffert par GVG ne pourrait être évalué qu'en fonction du prix révisé fixé dans l'Addendum.

### EN TOUT ÉTAT DE CAUSE, DEMANDES DE DOMMAGES ET INTÉRÊTS POUR PRÉJUDICE MORAL ET PROCÉDURE ABUSIVE

**145.**     La mise en cause par GVG de la moralité en affaire de l'ARPT et de la République de Guinée comme les nombreuses allégations dénigrantes de GVG à leur endroit dans ses écritures font subir aux Défenderesses un préjudice moral caractérisé qui ne saurait être inférieur pour chacune d'elle à 100.000 US$.

**146.**     Par ailleurs, la fraude manifeste de GVG à la réglementation guinéenne des marchés publics constitue le seul et unique support des demandes formées par GVG dans le cadre de la présente procédure d'arbitrage. Cette procédure est donc incontestablement abusive. Le préjudice subi par chacune des Défenderesses ne saurait être estimé, au regard de la gravité du comportement de GVG, à une somme inférieure à 100.000 US$.

### EN TOUT ÉTAT DE CAUSE, CONDAMNATION DE GVG AU PAIEMENT DE TOUS LES FRAIS RELATIFS À L'ARBITRAGE

**147.**    Il conviendra de condamner GVG à supporter l'intégralité des frais relatifs à l'arbitrage, en ce compris les honoraires et frais d'avocats ainsi que les honoraires et frais de tout expert missionné par les Défenderesses pour les besoins de la présente procédure.

## Conclusion

**148.**    Au regard de ce qui précède, les Défenderesses demandent au tribunal arbitral de :

a.  Se déclarer incompétent pour connaître des demandes de GVG à l'encontre à la fois de l'ARPT et de la République de Guinée, et les rejeter en conséquence ;

b.  Subsidiairement, se déclarer incompétent pour connaître des demandes de GVG à l'encontre de la République de Guinée, et les rejeter en conséquence ;

c.  Subsidiairement, dire et juger GVG irrecevable en ses demandes à l'encontre à la fois de l'ARPT et de la République de Guinée, et les rejeter en conséquence ;

d.  Subsidiairement, dire et juger mal fondées les demandes de GVG à l'encontre de l'ARPT et de la République de Guinée, et les rejeter en conséquence ;

e.  Reconventionnellement, condamner GVG en cas de nullité à restituer les sommes indûment perçues et à des dommages et intérêts, à hauteur de montants que les Défenderesses préciseront dans le courant de la procédure d'arbitrage ; subsidiairement condamner GVG en cas de résiliation au paiement de dommages et intérêts à hauteur d'un montant que les Défenderesses préciseront dans le courant de la procédure d'arbitrage ;

f.  En tout état de cause, condamner GVG au paiement à chacune des Défenderesses de la somme de 100.000 US$ en réparation du préjudice moral subi par chacune d'elle du fait des allégations contenues dans les écritures de GVG ;

g.  Condamner GVG au paiement à chacune des Défenderesses de la somme de 100.000 US$ pour procédure abusive ;

h.  En tout état de cause, condamner GVG à supporter l'intégralité des frais relatifs à l'arbitrage, en ce compris les honoraires et frais d'avocats ainsi que les honoraires

34

et frais de tout expert missionné par les Défenderesses pour les besoins de la présente procédure.

## POINTS LITIGIEUX À RÉSOUDRE

149.    La mission du tribunal arbitral consiste à trancher le litige qui oppose les parties en statuant sur les demandes précitées et sur les demandes additionnelles qui viendraient à être présentées dans les écritures à venir des parties en conformité avec l'Article 23(4) du Règlement.

## RÈGLEMENT APPLICABLE

150.    Le règlement applicable est le Règlement d'arbitrage de la Chambre de commerce internationale, en vigueur à compter du 1$^{er}$ janvier 2012.

## LIEU ET LANGUE DE L'ARBITRAGE

151.    Le 13 avril 2017, la Cour a fixé Paris (France) comme lieu de l'arbitrage.

152.    La Demanderesse a souhaité que la langue de l'arbitrage soit le français. Les Défenderesses n'ayant fait part d'aucun commentaire à cet égard, le tribunal arbitral détermine que la langue de la procédure arbitrale est le français (article 20 du Règlement).

## CONFIDENTIALITÉ

153.    Les parties s'engagent à assurer le caractère confidentiel de cette procédure d'arbitrage, notamment leurs écritures et correspondances, les ordonnances de procédure, les pièces et données produites par les parties pendant l'arbitrage, pour autant qu'elles ne soient pas déjà de notoriété publique, à l'exception et dans la mesure où une révélation serait nécessaire pour accomplir une obligation légale de la partie ou pour protéger un

droit, ou encore pour recourir contre une sentence arbitrale ou en obtenir son exécution en justice.

**154.**     L'obligation de confidentialité vaut aussi pour les arbitres et pour toute autre personne qui prête service dans la procédure arbitrale (secrétaire du tribunal arbitral, témoins, etc.)

**155.**     Les délibérations du tribunal arbitral et les échanges entre arbitres, de quelque nature et sur quelque support que ce soit, sont confidentiels.

Date :  Le 16 octobre 2017

Lieu de l'arbitrage : Paris, France

_____

**Pour la Demanderesse**

_____

**Pour les Défenderesses**

36

**<u>Le tribunal arbitral:</u>**


_____

**<u>Charles Jarrosson, coarbitre</u>**




_____

**<u>Carmen Núñez-Lagos, coarbitre</u>**




_____

**<u>Sophie Nappert, Président</u>**

droit, ou encore pour recourir contre une sentence arbitrale ou en obtenir son exécution en justice.

154.     L'obligation de confidentialité vaut aussi pour les arbitres et pour toute autre personne qui prête service dans la procédure arbitrale (secrétaire du tribunal arbitral, témoins, etc.)

155.     Les délibérations du tribunal arbitral et les échanges entre arbitres, de quelque nature et sur quelque support que ce soit, sont confidentiels.

Date :  Le 16 octobre 2017

Lieu de l'arbitrage : Paris, France

**Pour la Demanderesse**

**Pour les Défenderesses**

36

droit, ou encore pour recourir contre une sentence arbitrale ou en obtenir son exécution en justice.

154.     L'obligation de confidentialité vaut aussi pour les arbitres et pour toute autre personne qui prête service dans la procédure arbitrale (secrétaire du tribunal arbitral, témoins, etc.)

155.     Les délibérations du tribunal arbitral et les échanges entre arbitres, de quelque nature et sur quelque support que ce soit, sont confidentiels.

Date : Le 16 octobre 2017

Lieu de l'arbitrage : Paris, France

_____

**Pour la Demanderesse**

_____

**Pour les Défenderesses**

36

**Le tribunal arbitral:**

_____

**Charles Jarrosson, coarbitre**

_____

**Carmen Núñez-Lagos, coarbitre**

_____

**Sophie Nappert, Président**

37

**Le tribunal arbitral:**

_____

**Charles Jarrosson, coarbitre**

_____

**Carmen Núñez-Lagos, coarbitre**

_____

**Sophie Nappert, Président**

**Le tribunal arbitral:**

_____

**Charles Jarrosson, coarbitre**

**Carmen Núñez-Lagos, coarbitre**

_____

**Sophie Nappert, Président**

37