## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

GLOBAL VOICE GROUP SA,

               Plaintiff,

     v.

REPUBLIC OF GUINEA,

               Defendant.

Case No. 22-cv-2100 (JMC)

## MEMORANDUM OPINION

This case turns on one question: with whom did Plaintiff Global Voice Group SA ("GVG") agree to arbitrate disputes arising out of the "Partnership Agreement" that GVG entered into to provide telecommunications services for the benefit of Defendant Republic of Guinea and the Postal and Telecommunications Regulatory Authority of Guinea (the "PTRA")? According to GVG, it entered into such an agreement with both the PTRA and Guinea itself. So, when the PTRA and Guinea breached their duties under the Partnership Agreement and GVG won an arbitration award and related judgment against them, GVG reasons, GVG was entitled to enforce that award against Guinea in the United States in its quest to recover its contract damages and related costs. Guinea disagrees. In Guinea's telling, it was not a party to the Partnership Agreement—or, at a minimum, was not a party to the arbitration agreement included in that contract (the "Arbitration Agreement"). Rather, GVG and the PTRA were the Agreement's only two parties. And as a result, Guinea retorts, GVG may not enforce against Guinea the arbitral award and related judgment arising out of the Partnership Agreement.

Guinea challenges GVG's suit on multiple fronts, but the Court finds Guinea's subject matter jurisdiction challenge dispositive. As an initial matter, the Court agrees with Guinea that it

1

should set aside the Clerk's entry of default against Guinea, which was entered because of Guinea's three-week delay in responding to GVG's complaint. Once doing so, and in light of the record before it, the Court agrees with Guinea that the sovereign was not a party to the arbitration agreement invoked by GVG to hale Guinea into a U.S. court. Without a basis for an exception to Guinea's general immunity from suit, the Court lacks subject matter jurisdiction to hear this dispute. And given that threshold determination, the Court need not and may not go further.

Accordingly, the Court will **GRANT** Guinea's motion to set aside default and motion to dismiss, ECF 16. [1] As part of its review, the Court will also **GRANT** GVG's motion for leave to file a surreply in opposition to that motion, ECF 20, and consider GVG's additional arguments. Beyond that, the Court will **DENY as MOOT** GVG's motion for default judgment or summary judgment, ECF 25, and will **DENY** Guinea's motion for sanctions, ECF 26.

## I.    BACKGROUND

### 1.    Factual and Procedural History

#### A.   *The Agreements*

In May of 2009, GVG entered into the Partnership Agreement to "provide and install control tools to enable Guinea to view and tax all international telecommunications traffic." ECF 1 ¶ 2; *see* ECF 4-6 (the Partnership Agreement). The first page of the Partnership Agreement refers to "[t]he [PTRA], located in Conakry, Guinea, represented by its Director General, Mr. Nfa Ousmane Camara," as "one of the parties" and "[GVG], . . . represented by its Chief Executive Officer Mr. Laurent Lamothe," as "the other party." ECF 4-6 at 2. It then defines those two parties individually as "the Party" and collectively as "the Parties." *Id.*

---

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

Article 17 of the Partnership Agreement provides for "Settlement of Disputes." *Id.* at 11. It reads as follows:

> In the absence of an amicable agreement between the Parties within a period of six (6) months following the date on which a dispute arises, any dispute of any kind, including the Annexes and any amendments thereto, which may arise between them, shall be subject to the exclusive jurisdiction of the Arbitration Rules of the International Chamber of Commerce in Paris by one or more arbitrators appointed in accordance with those Rules.

*Id.* The Court, like GVG and Guinea, refers to this provision as the "Arbitration Agreement."

Finally, the last page of the Partnership Agreement bears three signatures: (1) Mr. Camara, director of the PTRA; (2) Patrick Sinclair, a "Project Director" signing on behalf of GVG's CEO; and (3) Colonel Mathurin Bangoura, Minister of Guinea's Ministry of Telecommunications and New Information Technologies. *Id.* at 11, 22.

The following month, in June 2009, those same three entities signed a "First Amendment" to the Partnership Agreement (though the CEO, rather than a Project Director, signed on behalf of GVG). *See* ECF 4-7 at 4. The First Amendment, like the Partnership Agreement itself, defined the "Parties" as the PTRA and GVG. *Id.* at 2. It also stated that the "clauses of the [Partnership Agreement] remain fully applicable." *Id.* at 4. Three years later, in June 2012, the PTRA and GVG entered into and signed an "Addendum" to the Partnership Agreement, which purported to "change[] . . . the agreements previously established between" the PTRA and GVG and referred to those two entities as "the parties." ECF 4-8 at 2. The Addendum had just two signatories: Diaby Moustapha Mamy, the new Director General of the PTRA, and Katim Touray, Managing Director of GVG. *Id*. at 4; *see* ECF 4-1 ¶¶ 24–28. The Addendum revised and renegotiated payments due from the PTRA to GVG under the Partnership Agreement and reduced the PTRA's outstanding debt to GVG; it did not mention or modify the Arbitration Agreement. *See id.* ¶ 28.

### B. The Arbitration

Despite the renegotiation and debt waiver effectuated by the Addendum, payment disputes continued. ECF 4-1 ¶¶ 29–39. Following more than a year of back-and-forth negotiations and meetings among GVG and the PTRA—including at least two meetings between GVG and Guinea's Minister of Telecommunications and New Information Technology—GVG and the PTRA were unable to reach a resolution. *Id.* ¶¶ 40–48. Instead, on May 3, 2016, GVG's counsel asked the PTRA to pay it a sum of $103,171,862.66, which it said it was owed under the Partnership Agreement as amended. *Id.* ¶ 48.

In December 2016, GVG filed a Request for Arbitration with the International Chamber of Commerce's International Court of Arbitration ("ICC") in Paris, France, against both the PTRA and Guinea. ECF 1 ¶ 3; ECF 4 ¶ 12; ECF 4-1 ¶ 49. In response, the ICC constituted an arbitral tribunal (the "Arbitration Tribunal") that named the PTRA and Guinea as defendants. ECF 1 ¶ 3; ECF 4 ¶ 12. Guinea and the PTRA both participated in the arbitration. ECF 4 ¶ 13. However, Guinea disputed the Arbitration Tribunal's jurisdiction over it, arguing that it "did not consent to being a party to" the Partnership Agreement and that its "mere signature" as "supervisory authority" did not suffice to "make it a party to the [Partnership] Agreement in the absence of a clear, express and unequivocal manifestation of its will to adhere to it." ECF 4-1 ¶¶ 125–26.

The Arbitration Tribunal disagreed with Guinea on its jurisdiction. To answer the question of its jurisdiction over Guinea under the Partnership Agreement and its component Arbitration Agreement, the Tribunal applied French law, holding that the question turned on "an examination of [Guinea's] behavior during contractual relations." *Id.* ¶ 145. Applying that legal rule, the Tribunal noted that both Guinea and the PTRA were "beneficiaries of the technological means that GVG was to set up under the Partnership Agreement," that the Partnership Agreement "was a

necessary instrument for" Guinea's collection of "some [$]212 million in tax revenue," and that Guinea "active[ly] participat[ed]" in "the contractual process, from its conclusion to its termination, including its execution." *Id.* ¶¶ 146–47. Based on those facts, the Arbitration Tribunal ruled that Guinea "was a party to the Partnership Agreement and that it considered itself . . . bound by its terms and by the Arbitration Agreement it contains." ECF 4-1 ¶ 152. Ultimately, satisfied of its jurisdiction, the Tribunal found Guinea and the PTRA jointly and severally liable under the Partnership Agreement and awarded GVG more than $21 million in damages, fees, and costs (the "Arbitration Award"). ECF 1 ¶ 5; ECF 4-2 ¶ 380.

### C. Appeals of the Arbitration Award

The following year, in September 2020, Guinea and the PTRA appealed to the Paris Court of Appeal to annul the Arbitration Award. ECF 1 ¶ 6; ECF 4 ¶ 20. As one of the bases for their appeal, Guinea and the PTRA once again contested the Arbitration Tribunal's jurisdiction over Guinea because Guinea "did not consent to be a party to the Partnership Agreement." ECF 4-5 ¶ 37. The Paris Court of Appeal applied the following rule of law, provided without citation, to assess that question:

> It should be recalled that an arbitration clause inserted into an international contract has its own validity and effectiveness that requires that its application be extended to a person, who, despite not being expressly mentioned as a "party" to the contract that includes the arbitration clause, is directly involved in the performance of the contract, in accordance with the common will of the parties, and the circumstances of the case, and has an interest in the benefits of this contract.

*Id.* ¶ 40.

In its September 2021 decision, based on that rule of law, the Court of Appeal agreed with the Arbitration Tribunal on its jurisdiction over Guinea, citing (a) Guinea's signature on the Partnership Agreement, (b) express references in the Partnership Agreement to Guinea's "expectations," which rendered Guinea a "direct beneficiary" of that Agreement, and (c) Guinea's

involvement in negotiation and termination of the Partnership Agreement. *Id.* ¶¶ 41–52. And after rejecting the PTRA's and Guinea's merits challenges to the Arbitration Award, the Paris Court of Appeal dismissed their appeal for annulment. *Id.* at 20. That court also ordered the PTRA and Guinea to pay 200,000 Euros in legal costs and expenses (the "Paris Judgment"). *Id.*; ECF 4 ¶ 22.

In August 2022, Guinea and the PTRA "appeal[ed]" the Paris Court of Appeal judgment to France's highest court, the French *Cour de Cassation*, challenging non-jurisdictional aspects of the Arbitration Tribunal and Paris Court of Appeal's decisions. ECF 16-1 at 6; *see* ECF 42-1.[2] The *Cour de Cassation* ruled in favor of GVG in July 2024 and upheld the Arbitration Award and Paris Judgment. *See* ECF 42; ECF 42-1 at 6.

### D.  This Suit

In July 2022, after the Paris Court of Appeal ruling and before Guinea's appeal to the *Cour de Cassation*, GVG filed a complaint in this Court seeking recognition and enforcement of the Arbitration Award and Paris Judgment against Guinea. ECF 1. GVG "elected in these proceedings not to seek enforcement of the [Arbitration] Award against the other named respondent in the Arbitration, [the PTRA]," and instead sued only Guinea. ECF 16-1 at 6. On October 21, 2022 (after Guinea had filed with the *Cour de Cassation*), GVG served three Guinean officials by mail.[3] ECF 12 at 1. Three months later, one day after Guinea's deadline to answer GVG's complaint,

---

[2] GVG disputes Guinea's characterization of the *Cour de Cassation* proceeding as an "appeal," instead calling it an "exceptional" proceeding on a discrete legal question that "[would] not revisit the facts of the Paris Court of Appeal Judgment," "[would] not consider new evidence," and would only address the limited, non-jurisdictional question of law before it. ECF 17 at 19–20. This dispute is immaterial because the *Cour de Cassation* proceeding did not disturb the Arbitration Award or Paris Judgment on either factual or legal grounds. *See* ECF 42-1 at 6.

[3] Guinea challenges GVG's method of service, arguing that GVG did not serve the appropriate officials and that lack of personal jurisdiction is therefore an alternative basis for dismissal of GVG's suit. ECF 16-1 at 13–17. However, the Court has no occasion to reach Guinea's alternative argument because it dismisses the case based on Guinea's primary argument, lack of subject matter jurisdiction. Accordingly, the Court will spare the reader the drier details of the Parties' method-of-service dispute.

GVG filed a motion for entry of default against Guinea due to Guinea's lapsed deadline. ECF 13. And eight days after that, the Clerk of Court entered default against Guinea. ECF 14.

On January 13, 2023, 24 days after its deadline to respond to GVG's complaint and 15 days after the entry of default, Guinea made an appearance and filed a motion to set aside entry of default and to dismiss GVG's complaint. ECF 16. Guinea argued that good cause existed to set aside default given the D.C. Circuit's "presumption against default judgments in cases involving foreign sovereigns" and its preference that such cases "proceed on the merits." ECF 16-1 at 10–11. Guinea also challenged this Court's subject matter jurisdiction on the basis of foreign sovereign immunity for lack of a valid arbitration award against Guinea or an implied waiver by Guinea, raising once again its contention that Guinea was not a "Party" to the Arbitration Agreement. *Id.* at 11–12. Finally, in the alternative, Guinea challenged its personal jurisdiction given GVG's failure to serve Guinea according to the method of service provided for in the Partnership Agreement. *Id.* at 13–17. GVG opposed on all three fronts and, following Guinea's reply, moved for leave to file a surreply to address what it claimed were new factual and legal arguments in Guinea's reply. ECF 17; ECF 20. Guinea opposed GVG's motion for leave to file a sur-reply. ECF 23.

While those motions were pending, GVG filed a motion for default judgment or, in the alternative, a motion for summary judgment against Guinea, repeating its default-related and jurisdictional arguments from its opposition to Guinea's motion to dismiss and arguing that GVG had established its right to relief under the relevant causes of action. ECF 25; ECF 25-2. In response, Guinea both opposed the motions in full and moved for sanctions against GVG for "vexatious conduct" in filing a redundant, "bad faith" motion for default judgment that constituted "a waste of judicial resources and the resources of [Guinea]." ECF 26 at 1; ECF 28 at 22–23.

Around the same time, in July 2023, Guinea also filed (and GVG opposed) a motion to stay proceedings in this case pending the D.C. Circuit's resolution of a consolidated appeal of three district court decisions concerning enforcement of arbitration awards against foreign states. ECF 27; ECF 28 at 16–21.[4] Guinea argued that a stay was warranted because the D.C. Circuit's decision would address "the very disputed point of law" in Guinea's motion to dismiss for subject matter jurisdiction. ECF 28 at 16. GVG opposed, ECF 30, and the Court agreed with GVG and denied Guinea's motion to stay, *see* Apr. 18, 2024 Minute Order. The D.C. Circuit has since issued its ruling in that consolidated appeal. *See NextEra Energy Glob. Holdings B.V. v. Kingdom of Spain*, 112 F.4th 1088 (D.C. Cir. 2024).[5]

To date, Guinea and the PTRA have not paid GVG any portion of the Arbitration Award or Paris Judgment. ECF 4 ¶ 25. GVG asks this Court ultimately to recognize and enforce those two awards against Guinea. ECF 1 at 12.

## 2. Statutory Framework

As is typical for suits against foreign sovereigns in U.S. courts, the threshold—and here, dispositive—issue in this case is subject matter jurisdiction. The Foreign Sovereign Immunities Act (FSIA) divests U.S. courts of subject matter jurisdiction over suits against foreign states, subject to "narrow" exceptions. 28 U.S.C. § 1604; *NextEra*, 112 F.4th at 1099. These exceptions are "the sole basis for obtaining jurisdiction over a foreign state in federal court." *Argentine*

---

[4] Those three district court cases were *Nextera Energy Glob. Holdings B.V. v. Kingdom of Spain*, 656 F. Supp. 3d 201 (D.D.C. 2023); *9REN Holding S.À.R.L. v. Kingdom of Spain*, No. 19-CV-1871, 2023 WL 2016933 (D.D.C. Feb. 15, 2023); and *Blasket Renewable Invs., LLC v. Kingdom of Spain*, 665 F. Supp. 3d 1 (D.D.C. 2023).

[5] For the record, the D.C. Circuit's decision in *NextEra* did not explicitly decide the "disputed point of law" that Guinea claimed it would in its motion to stay, namely: "whether this Court must independently satisfy itself of the existence of a valid arbitration agreement to which the Republic is a party in order to establish its subject matter jurisdiction under the FSIA ([Guinea's] position) or whether the Court should defer to the decision of the arbitral tribunal (GVG's position)." ECF 28 at 16–17. The *NextEra* decision did, however, reaffirm principles from earlier Supreme Court and D.C. Circuit caselaw that guide the Court's decision here. Notably, neither Party filed a notice of supplemental authority regarding the D.C. Circuit's decision, which was issued after briefing in this case concluded.

*Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 439 (1989). GVG invokes two of these exceptions in its attempt to call Guinea to this Court.

GVG primarily relies on the FSIA's arbitration exception, which permits suits to enforce an arbitration agreement "made by the foreign state with or for the benefit of a private party" or "to confirm an award made pursuant to such an agreement to arbitrate." 28 U.S.C. § 1605(a)(6). For a suit against a foreign state to fall under this exception, the statute requires at least one of the following:

A. "the arbitration takes place or is intended to take place in the United States";

B. "the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards";

C. "the underlying claim, save for the agreement to arbitrate, could have been brought in a United States court under this section or section 1607"; or

D. the waiver provision of the FSIA is "otherwise applicable."

*Id.*

GVG rests on option (B), arguing that the Arbitration Award and related Paris Judgment that it seeks to enforce here are governed by the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention") and that the New York Convention meets that FSIA provision's requirements. ECF 1 ¶ 3; ECF 17 at 31.

As an alternative basis for subject matter jurisdiction, GVG points to the FSIA's implied waiver exception. That exception permits suit against a foreign state where "the foreign state has waived its immunity either explicitly or by implication." 28 U.S.C. § 1605(a)(1). The D.C. Circuit reads this provision "narrowly," holding that a foreign sovereign waives immunity by implication

in "only three circumstances": when the foreign state has (1) "execut[ed] a contract containing a choice-of-law clause designating the laws of the United States as applicable"; (2) "fil[ed] a responsive pleading without asserting sovereign immunity"; or (3) "agree[d] to submit a dispute to arbitration in the United States." *TIG Ins. Co. v. Republic of Argentina*, 110 F.4th 221, 236 (D.C. Cir. 2024) (internal citation and quotation marks omitted). GVG contends that the arbitration agreement at issue in this case, by incorporating the New York Convention, qualifies as an agreement to "submit a dispute to arbitration in the United States." *Id.*; *see* ECF 17 at 31.

Next, GVG draws upon two statutory causes of action to confirm and enforce the Arbitration Award and related Paris Judgment. For the Arbitration Award, GVG cites the New York Convention, which Congress incorporated into the Federal Arbitration Act (FAA). *See* 9 U.S.C. ch. 2; ECF 1 ¶¶ 35–41. As relevant here, that statute grants district courts original jurisdiction over "action[s] or proceeding[s] falling under the [New York] Convention," regardless of the amount in controversy. 9 U.S.C. § 203. And it permits "any party" to an arbitration in which an arbitration award was made that qualifies under the New York Convention to "apply to any court having jurisdiction under this chapter for an order confirming the award as against any other party to the arbitration." *Id.* § 207. That provision requires the court to "confirm the award unless it finds" that one of the enumerated "grounds for refusal or deferral of recognition or enforcement of the award specified in the [New York] Convention" applies. *Id.*

In addition, for the Paris Judgment, GVG sues under the District of Columbia's Uniform Foreign-Country Judgments Recognition Act of 2011 (the "D.C. Recognition Act"), D.C. Code §§ 15-361, *et seq*. *See* ECF 1 ¶¶ 42–53. That law requires D.C. courts to "recognize [an eligible] foreign-country judgment," subject to a set of exceptions. *See* D.C. Code §§ 15-363, 15-364. The details of those eligibility requirements and exceptions do not matter here, because the Court

resolves this case on subject matter jurisdiction and does not reach the substantive requirements of the two invoked causes of action.

Finally, as to sanctions, 28 U.S.C. § 1927 authorizes courts to award sanctions against any attorney "who so multiplies the proceeding in any case unreasonably and vexatiously." Such sanctions may consist of "the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." *Id.*

## II.    LEGAL STANDARD

Because the Court rules for Guinea on its motion to dismiss for lack of subject matter jurisdiction, GVG's alternative motion to dismiss for lack of personal jurisdiction, as well as its motion for default judgment or summary judgment, are moot. Accordingly, the Court will not discuss the legal standards for those motions. Otherwise, the relevant legal standards for the motions before the Court are as follows.

### 1.    Motion to Set Aside Entry of Default

Under Federal Rule of Civil Procedure 55(c), the Court "may set aside an entry of default for good cause." To make a showing of good cause, the movant must "provide an explanation for the default or give reasons why vacation of the default entry would serve the interests of justice." *Haskins v. U.S. One Transp., LLC*, 755 F. Supp. 2d 126, 129 (D.D.C. 2010) (quoting 10A Fed. Prac. & Proc. Civ. 3d § 2696). The decision whether to set aside an entry of default "lies within the discretion of the trial court." *Keegel v. Key W. & Caribbean Trading Co.*, 627 F.2d 372, 373 (D.C. Cir. 1980).

### 2.    Motion for Leave to File Surreply

In this District, surreplies "are generally disfavored, and the determination of whether to grant or deny leave is entrusted to the sound discretion of the district court." *Crummey v. Soc. Sec.*

11

*Admin.*, 794 F. Supp. 2d 46, 62 (D.D.C. 2011), *aff'd*, No. 11-5231, 2012 WL 556317 (D.C. Cir. Feb. 6, 2012). Courts deciding a motion for leave to file a surreply from the nonmovant of the original motion "should consider whether the movant's reply in fact raises arguments or issues for the first time, whether the nonmovant's proposed sur-reply would be helpful to the resolution of the pending motion, and whether the movant would be unduly prejudiced were leave to be granted." *Anand v. U.S. Dep't of Health & Hum. Servs.*, No. 21-CV-1635, 2022 WL 18911137, at *1 (D.D.C. Nov. 15, 2022).

### 3. Motion to Dismiss for Lack of Subject Matter Jurisdiction

When moving to dismiss for lack of subject matter jurisdiction in an FSIA case, the foreign state defendant "bears the burden of proving that the plaintiff's allegations do not bring its case within a statutory exception to immunity." *Phoenix Consulting, Inc. v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000). "By moving to dismiss, the defendant may challenge either the legal sufficiency or the factual underpinning of an exception." *Id.* Where "the defendant challenges only the legal sufficiency of the plaintiff's jurisdictional allegations," *id.*, the court must "assume the truth of all material factual allegations in the complaint and construe the complaint liberally, granting [the] plaintiff the benefit of all [factual] inferences that can [reasonably] be derived from the facts alleged," *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011); *see Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 93 (D.C. Cir. 2002). A court "may [also] consider . . . undisputed facts evidenced in the record." *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992). In addition, "where necessary," a court may also consider its "resolution of disputed facts." *Id.* And a court "may consider materials outside the pleadings in deciding whether to grant a motion to dismiss for lack of jurisdiction." *Am. Freedom L. Ctr. v. Obama*, 821 F.3d 44, 49 (D.C. Cir. 2016).

Here, Guinea has not challenged the truth of any of GVG's allegations in its complaint. The Court therefore treats GVG's allegations as true, while also reviewing other documents in the record as applicable, in deciding Guinea's motion to dismiss.

### 4. Motion for Sanctions

28 U.S.C. § 1927 permits the Court to award personally against the attorney "the excess costs, expenses, and attorneys' fees reasonably incurred because of" conduct by an attorney who "so multiplies the proceedings in any case unreasonably and vexatiously." The award and calculation of sanctions lies within the district court's discretion. *See Manion v. Am. Airlines, Inc.*, 395 F.3d 428, 432 (D.C. Cir. 2004).

## III.    ANALYSIS

Taking the issues in logical order, the Court first addresses Guinea's motion to set aside the entry of default against it. Because it grants that motion, the Court reopens the case and addresses the scope of Guinea's arguments for its motion to dismiss and whether GVG may file its surreply on some of those arguments. After granting the motion for leave to file a surreply and considering all of the Parties' arguments regarding this Court's subject matter jurisdiction over this case, the Court resolves Guinea's motion to dismiss for lack of subject matter jurisdiction. Finally, the Court considers—and denies—Guinea's motion for sanctions against GVG's counsel.

### A. The Court Sets Aside the Clerk's Entry of Default

When applying Rule 55(c)'s "good cause" standard for setting aside an entry of default, courts in this District consider "whether (1) the default was willful, (2) a set-aside would prejudice plaintiff, and (3) the alleged defense was meritorious." *Keegel*, 627 F.2d at 373. Critically, the D.C. Circuit instructs courts to apply a "presumption against default judgment in cases involving foreign sovereigns." *Enka Insaat Ve Sanayi A.S. v. Gabonese Republic*, 406 F. Supp. 3d 84, 87

13

(D.D.C. 2019) (citing *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F. 2d 1543, 1551–52 (D.C. Cir. 1987)). That presumption is particularly "strong" when the foreign state "has appeared in the case and expressed a desire to contest the claims." *Owens v. Republic of Sudan*, 374 F. Supp. 2d 1, 9 (D.D.C. 2005). As the D.C. Circuit has explained, that strong presumption protects the "interest of [the] United States' foreign policy to encourage foreign states to appear before our courts in cases brought under the FSIA." *Practical Concepts*, 811 F.2d at 1152. Thus, "[w]hen a defendant foreign state has appeared and asserts legal defenses, [even] after a default judgment has been entered, it is important that those defenses be considered carefully and, if possible, that the dispute be resolved on the basis of all relevant legal arguments." *Id.*

Here, Guinea has established good cause for its 24-day delay in responding to GVG's complaint, particularly given the requisite "strong presumption" against default judgment that applies to a foreign sovereign. On the first consideration, willfulness of Guinea's default, the record reflects little evidence either way. The Court acknowledges that, at a hearing, Guinea's counsel stated that he had only been retained the day before Guinea's deadline to answer, that the deadline was right before "Christmas weekend," and that GVG's immediate motion for default the day after GVG's deadline forced Guinea to "reevaluate [its litigation] strategy," including consulting multiple "principals" and "governmental decision-making bodies," before it was able to respond to the Complaint. ECF 40 at 31–33 (Apr. 2, 2024 Hr'g Tr. 31:24–33:17). Although some of those details are not in evidence, the filing dates and time of year (of which the Court can take judicial notice) are consistent with that explanation and weigh against any finding of willful delay. Moreover, on this motion, "the court must resolve all doubts in favor of" the movant. *Haskins*, 755 F. Supp. 2d at 129 (citing *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980)). With regard to any prejudice to GVG: while setting aside default and proceeding to decide the case

does indeed delay any potential recovery, "delay[ed] satisfaction of plaintiffs' claim" is an "insufficient" reason to grant default. *Keegel*, 627 F.2d at 374. Finally, Guinea has put forward a "meritorious" subject matter jurisdiction defense that not only "contain[s] even a hint of a suggestion" that it could succeed—as the standard's low bar requires, *see id.*—but is so meritorious that it has in fact convinced the Court to dismiss GVG's complaint.

Those reasons, combined with the D.C. Circuit's strong presumption against default judgment against a foreign sovereign (particularly one that has since appeared in the case), make a strong case that setting aside default here would "serve the interests of justice." *Haskins*, 755 F. Supp. 2d at 129 (quoting 10A Fed. Prac. & Proc. Civ. 3d § 2696)). For its part, GVG responds that such a presumption does not apply "where, as here, Guinea has failed to argue the applicable legal standard or overcome the logical deduction that its Motion is being used to willfully sidetrack these proceedings." ECF 17 at 39. The first part of that objection seems intended to attack the merits of Guinea's defenses. *See id.* at 39–42. But again, and as the Court will discuss below, Guinea has a strong (indeed, a winning) defense to GVG's suit. As to GVG's second objection, GVG provides no evidence of Guinea's supposed effort to "willfully sidetrack these proceedings," besides the fact that it has pursued appellate and other review proceedings to which it is legally entitled. *Id.* at 43–44. The Court resolves all doubts as to Guinea's motives in Guinea's favor on this motion, as the D.C. Circuit instructs, and finds setting aside default to be more than warranted.

**B.  GVG's Surreply Will Be Considered**

Proceeding to Guinea's motion to dismiss GVG's complaint, the Parties dispute whether GVG is entitled to a surreply to respond to what it calls "a new factual claim and new arguments made by [Guinea]" in its reply brief. ECF 20 at 1. As to the "new factual claim," GVG cites Guinea's statement in its reply that the Arbitration Tribunal "acknowledged that 'the content of

the Partnership Agreement . . . makes no mention of [Guinea], nor does it impose any obligation on [Guinea][.]'" ECF 18 at 11 (quoting ECF 4-1 ¶ 127). GVG contends that the passage that Guinea quoted from the Arbitration Tribunal's decision represented merely a recitation of Guinea's and the PTRA's argument in the arbitration, not an "acknowledgment" of the truth of the statement. ECF 20 at 2–3. Guinea disagrees that it mischaracterized the Arbitration Tribunal's decision and insists that all arguments in its reply "were predicated on facts pled by GVG in its Complaint." ECF 23 at 1–2.

As to new legal arguments, GVG claims that Guinea "posits a new legal standard—for the first time in Reply—that Global Voice has 'failed to establish a *prima facie* case for the existence of an arbitration agreement to which Guinea was a party' because 'the Partnership Agreement defines only the PTRA and Plaintiff—*not Guinea*—as 'Parties' of the agreement,'" and that Guinea then offers corresponding caselaw that it did not raise in its original motion. ECF 20 at 3–4 (quoting ECF 18 at 15). GVG further claims that Guinea "misrepresents the holding" of one of its newly cited cases. *Id.* at 4–5. To that, Guinea retorts that "nothing about [its] argument should have been surprising or unexpected" based on Guinea's original motion. ECF 23 at 4.

The Court agrees with Guinea regarding the purportedly new factual argument but with GVG regarding the new legal argument. GVG's discussion of the Arbitration Tribunal's decision quoted directly from the Tribunal's opinion that GVG attached to its complaint. *See* ECF 4-1. Thus, the Tribunal's statement was not evidence "presented to the court for the first time" in Guinea's reply. *Ben-Kotel v. Howard Univ.*, 319 F.3d 532, 536 (D.C. Cir. 2003). To the extent GVG disputes the verb ("acknowledged") that Guinea uses to introduce that quote from the Arbitration Tribunal's decision, the Court doubts that such a wording choice alone would merit a surreply. However, the Court need not resolve that dispute because it agrees with GVG that Guinea

16

raised new legal arguments in its reply in the form of a set of Supreme Court and circuit court cases standing for the proposition that an agreement "cannot constitute *prima facie* evidence of the sovereign's agreement to arbitrate" when "the sovereign was manifestly not party to the relevant instrument that contained the arbitration agreement." ECF 18 at 13–18 (citing, *e.g.*, *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938 (1995); *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643 (1986); *Microchip Tech. Inc. v. U.S. Philips Corp.*, 367 F.3d 1350 (Fed. Cir. 2004)). Those cases appear nowhere in either Guinea's original motion or GVG's opposition, and the Court finds them (and the Parties' discussion of them) quite helpful in resolving the subject matter jurisdiction issue decided below. Accordingly, the Court considers GVG's surreply, particularly its discussion of that important legal issue, in addressing Guinea's motion.

## C.  The Court Lacks Subject Matter Jurisdiction Over GVG's Suit

GVG's briefing winds through multiple paths in its attempt to establish the Court's subject matter jurisdiction, but all lead to the same place: GVG's suit cannot proceed in this Court because the Court lacks sufficient evidence that Guinea agreed to arbitrate claims under the Partnership Agreement. GVG primarily relies upon the FSIA's arbitration exception, taking advantage of stray quotations and loose wording from the key cases to advance arguments that fall apart on closer inspection. In the alternative, GVG points to the FSIA's implied waiver exception. Neither gets GVG where it needs to go. The Court addresses, and rejects, each argument in turn.

### 1.  *No Jurisdiction Under the Arbitration Exception*

Determining whether Guinea waived its sovereign immunity under the Arbitration Agreement requires properly characterizing the interaction between the FSIA and the New York Convention (as codified in the FAA) and the burdens those two statutes place on parties seeking to enforce or dispute enforcement of foreign arbitration awards in U.S. courts.

<u>Who Decides, and By What Standard?</u>

To fall under the FSIA's arbitration exception, a plaintiff must put forward evidence of three "jurisdictional facts": "(1) an arbitration agreement, (2) an arbitration award, and (3) a treaty potentially governing award enforcement." *NextEra Energy Glob. Holdings B.V.*, 112 F.4th at 1100. "The plaintiff must initially satisfy a burden of production as to these facts, which when met requires the foreign sovereign to establish the absence of the factual basis by a preponderance of the evidence." *Id.* This regime reflects Congress's intent to prevent U.S. courts from becoming "small international courts of claims open to all comers to litigate any dispute which any private party may have with a foreign state anywhere in the world" by specifically delimiting U.S. courts' subject matter jurisdiction. *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 490 (1983). And in an FSIA case, like any case, courts have an "independent obligation to ensure that they do not exceed the scope of their jurisdiction." *Henderson ex rel. Henderson v. Shinseki*, 562 U.S. 428, 434 (2011).

By comparison, under the New York Convention, a court "shall confirm" an arbitration award made in another signatory state "unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." 9 U.S.C. § 207. In adopting the New York Convention, Congress codified an "emphatic federal policy in favor of arbitral dispute resolution" that "appl[ies] with special force in the field of international commerce" by "afford[ing] the district court little discretion in refusing or deferring enforcement of foreign arbitral awards." *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 727 (D.C. Cir. 2012) (quoting, in part, *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985)). Specifically, the Convention is "clear" that the district court "may refuse to enforce the award only on the grounds explicitly set forth in Article V of the Convention." *Id.* Meanwhile,

the Supreme Court has held that parties may agree to delegate to the arbitrator not just the merits of the dispute but also threshold questions of whether the dispute is subject to arbitration in the first place, or "arbitrability." *See Henry Schein, Inc. v. Archer & White Sales, Inc.*, 586 U.S. 63, 65 (2019). Under the FAA, including the New York Convention, if the parties have agreed to delegate the question of arbitrability to the arbitrator, "a court possesses no power to decide the arbitration issue . . . even if the court thinks that the argument that the arbitration agreement applies to a particular dispute is wholly groundless." *Id.* at 68 (2019); *see LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 878 (D.C. Cir. 2021) (applying this rule to international arbitration governed by New York Convention). In short, the New York Convention and the FAA supply what appears to be a much more permissive path to this Court than the FSIA's arbitration exception when the parties delegated arbitrability to the international arbitrator. Yet, critically, that deference to the arbitrator's arbitrability determination applies only where there exists "clear and unmistakable evidence" that the parties have agreed to arbitrate arbitrability. *Henry Schein*, 586 U.S. at 69.

GVG argues that the New York Convention's more deferential regime applies here and requires this Court to defer to the Arbitration Tribunal's holding that it had jurisdiction over Guinea. To get there, GVG first argues that the Arbitration Agreement delegates arbitrability questions to an ICC arbitrator. Indeed, the Arbitration Agreement provides that "any dispute of any kind" that may arise "between [the Parties] shall be subject to the exclusive jurisdiction of the Arbitration Rules of the [ICC] in Paris by one or more arbitrators appointed in accordance with these Rules." ECF 17 at 27 (quoting ECF 4-6 at 11). GVG then notes that the ICC Rules of Arbitration in effect at the time "grant[] the [Arbitration Tribunal] the authority to decide jurisdictional questions" and other "questions of arbitrability," and that the D.C. Circuit has found

that nearly identical arbitration rules incorporated into arbitration agreements "provide 'clear and unmistakable' delegation of arbitrability questions to the arbitrator." ECF 17 at 27–28 (citing, *e.g.*, *Chevron*, 795 F.3d at 208); *accord Stileks*, 985 F.3d at 878–79. Finally, GVG points to a set of cases characterizing as a question of arbitrability the question of whether one of the parties to an international arbitration enforcement action was a party to the underlying arbitration agreement and its delegation of arbitrability. ECF 17 at 32–34 (citing, *e.g.*, *Chiejina v. Fed. Republic of Nigeria*, No. 21-CV-2241, 2022 WL 3646377, at *11 (D.D.C. Aug. 24, 2022), *appeal dismissed*, No. 22-7146, 2023 WL 11156373 (D.C. Cir. Nov. 12, 2023); *Balkan Energy Ltd. v. Republic of Ghana*, 302 F. Supp. 3d 144, 151 (D.D.C. 2018)).

By GVG's logic, because the Arbitration Tribunal found that Guinea was subject to arbitration under the Partnership Agreement—and the Partnership Agreement delegated arbitrability to the Arbitration Tribunal—this Court must, under the New York Convention, defer to that determination that Guinea was a party. Once it does so, the Arbitration Tribunal's finding of a valid arbitration agreement between GVG and Guinea then also satisfies the requirements under the FSIA arbitration exception, allowing the Court to find that it has subject matter jurisdiction. ECF 17 at 29.

Guinea calls GVG's argument "circular reasoning." ECF 18 at 7. According to Guinea, GVG's claim that the Arbitration Tribunal's decision resolves the jurisdictional question "presumes its own conclusion" because "Guinea could only have delegated authority to the [Arbitration Tribunal] if Guinea had been a party to the Partnership Agreement that contained that delegation." *Id.* And Guinea insists that it was not a party to the Arbitration Agreement or its delegation of arbitrability: Guinea is not defined as a "Party" under the Partnership Agreement, and the Arbitration Agreement applies, by its plain text, only to disputes between "*the Parties*."

ECF 18 at 10–11; ECF 4-6 at 11 (emphasis added). Thus, Guinea maintains, this court must "assess independently whether the Court has subject matter jurisdiction" under the FSIA rather than deferring to the Arbitration Tribunal's decision. ECF 18 at 8.

Guinea has the better of the argument. It is true that the D.C. Circuit instructs courts to defer broadly to international arbitration tribunals on questions of arbitrability, even in the FSIA context, when enforcing awards subject to international arbitration agreements like the New York Convention. *See, e.g.*, *Chevron*, 795 F.3d at 206; *Stileks*, 985 F.3d at 878. It is also true that some courts in this District have extended that deference to determinations over whether one of the parties to the enforcement action was a party to the arbitration agreement, holding that such a question "implicate[s] only the merits of the petition [under the New York Convention], rather than the court's jurisdiction under the FSIA," when the arbitration agreement delegates questions of arbitrability. *Chiejina*, 2022 WL 3646377, at *5. But GVG cites no case in which a court deferred, over a foreign state's challenge, to an arbitrator's determination that the *foreign state* respondent (as opposed to the private petitioner) was a party to the arbitration agreement and thus subject to FSIA jurisdiction. Instead, the D.C. Circuit calls the question of whether the "foreign state has agreed to arbitrate" a "jurisdictional fact" that "the District Court must resolve in order to maintain jurisdiction." 795 F.3d at 204.

That rule makes eminent sense. First, take the FSIA's text. Its arbitration exception permits suits against foreign states "to enforce an agreement *made by the foreign state*" that is "with *or for the benefit of* a private party," or to "confirm an award made pursuant to such an agreement." 28 U.S.C. § 1605(a)(6) (emphases added). Notice the textual asymmetry: the foreign state respondent must have "made" the agreement to lose the protection of sovereign immunity, whereas the private party petitioner need only be a beneficiary of said agreement to enforce it against the

21

foreign state. Particularly when viewed in the context of the rest of the FSIA—which aims to protect foreign states from being hauled into U.S. courts unless a specific exception applies—that provision sets a higher bar for finding that the foreign state is subject to the agreement than that the private petitioner is. That distinction is also consistent with the D.C. Circuit's emphasis on the "sovereign's consent to arbitration" when "the agreement to arbitrate is the basis of a federal court's authority to exercise jurisdiction over the sovereign." *NextEra Energy Glob. Holdings B.V.*, 112 F.4th at 1102 (internal citation and quotation marks omitted). And it accords with the FAA's principle that "arbitration is simply a matter of contract between the parties; it is a way to resolve those disputes—but only those disputes—that the parties have agreed to submit to arbitration." *First Options*, 514 U.S. at 943. When a private party seeks to force a foreign state into U.S. court to confirm an arbitration award, the strictures of foreign sovereign immunity and principles of contractual consent both require the Court to satisfy itself that the foreign state agreed to arbitrate the dispute.

Furthermore, that rule aligns with caselaw requiring evidence that the party against whom an arbitration agreement is being enforced was a party to that agreement, whether or not the agreement delegated arbitrability. For instance, in *Gater Assets Ltd. v. Moldovagaz*, the Second Circuit found that the FSIA's arbitration exception did not apply because defendant Moldova "was not a party to the underlying arbitration agreement." 2 F.4th 42, 50 (2d Cir. 2021).[6] Similarly, the Federal Circuit in *Microchip Technology Inc. v. U.S. Philips Corp.* called the question of whether the defendant was a successor party to the arbitration agreement a "gateway issue for the district

---

[6] That court doubted that "a theory of direct benefits estoppel," on which the district court there relied, could satisfy the arbitration exception where the foreign state was not a party to the agreement, given the FSIA's requirement that the agreement be "made by the foreign state." *Gater Assets*, 2 F.4th at 50; 28 U.S.C. § 1605(a)(6). But even if it could, the Second Circuit held, the plaintiff had not advanced sufficient evidence that the direct benefits theory applied. *Gater Assets*, 2 F.4th at 50.

court to decide because it determines whether an arbitration agreement exists between" the plaintiff and defendant. 367 F.3d at 1356, 1358. Despite that arbitration agreement's delegation of arbitrability questions to the arbitrator, the Federal Circuit held, the district court had to independently determine whether the defendant was a party to the agreement "before any issue may be referred to arbitration under that agreement." *Id* at 1358. Further, the Supreme Court has instructed courts to "independent[ly] review" whether a defendant to arbitration enforcement "agree[d] to submit the question of arbitrability to arbitration" before deferring to an arbitrator's decision to enforce the underlying arbitration agreement against them. *First Options*, 514 U.S. at 947. And when conducting such a review, "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *Id.* at 944. *See also Lubin v. Starbucks Corp.*, 122 F.4th 1314, 1320 (11th Cir. 2024) (declining to enforce an arbitration agreement against a non-party to the agreement because the defendant was also "not a party to the delegation clause" that purported to delegate arbitrability to the arbitrator).

In the context of arbitration award enforcement against foreign states, it remains an open question whether a court may ever defer to an arbitrator's determination that the foreign state was a party to the underlying arbitration agreement given the FSIA's text. *See* 28 U.S.C. § 1605(a)(6) (requiring that the agreement be "made by the foreign state"). None of the cases described above presented exactly that question; neither did *Chevron* or *NextEra*. Indeed, GVG has provided no case from any court deferring to an arbitrator on that question. But at minimum, even if the FSIA permits such deference and the New York Convention requires it, the enforcing court must still independently determine whether there exists "clear and unmistakable evidence" that the foreign state agreed to arbitrate arbitrability. *First Options*, 514 U.S. at 944. That is the standard the Supreme Court has announced for arbitration enforcement under the FAA generally, and there is

23

no reason to think a looser standard would apply in the foreign sovereign immunity context given the statutory text and principles at play.

Accordingly, this Court must either find *de novo* that Guinea was a party to the Arbitration Agreement or, at least, find clear and unmistakable evidence that Guinea agreed to delegate that arbitrability question to the Arbitration Tribunal.

<u>The Court's Decision</u>

The Court finds neither.

Beginning with *de novo* review: GVG puts forward two pieces of evidence to meet its *prima facie* burden to establish a qualifying arbitration agreement under the FSIA. First, GVG points repeatedly to the signature of Colonel Mathurin Bangoura, Guinean Minister of Telecommunications and New Information Technologies, at the bottom of the Partnership Agreement, alongside the signatures of representatives of GVG and the PTRA. *See* ECF 4-6 at 11; ECF 17 at 22; ECF 20-1 at 3. Second, GVG refers the Court to contextual facts about the Partnership Agreement, recounted in opinions by the Arbitration Tribunal and Paris Court of Appeal, including that Guinea was a "direct beneficiary of numerous provisions of the Partnership Agreement," that Guinea was "directly involved in determining" the Agreement's content, and that Guinea played a "direct role in determining to terminate" the Agreement. ECF 17 at 24; *see* ECF 4-1 ¶¶ 145–53; ECF 4-5 ¶¶ 41–54.

Taking each in turn, the signature alone does not cut it. GVG provides no explanation as to why the Guinean minister's signature would render Guinea a party to the Partnership Agreement when it is not listed as a "Party." To the contrary, Guinea's own evidence, the Arbitration Tribunal's decision, explains that the Guinean statute that created the PTRA designated that minister as responsible for "oversight" of the PTRA. ECF 4-1 ¶ 7. GVG provides no contrary

evidence to support its assertion that the minister's signature represents agreement to and adoption of the contract by Guinea rather than, say, a routine sign-off associated with the minister's oversight responsibility for the PTRA.

Instead, GVG insists that FSIA and FAA caselaw determines whether a foreign state or other defendant agreed to arbitrate based on whether the defendant was a "signatory" to that agreement. *See* ECF 17 at 33–34; ECF 20-1 at 5–6. But none of those cases posits a signature as definitive proof of that party's consent to the arbitration agreement; instead, all of them posit the *lack* of a signature as some proof (even if not definitive) of the *lack* of a party's consent. *See Chiejina*, 2022 WL 3646377, at *4 (discussing the fact that the petitioner was "not a signatory to the Contract containing the arbitration provision"); *Gater Assets*, 2 F.4th at 67 ("It is undisputed that the Republic never signed that contract, and nowhere does the contract indicate that the Republic was a party to it."); *Microchip*, 367 F.3d at 1358 (discussing the fact that the defendant "did not itself sign the agreement"); *In re Paragon Offshore PLC*, 588 B.R. 735, 741 (Bankr. D. Del. 2018) (noting that the parties against whom the arbitration agreement was to be enforced "are not signatories to the contract"). At best, those cases suggest that the foreign state's signature is a *necessary* condition for finding the state's consent to be governed by the arbitration agreement; none says or even suggests that a signature is *sufficient* to establish such consent. And under both the FSIA and the FAA, *consent*, not a signature, is the key into court. *See NextEra*, 112 F.4th at 1102; *First Options*, 514 U.S. at 943. The minister's signature alone does not prove Guinea's consent as a party to the Arbitration Agreement.[7]

---

[7] GVG also cites *Contec Corp. v. Remote Sol., Co.* for the proposition that "a signatory to a contract" delegating arbitrability is bound by that agreement. 398 F.3d 205, 211 (2d Cir. 2005). But in that case, the respondent to the motion to compel arbitration was the "signatory" who was undisputedly a party to the arbitration agreement. That respondent sought to evade the arbitration agreement on the basis that the petitioner (the one seeking to enforce the arbitration agreement) was "not a signatory" to the arbitration agreement and thus could not enforce it. *Id.* at 207.

Neither do the proffered contextual facts about Guinea's benefits from or involvement in the Partnership Agreement, as recounted in the Arbitration Tribunal's and Paris Court of Appeal's decisions. For one thing, GVG did not attach to its filings any of the evidentiary documents that those two tribunals relied upon or cited for their findings about Guinea's involvement, besides the Partnership Agreement itself. Still, to the extent the Court may take judicial notice of those tribunals' findings and accept them for their truth, GVG does not explain how Guinea's involvement in or benefit from the Partnership Agreement bears on whether Guinea agreed to arbitration under the contract—particularly when the Arbitration Agreement applies by its text only to the Partnership Agreements' "Parties" (defined as GVG and the PTRA). *See* ECF 4-6 at 2, 11.[8] Instead, GVG points to those tribunals' decisions as if they speak for themselves. Yet, notably, both decisions appeared to rest their findings of Guinea's consent on general principles of French contract law. *See* ECF 4-1 ¶ 125; ECF 4-5 ¶ 40. GVG provides no authority establishing that those principles of French contract law govern this Court's analysis under the FSIA. Without more, GVG has either failed to meet its burden of production that Guinea agreed to the Arbitration Agreement or, at best, failed to overcome Guinea's contrary evidence (the text of the Partnership Agreement) that establishes by a preponderance that Guinea was not a party to the Arbitration Agreement.

---

Indeed, the respondent did not dispute that it had agreed to the arbitration agreement; it only disputed that the petitioner had agreed. So, even if that out-of-circuit case could stand for the notion that a signature is talismanic evidence of agreement in all contexts (which is doubtful), it would not establish what GVG needs to establish: that signing an agreement containing an arbitration agreement textually limited to two "parties" besides the respondent subjects that respondent to enforcement based on the respondent's signature alone. None of GVG's cases, in the D.C. Circuit or otherwise, holds as much.

[8] Federal Rule of Evidence 201(b)(2) permits the Court to take judicial notice of facts "not subject to reasonable dispute" because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Courts in FSIA cases have applied this rule to take judicial notice of "court records in related proceedings," although usually those proceedings are other actions in the same court. *See Est. of Fouty v. Syrian Arab Republic*, No. 18-CV-385, 2024 WL 3443591, at *3 n.6 (D.D.C. July 17, 2024). Further, courts may only accept those previous cases' findings and conclusions for their truth when they include "some particular indicia of indisputability," such as being the outcome of "adversarial litigation." *Valore v. Islamic Republic of Iran*, 700 F. Supp. 2d 52, 59 (D.D.C. 2010). And courts must still "reach their own, independent findings of fact in the cases before them" even when taking judicial notice of facts found in prior litigation. *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 172 (D.D.C. 2010).

Of course, those evidentiary deficiencies would not matter if this Court had to defer to the Arbitration Tribunal's arbitrability decision. As discussed above, however, to the extent a U.S. court applying the FSIA's arbitration exception ever owes deference to an arbitration tribunal's finding that the foreign state was a party, it may only defer once it has found by "clear and unmistakable evidence" that the foreign state agreed to delegate that question to the arbitration tribunal. *First Options*, 514 U.S. at 944. On that question, too, GVG puts forward insufficient evidence. First, the arbitrability delegation appears in the same paragraph (indeed, the same sentence) as the rest of the Arbitration Agreement. *See* ECF 4-6 at 11. As discussed above, any evidence of Guinea's consent to the Arbitration Agreement does not even meet a preponderance standard, much less the "clear and unmistakable" standard for arbitrability delegations.

Beyond that, GVG offers two other, equally insufficient pieces of evidence of Guinea's agreement to arbitrate arbitrability. First, Guinea notes that the D.C. Circuit has found that agreements incorporating international arbitral rules similar to the ICC's provide "the requisite clear and unmistakable delegation" of arbitrability. ECF 17 at 27 (quoting *Commc'ns Workers of Am. v. AT&T Inc.*, 6 F.4th 1344, 1347 (D.C. Cir. 2021) (citing *Chevron*, 795 F.3d at 207–08; *Stileks*, 985 F.3d at 878–79)). But in none of those cases did the defendant dispute that they were a party to the agreement incorporating the arbitral rules. Here, GVG has to first establish that Guinea agreed to incorporate the ICC's rules by agreeing to the Arbitration Agreement that incorporates them. For the reasons already discussed, it has not done so.

In later briefing, GVG attempts to wring sufficient evidence of Guinea's agreement to arbitrate arbitrability out of Guinea's participation in the Arbitration Tribunal's proceedings. Specifically, GVG notes that, at the outset of the Arbitration Tribunal proceedings, Guinea signed a "Terms of Reference" in which it "agreed that the Arbitration Tribunal 'must' rule on its

jurisdictional objection." ECF 30 at 7. That is true, as far as it goes. Indeed, GVG's evidence shows that Guinea contested and litigated the Arbitration Tribunal's jurisdiction before that tribunal and before the Paris Court of Appeal. *See* ECF 4-1 ¶ 125; ECF 4-5 ¶ 37. But the Supreme Court made clear in *First Options* that "merely arguing the arbitrability issue to an arbitrator does not indicate a clear willingness to arbitrate that issue, *i.e.*, a willingness to be effectively bound by the arbitrator's decision on that point." 514 U.S. at 946. Quite the opposite: "insofar as [the respondent was] forcefully objecting to the arbitrators deciding their dispute . . . , one naturally would think that they did *not* want the arbitrators to have binding authority over them." *Id.* (emphasis in original). Guinea has insisted from the jump that it was not a party to the Arbitration Agreement, and the fact that it made that argument before the Arbitration Tribunal weighs *against*, not in favor, of a finding of "clear and unmistakable" agreement to arbitrate arbitrability.

All told, on the record before it, this Court cannot find that Guinea "made" an agreement to arbitrate under 28 U.S.C. § 1605(a)(6). Thus, this suit does not fall within the FSIA's arbitration exception.

### 2. *No Jurisdiction Under the Implied Waiver Exception*

Changing tack, GVG also argues that Guinea waived its sovereign immunity "by implication" under 28 U.S.C. § 1605(a)(1) because Guinea "is a contracting party to the New York Convention and because Guinea agreed to arbitrate in the territory of another contracting party to the New York Convention: France." ECF 17 at 31. In support of that claim, GVG hangs its hat on the D.C. Circuit's unpublished judgment in *Tatneft v. Ukraine* and its statement that a "'sovereign, by signing the New York Convention, waives its immunity from arbitration-enforcement actions in other signatory states,'" including the United States. *Id.* (quoting *Tatneft v. Ukraine*, 771 F. App'x 9, 10 (D.C. Cir. 2019)).

28

GVG's theory has at least two major problems. First, the D.C. Circuit has never held in a published decision that a foreign state waives its sovereign immunity from suits seeking to enforce awards under the New York Convention (or similar conventions) solely by ratifying that convention. Indeed, the D.C. Circuit has recently and repeatedly declined to "formally adopt" that rule, despite the unpublished *Tatneft* decision and despite previous favorable citations (in dicta) to decisions from other circuits adopting that rule. *See NextEra*, 112 F.4th at 1100; *Process & Indus. Devs. Ltd. v. Fed. Republic of Nigeria*, 27 F.4th 771, 774–75 (D.C. Cir. 2022). Instead, the D.C. Circuit has "le[ft] clarification of" that question "for another day." *NextEra*, 112 F.4th at 1100; *see* D.C. Cir. R. 36(e)(2) (providing that unpublished dispositions "may be cited" but have "no precedential value").

Moreover, even if this Court were to adopt the *Tatneft* rule that GVG advocates, it would not result in a waiver by Guinea. To be sure, the quote GVG pulls from *Tatneft* appears to find implied waiver by a foreign state as long as (a) the arbitration award was made under the New York Convention, (b) the defendant foreign state was a signatory to the New York Convention, and (c) the forum country of the enforcement proceeding (here, the United States) is also a signatory to the New York Convention (which it is). *See* 771 F. App'x at 10. GVG argues that the Arbitration Award here satisfies those requirements, and that the Paris Judgment may be enforced under the same implied waiver because that judgment is "'closely related to the claim for enforcement of the arbitral award.'" ECF 17 at 31–32 (quoting *Seetransport Wiking Trader Schiffarhtsgesellschaft MBH & Co., Kommanditgesellschaft v. Navimpex Centrala Navala*, 989 F.2d 572, 583 (2d Cir. 1993), *as amended* (May 25, 1993) ("*Seetransport*")).

But the cases upon which *Tatneft* relies appear to impose a fourth requirement, and appropriately so: that (d) the foreign state agreed to arbitrate that *particular* dispute in the

underlying arbitration conducted under the New York Convention. That issue did not come up in *Tatneft* because the underlying arbitration there was based on a bilateral investment treaty, rather than a one-off arbitration agreement, and there was no question that the respondent foreign state had agreed to the investment treaty's blanket arbitration agreement. *See Tatneft*, 771 F. App'x at 9. Yet, in the primary case that *Tatneft* cites, *Creighton Ltd. v. Government of State of Qatar*, the arbitration agreement that incorporated the New York Convention appeared in a one-time contract between the petitioner private corporation and the respondent foreign state. *See* 181 F.3d 118, 120 (D.C. Cir. 1999). The same goes for the parties in *Seetransport*, the Second Circuit case that the D.C. Circuit has repeatedly cited favorably (though not formally adopted). 989 F.2d at 574. And in *Seetransport*, the Second Circuit made clear that the basis for finding waiver by the respondent foreign state (or, in that case, the wholly-owned instrumentality of a foreign state, to which the same rule applies) was that the respondent "*entered into a contract with [the petitioner] that had a provision that any disputes would be submitted to arbitration*, and then participated in an arbitration in which an award was issued against it," such that, "logically, as an instrumentality or agency of the Romanian Government—a signatory to the [New York] Convention—it had to have contemplated the involvement of the courts of any of the [signatory states to the Convention] in an action to enforce the award." 989 F.2d at 578–79 (emphasis added). In other words, the foreign state's agreement to arbitrate that particular dispute was an essential component for finding that the foreign state "contemplated" enforcement of the resulting arbitration award in the United States and thereby implicitly waived its foreign sovereign immunity. To put it even more simply: no arbitration agreement, no waiver.

For GVG to prevail on its theory, this Court would have to hold that Guinea implicitly waived its sovereign immunity to enforcement of all arbitration awards made subject to the New

York Convention, even if (as explained above) it never agreed to arbitrate the dispute that resulted

in that award, simply because it is a signatory to the New York Convention. Despite loose language

in some of the cases GVG cites, GVG provides no case holding such a thing. Particularly when

the D.C. Circuit has interpreted the implied waiver exception "narrowly," *Creighton*, 181 F.3d

at 122, this Court will not adopt an even more permissive rule than the unpublished decision in

*Tatneft* or the other caselaw holds. Under the law as it stands, Guinea did not implicitly waive its

sovereign immunity to enforcement of the Arbitration Award or Paris Judgment, and the Court

therefore lacks subject matter jurisdiction over this case.

### D.  GVG's Motions for Default Judgment or Summary Judgment Are Moot

Because GVG's complaint is dismissed for lack of subject matter jurisdiction, the Court

may not rule on GVG's motion for default judgment or, in the alternative, for summary judgment.

Both motions are denied as moot. *See N. Tex. Equal Access Fund v. Am. First Legal Found.*, 699

F. Supp. 3d 67, 71 n.2 (D.D.C. 2023) ("Because the Court is granting the motion to dismiss for

lack of subject matter jurisdiction, both the motion for summary judgment . . . and the motion to

defer considering the motion for summary judgment will be DENIED AS MOOT."); *Laufer v.*

*Alamac Inc.*, 621 F. Supp. 3d 1, 13 (D.D.C. 2021), *aff'd*, No. 21-7056, 2021 WL 4765435 (D.C.

Cir. Sept. 10, 2021) (dismissing for lack of subject matter jurisdiction and denying a pending

motion for default judgment as moot).

### E.  Sanctions Against GVG's Attorneys Are Not Warranted

Guinea asserts that GVG's motions for default judgment or summary judgment are not

only moot but, worse, are sanctionable. It moves for sanctions against GVG's attorneys under

28 U.S.C. § 1927 because, it claims, Guinea's motions were "vexatious" and "based on

'recklessness, bad faith, or improper motive.'" ECF 28 at 22 (quoting *Hall v. Dep't of Homeland*

*Sec.*, 219 F. Supp. 3d 112, 119 (D.D.C. 2016)). Specifically, Guinea says GVG's arguments for default judgment had "no merit." *Id.* at 22. They were also, according to Guinea, a "waste of judicial resources and the resources of [Guinea]" because they forced Guinea to "incur the unnecessary expense of responding (again) to arguments that have been fully briefed as part of the pending motions." *Id.* at 22–23. In addition, Guinea charges GVG's motion for summary judgment with "misrepresent[ing] as 'undisputed facts' hotly disputed legal issues that were pending before the Court prior to [GVG] filing this Motion." *Id.* at 23. Naturally, GVG objects. GVG says it had to file a motion for default judgment in order to conclude these proceedings and that it could not simply rest on its complaint, and it insists that filing that motion and its motion for summary judgment was intended to help expedite proceedings, not delay them, because the Court could resolve the various motions "at the same time" and thereby decide the case. ECF 31 at 15–16.

The Court agrees with GVG that Guinea's motion does not, by "clear and convincing evidence," meet the "extremely high" bar required for sanctions under section 1927. *Huthnance v. District of Columbia*, 793 F. Supp. 2d 177, 181 (D.D.C. 2011); *Patton Boggs, LLP v. Chevron Corp.*, 825 F. Supp. 2d 35, 52 (D.D.C. Aug. 8, 2011). First off, although the Court disagreed with GVG's arguments to maintain the Clerk's entry of default and enter default judgment against Guinea, those arguments were not so "utterly without colorable basis" as to be sanctionable given that Guinea did in fact default on its deadline to respond to GVG's complaint. *Kassatly v. Dynaco Acquisition Corp.,* 1997 WL 31104, at *3 (D.D.C. Jan. 22, 1997). And although GVG's motions for default judgment and summary judgment did rehash issues already pending before the Court on Guinea's motions to set aside default and to dismiss, that redundance alone did not constitute the kind of "bad faith" that section 1927 sanctions demand. In support of its position, Guinea points to *American Federation of Gov't Employees, AFL-CIO v. Hudson*, where the Court granted

32

sanctions against a party that "circumvented court scheduling of ongoing summary judgment briefing." 2022 WL 3098770, at *2 (D.D.C. Aug. 4, 2022); ECF 28 at 23. But here, GVG did not circumvent any order of this Court by filing its default judgment or summary judgment motions while Guinea's motion to set aside default and dismiss was pending. Indeed, unlike in *Hudson*, the Court here had issued no scheduling order and had not forbidden GVG from filing any motions it may wish. Further, GVG's motions were moot only because Guinea won on its motion to dismiss. Had the Court gone the other way—which was not inconceivable from GVG's perspective, as GVG had non-frivolous arguments against Guinea's motion—GVG's motions for default judgment or summary judgment would have been the appropriate next step. At that point, the motions could indeed have been "resolved at the same time," ECF 31 at 16, feeding two birds with one scone.

To be sure, Guinea incurred arguably unnecessary costs due to GVG's multiple, somewhat duplicative motions. But that is the cost of litigation. Happily for Guinea, because this Court lacks the power to proceed with this case, its litigation before this Court ends here.

*    *    *

For the foregoing reasons, it is **ORDERED** that

Guinea's motion to set aside default and motion to dismiss, ECF 16, are **GRANTED**;

GVG's motion for leave to file a surreply in opposition to that motion, ECF 20, is **GRANTED**;

GVG's motion for default judgment or summary judgment, ECF 25, is **DENIED as MOOT**; and

Guinea's motion for sanctions, ECF 26, is **DENIED**.

A separate order accompanies this memorandum opinion.

**SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: February 18, 2025